POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BHAPINDERPAL S. BHANGAL, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | |
| v. | CLASS ACTION |
| | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| HAWAIIAN ELECTRIC INDUSTRIES, INC., CONSTANCE H. LAU, SCOTT W. H. SEU, GREGORY C. HAZELTON, and PAUL K. ITO, | DEMAND FOR JURY TRIAL |
| Defendants. | |

Plaintiff Bhapinderpal S. Bhangal ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Hawaiian Electric Industries, Inc. ("Hawaiian

Electric" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Hawaiian Electric securities between February 28, 2019 and August 16, 2023, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Hawaiian Electric, together with its subsidiaries, engages in the electric utility, banking, and non-regulated renewable/sustainable infrastructure investment businesses in the state of Hawaii. The Company provides service to 95% of Hawaiian residents and operates in three segments, including the Electric Utility segment, which engages in the production, purchase, transmission, distribution, and sale of electricity in the islands of Oahu, Hawaii, Maui, Lanai, and Molokai.

3.      In early August 2023, a series of severe wildfires broke out in Hawaii, predominantly on the island of Maui. The most destructive fire began in West Maui near the town of Lahaina on the morning of August 8, 2023. By that afternoon, intense winds had knocked down approximately 30 utility poles throughout Maui, resulting in at least 15 separate outages impacting more than 12,400 customers. Moreover, videos captured by local residents showed that downed power lines belonging to Hawaiian Electric appeared to have ignited at least several

of the fires.  Ultimately, the wind-driven fires prompted evacuations, caused widespread damage, and have killed at least 114 people, with some 850 others still missing in Lahaina.

4.      On August 12, 2023, news outlets began reporting that Hawaiian Electric lacked the proper policies and procedures to mitigate the impact of the wildfires.  Specifically, it was revealed that, at the time the wildfires began, the Company did not maintain a public power shutoff plan—*i.e.*, a plan in which electricity is intentionally cut off to areas where strong wind events could cause the fires to spread.

5.      On this news, Hawaiian Electric's stock price fell $10.94 per share, or 33.76%, to close at $21.46 per share on August 14, 2023.

6.      Then, on August 16, 2023, the *Wall Street Journal* ("*WSJ*") reported that Hawaiian Electric is meeting with firms that specialize in restructuring advisory work, exploring options for the various financial and legal challenges that the Company faces as a consequence from the Maui wildfires.

7.      Finally, on August 17, 2023, the *WSJ* reported that Hawaiian Electric had for years been aware of the threat posed by wildfire but waited years to act.  Indeed, the WSJ stated that between 2019 and 2022 the Company spent less than $245,000 on wildfire-specific projects on Maui and did not seek state approval to raise utility rates to pay for broad wildfire safety improvements until 2022.

8.      Following the publication of the *WSJ* articles, Hawaiian Electric's stock price fell $2.54 per share, or 17.43%, to close at $12.03 per share on August 17, 2023.

9.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Hawaiian Electric's wildfire prevention and safety protocols and procedures were inadequate to meet the

3

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

challenges for which they were ostensibly designed; (ii) accordingly, despite knowing the degree of risk that wildfires posed to Maui, the Company's inadequate safety protocols and procedures placed Maui at a heightened risk of devastating wildfires; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

10.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## **JURISDICTION AND VENUE**

11.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

13.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Pursuant to Hawaiian Electric's most recently filed Quarterly Report with the SEC, as of July 18, 2023, there were 109,611,599 shares of the Company's common stock outstanding.  Hawaiian Electric's securities trade on the New York Stock Exchange ("NYSE").  Accordingly, there are presumably hundreds, if not thousands of investors in Hawaiian Electric securities located within the U.S., some of whom undoubtedly reside in this Judicial District.  Moreover, Plaintiff resides in this Judicial District.

14.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PARTIES**

15.    Plaintiff, as set forth in the attached Certification, acquired Hawaiian Electric securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

16.    Defendant Hawaiian Electric is a Hawaiian corporation with principal executive offices located at 1001 Bishop Street, Suite 2900, Honolulu, Hawaii 96813.  Hawaiian Electric's common stock trades in an efficient market on the NYSE under the ticker symbol "HE".

17.    Defendant Constance H. Lau ("Lau") served as Hawaiian Electric's President and Chief Executive Officer ("CEO") from prior to the start of the Class Period until January 2022.

18.    Defendant Scott W. H. Seu ("Seu") has served as Hawaiian Electric's President, CEO, and Director since January 2022.

19.    Defendant Gregory C. Hazelton ("Hazelton") served as Hawaiian Electric's Executive Vice President ("V.P."), Chief Financial Officer ("CFO"), and Treasurer from prior to the start of the Class Period until July 2022.

20.    Defendant Paul K. Ito ("Ito") served as Hawaiian Electric's Interim CFO from July 2022 until January 2023, and has served as the Company's Executive V.P., Treasurer, and CFO since January 2023.

21.    Defendants Lau, Seu, Hazelton, and Ito are sometimes referred to herein collectively as the "Individual Defendants."

22.    The Individual Defendants possessed the power and authority to control the contents of Hawaiian Electric's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Hawaiian Electric's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of

5

their positions with Hawaiian Electric, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.   The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

23.     Hawaiian Electric, together with its subsidiaries, engages in the electric utility, banking, and non-regulated renewable/sustainable infrastructure investment businesses in the state of Hawaii.  The Company provides service to 95% of Hawaiian residents and operates in three segments, including the Electric Utility segment, which engages in the production, purchase, transmission, distribution, and sale of electricity in the islands of Oahu, Hawaii, Maui, Lanai, and Molokai.

### Materially False and Misleading Statements Issued During the Class Period

24.     The Class Period begins on February 28, 2019, when Hawaiian Electric filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2018 (the "2018 10-K").  In providing an overview of the Company's business, the 2018 10-K stated, in relevant part:

*Electric Utility*. Hawaiian Electric and its operating utility subsidiaries, Hawaii Electric Light Company, Inc. (Hawaii Electric Light) and Maui Electric Company, Limited (Maui Electric), are regulated electric public utilities that provide essential electric service to approximately 95% of Hawaii's population through the operation of five separate grids that serve communities on the islands of Oahu, Hawaii, and Maui, Lanai and Molokai. Hawaiian Electric's mission is to provide innovative energy leadership for Hawaii, to meet the needs and expectations of customers and communities, and to empower them with affordable, reliable and clean energy. The goal is to create a modern, flexible and dynamic electric grid that enables an optimal mix of distributed energy resources (such as private rooftop solar and battery storage), demand response, and grid-scale resources to achieve the statutory goal of 100% renewable energy by 2045

6

25.   Further, in discussing the Company's compliance with environmental regulations, the 2018 10-K stated, in relevant part:

> Hawaiian Electric, Hawaii Electric Light and Maui Electric [the "Utilities"], like other utilities, are subject to periodic inspections by federal, state and, in some cases, local environmental regulatory agencies, including agencies responsible for the regulation of water quality, air quality, hazardous and other waste and hazardous materials. These inspections may result in the identification of items needing corrective or other action. Except as otherwise disclosed in this report [. . .], **the Company believes that each subsidiary has appropriately responded to environmental conditions requiring action and that, as a result of such actions, such environmental conditions will not have a material adverse effect on the Company or Hawaiian Electric**.[1]

26.   Finally, in discussing the Company's executive overview and strategy for its electric utility segment, the 2018 10-K stated, in relevant part:

> The Utilities provide electricity on all the principal islands in the state, other than Kauai, to approximately 95% of the state's population, and operate five separate grids. **The Utilities' mission is to provide innovative energy leadership for Hawaii, to meet the needs and expectations of customers and communities, and to empower them with affordable, reliable and clean energy**. The goal is to create a modern, flexible, and dynamic electric grid that enables an optimal mix of distributed energy resources, such as private rooftop solar, demand response, and grid-scale resources to enable the creation of smart, sustainable, resilient communities and achieve the statutory goal of 100% renewable energy by 2045.

27.   Appended to the 2018 10-K as an exhibit was a signed certification pursuant to the Sarbanes-Oxley Act of 2022 ("SOX") by Defendants Lau and Hazelton, attesting that "[t]he consolidated information contained in the [2018 10-K] fairly presents, in all material respects, the financial condition and results of operations of [the Company] and its subsidiaries as of, and for, the periods presented in this report."

28.   On May 7, 2019, Hawaiian Electric filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2019 (the "Q1 2019 10-Q"). The Q1 2019 10-Q contained a substantively similar description

---

[1] All emphases included herein are added unless otherwise indicated.

of the Company's executive overview and strategy for its electric utility segment as discussed, *supra*, in ¶ 26, and appended to the Q1 2019 10-Q as an exhibit was substantively the same certification as discussed, *supra*, in ¶ 27, signed pursuant to SOX by Defendants Lau and Hazelton.

29.     On August 2, 2019, Hawaiian Electric filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2019 (the "Q2 2019 10-Q"). The Q2 2019 10-Q contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed, *supra*, in ¶ 26, and appended to the Q2 2019 10-Q as an exhibit was substantively the same certification as discussed, *supra*, in ¶ 27, signed pursuant to SOX by Defendants Lau and Hazelton.

30.     On November 1, 2019, Hawaiian Electric filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2019 (the "Q3 2019 10-Q"). The Q3 2019 10-Q contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed, *supra*, in ¶ 26, and appended to the Q3 2019 10-Q as an exhibit was substantively the same certification as discussed, *supra*, in ¶ 27, signed pursuant to SOX by Defendants Lau and Hazelton.

31.     On February 28, 2020, Hawaiian Electric filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2019 (the "2019 10-K"). The 2019 10-K contained substantively similar descriptions of the Company's business, compliance with environmental regulations, and executive overview and strategy of its electric utility segment, as discussed, *supra*, in ¶¶ 24-26,

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

and appended to the 2019 10-K as an exhibit was substantively the same certification as discussed, *supra*, in ¶ 27, signed pursuant to SOX by Defendants Lau and Hazelton.

32.     In addition, in discussing the Company's environmental, social and governance ("ESG") risks and opportunities, the 2019 10-K stated, in relevant part:

> [ESG] considerations have long been an integral part of HEI's strategy to be a "catalyst for a better Hawaii" for the benefit of all stakeholders. The Company firmly believes that effective management of its ESG risks and opportunities creates a strategic business advantage; improves the lives of our employees, through focus on employee health, wellness, safety, empowerment and increased engagement; improves the sustainability, well-being and resilience of our communities, the state and the environment; and ultimately leads to sustained long-term value creation for our investors.

> The [Hawaiian Electric] Board of Directors is responsible for the oversight of the Company's enterprise risk management (ERM) programs, which are designed to address all material risks and opportunities, including ESG considerations. The Board of Directors has delegated the day-to-day responsibility to execute on these action plans to management. The Company believes ESG considerations are embedded in our daily actions and drive how we engage with our employees, communities, and shareholders.

> The Company intends to leverage the frameworks developed by the Task Force on Climate-related Financial Disclosure (TCFD) and the Sustainability Accounting Standards Board (SASB) to communicate our approach and progress on ESG matters in future filings.

> We are committed to achieving a renewable, sustainable energy future, providing leadership in corporate social responsibility, and adhering to governance best practices.

33.     On May 5, 2020, Hawaiian Electric filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2020 (the "Q1 2020 10-Q"). The Q1 2020 10-Q contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed, *supra*, in ¶ 26, and appended to the Q1 2020 10-Q as an exhibit was substantively the same certification as discussed, *supra*, in ¶ 27, signed pursuant to SOX by Defendants Lau and Hazelton.

9

34.    On August 6, 2020, Hawaiian Electric filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2020 (the "Q2 2020 10-Q"). The Q2 2020 10-Q contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed, *supra*, in ¶ 26, and appended to the Q2 2020 10-Q as an exhibit was substantively the same certification as discussed, *supra*, in ¶ 27, signed pursuant to SOX by Defendants Lau and Hazelton.

35.    On September 15, 2020, Hawaiian Electric issued a press release announcing that the Company had released its first ESG report (the "2019 ESG Report"). The press release stated, in relevant part:

> Hawaiian Electric [. . .] today released its first consolidated report describing its policies, actions and performance data with respect to [ESG] and sustainability-related matters. Such reports are frequently referred to as "ESG" reports and are becoming increasingly common as investors seek to understand how public companies are impacting the environment and society, as well as potential opportunities and risks to companies' long-term financial and operational strength.
>
> "We're proud to issue our first consolidated [Hawaiian Electric] ESG report to help customers, employees, investors and other stakeholders understand how [Hawaiian Electric's] strategies and operations advance ESG outcomes and create long-term value for all stakeholders," said [Defendant Lau[.]
>
> "While this is our first consolidated [Hawaiian Electric] ESG report, ESG principles and sustainability have long been fundamental values of [Hawaiian Electric], so much so that we've often said that ESG is in our DNA. With all of our operations in the middle of the Pacific Ocean, we know that our company's long-term health is inextricably linked with the strength of the economy, communities, and environment of the Hawaiian Islands. This linkage is all the more clear in the context of the COVID-19 pandemic, and we're working hard to help our customers, employees and communities through this period and to help our economy recover," said Lau.

36.    That same day, Hawaiian Electric published its 2019 ESG Report. In discussing sustainability governance, the 2019 ESG Report stated, in relevant part:

> We see ESG-related strategies and risks as having the same potential as other strategies and risks to impact long-term value creation. As such, we've integrated

material ESG factors into company governance structures and management activities. Just like other strategies and risks, we're identifying, measuring, managing and assigning accountability for material ESG issues.

Company strategies are overseen by the Board as a whole and are managed through our strategic planning and oversight process. The Board provides guidance on strategic priorities and plans, including at its annual strategic retreat, and approves the budget to allocate resources for agreed upon strategies.

Our full Board reviews and provides input on major risks for our companies and determines our risk appetite. ***This includes risks relating to safety and potential physical risk to utility infrastructure or to bank loan collateral from climate change impacts. The [Hawaiian Electric] Audit & Risk Committee assists the Board in its risk oversight role by overseeing our Enterprise Risk Management (ERM) program, which is designed to identify and assess key risks across the [Hawaiian Electric] enterprise and report such risks to the Board, along with strategies for mitigating such risks***. The Hawaiian Electric Audit & Risk Committee and the ASB Audit Committee and Risk Committee assist in risk oversight of those subsidiaries.

The [Hawaiian Electric] Nominating & Corporate Governance Committee (NCG Committee) reviews strategies and risks involving governance and assesses leadership development and succession planning to ensure we have the right leadership to execute our strategies. The role of the NCG Committee has recently expanded to include review of human capital management and ensuring ESG oversight.

37.     Further, in discussing environmental commitment and management, the 2019 ESG Report stated, in relevant part:

Our customers and communities expect that through our daily operations we will protect our air and water, reduce waste, and conserve natural resources. More than 30 environmental professionals, including scientists, engineers, chemists, and a wildlife biologist work full-time at our company to ensure that employees and external contractors understand and comply with all applicable environmental laws, regulations, permitting requirements and procedures regarding air and water quality, noise control, hazardous materials, and protected species.

Our Environmental Division's mission is to ensure that the company fulfills its kuleana, responsibility, to protect Hawai'i's unique environment through environmental compliance and stewardship and timely, innovative, cost-effective Environmental Management Programs and Standard Operating Procedures, which are comprehensive and formalized.

Critical elements of the programs and procedures include year-round risk and opportunities assessment, continuous improvement, compliance management and tracking, air and water quality monitoring, and extensive environmental

compliance training in air quality requirements, spill prevention control and countermeasures, storm water runoff, proper handling and disposal of hazardous materials, and protected species awareness and protection. All contractors and subcontractors working at Hawaiian Electric sites are required to attend Contractor Environmental Orientation training, conducted by our environmental staff.

Internal audits are conducted to verify compliance with environmental permits, regulations and policies, and fulfill corporate risk management requirements. Our internal Corporate Audit Team audits the Environmental Division at least once every three years. Audit reports are used to create Management Action Plans, ensuring that highest risk items are given priority and addressed in a timely manner. The Environmental Division also performs periodic environmental compliance audits of our company facilities to identify areas for improvement.

38.     Finally, in discussing the Company's purported commitment to safety, the 2019 ESG Report stated, in relevant part:

Safety is our number one priority at Hawaiian Electric. Our goal is to provide a safe and healthy work environment, where every employee makes safety a central part of his or her job.

Our safety commitment is to provide and support:

- Managerial responsibility for health and safety issues

- Procedures for hazard identification and safety risk assessment

- Operating health and safety guidelines, procedures, and policies

- ***Emergency planning and preparedness procedures***

- Safety performance monitoring, measurement, and reporting

- Internal and external health and safety audits

39.     On November 6, 2020, Hawaiian Electric filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2020 (the "Q3 2020 10-Q").  The Q3 2020 10-Q contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed, *supra*, in ¶ 26, and appended to the Q3 2020 10-Q as an exhibit was substantively the

same certification as discussed, *supra*, in ¶ 27, signed pursuant to SOX by Defendants Lau and Hazelton.

40.     On February 26, 2021, Hawaiian Electric filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2020 (the "2020 10-K").   The 2020 10-K contained substantively similar descriptions of the Company's business, compliance with environmental regulations, executive overview and strategy of its electric utility segment, and purported commitment to ESG principles as discussed, *supra*, in ¶¶ 24-26 and 32, and appended to the 2020 10-K as an exhibit was substantively the same certification as discussed, *supra*, in ¶ 27, signed pursuant to SOX by Defendants Lau and Hazelton.

41.     On April 22, 2021, Hawaiian Electric issued a press release announcing that the Company had issued a consolidated ESG report (the "2020 ESG Report").   The press release stated, in relevant part:

> Hawaiian Electric [. . .] today released an updated consolidated report describing its policies, actions and performance with respect to a number of [ESG] matters, including climate-related risks and opportunities.
>
> ***
>
> "With all of our operations in the middle of the Pacific Ocean, we know that our company's long-term health is inextricably linked with the strength of the economy, communities, and environment of the Hawaiian Islands. That's why ESG and sustainability considerations are at the core of our mission to be a catalyst for a better Hawai'i," said [Defendant] Lau[.]
>
> "Since issuing our inaugural ESG report last fall, we have continued our cross-enterprise work to further integrate ESG and climate-related factors into our governance, strategies, risk management and reporting. This second consolidated ESG report provides an update on our ESG efforts and reflects our commitment to continuous improvement, transparency and accountability surrounding these very important issues," said Lau.

42.     That same day, Hawaiian Electric published its 2020 ESG Report.   The 2020 ESG Report contained substantively similar descriptions of the Company's policies regarding

13

sustainability governance and risk management, environmental management, and purported commitment to safety as discussed, *supra*, in ¶¶ 36-38.

43.     On May 10, 2021, Hawaiian Electric filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2021 (the "Q1 2021 10-Q"). The Q1 2021 10-Q contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed, *supra*, in ¶ 26, and appended to the Q1 2021 10-Q as an exhibit was substantively the same certification as discussed, *supra*, in ¶ 27, signed pursuant to SOX by Defendants Lau and Hazelton.

44.     On August 9, 2021, Hawaiian Electric filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2021 (the "Q2 2021 10-Q"). The Q2 2021 10-Q contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed, *supra*, in ¶ 26, and appended to the Q2 2021 10-Q as an exhibit was substantively the same certification as discussed, *supra*, in ¶ 27, signed pursuant to SOX by Defendants Lau and Hazelton.

45.     On November 5, 2021, Hawaiian Electric filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2021 (the "Q3 2021 10-Q"). The Q3 2021 10-Q contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed, *supra*, in ¶ 26, and appended to the Q3 2021 10-Q as an exhibit was substantively the same certification as discussed, *supra*, in ¶ 27, signed pursuant to SOX by Defendants Lau and Hazelton.

46.     On February 25, 2022, Hawaiian Electric filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2021 (the "2021 10-K").   The 2021 10-K contained substantively similar descriptions of the Company's business, compliance with environmental regulations, executive overview and strategy of its electric utility segment, and purported commitment to ESG principles as discussed, *supra*, in ¶¶ 24-26 and 32, and appended to the 2021 10-K as an exhibit was substantively the same certification as discussed, *supra*, in ¶ 27, signed pursuant to SOX by Defendants Seu and Hazelton.

47.     On April 12, 2022, Hawaiian Electric issued a press release announcing that the Company had issued a consolidated ESG report (the "2021 ESG Report").   The press release quoted Defendant Seu, stating, in relevant part, "[o]ur ESG progress demonstrates our commitment not only to operating a sustainable business, but also to building a sustainable Hawai'i in which our children and grandchildren, our communities, our customers and our fellow employees will thrive together now and for generations to come," and "[o]ur company has been serving Hawai'i for over 130 years, and this deep-felt mindset comes naturally to us as a longstanding business in our island state. The alignment between ESG principles, state policy in Hawai'i, community expectations, and our goals as a company has never been stronger."

48.     That same day, Hawaiian Electric published the 2021 ESG Report.   The 2021 ESG Report contained substantively similar descriptions of the Company's policies regarding sustainability governance and risk management, environmental management, and purported commitment to safety as discussed, *supra*, in ¶¶ 36-38.

49.     In addition, in discussing reliability and resilience, the 2021 ESG Report stated, in relevant part:

We are focused on ensuring the resilience of our system. Our efforts include:

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- Using advanced climate risk modeling to assess risks and inform our planning process

- Deploying advanced meters and other technologies that allow us to respond more quickly to system interruptions

- ***Developing damage prediction modeling to estimate damage and outages from severe natural event scenarios in order to support resilience planning efforts***

- Developing plans for community microgrids and/or critical customer hubs to be able to quickly restore power to critical customers

- Building more modern and efficient power plants inland, away from the coastline. An example is the Schofield Generating Station, which was completed and brought online in 2018. The biofuel-capable generating facility is located on military property inland at a higher elevation. It can be isolated to serve the military base and other critical facilities in the event of an emergency, and feeds electricity to the grid that serves all O'ahu customers the rest of the time.

- Collaborating with key partners, such as the military, to supply energy to customers during an emergency

- Engaging with stakeholders to incorporate resilience needs and priorities through our Integrated Grid Planning process, including its Resilience Working Group

\*\*\*

We continually maintain and upgrade our transmission and distribution system to ensure seamless delivery of power to our customers. Day-to-day maintenance is a key part of keeping the grid resilient. We regularly inspect our poles, lines, and other equipment, and work to replace and upgrade aging and faulty equipment before failures happen. We regularly trim the vegetation around our equipment, as many power outages during high winds and storms are due to tree branches or other vegetation falling onto power lines. We have also replaced traditional power lines with insulated conductor systems to improve reliability and resilience in targeted areas prone to vegetation-related outages.

We're working to reduce the impact of outages by adding devices to section off parts of the grid to reduce the number of customers affected by an outage. We have also completed distribution protection studies to improve safety and mitigate risk on each of the five islands we serve. We measure and report reliability performance using metrics commonly used in the electric utility industry regarding the duration and frequency of power interruptions for customers.

16

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Both the company (through performance incentives) and executives (through executive compensation goals) have financial incentives to promote strong reliability performance.

We are working on a multi-year plan and PUC application focused on foundational investments in transmission and distribution system resilience. Our proposed plan will include:

- Strengthening our most critical transmission lines to withstand extreme winds

- Hardening distribution lines serving critical community lifeline facilities such as hospitals, military sites, communications infrastructure, water and wastewater facilities, ports and emergency response facilities

- Upgrading specific poles to improve restoration after a storm or hurricane

- Moving lines underground in targeted areas prone to vegetation-related damage

- Removing large trees that are at risk of falling into lines during a storm

- ***Strengthening lines and deploying devices to help prevent and respond to wildfires***

- Installing equipment in select substations to reduce flood impacts

50.    Finally, in discussing wildfire prevention and mitigation, the 2021 ESG Report stated, in relevant part:

Episodic drought, a warming climate and the expansion of nonnative fire-prone grasses and shrubs has led to an increase in wildfires in Hawai'i. 98% of wildfires in Hawai'i are human caused[17] and the threat to communities is high year-round. ***In addition to the utility's own wildfire mitigation plans, we have joined with community members and wildfire collaborators to help prevent and mitigate wildfires in known hot spots across our service areas***. As members of the Wai'anae Wildfire Hui in West O'ahu and Pacific Fire Exchange on Maui, we meet monthly to share ideas and discuss priority projects. We support the Hawai'i Wildfire Management Organization on Hawai'i Island, which works with communities across the state on wildfire planning, prevention and mitigation activities. By raising awareness, implementing key land management practices and collaborating on projects, these organizations are working to reduce the wildfire risk in Hawai'i and build strong, resilient communities.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

51.     On May 9, 2022, Hawaiian Electric filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2022 (the "Q1 2022 10-Q").  The Q1 2022 10-Q contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed, *supra*, in ¶ 26, and appended to the Q1 2022 10-Q as an exhibit was substantively the same certification as discussed, *supra*, in ¶ 27, signed pursuant to SOX by Defendants Seu and Hazelton.

52.     On August 8, 2022, Hawaiian Electric filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2022 (the "Q2 2022 10-Q").  The Q2 2022 10-Q contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed, *supra*, in ¶ 26, and appended to the Q2 2022 10-Q as an exhibit was substantively the same certification as discussed, *supra*, in ¶ 27, signed pursuant to SOX by Defendants Seu and Ito.

53.     On November 7, 2022, Hawaiian Electric filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2022 (the "Q3 2022 10-Q").  The Q3 2022 10-Q contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed, *supra*, in ¶ 26, and appended to the Q3 2022 10-Q as an exhibit was substantively the same certification as discussed, *supra*, in ¶ 27, signed pursuant to SOX by Defendants Seu and Ito.

54.     On February 27, 2023, Hawaiian Electric filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2022 (the "2022 10-K").  The 2022 10-K contained substantively similar descriptions of the Company's business, compliance with environmental regulations, executive

overview and strategy of its electric utility segment, and purported commitment to ESG principles, as discussed, *supra*, in ¶¶ 24-26 and 32, and appended to the 2022 10-K as an exhibit was substantively the same certification as discussed, *supra*, in ¶ 27, signed pursuant to SOX by Defendants Seu and Ito.

55.     On April 4, 2023, Hawaiian Electric issued a press release announcing that the Company had released its latest ESG report (the "2022 ESG Report").  The press release stated, in relevant part:

> Hawaiian Electric [. . .] today announced the publication of its newest consolidated report describing its updated policies, actions and performance for 2022 with respect to a range of environmental, social and governance (ESG) matters. This is HEI's fourth annual ESG report.
>
> "Our [Hawaiian Electric] family of companies is guided by a common purpose to create a better Hawai'i – one that is thriving economically, environmentally, culturally and socially," said [Defendant] Seu[.] "We believe this purpose serves the long-term interests of all of our stakeholders – it inspires us to act in ways that allow us not simply to advance, but to leap forward into a future that's brighter for us all."
>
> The theme of HEI's latest ESG report is "Laulima," which translates to "many hands working together." The report details the work of all of the [Hawaiian Electric] companies in 2022 toward their common purpose, including in areas such as decarbonization; economic health and affordability; reliability and resilience; diversity, equity and inclusion; and human capital management.

56.     That same day, Hawaiian Electric published its 2022 ESG Report.  The 2022 ESG Report contained substantively similar descriptions of the Company's policies regarding sustainability governance and risk management, environmental management, purported commitment to safety, reliability and resilience, and wildfire prevention and mitigation, as discussed, *supra*, in ¶¶ 36-38, and 49-50.

57.     On May 9, 2023, Hawaiian Electric filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2023 (the "Q1 2023 10-Q").  The Q1 2023 10-Q contained a substantively similar description

of the Company's executive overview and strategy for its electric utility segment as discussed, *supra*, in ¶ 26, and appended to the Q1 2023 10-Q as an exhibit was substantively the same certification as discussed, *supra*, in ¶ 27, signed pursuant to SOX by Defendants Seu and Ito.

58.    On August 7, 2023, Hawaiian Electric filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2023 (the "Q2 2023 10-Q").  The Q2 2023 10-Q contained a substantively similar description of the Company's executive overview and strategy for its electric utility segment as discussed, *supra*, in ¶ 26, and appended to the Q2 2023 10-Q as an exhibit was substantively the same certification as discussed, *supra*, in ¶ 27, signed pursuant to SOX by Defendants Seu and Ito.

59.    The statements referenced in ¶¶ 24-58 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Hawaiian Electric's wildfire prevention and safety protocols and procedures were inadequate to meet the challenges for which they were ostensibly designed; (ii) accordingly, despite knowing the degree of risk that wildfires posed to Maui, the Company's inadequate safety protocols and procedures placed Maui at a heightened risk of devastating wildfires; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

### **The Truth Emerges**

60.    On August 12, 2023, news outlets began reporting that Hawaiian Electric did not have a plan to shut off power in advance of the Hawaii wildfires.  For example, in an article entitled "Hawaii utility faces scrutiny for not cutting power to reduce fire risks," the *Washington Post* stated, in relevant part:

Four days before fast-moving brush fires engulfed parts of Maui, weather forecasters warned authorities that powerful wind gusts would trigger dangerous fire conditions across much of the island and Hawaii.

The state's electric utility responded with some preemptive steps but did not use what is widely regarded as the most aggressive but effective safety measure: shutting down the power.

Hawaiian Electric, the utility that oversees Maui Electric and provides service to 95 percent of the state's residents, did not deploy what's known as a "public power shutoff plan," which involves intentionally cutting off electricity to areas where big wind events could spark fires. A number of states, including California, have increasingly adopted this safety strategy after what were then the nation's most destructive and deadliest modern fires, in 2017 and 2018.

Hawaiian Electric was aware that a power shut-off was an effective strategy, documents show, but had not adopted it as part of its fire mitigation plans, according to the company and two former power and energy officials interviewed by The Washington Post. Nor, in the face of predicted dangerous winds, did it act on its own, utility officials said, fearing uncertain consequences.

The decision to avoid shutting off power is reflective of the utility's struggles to bolster its aging and vulnerable infrastructure against wildfires, said Jennifer Potter, who lives in Lahaina and was a member of the Hawaii Public Utilities Commission until just nine months ago.

"They were not as proactive as they should have been," Potter said about Hawaiian Electric's fire-prevention planning, adding that there had not been any real meaningful action to "address some of those inadequacies in terms of wildfire."

Doug McLeod, a former energy commissioner for Maui County, also said the utility was aware of the need for a regular shut-down system and to bury lines, especially given the "number of close calls in the past."

Earlier this week, high winds caused widespread damage to utility infrastructure. The intense gusts knocked down about 30 utility poles across the region, many onto trees and roads, complicating evacuations, according to Maui County Mayor Richard Bissen. He confirmed that some electrical lines were energized when they hit the ground.

61.     On this news, Hawaiian Electric's stock price fell $10.94 per share, or 33.76%, to close at $21.46 per share on August 14, 2023.

62.     Then, on August 16, 2023, the *WSJ* published an article entitled "Hawaiian Electric Is in Talks With Restructuring Firms."  The article stated, in relevant part:

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Hawaiian Electric is speaking with firms that specialize in restructuring advisory work, exploring options to address the electric utility's financial and legal challenges arising from the Maui wildfires, said people familiar with the matter.

Hawaiian Electric is facing a selloff in its stock and bonds, and has been hit with lawsuits alleging that its actions both before and during the wildfires exacerbated the devastation Maui residents have suffered.

The company is in discussions over the strategies it can pursue and to determine whether it needs to hire legal and financial advisers, the people said.

On Thursday evening, a day after the publication of this report, a company spokesperson said: "Like any company in this situation would do, and as we do in the normal course of business, we are seeking advice from experts—the goal is not to restructure the company but to endure as a financially strong utility that Maui and this state need."

More customer lawsuits are expected in coming weeks to increase the costs of defending and settling claims for Hawaiian Electric just as its access to financing is being threatened.

S&P Global Ratings downgraded Hawaiian Electric's credit rating to junk on Tuesday, saying the wildfires destroyed a significant segment of the company's customer base and will take many years to restore. S&P also said that wildfire lawsuits seeking compensation for injuries, deaths and property damage will weigh on the company's credit quality.

63.     Finally, on August 17, 2023, the *WSJ* published an article entitled "Hawaiian Electric Knew of Wildfire Threat, but Waited Years to Act." The article stated, in relevant part:

During the 2019 wildfire season, one of the worst Maui had ever seen, Hawaiian Electric concluded that it needed to do far more to prevent its power lines from emitting sparks.

The utility examined California's plans to reduce fires ignited by power lines, started flying drones over its territory and vowed to take steps to protect its equipment and its customers from the threat of fire.

Nearly four years later, the company has completed little such work. Between 2019 and 2022, it invested less than $245,000 on wildfire-specific projects on the island, regulatory filings show. It didn't seek state approval to raise rates to pay for broad wildfire-safety improvements until 2022, and has yet to receive it.

Now, the company is facing scrutiny, litigation and a financial crisis over indications that its power lines might have played a role in igniting the deadliest U.S. wildfire in more than a century. The blaze has caused at least 110 deaths,

22

destroyed the historic town of Lahaina and resulted in an estimated billions of dollars in damage.

The fire's cause hasn't been determined, but mounting evidence suggests the utility's equipment was involved. One video taken by a resident shows a downed power line igniting dry grass along a road near Lahaina. A firm that monitors grid sensors reported dozens of electrical disruptions in the hours before the fire began, including one that coincided in time with video footage of a flash of light from power lines.

Hawaiian Electric said it would investigate any role its infrastructure may have played and cooperate with a separate probe into the fire launched last week by the Hawaii attorney general.

"We all believe it's important to understand what happened. And I think we all believe it's important to make sure it doesn't happen again," said Shelee Kimura, Hawaiian Electric's chief executive.

In response to questions about its wildfire-mitigation spending, a spokesman for Hawaiian Electric said the company reduces wildfire risk through its routine utility work, including trimming or removing trees and upgrading, replacing and inspecting equipment. It said it has spent about $84 million on maintenance and tree work in Maui County since 2018.

The utility has long been a force in Hawaii politics and business. In the wake of the fire, its finances are reeling. Its stock has plunged 49% this week, and its credit rating was downgraded to junk by S&P.

\*\*\*

At the end of 2019, Hawaiian Electric issued a press release about wildfire risk. It said it would install heavier, insulated conductors on Maui and Oahu to minimize the risk of sparks when winds picked up, as well as technology to detect disruptions when the conductors came into contact with vegetation or each other. It said it would apply fire retardant on poles in risky areas and consider installing cameras and other devices to monitor weather conditions during fire season.

In filings over the next two years with the Hawaii Public Utilities Commission, which is tasked with approving utility projects and spending, the company made only passing reference to wildfire mitigation.

64.     Following publication of the *WSJ* articles, Hawaiian Electric's stock price fell $2.54 per share, or 17.43%, to close at $12.03 per share on August 17, 2023.

65.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

66.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Hawaiian Electric securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

67.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Hawaiian Electric securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Hawaiian Electric or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

68.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

69.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

70.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and prospects of Hawaiian Electric;

- whether the Individual Defendants caused Hawaiian Electric to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Hawaiian Electric securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages, and, if so, what is the proper measure of damages.

71.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

72.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Hawaiian Electric securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Hawaiian Electric securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

73.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

74.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

75.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

76.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

77.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.   Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Hawaiian Electric securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Hawaiian Electric securities and options at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

78.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Hawaiian Electric securities.   Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Hawaiian Electric's finances and business prospects.

79.     By virtue of their positions at Hawaiian Electric, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the

alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

80.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Hawaiian Electric, the Individual Defendants had knowledge of the details of Hawaiian Electric's internal affairs.

81.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Hawaiian Electric.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Hawaiian Electric's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Hawaiian Electric securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Hawaiian Electric's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Hawaiian Electric securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

82.     During the Class Period, Hawaiian Electric securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Hawaiian Electric securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Hawaiian Electric securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Hawaiian Electric securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

83.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

84.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## <u>COUNT II</u>

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

85.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

86.     During the Class Period, the Individual Defendants participated in the operation and management of Hawaiian Electric, and conducted and participated, directly and indirectly, in the conduct of Hawaiian Electric's business affairs.  Because of their senior positions, they knew the adverse non-public information about Hawaiian Electric's misstatement of income and expenses and false financial statements.

87.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Hawaiian Electric's financial condition and results of operations, and to correct promptly any public statements issued by Hawaiian Electric which had become materially false or misleading.

88.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Hawaiian Electric disseminated in the marketplace during the Class Period concerning Hawaiian Electric's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Hawaiian Electric to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Hawaiian Electric within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Hawaiian Electric securities.

89.     Each of the Individual Defendants, therefore, acted as a controlling person of Hawaiian Electric.  By reason of their senior management positions and/or being directors of Hawaiian Electric, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Hawaiian Electric to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Hawaiian Electric and possessed the power to control the specific activities which

comprise the primary violations about which Plaintiff and the other members of the Class complain.

90.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Hawaiian Electric.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  August 24, 2023                          Respectfully submitted,

                                                 POMERANTZ LLP

                                                 */s/ Jennifer Pafiti*
                                                 Jennifer Pafiti (SBN 282790)
                                                 1100 Glendon Avenue, 15th Floor
                                                 Los Angeles, California 90024
                                                 Telephone: (310) 405-7190
                                                 jpafiti@pomlaw.com

                                                 POMERANTZ LLP
                                                 Jeremy A. Lieberman
                                                 (*pro hac vice* application forthcoming)
                                                 J. Alexander Hood II
                                                 (*pro hac vice* application forthcoming)
                                                 600 Third Avenue, 20th Floor
                                                 New York, New York 10016

31

Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

PORTNOY LAW FIRM
Lesley F. Portnoy, Esq.
1800 Century Park East, Suite 600
Los Angeles, California 90067
Telephone: (310) 692-8883
lesley@portnoylaw.com

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS