# EXHIBIT A

Case 23-23-04302 JSE AED Document 542   Filed 1/30/23   Page 2 of 22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHRISTOPHER TURPEL, *individually and on behalf of all others similarly situated*,

                    Plaintiff,

        -v-

CANOPY GROWTH CORPORATION, *et al.*,

                    Defendants.

23 Civ. 4302 (PAE)

<u>OPINION & ORDER</u>

---

COLUMBUS ALLEN JR.,

                    Plaintiff,

        -v-

CANOPY GROWTH CORPORATION, *et al.*,

                    Defendants.

23 Civ. 5891 (PAE)

---

CHRISTIANN KANTNER, *individually, and on behalf of all others similarly situated*,

                    Plaintiff,

        -v-

CANOPY GROWTH CORPORATION, *et al.*,

                    Defendants.

23 Civ. 6266 (PAE)

---

PAUL A. ENGELMAYER, District Judge:

Plaintiffs in the three above-captioned cases assert securities fraud claims against Canopy Growth Corporation ("Canopy"), based on the company's allegedly false and misleading statements and omissions about its internal controls. This decision resolves undisputed motions to consolidate these actions, and disputed motions for appointment as lead plaintiff and lead

1

counsel. Although seven investors originally moved for appointment as lead counsel, only two such motions remain. For the following reasons, the Court appoints Chen Li as lead plaintiff, appoints his attorneys, Pomerantz LLP, as lead counsel, and consolidates the three actions.

## I. Background

### A. Factual Background[1]

Canopy produces, distributes, and sells consumer-packaged goods, with a focus on recreational and medicinal cannabis. It does so through subsidiaries, including BioSteel Sports Nutrition Inc. ("BioSteel"), a sports nutrition and hydration brand. Canopy is incorporated in Canada and based in Ontario. Its common stock trades on the NASDAQ under the ticker "CGC" and, more evocatively, on the Toronto Stock Exchange under the ticker "WEED."

In each of the three pending actions, the plaintiff sues Canopy, its chief executive officer David Klein, and its chief financial officer Judy Hong. Specifically:

On May 25, 2023, Christopher Turpel filed a complaint in this Court on behalf of a putative class of stockholders, to wit, "persons and entities that purchased or otherwise acquired Canopy Growth securities between May 31, 2022 and May 10, 2023, inclusive." Turpel Compl. ¶ 1. Turpel alleges that defendants failed to disclose material adverse facts about Canopy's ineffective internal controls, which concealed that the company's revenues were substantially lower than publicly represented. Turpel alleges that these misrepresentations began on May 31,

---

[1] The following facts are drawn from the complaints in the following cases and the parties' submissions on the lead-plaintiff motions: *Turpel v. Canopy Growth Corp.*, No. 23 Civ. 4302, Dkt. 1 ("Turpel Compl.") ¶¶ 11–15 (S.D.N.Y. filed May 23, 2023); *Allen v. Canopy Growth Corp.*, No. 23 Civ. 5891, Dkt. 1 ("Allen Compl.") ¶¶ 11–15 (S.D.N.Y. filed July 9, 2023); *Kantner v. Canopy Growth Corp.*, No. 23 Civ. 6266, Dkt. 1 ("Kantner Compl.") ¶¶ 15–21 (S.D.N.Y. filed June 21, 2023). The Court accepts these facts as true solely for the purpose of resolving these motions. Unless otherwise specified, all referenced filings are on the docket of *Turpel v. Canopy Growth Corp.*, No. 23 Civ. 4302 (S.D.N.Y.).

2022, when Canopy filed its annual Form 10-K with the United States Securities and Exchange Commission ("SEC"). *Id.* ¶¶ 17, 30. That filing highlighted "the growth in [Canopy's] BioSteel business." *Id.* ¶ 17. Over the next 12 months, similar press releases and SEC filings touted "[r]ecord BioSteel revenues," *id.* ¶ 21, "strong international sales growth," *id.* ¶ 22, and "299% net revenue increase for BioSteel as compared to the prior year," *id.* ¶ 23. These filings termed Canopy's internal controls "effective." *Id.* ¶ 18; *see also id.* ¶¶ 20, 23. On May 10, 2023, after the close of trading, Canopy filed a Form 8-K with the SEC, announcing it had "identified certain trends in the booking of sales by the [BioSteel] business unit for further review," such that its earlier financial statements "should no longer be relied upon because of certain material misstatements contained" therein. *Id.* ¶ 28. The next day, Canopy's stock price fell $0.18, or 14.8%, closing at $1.04 per share. *Id.* ¶ 29.

On June 21, 2023, Christiann Kantner filed a complaint against the same defendants in the Central District of California, bringing similar claims on behalf of a putative class. Kantner Compl. ¶¶ 1, 15–21. There are two notable differences between the complaints. First, Kantner's has a longer class period: June 1, 2021 through May 10, 2023. *Id.* ¶ 1. He alleges that Canopy's misrepresentations as to its BioSteel-related revenues began on June 1, 2021, when it issued a press release announcing that its "[o]ther revenue . . . increased 149% year-over-year due primarily to increased BioSteel sales in the U.S.," a market in which it was "already a top-7 sports drink brand." *Id.* ¶ 24. Kantner identifies similar statements in 2021 and 2022, hyping BioSteel's success. *See id.* ¶¶ 25–61. Second, Kantner alleges that an initial, partial, corrective disclosure was made on February 9, 2023, when Canopy announced, before the market opened, that it had missed its earnings targets, in part due to "lower gross margins in the BioSteel business" than it had anticipated. *Id.* ¶ 63. That same day, Canopy's stock price fell $0.47 per

3

share, or 17.15%, closing at $2.27.  *Id.* ¶ 64.  Kantner alleges that the truth fully emerged on May 10, 2023 (the same class-period end-date used by Turpel), when Canopy disclaimed its earlier financial statements and its stock price fell a further 14.8%.  *Id.* ¶¶ 71–72.  On July 20, 2023, Kantner's case was transferred to this Court.  *See Kantner*, No. 23 Civ. 6266 (S.D.N.Y), Dkt. 20.

On July 9, 2023, Columbus Allen Jr., proceeding *pro se*, filed a complaint in this Court identical to Turpel's in all relevant respects.  *Compare* Allen Compl. ¶¶ 1–62, *with* Turpel Compl. ¶¶ 1–62.

In sum, all plaintiffs allege that Canopy and the individual defendants made false and misleading statements and failed to disclose material adverse facts about BioSteel's business, causing Canopy's shares, at all relevant times, to be overvalued.  Each alleges violations of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.* ("Exchange Act"), and Rule 10b-5.

## B.    Background to the Pending Motions

On May 25, 2023, the same day that Turpel filed his complaint in this Court, his counsel, Glancy Prongay & Murray LLP, published a notice of this action on Globe Newswire, *see* Dkt. 36, Ex. 2, a "widely circulated national business-oriented publication or wire service," 15 U.S.C. § 78u-4(a)(3)(A)(i); *see Li Hong Cheng v. Canada Goose Holdings Inc.*, 19 Civ. 8204 (VSB), 2019 WL 6617981, at *4 (S.D.N.Y. Dec. 5, 2019).

On July 24, 2023, seven separate motions for appointment as lead plaintiff, and to consolidate the three pending cases, were brought by Erik Austin; Canopy Investor Group; James W. Skinner; Donald Russell; Thinh Nguyen; Jimmy Padgett; and Chen Li.  *See* Dkts. 12, 15, 16, 22, 27, 29, 33.  On July 25, 2023, the Court set an August 15, 2023 deadline for responses.  Dkt. 38.  On August 1, 2023, Canopy Investor Group withdrew its motion.  Dkt. 39.  On August 8,

2023, Russell did the same.  Dkt. 40.  On August 15, 2023, Padgett withdrew his motion, Dkt. 43, and Skinner and Austin filed statements of non-opposition, Dkts. 42, 44.  That same day, the remaining movants, Li and Nguyen, filed briefs opposing each other's motions for appointment as lead counsel.  Dkts. 45 ("Li Opp."), 46 ("Nguyen Opp.").

## II.  Discussion

### A.  Consolidation

#### 1.  Legal Standard

Under Federal Rule of Civil Procedure 42(a), "[i]f actions before the court involve a common question of law or fact, the court may: (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay."

Rule 42(a) "empowers a trial judge to consolidate actions for trial when there are common questions of law or fact," and where consolidation will avoid needless costs or delay. *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1284 (2d Cir. 1990).  "In assessing whether consolidation is appropriate in given circumstances," a court "should consider both equity and judicial economy." *Devlin v. Transp. Commc'ns Int'l Union*, 175 F.3d 121, 130 (2d Cir. 1999). "However, efficiency cannot be permitted to prevail at the expense of justice—consolidation should be considered when savings of expense and gains of efficiency can be accomplished without sacrifice of justice." *Chem One, Ltd. v. M/V Rickmers Genoa*, 660 F.3d 626, 642 (2d Cir. 2011) (quoting *Devlin*, 175 F.3d at 130).  Before a Court orders consolidation, it must consider several factors and determine, *inter alia*, whether the gains in efficiency and economy are outweighed by the risks of prejudice and possible confusion. *Johnson*, 899 F.2d at 1284.

The Exchange Act provides that consolidation should occur where multiple actions under securities laws assert "substantially the same claim." 15 U.S.C. § 78u-4(a)(3)(B)(ii).

### 2. Discussion

Each movant seeks consolidation, which is clearly merited. All three complaints sue Canopy and its officers under the Exchange Act on the same basis: that Canopy and its officers unlawfully failed to disclose BioSteel's improperly booked revenues and Canopy's subpar internal controls; that these violations led to artificially inflated share prices; and that, after the truth was revealed, these prices collapsed to the financial detriment of the proposed class. *See* Turpel Compl. ¶¶ 1–6; Allen Compl. ¶¶ 1–6; Kantner Compl. ¶¶ 1–10. The defendants in the three suits are also identical: Canopy and officers Klein and Hong. The lawsuits are overwhelmingly similar.

That one complaint proposes a longer class period does not defeat consolidation. Turpel and Allen propose a start date of May 31, 2022; Kantner proposes an earlier start date of June 1, 2021. *Compare* Turpel Compl. ¶ 1, *and* Allen Compl. ¶ 1, *with* Kantner Compl. ¶ 1. "[A]ctions need not be 'identical' to allow for consolidation." *Reitan v. China Mobile Games & Entm't Grp., Ltd.*, 68 F. Supp. 3d 390, 394 (S.D.N.Y. 2014). The actions need only assert "substantially the same claim," as is the case here. 15 U.S.C. § 78u-4(a)(3)(B)(ii). Each complaint brings "securities fraud claims that arise from a common course of conduct": Canopy Growth's allegedly false and misleading statements as to BioSteel's growth. *Kaplan v. Gelfond*, 240 F.R.D. 88, 92 (S.D.N.Y. 2007). "The dates on which the misrepresentations occurred do not change their nature." *Id.* Here, "the difference in start dates results from the parties' reliance upon different financial statements in their pleadings," rather than different theories of the case. *Kux-Kardos v. VimpelCom, Ltd.*, 151 F. Supp. 3d 471, 475 (S.D.N.Y. 2016). That all movants

6

support consolidation reflects a consensus that the cases have a common core.  *See, e.g.*, *Olsen v. N.Y. Community Bancorp, Inc.*, 233 F.R.D. 101, 104–05 (E.D.N.Y. 2005) ("[I]t is apparent that no party will suffer prejudice from consolidation, a fact confirmed by the complete absence of any opposition thereto.").

Courts routinely consolidate securities class actions arising from the same allegedly actionable statements, even when the proposed class periods are not identical.  *See, e.g.*, *May v. Barclays PLC*, No. 23 Civ. 2583 (LJL), 2023 WL 5950689, at *6 (S.D.N.Y. Sept. 13, 2023) (nine months' difference); *Schaeffer v. Depaolo*, No. 23 Civ. 1921 (FB) (JRC), 2023 WL 5153481, at *3 (E.D.N.Y. Aug. 10, 2023) (three years' difference); *Kaplan*, 240 F.R.D. at 92 (16 months' difference).  As in those cases, all relevant factors support consolidation here.  Accordingly, the Court consolidates these actions.

### B.      Lead Plaintiff

#### 1.      Legal Standard

The Private Securities Litigation Reform Act ("PSLRA") governs motions for appointment of lead plaintiff and approval of lead counsel in putative class actions brought under federal securities laws.  The PSLRA directs the court to appoint as lead plaintiff the party or parties "most capable of adequately representing the interests of class members."  15 U.S.C. § 78u-4(a)(3)(B)(i).

Under the PSLRA, there is a rebuttable presumption that the most adequate plaintiff is the person who: (1) either "filed the complaint" or "made a motion in response to a notice," *id.* § 78u-4(a)(3)(B)(iii)(I)(aa); (2) has the "largest financial interest in the relief sought by the class," *id.* § 78u-4(a)(3)(B)(iii)(I)(bb); and (3) "satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure," *id.* § 78u-4(a)(3)(B)(iii)(I)(cc).  "[T]his presumption may be rebutted

only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff" either "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." *Metro Servs. Inc. v. Wiggins*, 158 F.3d 162, 164 (2d Cir. 1998) (quoting 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)).

### 2. Application

#### a. *Timely motion*

Both Nguyen and Li satisfy the first requirement. Each timely submitted a motion to become lead plaintiff in response to a notice. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(aa); *see also City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, 269 F.R.D. 291, 293 (S.D.N.Y. 2010).

#### b. *Financial interest*

##### i. *Applicable legal principles*

In determining who has the largest financial stake in the litigation, courts in this Circuit have traditionally applied a four-factor test, first set forth in *Lax v. First Merchants Acceptance Corp.*, No. 97 Civ. 2715 (DHC), 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997). The *Lax* factors are:

(1) the total number of shares purchased during the class period;

(2) the net shares purchased during the class period (in other words, the difference between the number of shares purchased and the number of shares sold during the class period);

(3) the net funds expended during the class period (in other words, the difference between the amount spent to purchase shares and the amount received for the sale of shares during the class period); and

(4) the approximate losses suffered.

8

*City of Monroe Emps.' Ret. Sys.*, 269 F.R.D. at 293. Of these factors, courts have consistently held the fourth, the magnitude of the loss suffered, most significant. *See, e.g., Kaplan*, 240 F.R.D. at 93 ("Although courts have differed on how much weight to assign to each of the *Lax* factors, we, as have other courts, shall place the most emphasis on the last of the four factors: the approximate loss suffered by the movant."); *Kniffin v. Micron Tech., Inc.*, 379 F. Supp. 3d 259, 263 (S.D.N.Y. 2019); *Bo Young Cha*, 2012 WL 2025850, at *2; *see also Foley v. Transocean Ltd.*, 272 F.R.D. 126, 128 (S.D.N.Y. 2011) ("[I]n determining the largest financial interest, most courts simply determine which potential lead plaintiff has suffered the greatest total losses.").

### ii. The movants' financial stakes

Both movants agree that the longer class period (that proposed in Kantner's complaint) should be used to determine which plaintiff has the largest financial interest in the litigation. *See, e.g.*, *Hom v. Vale, S.A.*, No. 15 Civ. 9539 (GHW), 2016 WL 880201, at *4 (S.D.N.Y. Mar. 7, 2016) (holding that "use of the longer, more inclusive class period is proper . . . because the longer [period] encompasses more potential class members and damages," and collecting cases). For purposes of this motion, the relevant class period is thus between June 1, 2021 and May 10, 2023. Kantner Compl. ¶ 1.

Both movants also largely agree as to the relevant calculations for each *Lax* factor.[2] The table below summarizes the movants' relative positions:

---

[2] The movants' calculations vary slightly as to Nguyen's losses. *Compare* Nguyen Opp. at 4 (calculating his total loss as $1,036,384.32), *with* Li Opp. at 3 (calculating Nguyen's total loss as $1,037,561). The Court's calculation likewise differs marginally from the parties'. This appears to be due to the Court's use of a rounded 90-day post-disclosure trading price. These minor differences have not affected the outcome of these motions.

|  | Thinh Nguyen | Chen Li |
|---|---|---|
| **Total Shares Purchased During Class Period** | 91,240 | 310,000 |
| **Net Shares Purchased During Class Period** | 91,240 | 310,000 |
| **Net Funds Expended During Class Period** | $1,100,634 | $975,603 |
| **Approximate Losses Suffered**[3] | $1,037,560 | $761,300 |

The movants part ways, however, in assessing these factors. In arguing for his appointment, Nguyen notes that courts in this Circuit tend to prioritize the fourth factor (approximate losses suffered), and have often termed it "by far the most important." Nguyen Opp. at 3 (quoting *City of Sunrise Firefighter's Pension Fund v. Citigroup, Inc.*, No. 20 Civ. 9132 (AJN), 2021 WL 396343, at *3 (S.D.N.Y. Feb. 4, 2021)). Li counters that the first three factors (two of which favor him) offer a "more objective assessment" of each movant's financial interest in the litigation, as opposed to the fourth, "which is subject to change based on the methodology applied to calculate losses and changes in future share prices." Li Opp. at 6.

In this Court's assessment, the mechanistic approaches of Nguyen (treating factor four as conclusive) and Li (treating the first three factors as more influential) both miss the mark. Nguyen is fundamentally correct that the fourth factor, in most cases, proves dispositive; the shareholder who lost the most from trading a company's stock generally has the most to gain if a securities-fraud lawsuit against the company succeeds. *See, e.g.*, *In re McKesson HBOC, Inc. Sec. Litig.*, 97 F. Supp. 2d 993, 997 (N.D. Cal. 1999); *City of Sunrise*, 2021 WL 396343, at *3. But close attention to the facts underlying the respective loss calculations is essential. In

---

[3] To calculate the approximate losses sustained by a proposed lead plaintiff in a securities class action, courts, including in this District, typically employ one of two methodologies: First-In-First-Out ("FIFO") or Last-In-First-Out ("LIFO"). Under FIFO, stocks acquired first are assumed to have been sold first in the calculation of losses; under LIFO, stocks acquired most recently are assumed to have been the first sold. *See, e.g.*, *Rodriguez v. DraftKings Inc.*, No. 21 Civ. 5739 (PAE), 2021 WL 5282006, at *4 (S.D.N.Y. Nov. 12, 2021). Because neither movant sold any of their Canopy Growth shares during the class period, there is no need to select between the two methodologies here.

particular, in evaluating a putative lead plaintiff's claim as to his approximate loss, a court must inquire whether the claimed loss tracks his plausible recovery *in this litigation*. Here, as developed below, Nguyen lost far more money over the course of his investment than Li, but Li stands to recover far more in this litigation than Nguyen. And, as the case law reflects, the focus of the PSLRA is each movant's plausible recovery in the action at hand, not the movant's investment losses writ large. *See, e.g.*, *In re Cavanaugh*, 306 F.3d 726, 730 (9th Cir. 2002) ("One's 'interest' in a litigation is rather directly tied to what one might recover.").[4] Measured by that standard, Li has the larger stake in this litigation, and is thus entitled to the presumption that he is the most adequate plaintiff to represent the putative class.

A review of damages methodology in securities-fraud cases involving publicly traded issuers underscores the vital distinction between an investor's overall investment losses and his recoverable losses. Cognizable damages in such cases are based on the drop in a stock's price occasioned by the revelation to the market of facts revealing the falsity of the issuer's earlier representations. Such cases classically entail the following sequence of events. First, an issuer makes a false or misleading statement (or material omission) that artificially inflates its share price. Second, investors, in presumed reliance on the issuer's disclosures, purchase its shares at the artificially inflated price. And third, the truth is revealed, and investors either sell at a loss or retain their shares at the lower (albeit accurate) price. In such cases, the shareholder's damages are limited to the artificial inflation in the stock price caused by the actionable statement or omission (also known as the fraud premium). *See In re Exec. Telecard Ltd. Sec. Litig.*, 979 F.

---

[4] In this context, *Lax*'s reference to "the approximate loss suffered" is thus a judicial shorthand that is "not . . . to be parsed as though we were dealing with the language of a statute." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979). The *Lax* factors are a means to an end—the determination of which plaintiff has the "largest financial interest in the relief sought by the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb).

Supp. 1021, 1025 (S.D.N.Y. 1997) ("[D]amages in a securities fraud case . . . are measured by the difference between the price at which a stock sold and the price at which the stock would have sold absent the alleged misrepresentations or omissions."); *see also, e.g.*, Frederick C. Dunbar & Arun Sen, *Counterfactual Keys to Causation and Damages in Shareholder Class-Action Lawsuits*, 2009 WIS. L. REV. 199, 216–17, 228–29 (similar).

Critically, in this process, it is the drop in share price occasioned by exposure of the fraud that is used to measure cognizable loss. The seminal decision in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), explains why this must be so. In *Dura*, the Supreme Court held that a plaintiff shareholder must allege both that (1) the defendant's misrepresentation caused "inflation" in the stock price at the time of the shareholder's purchase and (2) the price declined, to the shareholder's detriment, when the truth came out. *See id.* at 342–43. "[A]n inflated purchase price" does "not itself constitute" a recoverable loss, because the "payment is offset by ownership of a share that at that instant possesses equivalent value." *Id.* at 342 (emphasis omitted). The Court emphasized that a low resale price (that is, a price lower than the shareholder paid upon purchase) does not itself inherently bespeak a recoverable loss either, because "that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events." *Id.* at 343. And, the Court noted, because Rule 10b-5 creates "a private securities action," not "a partial downside insurance policy," courts must be cautious not to attribute an investor's loss to a corporation's misdeeds without causal evidence of such. *Id.* at 347–48.

In light of the multiplicity of factors bearing on a security's market price, nuanced proof of causation, in practice, is often hard to come by. Judge Sykes has well explained the challenge,

12

and why tracking the market's reaction to particular revelations offers the most viable means of

gauging an investor's cognizable loss:

> It's very difficult to know exactly how much stock-price inflation a false statement causes because it requires knowing a counterfactual: what the price would have been without the false statement. It's tempting to think that inflation can be measured by observing what happens to the stock immediately after a false statement is made. But that assumption is often wrong. For example, say the president of a company lies to the public about earnings ("We made $200 million more than we predicted this year!") and immediately afterward the company's stock price rises by $10. The new price could be inflated by exactly $10 if in reality the company had merely met expectations and its stock price would have remained the same had the president told the truth. Or the inflation could be less than $10 if, say, the company really only made $100 million more than predicted and the stock price would have risen by only $5 had the president told the truth. And the inflation might be significantly more than $10 if the company had actually made less than predicted and the stock price would have fallen had the truth been known.
>
> Note too that a stock can be inflated even if the price remains the same or declines after a false statement because the price might have fallen even more (*e.g.*, "We only lost $100 million this year," when actually losses were $200 million). So the movement of a stock price immediately after a false statement often tells us very little about how much inflation the false statement caused.
>
> The best way to determine the impact of a false statement is to observe what happens when the truth is finally disclosed and use that to work backward, on the assumption that the lie's positive effect on the share price is equal to the additive inverse of the truth's negative effect. (Put more simply: what goes up, must come down.)

*Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015); *see also* THOMAS

LEE HAZEN, HAZEN'S TREATISE ON THE LAW OF SECURITIES REGULATION § 12:99 (8th ed., June

2023 update).[5]  It is therefore "standard operating procedure" for courts (often aided by experts)

to parse the market's reaction on "relevant dates . . . [of] disclosure" to determine the extent of

---

[5] An inquiry focused on the impact of disclosure also accords with the efficient market hypothesis, accepted in *Basic v. Levinson*, 485 U.S. 224 (1988), that a share's price reflects all publicly available information. On that premise, "the price of a [previously] fraudulently inflated security and its 'true' value should converge on or shortly after the date the fraud or misrepresentation is disclosed." *In re Exec. Telecard Ltd.*, 979 F. Supp. at 1028.

artificial inflation in the stock price—and thus the amount of each plaintiff's damages. *United States v. Gushlak*, 728 F.3d 184, 201 (2d Cir. 2013).

In enacting the PSLRA, Congress adopted this approach—using the stock price drop upon a fraud's revelation as the measure of cognizable damages—but with one qualification. Congress recognized that "the sudden revelation of a fraud may cause a momentary overcorrection in market price," *In re Oxford Health Plans, Inc. Sec. Litig.*, 244 F. Supp. 2d 247, 250 (S.D.N.Y. 2003), and that calculating damages solely "based on the date corrective information is disclosed may substantially overestimate [each] plaintiff's actual damages," S. Rep. No. 104-98, at 20 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 699.  The PSLRA therefore caps a shareholder's damages by using the "mean trading price" of an issuer's security "during the 90-day period beginning on the date on which the information correcting the misstatement or omissions that is the basis for the action is disseminated to the market."  15 U.S.C. § 78u-4(e)(1). In basic terms, "if the mean trading price [of a security] during the 90-day period [following disclosure] is less than the plaintiff's purchase price, then the plaintiff may recover out-of-pocket damages up to the difference between her purchase price and the mean trading price." *Acticon AG v. China N.E. Petroleum Holdings Ltd.*, 692 F.3d 34, 39 (2d Cir. 2012).[6]

That 90-day period is then used to determine each movant's loss under the fourth *Lax* factor ("approximate losses suffered").  That value thus does not capture each movant's *actual* loss on the investment or even necessarily each movant's actual loss stemming from the alleged fraud.  It is, instead, a measure of each movant's *maximum* recoverable damages under the

---

[6] Inversely, "if the mean trading price of a security during the 90-day period following the correction is greater than the price at which the plaintiff purchased his stock then that plaintiff would recover nothing under the PSLRA's limitation on damages." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 461 (9th Cir. 2000); *see also Acticon AG*, 692 F.3d at 39.

PSLRA.  In a simple case like this one, in which each movant retained all his shares through the end of the class period, a movant's maximum recoverable loss is calculated as follows.  The Court: (1) starts with the amount each movant spent on his shares; (2) tabulates the 90-day lookback price and multiplies it by the number of shares purchased; and (3) subtracts (2) from (1).  In sum:

*approximate losses = amount expended to purchase shares –*
*(number of shares purchased \* lookback price)*

As applied here, this formula, using the 90-day lookback price of $0.6913, results in a $1,037,560 loss for Nguyen and a $761,300 loss for Li:

Nguyen: $1,100,634 – (91,240 shares \* $0.6913) = $1,037,560
Li: $975,603 – (310,000 shares \* $0.6913) = $761,300

Were the analysis to stop there, Nguyen's loss would be greater.  But a critical additional fact needs to be taken into account: As Nguyen's filings reveal, almost all of the diminution in the market value of his Canopy shares occurred *prior* to the first date when any plaintiff alleges that Canopy Growth's alleged misconduct was disclosed, even in part.  Nguyen owned Canopy stock for a long period before any partial disclosure of the fraud, during which Canopy's share price plummeted considerably.  And because that drop preceded any corrective disclosure, it must, on the pleadings, be taken to reflect factors independent of any revelation of the fraud.

The following graph represents Canopy's share price over the class period, with the two disclosure events (as alleged in Kantner's complaint, the broadest) highlighted:

15



Nearly all of Nguyen's shares ($1,062,699 worth, of $1,100,634 total) were purchased between mid-August and early November 2021, when Canopy's share price was above $11. Plotted graphically, Nguyen's purchases occurred as follows:



In contrast, the vast majority of Li's shares ($961,021 worth, of $975,603 total) were purchased between mid-May and mid-July 2022, *after* Canopy Growth's share price had already dropped

16

significantly. Li's purchases were made during a period when Canopy traded between $2 and $6 a share, as reflected on the following graph:



Thus, from an investment perspective, Nguyen fared worse than Li, as a result of the precipitous drop in Canopy's stock price after his purchases. But from the perspective *of this litigation*, Li fared worse than Nguyen. A shareholder can recover only what he lost *as a result of disclosure of the false statement. See Dura*, 544 U.S. at 342–43. As of the first corrective disclosure that occurred in this case on February 9, 2023, Canopy's shares were trading at $2.74 apiece—a far cry from the average price Nguyen paid per share of $12.06. As of that point, Nguyen held 91,240 shares and Li held 310,000 shares—more than three times as many as Nguyen. The cognizable portion of the stock's drop necessarily affected Li more than Nguyen: Li's post-disclosure losses were $634,200, whereas Nguyen's were $187,203.[7]

Li thus has by far the greater stake in this litigation, in which only the movants' post-disclosure losses may be recovered. Put differently, Nguyen's pre-disclosure loss

---

[7] These figures are calculated by multiplying the number of shares each purchased (91,240 for Nguyen; 310,000 for Li) by the per-share diminution in value after the alleged corrective disclosure (*i.e.*, the pre-disclosure value per share, $2.74, minus the post-disclosure value per share, $0.69, as tabulated per the PSLRA's 90-day lookback provision).

(approximately $850,357), which accounts for the vast majority of his overall investment loss ($1,037,560), must be put aside as predating the first disclosure.[8]  In contrast, of Li's overall investment loss of $761,300, only $127,100 must be put aside on that ground.[9]

In selecting the lead plaintiff, it is essential that the Court undertake the analysis above as to the respective recoverable losses.  The Court "would be abdicating its responsibility under the PSLRA" were it to elide the distinction between unrecoverable pre-disclosure losses and recoverable post-disclosure losses; as such would be "irreconcilable with this Court's duty to ascertain which plaintiff has the greatest financial interest in this litigation." *Sallustro v. CannaVest Corp.*, 93 F. Supp. 3d 265, 273–74 (S.D.N.Y. 2015); *see also, e.g.*, *Kniffin*, 379 F. Supp. 3d at 264.  For this reason, courts, in this District and elsewhere, have relied on modified loss calculations such as those above to exclude losses attributable to pre-disclosure sales.  *See, e.g.*, *Sallustro*, 93 F. Supp. 3d at 272 (noting that such losses are not recoverable, and thus should not be included in lead plaintiff tabulations, as they are "not proximately caused by the defendant's misstatements"); *Peacock v. Dutch Bros, Inc.*, No. 23 Civ. 1794 (PAE), 2023 WL 4976814, at *4 (S.D.N.Y. Aug. 3, 2023) (same); *see also Micholle v. Ophthotech Corp.*, No. 17 Civ. 210 (VSB), 2018 WL 1307285, at *5 (S.D.N.Y. Mar. 13, 2018) (collecting cases).

---

[8] Nguyen's pre-disclosure loss is calculated by multiplying the number of shares he purchased (91,240) by the per-share diminution in value prior to the alleged corrective disclosure (*i.e.*, the average price Nguyen paid, $12.06, minus the pre-disclosure value per share, $2.74).  In other words, Nguyen's shares had already declined in value by $9.32, on average, before the truth of Canopy's alleged misdeeds began to emerge.

[9] Li's pre-disclosure loss is calculated by multiplying the number of shares he purchased (310,000) by the per-share diminution in value prior to the alleged corrective disclosure (*i.e.*, the average price Li paid, $3.15, minus the pre-disclosure value per share, $2.74).  Li's shares thus had declined in value by only $0.41 before the first disclosure.

18

Ultimately, "the lead plaintiff should be the class member who stands to recover the most *from that litigation.*" *City of Sunrise*, 2021 WL 396343, at *3 (emphasis in original) (cleaned up). Here, that is Li. Li demonstrably lost more due to the alleged fraud, and thus has more to gain from this lawsuit. Li, having the greatest financial interest in this litigation, is thus entitled to the presumption that he is the most adequate plaintiff to represent the class.[10]

### c. Rule 23 requirements

The Rule 23 requirements for class certification are commonly referred to as numerosity, commonality, typicality, and adequacy. *Sykes v. Mel S. Harris & Associates LLC*, 780 F.3d 70, 80 (2d Cir. 2015). At this early stage of litigation, however, "'only the last two factors— typicality and adequacy—are pertinent.'" *Lopez v. CTPartners Exec. Search Inc.*, No. 15 Civ. 1476 (PAE), 2015 WL 2431484, at *2 (S.D.N.Y. May 18, 2015) (quoting *Constance Sczesny Trust v. KPMG LLP*, 223 F.R.D. 319, 324 (S.D.N.Y. 2004)). A lead plaintiff's claims are typical where "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Sgalambo v. McKenzie*, 268 F.R.D. 170, 173–74 (S.D.N.Y. 2010); *see also In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992). A lead plaintiff is adequate where he "does not have interests that are antagonistic to the class that he seeks to represent and has retained counsel that is capable and qualified to vigorously represent the interests of the class that he seeks to represent." *Glauser v. EVCI Ctr. Colls. Holding Corp.*, 236 F.R.D. 184, 189 (S.D.N.Y. 2006) (citing

---

[10] No party has claimed that, outside of the two alleged disclosures, the truth as to Canopy's fraud "leaked out" over the class period, thus giving rise to an argument that the fraud premium varied over the period in which the movants purchased their shares. The challenging loss-tabulation issues presented in that scenario are absent here. *Cf. In re Williams Sec. Litig.*, 558 F.3d 1130, 1138 (10th Cir. 2009) (discussing loss causation in cases where the truth "leak[s] out" over time in a "gradual process").

*Dietrich v. Bauer*, 192 F.R.D. 119, 124 (S.D.N.Y. 2000)). To obtain appointment as lead plaintiff, "[t]he moving plaintiff must make only a preliminary showing that the adequacy and typicality requirements under Rule 23 have been met." *Weinberg v. Atlas Air Worldwide Holdings, Inc.*, 216 F.R.D. 248, 252 (S.D.N.Y. 2003).

Li's claims "are typical of the class because [his] claims and injuries arise from the same conduct from which the other class members' claims and injuries arise." *In re Oxford Health Plans, Inc. Sec. Litig.*, 182 F.R.D. 42, 45 (S.D.N.Y. 1998) (citing *Drexel*, 960 F.2d at 291). As alleged in the complaints, every member of the putative class, "(1) purchased or acquired [Canopy Growth] securities during the class period; (2) at prices allegedly artificially inflated by defendants' materially false and misleading statements and/or omissions; and (3) suffered damages when the truth was disclosed to the market." *Jolly Roger*, 2007 WL 2363610, at *4. Accordingly, Li's claims arise from the same course of conduct as other class members' claims.

On the facts presently known, Li is also an adequate class representative. He has certified that he is willing to fulfill the duties of lead plaintiff, Dkt. 36, Ex. 4, and he has retained counsel with significant experience in securities fraud cases, *id.*, Ex. 5. And there is, as yet, no indication that Li has any interests that are antagonistic to those of the class. *See Plumbers, Pipefitters & MES*, 2011 WL 4831209, at *2; *Jolly Roger*, 2007 WL 2363610, at *5.

Because Li has thus far satisfied all of the PSLRA requirements, the Court finds that he is the most adequate plaintiff. There has been no credible claim that he "will not fairly and adequately protect the interests of the class" or is subject to "unique defenses" that render him incapable of adequately representing the class. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). The Court therefore appoints Li as lead plaintiff.

20

## C.    Lead Counsel

The most adequate plaintiff may retain counsel to represent the class, subject to the Court's approval.  15 U.S.C. § 78u-4(a)(3)(B)(v).  "There is a 'strong presumption in favor of approving a properly selected lead plaintiff's decisions as to counsel selection.'" *Sallustro v. CannaVest Corp.*, No. 14 Civ. 2900 (PGG), 2015 WL 1262253, at \*10 (S.D.N.Y. Mar. 19, 2015) (quoting *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03 MDL 1529 (LMM), 2008 WL 4128702, at \*2 (S.D.N.Y. Sept. 3, 2008)).  Here, as noted, Li has selected the firm of Pomerantz LLP.  Having reviewed the firm's submissions as to its pertinent background and experience, including its experience litigating securities class actions, the Court finds that it is well qualified to serve as lead counsel.  *See Elstein v. Net1 UEPS Techs., Inc.*, 13 Civ. 9100 (ER), 2014 WL 3687277, at \*8 (S.D.N.Y. July 23, 2014) ("Courts in this Circuit have previously approved the Pomerantz Firm as lead plaintiffs' counsel in securities class actions on a number of occasions.").  Accordingly, the Court appoints Pomerantz LLP as lead counsel.

## CONCLUSION

For the foregoing reasons, the Court appoints Chen Li as lead plaintiff and Pomerantz LLP as lead counsel, and consolidates the above-captioned cases.  The Clerk of Court is respectfully directed to amend the caption to read "In re Canopy Growth Securities Litigation" and to terminate all pending motions.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: November 30, 2023
        New York, New York

21