POMERANTZ LLP
Jeremy A. Lieberman (pro hac vice)
Austin P. Van (pro hac vice)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
jalieberman@pomlaw.com
avan@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Lead Counsel for Lead Plaintiff*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BHAPINDERPAL S. BHANGAL, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> HAWAIIAN ELECTRIC INDUSTRIES, INC., CONSTANCE H. LAU, SCOTT W. H. SEU, GREGORY C. HAZELTON, and PAUL K. ITO, <br><br> Defendants. | Case No. 3:23-cv-04332-JSC <br><br> **CLASS ACTION** <br><br> **AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **DEMAND FOR JURY TRIAL** <br><br> Hon. Jacqueline Scott Corley |

AMENDED COMPLAINT

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................... 1

II.   JURISDICTION AND VENUE ............................................................................ 5

III.  PARTIES ............................................................................................................... 6

    A.    Plaintiffs ..................................................................................................... 6

    B.    Defendants .................................................................................................. 6

IV.   HEI KNEW FOR YEARS FROM NUMEROUS SOURCES THAT THE RISK OF SEVERE WILDFIRES ON MAUI WAS EXTREME AND REQUIRED APPROPRIATE MITIGATION EFFORTS ................................................................. 7

    A.    Local Wildfire Community Group Warned Early on of Ongoing Wildfire Hazards and Offered HEI Recommendations To Mitigate the Risk .................................. 7

    B.    August 2018 Lahaina Wildfire and Aftermath ........................................ 9

    C.    Maui Resiliency Working Group Studies Wildfire Risk ....................... 11

    D.    May 2020 Hawaiian Public Utilities Commission Audit ...................... 14

    E.    Maui County Hazard and Wildfire Mitigation Plans ............................ 15

    F.    Hawaiian Electric Wildfire Mitigation Plan ........................................ 18

V.    HEI REPEATEDLY MISLED INVESTORS TO BELIEVE IT WAS TAKING APPROPRIATE ACTION TO MITIGATE WILDFIRE RISK, WHEN IT KNEW IT WAS FAILING TO DO SO ........................................................................................ 20

    A.    HEI Created The Impression That It Was Regularly Maintaining Its Poles and Had Replaced Uninsulated Wire, When In Fact It Had Fallen Behind ............... 20

        1.    HEI Misled Investors To Believe It Had Replaced Exposed Power Lines with Insulated Conductor Wires ........................................................ 20

        2.    HEI Misled Investors To Believe It Regularly Maintained Its Poles ....... 21

    B.    HEI Misled Investors To Believe Its Mitigation Plans Addressed Risk of Dry Grasses and Shrubs, When In Fact Its Plans Recommended *Against* Trimming of Grasses Around Power Lines ........................................................................ 25

    C.    HEI Misled Investors To Believe That It Had Followed Advice Given To It Concerning Fire Mitigation, When In Fact It Went Against The Central Components Of That Advice ........................................................................ 29

    D.    HEI Misled Investors To Believe That It Prioritized Safety Over Customer Convenience, When In Fact, As an Objective Matter of Written Policy, It Prioritized Customer Convenience ........................................................... 32

VI.   AUGUST 8, 2023 LAHAINA WILDFIRE DISASTER ............................... 33

VII.  LOSS CAUSATION ......................................................................................... 37

    A.    August 8-9, 2023. .................................................................................... 37

    B.    August 12, 2023. ..................................................................................... 38

    C.    August 15, 2023. ..................................................................................... 39

    D.    August 16, 2023. ..................................................................................... 40

E.    August 17, 2023. ........................................................................... 41

F.    August 19, 2023 to August 21, 2023. ......................................... 42

G.    August 22-23, 2023 ..................................................................... 44

H.    August 25, 2023. .......................................................................... 44

I.    September 5, 2023. ....................................................................... 45

VIII.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................................. 46

A.    Defendants' False and Misleading Statements in 2019 ............... 46

B.    Defendants' False and Misleading Statements in 2020 ............... 48

C.    Defendants' False and Misleading Statements in 2021 ............... 51

D.    Defendants' False and Misleading Statements in 2022 ............... 54

E.    Defendants' False and Misleading Statements in 2023 ............... 58

IX.   ADDITIONAL SCIENTER ALLEGATIONS ................................................ 61

A.    Defendants Knew that Certain of Their Statements Were False and Misleading Because Defendants Knew About Their Own Wildfire Mitigation Plan ............ 61

B.    Defendants Knew, or Were Severely Reckless in Not Knowing, that Certain of Their Statements Implying that They Had Followed Consultant and Community Advice Were False and Misleading Because Defendants Knew About that Advice ................................................................................................... 62

C.    Mitigation of Environmental Risk Was a Core Part of Hawaiian Electric's Business, Defendants' Compensation Was Tied to Enterprise Risk Mitigation, and Board Members Were Expressly Apprised of Risks ............................................ 63

X.    CLASS ACTION ALLEGATIONS ....................................................... 65

XI.   COUNT ONE .................................................................................. 67

(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants) ................................................................................. 67

XII.  COUNT TWO ................................................................................. 70

(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants) .............. 70

XIII. PRAYER FOR RELIEF ...................................................................... 71

XIV.  DEMAND FOR TRIAL BY JURY ......................................................... 71

ii
AMENDED COMPLAINT

Lead Plaintiff Daniel Warren ("Lead Plaintiff" or "Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Hawaiian Electric Industries, Inc. ("HEI" or the "Company"), analysts' reports and advisories about the Company, interviews of former employees, and information readily obtainable on the Internet.

## I.    INTRODUCTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired HEI securities between February 28, 2019 and September 4, 2023, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      HEI, the holding company of Hawaiian Electric Company, Inc., the subsidiary through which HEI operates, engages in the electric utility, banking, and non-regulated renewable/sustainable infrastructure investment businesses in the state of Hawaii. The Company provides service to 95% of Hawaiian residents and operates in three segments, including the Electric Utility segment, which engages in the production, purchase, transmission, distribution, and sale of electricity in the islands of Maui, Oahu, Hawaii, Lanai, and Molokai.

3.      Hawaiian Electric provides electricity to customers through utility poles throughout Hawaii, including on Maui. These utility poles are extremely dangerous, among other reasons, because they may fall over into dry vegetation when energized and ignite a wildfire. This danger was particularly heightened in Western Maui, where an invasive grass species prone to drying out

had spread throughout the area by the start of the Class Period, in effect creating ubiquitous, naturally occurring, highly flammable haystacks all around a populated area.

4.    Plaintiff brings this Action because, throughout the Class Period, HEI repeatedly misled investors to believe that the Company was taking appropriate action to mitigate this wildfire risk, when in fact, HEI was failing to do so.  In fact, in some cases, HEI's own written policies were not to take the very actions it assured investors it was taking.

5.    *First*, HEI informed investors that it had successfully replaced uninsulated (traditional) power lines with insulated wires, when it had not.  For example, in HEI's April 12, 2022 ESG Report for 2021, it stated:

> We have also replaced traditional power lines with insulated conductor systems to improve reliability and resilience in targeted areas prone to vegetation-related outages.

6.    In fact, Hawaiian Electric had not replaced uninsulated power lines with insulated lines even in areas it recognized to be at high risk of wildfires due to dry vegetation, including West Maui.  Multiple sources confirm that the power lines in West Maui were not insulated at the time of the 2023 Maui fires, and that the August 8, 2023 Lahaina wildfire was caused by electrical poles with uninsulated wires falling into dry brush.

7.    *Second*, HEI repeatedly assured investors that it was regularly maintaining its utility poles and that they complied with national safety standards, when in fact, HEI's pole maintenance was severely deficient and the majority of its poles did not meet national standards.  For example, on April 22, 2021, HEI issued its consolidated 2020 ESG Report, which stated:

> We continually maintain and upgrade our transmission and distribution system to ensure seamless delivery of power to our customers.  Day-to-day maintenance is a key part of keeping the grid resilient.  We regularly inspect our poles, lines, and other equipment, and work to replace and upgrade aging and faulty equipment before failures happen.

8.    In fact, at all relevant times during the Class Period, HEI was failing to replace thousands of severely outdated utility poles that posed a danger of falling and sparking during high winds.  Likewise, at all relevant times, HEI's poles did not meet National Electric Safety Code ("NESC") national safety standards.

9.    *Third,* the Company repeatedly assured investors that it was actively trimming and otherwise addressing dry grasses and brush beneath and around power lines.  In the Company's 2020 ESG Report, Defendants stated, for example, "[w]e regularly trim the vegetation around our equipment."  In fact, the Company's own written policy, expressed in its Wildfire Mitigation Plan since 2019, expressly recommended *against* trimming already low-lying vegetation, and *against* creating vegetation fire-breaks as part of the vegetation management program, on the grounds that the measures were too costly.

10.    *Fourth*, HEI misled investors to believe that it was following advice regarding wildfire mitigation from a hired consultant, and that its wildfire mitigation plans aligned with recommendations from wildfire collaborators, when in fact, its wildfire mitigation policies went *against* that advice.  For example, the 2020 ESG Report stated:

> The utility engaged Exponent, a leading consulting firm in electric utility resilience . . . to identify key vulnerabilities to severe natural events. [. . .] Exponent outlined a set of recommendations . . . includ[ing] . . . enhanced vegetation management.

11.    *Fifth*, Defendants repeatedly misled investors to believe that the Company's policies prioritized safety over other considerations, when in fact, as an objective matter of written policy, Hawaiian Electric prioritized customer convenience.  For example, the Company's 2019 ESG Report stated, in relevant part:  "Safety is our number one priority at Hawaiian Electric." This statement of policy was objectively false in at least one critical respect—the Company's Wildfire Mitigation Plan set forth its policy of not "preemptively turning off circuits," despite the fact that such deenergizing was the safest reasonable policy to prevent wildfires, because the policy "was not well received by certain customers affected."

12.    Through these misrepresentations and omissions, in which HEI assured investors that it was taking actions to mitigate wildfire risk that it was not in fact taking, HEI concealed the true, heightened and unmitigated risk of wildfires from the public.  It also concealed facts about its own wildfire mitigation strategy, and with that, its risk of liability relating to wildfires.  Over a series of events and disclosures, the true, heightened and unmitigated risk of wildfires—the

unmitigated risk that HEI had obfuscated and concealed from investors—materialized in the deadliest U.S. wildfire since 1918.

13.    In early August 2023, a series of severe wildfires broke out in Hawaii, predominantly on the island of Maui.  The most destructive fire began in West Maui near the town of Lahaina on the morning of August 8, 2023.  By that afternoon, intense winds had knocked down approximately 30 utility poles throughout Maui, resulting in at least 15 separate outages impacting more than 12,400 customers.  Videos captured by local residents showed that the most destructive of the fires were cause by uninsulated power lines belonging to Hawaiian Electric falling onto dry, untrimmed and unmanaged grassy areas.

14.    The fires killed at least 101 people.

15.    In the following days, weeks and months, on August 8-9, 12, 15-22, 25, and September 5, the heightened, unmitigated risk of catastrophic wildfire Hawaiian Electric had concealed materialized in the tragic Lahaina fire and subsequent events revealing the full scope of that concealed risk.  Moreover, the truths about Hawaiian Electric's operations that it had obscured were revealed.

16.    For example, on August 12, 2023, news outlets began reporting that Hawaiian Electric lacked the proper policies and procedures to mitigate the impact of the wildfires.  Specifically, it was revealed that, at the time the wildfires began, the Company did not maintain a public power shutoff plan—*i.e.*, a plan in which electricity is intentionally cut off to areas where strong wind events could cause the fires to spread.

17.    On this news, HEI's stock price fell $10.94 per share, or 33.76%, to close at $21.46 per share on August 14, 2023.

18.    Similarly, on August 16, 2023, the *Wall Street Journal* ("*WSJ*") reported that Hawaiian Electric was meeting with firms that specialize in restructuring advisory work, exploring options for the various financial and legal challenges that the Company faces as a consequence from the Maui wildfires.  On August 17, 2023, the *WSJ* reported that Hawaiian Electric had for years been aware of the threat posed by wildfire but waited years to act.  Indeed, the *WSJ* stated

that between 2019 and 2022 the Company spent less than $245,000 on wildfire-specific projects on Maui and did not seek state approval to raise utility rates to pay for broad wildfire safety improvements until 2022.

19.    On this news, HEI's stock price fell $2.54 per share, or 17.43%, to close at $12.03 per share on August 17, 2023.

20.    Altogether, the disclosures on August 8-9, 12, 15-22, 25, and September 5, 2023 caused the value of HEI's stock to lose over 60% of its value.  Plaintiff and other Class members sue to recover these losses.

## II.    JURISDICTION AND VENUE

21.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

22.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

23.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Pursuant to HEI's most recently filed Quarterly Report with the SEC, as of July 18, 2023, there were 109,611,599 shares of the Company's common stock outstanding.  HEI's securities trade on the New York Stock Exchange ("NYSE").  Accordingly, there are presumably hundreds, if not thousands of investors in HEI securities located within the U.S., some of whom undoubtedly reside in this Judicial District.  Moreover, Lead Plaintiff resides in this Judicial District.

24.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

III.    PARTIES

A.    Plaintiffs

25.    Lead Plaintiff Daniel Warren, as set forth in his certification filed herewith as Exhibit A, acquired HEI securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

26.    Additional Plaintiff Bhapinderpal S. Bhangal, as set forth in his previously filed certification (ECF No. 12-1), acquired HEI securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

27.    Additional Plaintiff Emaad Kuhdear, as set forth in his certification filed herewith as Exhibit B, also acquired HEI securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

B.    Defendants

28.    Defendant Hawaiian Electric Industries Inc. ("HEI") is a Hawaiian corporation with principal executive offices located at 1001 Bishop Street, Suite 2900, Honolulu, Hawaii 96813. HEI's common stock trades in an efficient market on the NYSE under the ticker symbol "HE".

29.    HEI is a holding company that wholly owns Hawaiian Electric Company, Inc. ("Hawaiian Electric" or "HECO").  Hawaiian Electric wholly owns Hawaiian Electric Light Company Inc. and Maui Electric Company.  Through HECO, HEI engages in electric utility, banking, and non-regulated renewable/sustainable infrastructure investment businesses in the state of Hawaii.  The Company provides service to 95% of Hawaiian residents and operates in three segments, including the Electric Utility segment, which engages in the production, purchase, transmission, distribution, and sale of electricity in the islands of Maui, Oahu, Hawaii, Lanai, and Molokai.

30.    HECO is the operating company through which HEI conducts the vast majority of its business.  In 2019, HECO's revenues and net income amounted to approximately 89% and 72% respectively, of HEI's consolidated revenues and net income.  In 2020, HECO's revenues and net income amounted to approximately 88% and 86% respectively, of HEI's consolidated revenues

and net income.  In 2021, HECO's revenues and net income amounted to approximately 89% and 72% respectively, of HEI's consolidated revenues and net income.  In 2022, HECO's revenues and net income amounted to approximately 91% and 78% respectively, of HEI's consolidated revenues and net income.

31.     Defendant Constance H. Lau ("Lau") served as HEI's President and Chief Executive Officer ("CEO") from prior to the start of the Class Period until January 2022.

32.     Defendant Scott W. H. Seu ("Seu") has served as HEI's President, CEO, and Director since January 2022.

33.     Defendant Gregory C. Hazelton ("Hazelton") served as HEI's Executive Vice President ("V.P."), Chief Financial Officer ("CFO"), and Treasurer from prior to the start of the Class Period until July 2022.

34.     Defendant Paul K. Ito ("Ito") served as HEI's Interim CFO from July 2022 until January 2023, and has served as the Company's Executive V.P., Treasurer, and CFO since January 2023.

35.     Defendants Lau, Seu, Hazelton, and Ito are sometimes referred to herein collectively as the "Individual Defendants."

**IV.     HEI KNEW FOR YEARS FROM NUMEROUS SOURCES THAT THE RISK OF SEVERE WILDFIRES ON MAUI WAS EXTREME AND REQUIRED APPROPRIATE MITIGATION EFFORTS**

**A.     Local Wildfire Community Group Warned Early on of Ongoing Wildfire Hazards and Offered HEI Recommendations To Mitigate the Risk**

36.     For years leading up to the August 2023 wildfires, officials were acutely aware that the historic town of Lahaina on the island of Maui faced an extreme wildfire risk.

37.     As early as 2014, the Hawaii Wildfire Management Organization released a wildfire mitigation plan that explicitly warned that Lahaina was among the areas in Maui most

vulnerable to fires due to its proximity to dry brush, steep grasslands, and the prevalence of strong winds.  The group outlined a plan for working with utilities to help reduce the risk of fires.[1]

38.    The 2014 Wildfire Mitigation Plan included a map of communities at risk from wildfires for each island in the State of Hawai'i and identified Lahaina as a "Zone 1" community with a high fire risk rating ascribed to those communities at the greatest risk from wildfires.[2]

39.    With firefighting agencies and landowners, the Hawaii Wildfire Management Organization assessed specific areas—designated as high priorities for protection based on their personal and community value and overall risk of wildfire—for relative risk of wildfire and assigned a hazard ranking of low, moderate, high, or extreme for certain categories including vegetation and fire environment.  The majority of Lahaina, including the Lahaina Water Plant and Lahaina North Mauka Shops, was assigned an extreme hazard ranking in the Fire Environment Hazard category, which rates the fire environment by rainfall, wind, slope, topography, seasonal conditions and ignition risk.[3]

40.    The 2014 Wildfire Mitigation Plan outlined the agency's wildfire concerns and recommended actions in order of priority.  The agency listed "Pre-Suppression", and specifically vegetation management and maintenance by the utilities, as a leading priority wildfire concern for fire protection.  Recommended actions for pre-suppression included that the utilities "must adhere to fire prevention standards" and be "held accountable for starting fires."[4]

41.    The agency also conducted public outreach and yielded public-prioritized input regarding wildfire-related concerns and recommended actions.  The majority of the public's

---

[1] Elizabeth Pickett & Ilene Grossman, *Western Maui Community Wildfire Protection Plan*, Hawaii Wildfire Management Organization (Jan. 2014), https://dlnr.hawaii.gov/forestry/files/2024/01/Western-Maui-CWPP.pdf (hereinafter the "2014 Wildfire Mitigation Plan").

[2] *See* 2014 Wildfire Mitigation Plan at 60, Communities at Risk from Wildfires Map (Fig. 24).

[3] *Id.* at 55, Fire Environment Hazard Rating Map (Fig. 21).

[4] *Id.* at 63, Agency and Resource Manager Priorities: Pre-Suppression (Table 10).

concerns and recommended actions were within the pre-suppression category (53%).[5]  The public similarly prioritized fuels management and reduction around and within communities as a foremost wildfire concern and recommended that "Utility companies must manage vegetation and powerline-cause ignitions" as the first line of action to address this concern.[6]

42.     Over the next several years, numerous government and non-profit reports reiterated the heightened fire danger in Lahaina.  Subsequent reports in 2018, 2019 and 2020 from various agencies continued to identify Lahaina as particularly vulnerable to wildfires due to factors like strong winds, proximity to brush and grasslands, presence of non-native vegetation, and substandard power infrastructure.

**B.     August 2018 Lahaina Wildfire and Aftermath**

43.     On July 26, 2018, a Hawaii Wildfire Fact Sheet published by the Hawaii Wildfire Management Association warned that over the prior decade, Hawaii averaged 1,000 wildfires burning 17,000 acres annually.[7]

44.     Then, on August 6, 2018, the Hawaii Emergency Management Agency published the 2018 State of Hawai'i Hazard Mitigation Plan Update, which detailed a multitude of wildfire events that occurred in Lahaina over the past decade and designated all of Maui as occupying a "high" wildfire hazard zone based on multiple risk factors.[8]

45.     On August 24, 2018, a wildfire in Lahaina destroyed more than 2,100 acres and caused $4.3 million in damage—what was then the largest wildfire event in Maui history.[9]  Maui's

---

[5] *Id.* at 66, Percentage of Public Recommendations Organized by Fire Protection Category (Fig. 29).

[6] *Id.* at 68.

[7] Hawai'i Wildfire Management Association, *Wildfire in Hawaii Fact Sheet* (July 26, 2018), https://www.hawaiiwildfire.org/fire-resource-library-blog/wildfire-in-hawaii-factsheet.

[8] Hawai'i Emergency Management Agency, *2018 State of Hawai'i Hazard Mitigation Plan Update*, at 4-337, 4-374, and Appendix E (Aug. 6, 2018), https://dod.hawaii.gov/hiema/files/2020/06/2018-State-HI-HMP-Update-100218.pdf.

[9] Brianna Sacks & Justine McDaniel, *A terrifying fire struck Maui in 2018. Officials were warned of a repeat*, Wash. Post (Aug. 22, 2023), https://www.washingtonpost.com/weather/2023/08/22/maui-fire-2018-lahaina-warning/.

top emergency management official stated that the fire nearly jumped Lahainaluna Road, which would have reached Lahaina's town center and been catastrophic.  Many residents demanded answers from county officials at the time as they "inquired about the lack of a shutoff system for power lines.  Others reported problems accessing water to help firefighting efforts and complained of failures to reduce overgrown brush and to better irrigate drought-prone fields.  Some raised concerns about problems with evacuation routes, planning and communications, among other issues."[10]

46.     At a heated town hall on August 29, 2018, for three hours, residents peppered Mayor Alan Arakawa and other state and county officials with questions in the aftermath of the 2018 Lahaina wildfire.  They specifically asked why Maui Electric (part of Hawaiian Electric) failed to shut off power given the high winds and the fact that their equipment had previously caused other fires.  According to residents in the 2018 meeting, the Company's wires were seen whipping around due to extreme winds and had caused the fire.  In response, the utility's then-director of government and community relations, Mahina Martin, confirmed that as of August 2018, Hawaiian Electric "did not have a protocol to shut down power ahead of high winds."[11]

47.     On November 2, 2018, the Public Utilities Commission ("PUC") approved an agreement that would transfer ownership of 120,000 utility poles from Hawaiian Telcom to Hawaiian Electric, effectively granting Hawaiian Electric sole ownership of the poles on Oahu, Maui, Molokai, Lanai, and Hawaii island.  PUC stated in its press release that the "agreement aims to administer a more efficient and effective servicing of pole infrastructure, which includes the removal of 14,000 double poles."[12]

---

[10] Lewis Kamb & Evan Bush, *Maui dodged catastrophe in wildfires five years ago but missed an opportunity to prevent future disaster, residents say*, NBC NEWS, (Aug. 24, 2023, 12:00 PM), https://www.nbcnews.com/news/us-news/maui-officials-warned-lahaina-wildfires-2018-critics-rcna101515.

[11] Brianna Sacks & Justine McDaniel, *A terrifying fire struck Maui in 2018. Officials were warned of a repeat*, Wash. Post (Aug. 22, 2023), https://www.washingtonpost.com/weather/2023/08/22/maui-fire-2018-lahaina-warning/.

[12] Hawaii Public Utilities Commission, *PUC Approves Joint Pole Agreement Between Hawaiian Telcom and Hawaiian Electric Companies* (Nov. 2, 2018),  https://puc.hawaii.gov/news-

48.    In June 2019, the Hawaii Wildfire Management Organization released a report titled "A Collaborative, Landscape-Level Approach to Reduce Wildfire Hazard Across Hawai'i", which included maps of vulnerable areas in Maui in 2018 and 2019 and findings that Lahaina was of particular concern due to the level of invasive grass that blankets the old plantation lands above the town.  The report found at the time that vegetation in the area, around where the current fire ignited, needed to be a priority for maintenance.[13]

### C.    Maui Resiliency Working Group Studies Wildfire Risk

49.    Hawaiian Electric also was continuously apprised of Lahaina's exceptional wildfire vulnerability through its participation in a Resiliency Working Group ("RWG") with state regulators.  HECO meeting minutes show the working group specifically discussed in 2019 whether power lines should be de-energized proactively during severe winds to reduce fire ignition risks, as California utilities had implemented.

50.    In 2019, HECO organized several stakeholder working groups, including the RWG, to develop a long-term Integrated Grid Planning ("IGP") process.  HECO retained energy business advisory Siemens Industry, Inc., and collaborative meeting facilitator Where Talk Works, Inc., to facilitate a series of six RWG meetings and to assist the RWG in reaching consensus around the definition of resilience of the grid, its importance to its customers, the vulnerability of the grid to severe events, and utility and customer options for mitigating these vulnerabilities.  Some of these meetings were attended by Defendants.  For example, Defendant Seu attended the November 22, 2019 RWG meeting.

---

release/puc-approves-joint-pole-agreement-between-hawaiian-telcom-and-hawaiian-electric-companies/.

[13] Hawai'i Wildfire Management Organization, *A Collaborative, Landscape-Level Approach to Reduce Wildfire Hazard Across Hawai'i* (June 30, 2019), https://static1.squarespace.com/static/5254fbe2e4b04bbc53b57821/t/5dbf80628fc82a626b9dc2e2/1572831359536/Kaua%CA%BBi_compressed.pdf.

51.    Starting on July 22, 2019, HECO held its first Resiliency Working Group meeting, consisting of high-level Hawaiian Electric officials as well as various state and local officials, for the purpose of developing grid resilience, identifying critical threats for the island, and planning.[14]

52.    On August 29, 2019, HECO held its second Resilience Working Group meeting that included objectives such as threat prioritization.  During the meeting, attendees ranked wildfires as the third highest threat for Maui, ranking behind hurricanes and tsunamis.[15]

53.    On September 17, 2019, HECO held its third Resilience Working Group meeting in which attendees defined severe event priorities, identified potential impact areas of all hazards, and discussed mitigation options.  During the meeting, HECO Director Lisa Dangelmaier noted that for Maui, wildfires "have been an issue this year," while further assessments on Maui's threat scenarios included comments such as:  "Wildfire is a threat now.  Someday, if lands are planted and irrigated, the threat may be reduced."[16]  When the working group was asked to provide recommendations for mitigation strategies to improve reliance from the priority threats and power outages, attendees replied that "County, State, Federal grant funding mitigation plans are already in place & expanding," and recommended "coordination between mitigation plans & utility," noting that up until that point, this would be the Company's "1st instance to do that." [17]

54.    On October 28, 2019, meeting minutes from HECO's fourth Resilience Working Group meeting showed the Company discussed with state officials, among other things, whether HECO's power lines should be de-energized proactively if wildfires threatened equipment, as California utilities had implemented.  While the meeting concluded without a definitive answer to

---

[14] HECO, *Integrated Grid Planning (IGP) Resilience Working Group: Kick-off Meeting* (July 22, 2019), https://www.hawaiianelectric.com/a/6499.

[15] HECO, *Resilience Working Group (RWG) Meeting Notes*, at 5 (Aug. 29, 2019), https://www.hawaiianelectric.com/a/6738.

[16] HECO, *Resilience Working Group (RWG) Meeting Notes*, at 3-4, 6 (Sept. 17, 2019), https://www.hawaiianelectric.com/a/6833.

[17] HECO, *Resilience Working Group: Breakout Session Results*, at 15 (Sept. 17, 2019), https://www.hawaiianelectric.com/a/6834.

the question, RWG attendees discussed understanding "the threat impact to grid and customers" and how that relates to a "wildfire threat scenario."[18]

55.    On November 22, 2019, HECO's Resilience Working Group met again to discuss the group's final report on its findings regarding resilience threats and impacts to grid and customers, and its proposed mitigation strategies.[19]  HECO presentation slides during the meeting showed that wildfire impact risks were high in Maui, Oahu, Hawai'i Island and Moloka'i.[20]

56.    On December 16, 2019, the HECO Resiliency Working Group met for the final time before publishing its report the following year.[21]

57.    On April 29, 2020, HECO's Resiliency Working Group released its report titled the "Resilience Working Group Report for Integrated Grid Planning."[22]  Produced by Hawaiian Electric and a group of state and local government officials, the report discussed wide-ranging plans to strengthen Hawaiian Electric's grids.  They included plans regarding five priority critical threats, among them wildfires.

58.    Wildfires were deemed most important regarding grid impacts on Maui and O'ahu. "The frequency and impacts of wildfires have increased recently," the report noted.  The report went on to explain that this increase in wildfires "may be attributable in some parts of the islands to the decline of the sugarcane industry" which "historically managed wildfire risks on the islands, including responding to fires" but, "today these areas present vast amounts of vegetation that can burn longer and with less ability and resources to control them."[23]

---

[18] HECO, *Resilience Working Group (RWG) Meeting Notes*, at 8 (Oct. 28, 2019), https://www.hawaiianelectric.com/a/7097.

[19] HECO, *Resilience Working Group (RWG) Meeting Notes*, at 8 (Nov. 22, 2019), https://www.hawaiianelectric.com/a/7210.

[20] HECO, *Integrated Grid Planning - Resilience Working Group Meeting: Presentation Slides*, at 29 (Nov. 22, 2019), https://www.hawaiianelectric.com/a/7098.

[21] HECO, *Resilience Working Group (RWG) Meeting Notes*, at 8 (Dec. 16, 2019), https://www.hawaiianelectric.com/a/7212.

[22] HECO, *Resilience Working Group Report for Integrated Grid Planning* (Apr. 29, 2020), https://www.hawaiianelectric.com/a/7883.

[23] *Id.* at 35.

59.     The report went on to state that "Maui presents unique wildfire risks" which are "highest along the saddle road due in part to existence of an invasive grass species prone to drying out." The main power plant island at Maalaea was specifically indicated as a high-risk area for wildfire.[24]

### D.     May 2020 Hawaiian Public Utilities Commission Audit

60.     On May 12, 2020, the PUC released an audit report on Hawaiian Electric that found, *inter alia*, existing operational inefficiencies including excessive overtime costs. In addition, the Audit Report found that, with respect to Vegetation Management, the Company had not completed its planned mitigation programs and had underspent its budget for years, increasing hazards. Among other things, the audit's findings on HECO's Vegetation Management program revealed that:

> When we reviewed vegetation management, ***we found that there was no recording or measurement of what total length of line had been cleared***. ***Vegetation Management has not been able to complete its planned mitigation programs over the last few years and has underspent its budgets.*** This may in part be a result of its yearly spend being curtailed in order to counter overspends elsewhere to meet the overall budget in Energy Delivery. ***Regardless, the impact of not completing vegetation management work is showing up in increased Distribution trouble calls as a result of vegetation interference with overhead lines.*** It also means that some scheduled distribution work has to be delayed until Vegetation Management crews can make work sites ready for T&D Operations to commence its routine work, increasing costs.

> The other impact is that when Vegetation crews are required to divert to respond to specific sites to clear work areas for crews, this delays the program and creates a higher unit cost for T&D Operations. Without a strategy to complete the annual work program as well as catch up on the overdue work, these results will continue and will increase the negative impact on the Company and costs for T&D Operations, as well as impacting reliability and increasing fault outages.

> We were surprised to discover that management and monitoring of vegetation management work by the Company was based purely on the expenditure on the program. There were zero metrics identifying the volume of work performed and line miles cleared. When this issue was raised with the Company, they appeared to have little understanding that unit measurements are essential in order to provide feedback as to whether the spend is effective and to estimate the scale of the backlog. It is concerning that they would budget $22.6m in 2020 for vegetation management with no supporting metrics or unit costs, only considering historic

---

[24] *Id.*

spend against budget. This is an unacceptable approach that must be remediated urgently.[25],[26]

**E.    Maui County Hazard and Wildfire Mitigation Plans**

61.    In August of 2020, the County of Maui formally adopted its Updated Hazard Mitigation Plan.  The 2020 Maui County Hazard Mitigation Plan labeled all of Lahaina as a "high" wildfire risk zone and warned that west Maui had greater than 90% annual probability of experiencing wildfires based on climate and vegetation.[27]

62.    In July 2021, the County of Maui's Cost of Government Commission released a Report on Wildfire Prevention and Cost Recovery on Maui ("Wildfire Prevention Report").  The July 2021 Wildfire Prevention Report, effectively a wildfire mitigation plan following Maui's unprecedented wildfire season in 2019, warned county and state officials of the growing fire threat and emphasized that not enough was being done to address the concerns.[28]

63.    The July 2021 Wildfire Prevention Report warned about the wildfire threats to the State of Hawaiʻi and, specifically, to Maui, including:

• "[T]he number of incidents from a combination of wild/brush/forest fires appears to be increasing, and that this increase poses an increased threat to citizens, properties, and sacred sites;"

• "Importantly, Hawaii's and Maui's fire problem is more extreme than on the U.S. mainland;" and

---

[25] Management Audit of the Hawaiian Electric Company (HECO) Final Report dated May 12, 2020 ("Audit Report") filed on May 13, 2020 in Docket No. 2019-0085, at 156.

[26] All emphases are added unless otherwise indicated.

[27] Maui Emergency Management Agency, County of Maui, Hawaiʻi, *Hazard Mitigation Plan Update*, at 489, 503 (Aug. 2020),
https://www.mauicounty.gov/DocumentCenter/View/125977/2020-Maui-County-Hazard-Mitigation-Plan-Final.

[28] Cost of Government Commission, County of Maui, *Report on Wildfire Prevention and Cost Recovery on Maui* (July 2021),
https://www.mauicounty.gov/DocumentCenter/View/129493/Report-on-Wildfire-Prevention--Cost-Recovery-on-Maui---Part-1-Report--Exhibits-A-B-33-MB/.

AMENDED COMPLAINT

1  • "As of June 22, 2021, the U.S. Drought Monitor designated all of Maui Island as either

2  in a 'moderate drought' or 'severe drought.'"[29]

3      64.    The Wildfire Prevention Report included data showing that fires will continue

4  increasing in frequency and severity, exhibits depicting which Maui communities were the most

5  vulnerable to wildfires (including Lahaina), and the activities that increase wildfire risk (such as

6  power lines):[30]

7

8

9

10  [The remainder of this page is deliberately left blank.]

11

12

13

14

15

16

17

18

19

20

21

22

23

---

24  [29] *Id.* at 1–3.

25  [30] Hawaii Wildfire Management Association, *A Collaborative Landscape-Level Approach to Reduce Wildfire Hazard Across Hawaiʻi: 2018–2019 Vegetation Management — Rapid Mapping Assessment and Collaborative Action Planning — Maui Report*, at 2, 7–8 (2018),
26  https://www.mauicounty.gov/DocumentCenter/View/129491/Report-on-Wildfire-Prevention--
27  Cost-Recovery-on-Maui--Part-4-Exhibit-D-25-MB.

28
AMENDED COMPLAINT





65.     Additionally, the Wildfire Prevention Report identified several problems and actionable solutions that would have lessened the risk of the August 8, 2023 Lahaina fire, such as the "[r]eduction of alien plant life that serves as fuel" through the implementation of "an aggressive plan to replace these hazardous fuel sources with native plants to reduce combustible fuel while increasing water retention."  The Wildfire Prevention Report also explained that "[a]boveground power lines that fail, short, or are low hanging can cause fire ignition (sparks) that could start a wildfire, particularly in windy or stormy conditions," which "is exacerbated by overgrown areas in the rights of way beneath the lines."  The Wildfire Prevention Report identified responsive action to the problems posed by power lines, which included routine inspections of "power transmission lines and rights of way" and tasking both the County and "electric utility companies with corrective actions," like "fuels reduction and firebreaks around power infrastructure in 'hotspot' areas whichever the source of ignition."[31]

### F.     Hawaiian Electric Wildfire Mitigation Plan

66.     In the beginning of 2019, Hawaiian Electric drafted a Wildfire Mitigation Plan of its own.[32]  From 2019 onwards, the Wildfire Mitigation Plan represented HECO's internal wildfire mitigation policies.

67.     In January 2023, HECO finalized the Wildfire Mitigation Plan after four years, but did not release it publicly.[33]

68.     The Wildfire Mitigation Plan recommended *against* installing insulated conductors.  The Plan noted that "major California utilities are replacing existing overhead conductors with insulated conductors such as tree wire or spacer cable" and that "[t]hese

---

[31] Cost of Government Commission, County of Maui, *Report on Wildfire Prevention and Cost Recovery on Maui*, at 11–12 (July 2021), https://www.mauicounty.gov/DocumentCenter/View/129493/Report-on-Wildfire-Prevention--Cost-Recovery-on-Maui---Part-1-Report--Exhibits-A-B-33-MB/.

[32] HECO, *Hawaiian Electric Wildfire Mitigation Plan* (Jan. 2023), https://www.hawaiianelectric.com/documents/about_us/our_vision_and_commitment/resilience/20230101_wildfire_mitigation_plan.pdf.

[33] *Id.*

technologies are excellent in preventing sparks if tall vegetation is in or adjacent to the line right-of-way." Yet the plan determined that "the type of vegetation in the Hawaii wildfire areas are grasses, shrubs with few tall trees" and "[t]hus, tree wire or spacer cable would not be cost-effective in the Hawaii wildfire areas as opposed to other hardening solutions."[34]

69.    With respect to deenergizing power lines in red-flag events, Hawaiian Electric's mitigation plan stated:

> Based on news reports, Pacific Gas & Electric's practice to preemptively turn off circuits in certain areas if conditions were ripe for a wildfire **was *not well-received* by certain customers affected**. For Hawaii, **it is *not recommended*** that Hawaiian Electric adopt this practice. As noted previously, the type of vegetation in the potential wildfire areas in Hawaii would not likely cause the same catastrophic level of wildfires that California has experienced. In addition, a lot of the Hawaiian Electric distribution circuits meander through non-wildfire areas and then through potential wildfire areas. Thus, preemptively turning off circuits would impact customers that may not be in potential wildfire areas.[35]

70.    The Wildfire Mitigation Plan recommended *against* enhanced vegetation management, such as clearing grasses and brush under power lines. The plan emphasized that "the type of vegetation in the Hawaii wildfire areas are primarily grasses, shrubs, and few trees, which rarely grow into conductors. Thus, adjusting vegetation management plans in the wildfire areas will not likely produce any appreciable results."[36]

71.    The Wildfire Mitigation Plan stated further:

> As noted previously, the type of vegetation in the Hawaii wildfire areas are primarily grasses, shrubs, and few trees, which rarely grow into conductors. Thus, it is not recommended that vegetation management plans be adjusted in the wildfire areas. Further trimming of the already low-lying vegetation will not likely produce any appreciable results in the potential wildfire areas. The exception would be creating fire breaks in the vegetation areas…. However, creating a fire break would require agreement from landowners and stakeholders and would be very costly. If this strategy is pursued, then it should be done outside of the vegetation management programs.[37]

---

[34] *Id.* at 6.

[35] *Id.* at 11.

[36] *Id.* at 32-33.

[37] *Id.* at 36-37.

**V.    HEI REPEATEDLY MISLED INVESTORS TO BELIEVE IT WAS TAKING APPROPRIATE ACTION TO MITIGATE WILDFIRE RISK, WHEN IT KNEW IT WAS FAILING TO DO SO**

> **A.    HEI Created The Impression That It Was Regularly Maintaining Its Poles and Had Replaced Uninsulated Wire, When In Fact It Had Fallen Behind**

> > **1.    HEI Misled Investors To Believe It Had Replaced Exposed Power Lines with Insulated Conductor Wires**

72.    During the Class Period, HEI repeatedly misled investors to believe it had replaced uninsulated power lines with insulated wires to prevent wildfires from starting when poles fall and exposed wires contact dry vegetation.  In fact, HEI's power lines, like those in Lahaina that fell and caused the August 8, 2023 Lahaina wildfires, were totally bare and uninsulated.

73.    HEI promised to conduct such replacements as early as 2019.  On November 5, 2019, Hawaiian Electric released a press release titled, "Hawaiian Electric Companies to conduct drone surveys as part of overall wildfire mitigation planning."  In that release, the Company stated:

> Other resilience initiatives launched by the companies to prevent wildfires include: Installing heavier, insulated conductors on Maui and Oʻahu to stop lines from slapping and sparking in areas prone to high winds. The companies are identifying more areas where it makes sense to install these conductors.

74.    Later, in April 2022, HEI informed investors that it had successfully replaced uninsulated (traditional) power lines with insulated wires.  On April 12, 2022, HEI issued its consolidated 2021 ESG Report, which stated:

> We have also replaced traditional power lines with insulated conductor systems to improve reliability and resilience in targeted areas prone to vegetation-related outages.

75.    In fact, Hawaiian Electric had not replaced uninsulated power lines with insulated lines even in areas it recognized to be at high risk of wildfires due to dry vegetation, including West Maui.  Multiple sources confirm that the power lines in West Maui were not insulated at the time of the 2023 Maui fires.  The Associated Press analyzed videos and images of West Maui power lines and found that Hawaiian Electric had left miles of electrical line "naked to the weather and often-thick foliage."  According to the Associated Press, those videos and images show that in the first moments of the Maui fires, when high winds brought down power poles, which slapped

electrified wires to the dry grass below, the flames erupted all at once in long, neat rows because those wires were bare, uninsulated metal that could spark on contact.

76.     An expert in electrical systems, Michael Ahern, who served as a director of power systems at Worcester Polytechnic Institute in Massachusetts, has stated that it is "very unlikely" a fully-insulated cable would have sparked and caused a fire in dry vegetation.[38]  Other experts who watched videos showing downed power lines agreed that wire that was insulated would not have arced and sparked, igniting a line of flame.

77.     As noted above, remarkably, the Company's *own policy*, stated in its Wildfire Mitigation Plan, was *against* "replacing existing overhead conductors with insulated conductors such as tree wire . . . ."  The Company reasoned that "[t]hese technologies are excellent in preventing sparks if tall vegetation is in or adjacent to the line right-of-way.  But as noted previously, the type of vegetation in the Hawaii wildfire areas are grasses, shrubs with few tall trees," so "[insulated] tree wire . . . would not be cost-effective."  Accordingly, the Company's own internal policy directly contradicted its public statements in which it assured the public it had "replaced traditional power lines with insulated conductor systems."

### 2.     HEI Misled Investors To Believe It Regularly Maintained Its Poles

78.     Separately and relatedly, during the Class Period, HEI repeatedly assured investors that it was regularly maintaining its poles, when in fact, HEI's pole maintenance was severely deficient.  For example, on April 22, 2021, HEI issued its consolidated 2020 ESG Report, which stated:

> We continually maintain and upgrade our transmission and distribution system to ensure seamless delivery of power to our customers.  Day-to-day maintenance is a key part of keeping the grid resilient.  We regularly inspect our poles, lines, and other equipment, and work to replace and upgrade aging and faulty equipment before failures happen.

---

[38] Jennifer McDermott, Bernard Condon, & Michael Scott, *Bare electrical wire and leaning poles on Maui were possible cause of deadly fires*, Associated Press (Aug. 27, 2023, 12:33 AM), https://apnews.com/article/hawaii-wildfires-maui-electricity-power-utilities-9f23f79821ea50256f0725ac9b0b3905.

79.    In fact, at all relevant times during the Class Period, HEI was failing to replace thousands of severely outdated utility poles that posed a danger of falling and sparking during high winds.  As reported by the *WSJ*, generally, wooden poles that have deteriorated or were built to outdated standards are at risk of falling during high winds and dropping live wires that could spark wildfires. [39]  The *WSJ* reviewed regulatory records and found that Hawaiian Electric regularly fell behind on plans to replace tens of thousands of utility poles at risk of failure.  The regulatory filings show Hawaiian Electric frequently cited resource constraints and engineering challenges for not making as many upgrades as it intended.

80.    The *WSJ* review of the Company's regulatory filings also revealed that Hawaiian Electric spent millions of dollars less on upgrades than it planned in the years leading up to the Lahaina fire, including during the Class Period.  In 2022, Hawaiian Electric planned to spend at least $25 million to make its infrastructure on the island more resilient, but spent about $17 million and replaced fewer poles than anticipated.  The utility designated roughly $2.4 million for a program to bolster reliability on Maui in 2022, but spent $355,832.  After stating that it would spend $1.15 million last year to better prevent its high- and low-voltage lines from starting fires, Hawaiian Electric spent about $9,300 on the program.

81.    Hawaiian Electric has acknowledged that downed power lines caused a fire the morning of August 8, 2023 in the same spot where the blaze that destroyed Lahaina began.

82.    A former employee of Hawaiian Electric ("FE1") has confirmed that the majority of the Company's poles were leaning and approaching the end of their lifespan.  FE1 was the Director of Regional Transmission and Distribution Operations for Hawaiian Electric from October 2018 to July 2020.  FE1 was based in Honolulu and reported to Vice President of Energy Delivery Cecily Barnes, who reported to a Senior Vice President who reported to Hawaiian Electric's CEO.  FE1's role was to serve as a managing director over the electric grid on all five

---

[39] Katherine Blunt & Dan Frosch, *Before Lahaina Burned, Hawaiian Electric Was Slow to Replace Poles That Posed Fire Risk*, Wall St. J. (Sept. 24, 2023), https://www.wsj.com/us-news/climate-environment/maui-fire-hawaiian-electric-power-lines-1eaef7cf.

islands.  According to FE1, "Hawaiian Electric is powered by a grid that uses large wooden poles that are largely uninsulated, leaning, and nearing the end of their lifespan and are strung with vegetation over miles of rugged terrain."

83.    Hawaiian Electric has admitted in regulatory filings that utility poles on the islands have an average service life of 40 to 45 years or less before they need replacing.  That useful lifespan is up to a decade shorter than other places across the U.S. because Hawaiian Electric operates in what the Company calls a "severe wood decay hazard zone," meaning the poles deteriorate faster.  The risk of failure is most acute when winds pick up.

84.    During the Class Period, thousands of Hawaiian Electric's poles were more than 40 years old, and so were at high risk of breaking down.  Some dated to the 1920s.  In Hawaiian Electric's most recent public accounting of infrastructure on Maui, from 2016, a consultant wrote that it could not determine the age of roughly 3,500 of the utility's poles.  Of the remaining 21,673, the consultant determined about 7,700, *more than one-third*, were at least 40 years old.

85.    Relatedly, the Company blatantly misled the public to believe that their poles were in compliance with national safety standards designed to prevent them from falling and sparking in severe weather.  For example, on November 23, 2022, the Company stated:  "[O]ur poles follow standards set by the National Electric Safety Code ("NESC") to ensure they are safe for our employees to work on and can withstand impact of severe weather."

86.    In fact, the *majority* of the Company's poles were outdated and did not comply with current NESC standards to withstand severe weather.  Even setting aside the number of poles 40 years or older, Hawaiian Electric repeatedly told regulators that *the majority* of its poles were built to a 1960s standard that did not account for hurricane-strength winds.  The 1960s standard required only that the poles be able to resist a minimum of 56 mph sustained winds, weaker than a Category 1 hurricane.  A 2007 generally accepted, national standard under the NESC, adopted and implemented as a rule by Hawaii's Public Utilities Commission, required all poles to be able to

withstand 105 mph winds.[40]  Accordingly, the majority of Hawaiian Electric's poles were not in compliance with NESC standards and were in dire need of upgrade to prevent falling and sparking during weather event even less severe than a Category 1 hurricane.[41]

87.    A former member of the Hawaii Public Utilities Commission, Jennifer Potter, personally confirmed many of Maui's wooden power poles were in poor condition.  Indeed, that the majority of Hawaiian Electric's poles were in dire need of upgrade and replacement was proved by the August 8, 2023 weather—according to Shelee Kimura, CEO of Hawaiian Electric, at least sixty percent of the utility poles on West Maui were unable to withstand the weather events on August 8, 2023 and were still down as of August 14, 2023.  On the day of the Lahaina fire, the National Weather Service recorded wind speeds of only 62 mph on Maui, only modestly above the 1960's standards.

88.    In addition to aging and outdated poles, Hawaiian Electric needed to replace thousands of hazardous "double poles," where a replacement pole was installed next to a damaged one yet both were left in place.  A 2019 audit by the Public Utilities Commission found a backlog of 9,400 double poles that need to be fixed by Hawaiian Electric.  As of 2023, Hawaiian Electric still had 6,500 double poles left to replace.[42]

---

[40] The use of wood utility poles is guided by national standards, including ANSI 05.1 - Wood Poles, Specifications and Dimensions and the National Electrical Safety Code (NESC). North American Wood Pole Council, *National Wood Pole Standards Overview* (last accessed Feb. 29, 2024), https://woodpoles.org/Why-Wood-Poles/National-Standards.

[41] The Associate Press has likewise reported that "many" of Hawaiian Electric's utility poles "were leaning and near the end of their projected lifespan."  Jennifer McDermott, Bernard Condon, & Michael Scott, *Bare electrical wire and leaning poles on Maui were possible cause of deadly fires*, Associated Press (Aug. 27, 2023, 12:33 AM), https://apnews.com/article/hawaii-wildfires-maui-electricity-power-utilities-9f23f79821ea50256f0725ac9b0b3905.

[42] Catherine Cruz, *What happened to the plan to remove thousands of utility poles?*, Haw. Pub. Radio (Mar. 14, 2023), https://www.hawaiipublicradio.org/the-conversation/2023-03-14/removing-utility-poles-heco-energy-hawaiian-telcom.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.    HEI Misled Investors To Believe Its Mitigation Plans Addressed Risk of Dry Grasses and Shrubs, When In Fact Its Plans Recommended *Against* Trimming of Grasses Around Power Lines**

89.    During the Class Period, the Company repeatedly created the misleading impression that it was actively trimming and otherwise addressing dry grasses and brush beneath and around power lines, when in fact, the Company's own written policy, expressed in its Wildfire Mitigation Plan since 2019, expressly recommended *against* trimming already low-lying vegetation, and *against* creating vegetation fire-breaks as part of the vegetation management program, on the grounds that the measures were too costly.

90.    For example, on November 5, 2019, Hawaiian Electric released a press release in which it stated that it was conducting "drone surveys across their five-island territory to identify areas vulnerable to wildfire," and explained that "[t]hese aerial inspections are part of the companies' **proactive assessment and management of vegetation** near their electrical infrastructure, especially **in** drought-prone or **dry brush areas**." The press release also stated:

> Hawaiian Electric, Maui Electric and Hawai'i Electric Light earlier this year evaluated the wildfire mitigation plans filed by the major utilities in California and studied Hawai'i fire ignition maps to determine where the greatest risks are and to provide a basis for planning. Unlike California, many utility lines in Hawai'i run through tropical forests and areas that typically receive abundant rainfall. That makes it easier to **concentrate on mapping drought-prone areas where sparks could ignite dry grass and brush beneath power lines**.

These statements misled the public to believe that Hawaiian Electric "proactive[ly] manage[d]" vegetation, specifically including "dry grass and brush beneath power lines."

91.    Likewise, in the 2020 ESG Report, Defendants stated:

> **We regularly trim the vegetation around our equipment**, as many power outages during high winds and storms are due to tree branches or other vegetation falling onto power lines.

This statement likewise misled investors to believe that Hawaiian Electric "regularly trim[med] the vegetation around its equipment," including the grasses and shrubs in the immediate vicinity of its power lines.

92.    Similarly, the 2021 ESG Report stated:

> Episodic drought, a warming climate and **the expansion of nonnative fire-prone grasses and shrubs has led to an increase in wildfires** in Hawai'i. 98% of

25
AMENDED COMPLAINT

wildfires in Hawai'i are human caused and the threat to communities is high year-round. **In addition to the utility's own wildfire mitigation plans, we have joined with community members and wildfire collaborators to help prevent and mitigate wildfires in known hot spots across our service areas**.

This statement further led the public to believe that Hawaiian Electric's "own wildfire mitigation plans" took affirmative steps to address "the expansion of nonnative fire-prone grasses and shrubs" that had led to an increase in wildfires.

93.    In fact, Hawaiian Electric was blatantly misleading the public about its trimming of grasses and shrubs around its power lines.  Hawaiian Electric's express internal policy, written in its Wildfire Mitigation Plan, was certainly not to "proactive[ly] manage" "dry grass and brush beneath power lines," not to "regularly trim the [grass and brush] vegetation around its equipment," and indeed not to take any action with respect to "nonnative fire-prone grasses and shrubs."  Rather, the Wildfire Mitigation Plan stated:

> Hawaiian Electric's vegetation management programs involve trimming, removing, and herbicide spraying of vegetation on prescribed cycles and is limited to the boundaries of the right-of-way and roadsides.  Due to plant species and rainfall amounts, certain areas will have more frequent maintenance cycles than other areas.  Vegetation management is critical to maintaining and improving system reliability performance for overhead systems by executing work plans to minimize the frequency and duration of vegetation-related outages.  As noted previously, the type of vegetation in the Hawaii wildfire areas are primarily grasses, shrubs, and few trees, which rarely grow into conductors.  Thus, **it is not recommended that vegetation management plans be adjusted in the wildfire areas.  Further trimming of the already low-lying vegetation will not likely produce any appreciable results in the potential wildfire areas**. The exception would be creating fire breaks in the vegetation areas . . . .  However, creating a fire break would require agreement from landowners and stakeholders and would be very costly. If this strategy is pursued, then it should be done outside of the vegetation management programs.[43]

94.    Indeed, the May 12, 2020 audit of Hawaiian Electric by PUC, confirmed that the Company was regularly behind schedule in vegetation maintenance, had failed to complete planned vegetation work for years, and had underspent its budget:

> Vegetation Management has not been able to complete its planned mitigation programs over the last few years and has underspent its budgets.  This may in part be a result of its yearly spend being curtailed in order to counter overspends

---

[43] HECO, *Hawaiian Electric Wildfire Mitigation Plan* (Jan. 2023), https://www.hawaiianelectric.com/documents/about_us/our_vision_and_commitment/resilience/20230101_wildfire_mitigation_plan.pdf.

elsewhere to meet overall budget in Energy Delivery. Regardless, the impact of not completing vegetation management work is showing up in increased Distribution trouble calls as a result of vegetation interference with overhead lines. It also means that some scheduled distribution work has to be delayed until Vegetation Management crews can make work sites ready for T&D Operations to commence its routine work, increasing costs.[44]

95.    A former employee ("FE2") has confirmed that utility poles, including those near Lahaina, were "consumed by brush," and that FE2 was repeatedly instructed by superiors ***not*** to trim the brush at the bases of the poles. FE2 was a Troubleman for Hawaiian Electric in the Lahaina area from 2014 to 2021. FE2 reported to Troubleman Supervisor Gunther Taua, who reported to T&D Construction Superintendent Rod Morton. FE2's duties were standard troubleman duties, including responding to "trouble" calls from HECO dispatchers. FE2 asked his first level supervisor to rent him a backhoe to clear overgrown vegetation in the Lahaina area. FE2 stated, "I have pictures of me driving through grass that's so high . . . it grows six, seven feet tall." FE2 cleared about 40 poles before a new supervisor expressly instructed him to stop in 2016 or 2017. FE2 added the poles in Lahaiana were "not in good shape."

96.    Another former employee ("FE3") likewise has confirmed that HECO "neglected" keeping invasive grasses "under control" due to cost. FE3 was the Senior Environmental Specialist for Hawaiian Electric from May 2004 to January 2023. His job responsibilities included addressing environmental hazards, including spill hazards from electric transformers on poles. FE3 stated that while trees are widespread on Maui, the invasive cane grass "is the larger issue." "It's more the cane grass that grows fastest during the wet periods but once it dries out it gets really tindery and any kind of spark can set it off." According to FE3, land use in Hawaii changed when sugar cane became more expensive to grow in Hawaii than other areas like the Philippines and the sugar cane plantations began to shut down in the 1990s. "So all that land that was formerly used to cultivate sugar canes—which was kept well-watered during the sugar cane cultivation—just kind of dried up once those cultivation activities stopped, and that just allows all the invasives like the cane grass and the California grass to fill in where the cane was growing." FE3 explained, "[i]t

---

[44] Management Audit of the Hawaiian Electric Company (HECO), Final Report dated May 12, 2020 ("Audit Report"), filed on May 13, 2020 in Docket No. 2019-0085, at 156.

1   is costly to maintain that land, keep that vegetation down low," and as a result, Hawaiian Electric

2   neglected maintaining the grasses down low.

3          97.     Additionally, ariel drone-captured images taken by Hawaiian Electric itself in 2019

4   and 2020 of its own power lines, and included in its Wildfire Mitigation Plan, confirm that the

5   Company was not trimming low-lying vegetation surrounding its power lines at all.  The pictures

6   on pages 20-26 of the Plan show grasses and shrubs below and around the power lines growing

7   unabated in equal size to the surrounding vegetation.  For example, the following exhibits show

8   tall, untrimmed grasses surrounding power lines on Maui and Oahu:



*Figure 8 – Lahaina #2 Mauka 69kV Circuit and 1381 12kV Circuit, Kapalua, Maui 2020.*

28                                      28
                                 AMENDED COMPLAINT



*Figure 10 – Punaluu 12kV Circuit, Mauka of Honuapo Bay, Hawaii Island 2020.*

**C.    HEI Misled Investors To Believe That It Had Followed Advice Given To It Concerning Fire Mitigation, When In Fact It Went Against The Central Components Of That Advice**

98.    During the Class Period, the Company misled investors to believe that it was following advice regarding wildfire mitigation from a hired consultant, and that its wildfire mitigation plans aligned with recommendations from wildfire collaborators, when in fact, its wildfire mitigation policies went against that advice.  For example, the 2020 ESG Report stated:

> **The utility engaged Exponent**, a leading consulting firm in electric utility resilience, **to perform an independent assessment to identify key vulnerabilities to severe natural events. Following this assessment, Exponent outlined a set of recommendations** to ensure quick restoration of critical customers, reduce total restoration time and minimize the total amount of damage from a severe natural event. **This included recommendations for system hardening**, substation flood monitoring, **enhanced vegetation management**, emergency restoration, damage prediction modeling and additional in-depth studies. **The utility is currently developing work plans based on Exponent's recommendations**, climate risk analysis and ongoing IGP efforts.
>
> [. . .]

**The utility is using the Exponent** and Jupiter Intelligence **analyses to inform its IGP process and planning**.  The IGP process also includes a Resilience Working Group composed of stakeholders representing critical infrastructure providers, emergency management agencies, state and local government energy, planning, climate change and resilience officials, the hospitality and healthcare industries, the military, solar and other renewable energy providers and other stakeholders.

This statement misled investors to believe that Hawaiian Electric was adopting the recommendations of the consulting firm it hired, Exponent, including recommendations to "enhance[] vegetation management."  In fact, as shown in the Company's Wildfire Mitigation Plan, the Company had determined that "the type of vegetation in the Hawaii wildfire areas are primarily grasses, shrubs, and few trees, which rarely grow into conductors," so "it is not recommended that vegetation management plans be adjusted in the wildfire areas."  That is, contrary to its public statement, Hawaiian Electric made no effort to "enhance" or otherwise "adjust" its vegetation management in light of the consultant's recommendations.

99.    Similarly, the 2021 ESG Report stated, in relevant part:

Episodic drought, a warming climate and **the expansion of nonnative fire-prone grasses and shrubs** has led to an increase in wildfires in Hawai'i. 98% of wildfires in Hawai'i are human caused and the threat to communities is high year-round. **In addition to the utility's own wildfire mitigation plans, we have joined with community members and wildfire collaborators to help prevent and mitigate wildfires in known hot spots across our service areas**. As members of the Wai'anae Wildfire Hui in West O'ahu and Pacific Fire Exchange on Maui, we meet monthly to share ideas and discuss priority projects. **We support the Hawai'i Wildfire Management Organization** on Hawai'i Island, which works with communities across the state on wildfire planning, prevention and mitigation activities. By raising awareness, implementing key land management practices and collaborating on projects, these organizations are working to reduce the wildfire risk in Hawai'i and build strong, resilient communities.

100.    Yet the Hawaii Wildfire Management Organization recommended reduction of fuels, such as grasses and shrubs.  The group produced a report entitled, "Collaborative Landscape-Level Approach to Reduce Wildfire Hazard Across Hawaii:  2018-19 Vegetation Management— Rapid Mapping Assessment and Collaborative Action Planning—Maui Report."[45]  That report was

---

[45] Hawai'i Wildfire Management Organization, *A Collaborative, Landscape-Level Approach to Reduce Wildfire Hazard Across Hawai'i* (June 30, 2019), https://static1.squarespace.com/static/5254fbe2e4b04bbc53b57821/t/5dbf80628fc82a626b9dc2e2/1572831359536/Kaua%CA%BBi_compressed.pdf.

a product of the Collaborative Action Planning Workshop, in which private companies, nonprofit organizations, landowners, and various fire research organizations identified numerous maintenance actions needed to reduce the spread of wildfires. The recommendations included:

> Above ground power lines are vulnerable to wildfire and can even provide the ignition (sparks) that could start a wildfire, particularly in windy or stormy conditions. There are long-term solutions for reducing power line related wildfire hazards such as infrastructure upgrades. More **immediate solutions include fuels reduction and firebreaks around power infrastructure** in "hotspot" areas whichever the source of ignition.

101.    Indeed, the Resiliency Working Group for Integrated Grid Planning for Hawaiian Electric, described above, Hawaiian Electric recognized with community members that dry invasive grasses were a primary cause of wildfire risk on Maui. Its April 29, 2020 Report noted, at page 35:

> The frequency and impacts of wildfires have increased recently. This may be attributable in some parts of the islands to the decline of the sugarcane industry. Sugarcane enterprises historically managed wildfire risks on the islands, including responding to fires. However, today these areas present vast amounts of vegetation that can burn longer and with less ability and resources to control them.

The Report noted further: "Maui presents unique wildfire risks. Risk is highest along the saddle road due in part to existence of an invasive grass species prone to drying out."

102.    Yet contrary to its statements suggesting that its wildfire mitigation planning aligned with the recommendations and concerns of community organizations, Hawaiian Electric held as a matter of policy that the vegetation in wildfire areas required no special attention or additional mitigation efforts. As noted above, it stated that "the type of vegetation in the Hawaii wildfire areas are primarily grasses, shrubs, and few trees, which rarely grow into conductors," so "it is not recommended that vegetation management plans be adjusted in the wildfire areas."

103.    The Company also held a policy, stated in its Wildfire Mitigation Plan, that it would not deenergize power lines in the event of a red-flag event. The practice of deenergizing power lines during fire weather conditions is commonplace in the Western United States. California utilities, such as Southern California Edison Company, Pacific Gas & Electric, and San Diego Gas & Electric, all have implemented Public Safety Power Shutoffs ("PSPS") during Red Flag and

1  High Wind conditions.  These utilities have been using PSPS for years to prevent wildfires.  The

2  practice is broadly recommended, and would have been recommended by consultants and

3  community groups, including Hawai'i Wildfire Management Organization.

    **D.    HEI Misled Investors To Believe That It Prioritized Safety Over Customer Convenience, When In Fact, As an Objective Matter of Written Policy, It Prioritized Customer Convenience**

104.    Finally, during the Class Period, Defendants repeatedly misled investors to believe that the Company's policies prioritized safety over other considerations, such as customer convenience, when in fact, as a matter of written policy, Hawaiian Electric prioritized customer convenience.

105.    For example, on September 15, 2020, HEI released its first ESG report (the "2019 ESG Report").  The 2019 ESG Report stated, in relevant part:  "Safety is our number one priority at Hawaiian Electric."  Likewise, the 2020 10-K stated:  "Hawaiian Electric is committed to maintaining a strong safety culture.  Due to the nature of its operations, safety is of paramount importance."

106.    Yet as a matter of written policies, safety was not Hawaiian Electric's "number one priority."  The Company's Wildfire Mitigation Plan set forth its policy of not "preemptively turning off circuits," despite the fact that such deenergizing was the safest reasonable policy to prevent wildfires, because the policy "was not well received by certain customers affected."

107.    Also, according to the May 12, 2020 audit of Hawaiian Electric requested by Hawaii's PUC, the Company underspent its budgets for vegetation management and failed to complete its planned wildfire mitigation programs for years.  The audit stated:

    Vegetation Management has not been able to complete its planned mitigation programs over the last few years and has underspent its budgets.

108.    Importantly, the audit found that "its yearly spending [was] curtailed in order to counter overspends elsewhere to meet the overall budget in Energy Delivery."

VI.    **AUGUST 8, 2023 LAHAIANA WILDFIRE DISASTER**

109.    The heightened risk of catastrophic wildfires caused by uninsulated wires, outdated poles, and unmanaged vegetation—a heightened risk that Hawaiian Electric's misstatements and omissions had concealed by repeatedly assuring the public it had mitigated the risk—tragically materialized in part on August 8, 2023 in the Lahaina wildfire disaster.

110.    On August 3, 2023, the National Weather Service ("NWS") began warning of dangerous fire conditions in Hawaii due in part to the approach of Hurricane Dora.

111.    On August 7 and 8, 2023, High Wind and Red Flag warnings for portions of the Hawaiian Islands, including West Maui, were issued by the weather service and extensively reported across media outlets.[46]  Per NWS, a Red Flag Warning "means that critical fire weather conditions are either occurring now or will shortly.  A combination of strong winds, low relative humidity, and warm temperatures can contribute to extreme fire behavior."

112.    On Monday, August 7, 2023, NWS issued an updated warning for the Hawaiian Islands, as reported in The Maui News.  This warning contained both a High Wind Watch and a Fire Warning for the leeward portions of the State, which included Lahaina.  The warning cautioned that damaging winds could blow down power lines and that any fires that developed would likely spread rapidly.[47]

113.    On August 8, 2023, as predicted by numerous forecast warnings, power lines fell near one of the flammable fields above Lahaina's historic downtown, whipping fire down the hills, in a sequence of events that would lead to one of the deadliest wildfires in U.S. history (the "August 8, 2023 Wildfire").[48]

---

[46] Michael Biesecker, Bernard Condon, & Jennifer McDermott, *Videos put scrutiny on downed power lines as possible cause of deadly Maui wildfires*, Associated Press (Aug. 16, 2023, 8:44 AM), https://apnews.com/article/hawaii-wildfires-maui-electricity-power-utilities-c46a106db3c5019ac835ddcb01fde25f.

[47] *National Weather Service issues high wind watch, fire warning in effect through late Tuesday*, Maui News (Aug. 7, 2023), https://www.mauinews.com/news/local-news/2023/08/national-weather-service-issues-high-wind-watch-fire-warning-in-effect-through-late-tuesday/.

[48] Imogen Piper, *et al.*, *Maui's Neglected Grasslands Caused Lahaina Fire to Grow With Deadly Speed*, Wash. Post (Sept. 2, 2023),

114.    The initial fire was reported around 6:37 a.m. on August 8, 2023 near Lahainaluna Road, more than a mile above Lahaina's central business district.  Authorities ordered evacuations minutes later, at 6:40 a.m., in the area surrounding Lahaina Intermediate School and closed Lahainaluna Road between Kelawea Street and Kuialua Street.[49]

115.    At 6:37 a.m., local resident Shane Treu took a video of the brush fire, which was near his home on Lahainaluna road in Lahaina, not far from a Maui Electric substation.  Video images show that flames broke out in the vicinity of a broken power line operated by Hawaiian Electric.

116.    Treu says he saw a wooden power pole snap with a spark, with the line falling to the dry grass below and quickly igniting a row of flames.

117.    The fire was already sweeping through dry grass, as firefighters arrived on the scene, and had grown serious enough that some residents were evacuated through thick smoke.[50] Power outages negatively impacted the ability of fire crews to pump water, so authorities asked the public to conserve water in West Maui.  The authorities kept Lahainaluna Road closed between Kelawea and Kuialua Streets, while Hawaiian Electric responded to a downed power line in the area.[51]

118.    Despite initial efforts to put the fire out, residents said that the fire reemerged along the edge of the neighborhood and began rapidly churning down the hillside.  Although fire crews

https://www.washingtonpost.com/investigations/interactive/2023/lahaina-wildfires-invasive-grass-destruction/.

[49] *Fire crews battling brush fire in Lahaina; residents in area evacuated*, Maui Now, (Aug 8, 2023, 8:13 AM), https://mauinow.com/2023/08/08/haleakala-highway-closure-due-to-brush-fire-evacuation-of-kula-200-off-auli%CA%BBi-dr/;
Serge F. Kovaleski & Mike Baker, *Lahaina Inferno Began After Firefighters Departed a 'Contained' Scene*, N.Y. Times (Aug. 23, 2023), https://www.nytimes.com/2023/08/23/us/hawaii-maui-lahaina-fire-contained.html.

[50] Michael Biesecker, Bernard Condon, & Jennifer McDermott, *Videos put scrutiny on downed power lines as possible cause of deadly Maui wildfires*, Associated Press (Aug. 16, 2023, 8:44 AM), https://apnews.com/article/hawaii-wildfires-maui-electricity-power-utilities-c46a106db3c5019ac835ddcb01fde25f.

[51] *Lahaina fire declared 100% contained; water conversation urged due to power outages*, Maui Now (Aug. 8, 2023, 9:55 AM), https://mauinow.com/2023/08/08/haleakala-highway-closure-due-to-brush-fire-evacuation-of-kula-200-off-auli%CA%BBi-dr/.

1  raced back to the scene, the flames were well beyond containment with winds pushing the fire

2  toward the dense residential neighborhoods below.[52]

3      119.    Treu's neighbor, Robert Arconado, also took videos.  His footage starts at 6:48 a.m.

4  He has confirmed that around 2:00 p.m. the same area had reignited.  A video he filmed at

5  3:06 p.m. shows smoke and embers being carried toward town as howling winds continued to lash

6  the island.  Arconado continued to film for hours, as towering pillars of flame and smoke billowed

7  from the neighborhoods downhill, forcing people to jump into the ocean to escape.

8      120.    Hawaiian Electric admitted in a press release on August 27, 2023 that sparks on dry

9  grasses from downed power lines appears to have been the cause of the fire that morning.[53]  The

10  Company stated, "A fire at 6:30 a.m. . . . appears to have been caused by power lines that fell in

11  high winds."  As noted above, the same fire reemerged later in the day and caused the wildfire

12  disaster.

13      121.    While Hawaiian Electric initially claimed that power to Lahaina was deenergized

14  shortly before 7:00 a.m. on August 8, 2023, after the first fire, and was never reenergized, a former

15  employee ("FE4") has stated that a troubleman who was on duty during the Lahaina fire told FE4

16  that one of the three transmission lines was still energized after 7:00 a.m. on August 8, 2023.  FE4

17  was a Troubleshooter/Troubleman for Hawaiian Electric from August 2017 to August 2021, a

18  Trouble Dispatcher from August 2021 to May 2022, and a System Operator Shift Supervisor from

19  May 2022 to May 2023.  FE4 also confirmed that "it was the same brush fire from the morning of

20  August 8, 2023 that reignited later in the day, shortly after the firefighters left the area."

21

22

23

24  [52] Serge F. Kovaleski & Mike Baker, *Lahaina Inferno Began After Firefighters Departed a*
25  *'Contained' Scene*, N.Y. Times (Aug. 23, 2023),
   https://www.nytimes.com/2023/08/23/us/hawaii-maui-lahaina-fire-contained.html.

26  [53] HECO, *Hawaiian Electric provides update on Lahaina fires, response* (Aug. 27. 2023),
27  https://www.hawaiianelectric.com/documents/about_us/news/2023/20230827_lahaina_fires_upd
   ate.pdf.

28

122.   The Google Earth map image below depicts the location where the August 8, 2023 Wildfire reportedly started.  One of the Hawaiian Electric power substations is located near where both the initial three-acre fire started and where authorities reported a downed power line early on August 8, 2023.



123.   The image below is an aerial view of the area:



36
AMENDED COMPLAINT

124.    *Hawaii News Now* reported that "[m]ore than 30 downed power poles" were "reported on Maui" on August 8, 2023.[54]

125.    *Maui Now* reported that Hawaiian Electric was working to restore power to 12,400 customers and reminded residents that they should assume a downed power line "is energized and dangerous."  The same article included depictions of downed, leaning, and/or damaged power poles, many touching vegetation below them.[55]

126.    The August 8, 2023 Wildfire resulted in the destruction of the historic town of Lahaina.  The wildfire killed at least 101 people.

## VII.    LOSS CAUSATION

127.    In news of the August 8, 2023 Lahaina wildfire, and in news emerging in the following days, weeks and months, on August 9, 12, 15-22, 25, and September 5, 2023 revealing the full scope of its consequences, the heightened risk of wildfire, and its attendant liabilities, that Hawaiian Electric had concealed from investors, materialized, and the truths about Hawaiian Electric's operations that it had obscured were revealed.

### A.    August 8-9, 2023.

128.    On August 8 and 9, 2023, numerous news sources reported the devastating Lahaina wildfire and related wildfires.  For example, local news source KITV4 Island quoted Hawaiian Electric as a source that "[a]pproximately 12,400 Hawaiian Electric customers in West Maui are without power as crews work to repair about 30 downed power poles and multiple spans of power lines in various areas[.]"  The report also included a link to Hawaiian Electric's outage map for the county and a Hawaiian Electric tweet showing a photo of a destroyed electric pole, warning that customers may experience "possible overnight outages."

---

[54] Kiana Kalahele, *More than 30 downed power poles reported on Maui; thousands without power*, Hawaii News Now (Aug. 8, 2023, 10:32 PM), https://www.hawaiinewsnow.com/2023/08/08/strong-winds-knock-out-power-thousands-statewide/.

[55] *High winds result in power outages to thousands in West Maui, Olinda Piʻiholo*, Maui Now, (Aug. 10, 2023), https://mauinow.com/2023/08/08/high-winds-result-in-power-outages-in-west-maui-olinda-pi%CA%BBiholo-and-moloka%CA%BBi/.

129.   On the same day, in a statement quoted by local news source Maui Now, Hawaiian Electric spokesperson Shayna Decker stated the Company was "responding to Maui communities affected by the outages, active wildfires, and sustained high wind damage . . . .  We continue to actively monitor the fluid wildfire situation and will move our restoration efforts to other areas if and as they become safe and accessible.  We appreciate the continued understanding and ask customers to please prepare for possible extended outages as we conduct damage assessments and make extensive repairs."  On August 9, 2023, local news source KRON4 quoted Hawaiian State Senator Lynn Decoite as saying "[d]ue to some areas that electric is down, there is a hard time getting connections with [Maui Emergency Management Authority] would [sic] have emergency center set up."  The State Senator's quote for the first time indicated the materialization of the risk that Hawaiian Electric's unprepared infrastructure would hamper emergency response efforts, which could contribute to additional liability.

130.   The August 8, 2023 Wildfire was a materialization of the heightened risk of wildfires caused by uninsulated wires, outdated poles, and unmanaged vegetation, a heightened risk that Hawaiian Electric's misstatements and omissions had concealed.

131.   On this news and related news stories, HEI's stock price fell $1.78 per share, or 4.76%, to close at $35.58 per share on August 8, 2023, and $2.61 per share, or 7.38%, to close at $32.77 per share on August 10, 2023.

**B.   August 12, 2023.**

132.   On August 12, 2023, news outlets began reporting that Hawaiian Electric's wildfire mitigation had been inadequate.  For example, the *Washington Post* stated, in relevant part:

> Four days before fast-moving brush fires engulfed parts of Maui, weather forecasters warned authorities that powerful wind gusts would trigger dangerous fire conditions across much of the island and Hawaii.
>
> The state's electric utility responded with some preemptive steps but did not use what is widely regarded as the most aggressive but effective safety measure: shutting down the power.
>
> Hawaiian Electric, the utility that oversees Maui Electric and provides service to 95 percent of the state's residents, did not deploy what's known as a "public power shutoff plan," which involves intentionally cutting off electricity to areas where big

38

AMENDED COMPLAINT

wind events could spark fires. A number of states, including California, have increasingly adopted this safety strategy after what were then the nation's most destructive and deadliest modern fires, in 2017 and 2018.

Hawaiian Electric was aware that a power shut-off was an effective strategy, documents show, but had not adopted it as part of its fire mitigation plans, according to the company and two former power and energy officials interviewed by The Washington Post. Nor, in the face of predicted dangerous winds, did it act on its own, utility officials said, fearing uncertain consequences.

The decision to avoid shutting off power is reflective of the utility's struggles to bolster its aging and vulnerable infrastructure against wildfires, said Jennifer Potter, who lives in Lahaina and was a member of the Hawaii Public Utilities Commission until just nine months ago.

"They were not as proactive as they should have been," Potter said about Hawaiian Electric's fire-prevention planning, adding that there had not been any real meaningful action to "address some of those inadequacies in terms of wildfire."

Doug McLeod, a former energy commissioner for Maui County, also said the utility was aware of the need for a regular shut-down system and to bury lines, especially given the "number of close calls in the past."

Earlier this week, high winds caused widespread damage to utility infrastructure. The intense gusts knocked down about 30 utility poles across the region, many onto trees and roads, complicating evacuations, according to Maui County Mayor Richard Bissen. He confirmed that some electrical lines were energized when they hit the ground.

133.    This news was a partial revelation that Hawaiian Electric's statements about its wildfire mitigation efforts were false and misleading.  The news was also a materialization of a risk of liability attendant to the heightened risk of wildfires caused by uninsulated wires, outdated poles, and unmanaged vegetation, a heightened risk that Hawaiian Electric's misstatements and omissions had concealed.

134.    On this news, HEI's stock price fell $10.94 per share, or 33.76%, to close at $21.46 per share on August 14, 2023.

**C.    August 15, 2023.**

135.    On August 15, 2023, the ratings agency S&P Global downgraded HEI to a rating of BB0, stating that the risk of legal and regulatory risks jeopardize the Company's credit rating.

136.    This downgrade was a materialization of a risk attendant to the heightened risk of wildfires caused by uninsulated wires, outdated poles, and unmanaged vegetation, a heightened

risk that Hawaiian Electric's misstatements and omissions had concealed.  The downgrade was a materialization of a concealed heightened risk that the Company would have credit problems.

137.    On this news, HEI's stock price fell $6.67 per share, or 31.08%, to close at $14.79 per share on August 15, 2023.

**D.    August 16, 2023.**

138.    Then, on August 16, 2023, the *WSJ* published an article entitled "Hawaiian Electric Is in Talks With Restructuring Firms."  The article stated, in relevant part:

> Hawaiian Electric is speaking with firms that specialize in restructuring advisory work, exploring options to address the electric utility's financial and legal challenges arising from the Maui wildfires, said people familiar with the matter.
>
> Hawaiian Electric is facing a selloff in its stock and bonds, and has been hit with lawsuits alleging that its actions both before and during the wildfires exacerbated the devastation Maui residents have suffered.
>
> The company is in discussions over the strategies it can pursue and to determine whether it needs to hire legal and financial advisers, the people said.
>
> On Thursday evening, a day after the publication of this report, a company spokesperson said: "Like any company in this situation would do, and as we do in the normal course of business, we are seeking advice from experts—the goal is not to restructure the company but to endure as a financially strong utility that Maui and this state need."
>
> More customer lawsuits are expected in coming weeks to increase the costs of defending and settling claims for Hawaiian Electric just as its access to financing is being threatened.
>
> S&P Global Ratings downgraded Hawaiian Electric's credit rating to junk on Tuesday, saying the wildfires destroyed a significant segment of the company's customer base and will take many years to restore. S&P also said that wildfire lawsuits seeking compensation for injuries, deaths and property damage will weigh on the company's credit quality.

139.    This news of restructuring efforts was a materialization of a risk attendant to the heightened risk of wildfires caused by uninsulated wires, outdated poles, and unmanaged vegetation, a heightened risk that Hawaiian Electric's misstatements and omissions had concealed. The news was a materialization of a concealed heightened risk that the Company would have legal and financial problems.

E.    **August 17, 2023.**

140.    On August 17, 2023, the *WSJ* published an article entitled "Hawaiian Electric Knew of Wildfire Threat, but Waited Years to Act."  The article stated, in relevant part:

> During the 2019 wildfire season, one of the worst Maui had ever seen, Hawaiian Electric concluded that it needed to do far more to prevent its power lines from emitting sparks.
>
> The utility examined California's plans to reduce fires ignited by power lines, started flying drones over its territory and vowed to take steps to protect its equipment and its customers from the threat of fire.
>
> Nearly four years later, the company has completed little such work. Between 2019 and 2022, it invested less than $245,000 on wildfire-specific projects on the island, regulatory filings show. It didn't seek state approval to raise rates to pay for broad wildfire-safety improvements until 2022, and has yet to receive it.
>
> Now, the company is facing scrutiny, litigation and a financial crisis over indications that its power lines might have played a role in igniting the deadliest U.S. wildfire in more than a century. The blaze has caused at least 110 deaths, destroyed the historic town of Lahaina and resulted in an estimated billions of dollars in damage.
>
> The fire's cause hasn't been determined, but mounting evidence suggests the utility's equipment was involved. One video taken by a resident shows a downed power line igniting dry grass along a road near Lahaina. A firm that monitors grid sensors reported dozens of electrical disruptions in the hours before the fire began, including one that coincided in time with video footage of a flash of light from power lines.
>
> Hawaiian Electric said it would investigate any role its infrastructure may have played and cooperate with a separate probe into the fire launched last week by the Hawaii attorney general.
>
> "We all believe it's important to understand what happened. And I think we all believe it's important to make sure it doesn't happen again," said Shelee Kimura, Hawaiian Electric's chief executive.
>
> In response to questions about its wildfire-mitigation spending, a spokesman for Hawaiian Electric said the company reduces wildfire risk through its routine utility work, including trimming or removing trees and upgrading, replacing and inspecting equipment. It said it has spent about $84 million on maintenance and tree work in Maui County since 2018.
>
> The utility has long been a force in Hawaii politics and business. In the wake of the fire, its finances are reeling. Its stock has plunged 49% this week, and its credit rating was downgraded to junk by S&P.
>
> \* \* \*
>
> At the end of 2019, Hawaiian Electric issued a press release about wildfire risk.  It said it would install heavier, insulated conductors on Maui and Oahu to minimize

41
AMENDED COMPLAINT

the risk of sparks when winds picked up, as well as technology to detect disruptions when the conductors came into contact with vegetation or each other. It said it would apply fire retardant on poles in risky areas and consider installing cameras and other devices to monitor weather conditions during fire season.

In filings over the next two years with the Hawaii Public Utilities Commission, which is tasked with approving utility projects and spending, the company made only passing reference to wildfire mitigation.

141.    This news was a partial revelation that Hawaiian Electric's statements about its wildfire mitigation efforts were false and misleading. The news was also a materialization of a risk of liability attendant to the heightened risk of wildfires caused by uninsulated wires, outdated poles, and unmanaged vegetation, a heightened risk that Hawaiian Electric's misstatements and omissions had concealed.

142.    Following publication of the *WSJ* articles, HEI's stock price fell $2.54 per share, or 17.43%, to close at $12.03 per share on August 17, 2023.

**F.    August 19, 2023 to August 21, 2023.**

143.    On Saturday, August 19, 2023, the *New York Times* issued a report with the headline "Hawaiian Electric Was Warned of Its System's Fragility Before Wildfire." The report stated, in relevant part:

Hawaiian Electric has known for years that extreme weather was becoming a bigger danger, but the company did little to strengthen its equipment and failed to adopt emergency plans used elsewhere, like being prepared to cut off power to prevent fires.

Before the wildfire on Maui erupted on Aug. 8, killing more than 100 people, many parts of Hawaiian Electric's operations were showing signs of stress — and state lawmakers, consumer groups and county officials were saying that the company needed to make big changes.

In 2019, Hawaiian Electric itself started citing the risk of fires. The company said that year that it was studying how utilities in California were dealing with similar threats.

Two years later, in a report about Hurricane Lane in 2018, the Maui County government warned of the potential that "aboveground power lines that fail, short or are low-hanging can cause fire ignition (sparks) that could start a wildfire, particularly in windy or stormy conditions."

But it wasn't until last year that the company asked state regulators to authorize it to spend $190 million to strengthen power poles and other equipment — a request that is still pending. Even when it is approved, the work will take several years to complete.

Attention turned to the company after the emergence of a video recorded on Aug. 8 that appeared to show a power line in Lahaina throwing off sparks and igniting dry grass just hours before the fire devastated the city. In addition, data from sensors owned by a company called Whisker Labs appear to show major faults with the company's systems just as the wind picked up.

[. . . .]

Electric utilities in California have had to pay billions of dollars to fire victims in recent years. Hawaiian Electric might have to make big payouts, too. At least four lawsuits have been filed on behalf of Maui residents, and the company's shares and bond prices have plunged.

[ . . . . ]

[Michael Wara, a scholar focused on climate and energy policy at Stanford University] said that Hawaiian Electric could have established a power shut-off program in consultation with local authorities and emergency services. In California, after warning residents and local officials, utilities shut off power when high winds approach to reduce the chance that power lines will ignite fires.

Henry Curtis, executive director of Life of the Land, a Hawaii nonprofit group that represents consumers before the state Public Utilities Commission, said he "strongly supports" power shut-off programs. The utility, he said, has been dismissive of the idea.

"We've been raising climate change for more than two decades, and the utility has been really slow in dealing with it," Mr. Curtis said. "Certainly Hawaiian Electric knew that Lahaina was the most vulnerable place.  They've known that for years."

144.    On Monday, August 21, 2023, Bank of America Global Research cut its price target on HEI from $10 to $8.50.  Bank of America Global Research noted that if utility was found liable for the wildfires, which they calculated could cost $5.4 billion, "we don't believe there would be any equity value" for shareholders.

145.    This news was a partial revelation that Hawaiian Electric's statements about its wildfire mitigation efforts were false and misleading.  The news was also a materialization of a risk of liability attendant to the heightened risk of wildfires caused by uninsulated wires, outdated poles, and unmanaged vegetation, a heightened risk that Hawaiian Electric's misstatements and omissions had concealed.

146.    Following the *New York Times* report and analyst report from Bank of America, on August 21, 2023, HEI's stock price fell $ 0.73 per share, or 5.30%, to close at $13.04 per share.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**G.    August 22-23, 2023.**

147.    On August 22, 2023, after trading, Hawaiian Electric announced that it was seeking advisory input from Guggenheim Securities, a company with experience in bankruptcy and restructuring.

148.    This further news of restructuring efforts was a materialization of a risk attendant to the heightened risk of wildfires caused by uninsulated wires, outdated poles, and unmanaged vegetation, a heightened risk that Hawaiian Electric's misstatements and omissions had concealed. The news was a materialization of a concealed heightened risk that the Company would face financial problems including possible restructuring and bankruptcy.

149.    On this news, on August 23, 2023, HEI's stock price fell $1.26 per share, or 9.42%, to close at $12.11 per share.

**H.    August 25, 2023.**

150.    On August 25, 2023, the *Washington Post* published an article titled "Hawaiian Electric may collapse after fires, forcing reckoning for utilities."  The *Washington Post* wrote, in relevant part:

> The multibillion-dollar liabilities faced by Hawaiian Electric for the deadly wildfire in Maui—compounded by Maui County's lawsuit against the utility on Thursday— are reverberating through the electricity industry and are forcing a reckoning for power companies and their customers, nationwide.
>
> Hawaiian Electric, which serves nearly all of Hawaii's 1.4 million residents, is careening toward insolvency, much like Pacific Gas & Electric did in California in 2019. Investors in the company are scrambling to sell their shares, and bond rating agencies are downgrading the Hawaii utility's ratings because of its role in potentially causing or contributing to the most deadly U.S. wildfire in a century.
>
> [. . . .]
>
> In Hawaiian Electric's case, it did not power down its lines in advance of expected hurricane-force winds, a major focus of lawsuits filed against it by Maui County and other litigants.
>
> [. . . .]
>
> Hawaiian Electric is hardly an outlier in the power industry. Companies routinely put off acting on warnings of wildfire risk made by their own safety teams and government agencies. Like other companies, Hawaiian Electric did not follow through on recommendations to better fireproof systems. Nor did it follow the lead of California utilities implicated in tragic wildfires that have since installed

44
AMENDED COMPLAINT

technologies to stop the flow of electricity when extreme winds approach power lines vulnerable to ignition.

[. . . .]

The entire budget for "hardening" the grid against wildfires in Maui was $15 million.

"Even if this utility had done all that it proposed to do, Lahaina still would have burned down," said Michael Wara, an energy scholar at Stanford University's Woods Institute for the Environment. "The thing that would have kept people alive is a power shut-off program. The only costs involved are weather stations and paying people to interpret the data to determine when things should be shut off."

[. . . .]

The problem, he said, is regulators and company executives in too many parts of the country are still gambling that fires won't come their way. In Maui, a place more frequently associated with hurricanes and cyclones, wildfire protection appeared to rank low on the utility's priority list.

"It is pretty clear just looking at the public record that the utility had identified wildfire as one of the risks they needed to manage," said Doug McLeod, the former energy commissioner in Maui. "There was some amount of argument being made that the risk was lower in Hawaii because we had no lightning. In hindsight, it is clear the risk was quite high."

151.     This news provided new information that Hawaiian Electric's decision not to de-energize the power lines would be a significant source of liability, that Hawaiian Electric was out-of-step with other energy companies in preventing wildfires, and that Hawaiian Electric was headed towards insolvency.

152.     This news was a partial revelation that Hawaiian Electric's statements about its wildfire mitigation efforts were false and misleading.  The news was also a materialization of a risk of liability attendant to the heightened risk of wildfires caused by uninsulated wires, outdated poles, and unmanaged vegetation, a heightened risk that Hawaiian Electric's misstatements and omissions had concealed.

153.     On this news, on August 25, 2023, HEI's stock price fell $2.20 per share, or 18.55%, to close at $9.66 per share.

**I.     September 5, 2023.**

154.     On September 5, 2023, the Hawaiian Public Utilities Commission ordered a moratorium on service disconnections by Hawaiian Electric through October 17, recognizing the

financial hardship caused by the wildfires.  This news showed that Hawaiian Electric's unprepared infrastructure and policies would so damage its own customer base that it would be limited in its ability to pursue collections, at a time when credit was tightening, the costs of repairs were high, and it was facing multibillion-dollar lawsuits.

155.    The news was a materialization of a risk of liability attendant to the heightened risk of wildfires caused by uninsulated wires, outdated poles, and unmanaged vegetation, a heightened risk that Hawaiian Electric's misstatements and omissions had concealed.

156.    On this news, on September 5, 2023, HEI's stock price fell $2.63 per share, or 17.48%, to close at $12.42 per share.

157.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## VIII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

### A.    Defendants' False and Misleading Statements in 2019

158.    The Class Period begins on February 28, 2019, when HEI filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2018 (the "2018 10-K").  In discussing the Company's compliance with environmental regulations, the 2018 10-K stated, in relevant part:

> Hawaiian Electric, Hawaii Electric Light and Maui Electric [the "Utilities"], like other utilities, are subject to periodic inspections by federal, state and, in some cases, local environmental regulatory agencies, including agencies responsible for the regulation of water quality, air quality, hazardous and other waste and hazardous materials. These inspections may result in the identification of items needing corrective or other action. Except as otherwise disclosed in this report [. . .], **_the Company believes that each subsidiary has appropriately responded to environmental conditions requiring action and that, as a result of such actions, such environmental conditions will not have a material adverse effect on the Company or Hawaiian Electric_**.

159.    The statements in ¶ 158 were materially false and misleading because the Company knew of environmental conditions, including dry vegetation, outdated poles, and conductor wires

in need of replacement, that required action and that could have a material adverse effect on the Company.

160.    On November 5, 2019, Hawaiian Electric issued a press release in which it stated that it was conducting "drone surveys across their five-island territory to identify areas vulnerable to wildfire," and explained that "[t]hese aerial inspections are part of the companies' **proactive assessment and management of vegetation** near their electrical infrastructure, especially **in** drought-prone or **dry brush areas**." The press release also stated:

> Hawaiian Electric, Maui Electric and Hawai'i Electric Light earlier this year evaluated the wildfire mitigation plans filed by the major utilities in California and studied Hawai'i fire ignition maps to determine where the greatest risks are and to provide a basis for planning. Unlike California, many utility lines in Hawai'i run through tropical forests and areas that typically receive abundant rainfall. That makes it easier to **concentrate on mapping drought-prone areas where sparks could ignite dry grass and brush beneath power lines**.

161.    The statements in ¶ 160 were materially false and misleading because the Company's actual policy, as stated in its Wildfire Mitigation Plan, was against "proactive . . . management" of vegetation in dry grass and brush areas, as it recommended against trimming of low-lying vegetation and creating fire breaks due to their purported cost inefficiency.

162.    On November 6, 2019, Hawaiian Electric posted a video on YouTube titled "Committed to Wildfire Mitigation." In discussing the Company's mitigation and resilience initiatives, the video stated, in relevant part:

> The Hawaiian Electric Companies use drone, or unmanned aircraft system, surveys to **assess drought-prone or dry brush areas especially near electrical infrastructure**. **Other resilience initiatives such as installing heavier, insulated conductors and applying fire retardants on poles are also done as part of our proactive plan to reduce risks of wildfires.**[56]

163.    The statements in ¶ 162 were materially false and misleading because: (1) the statement gave the misleading impression that the Company was "assess[ing] drought-prone or dry brush areas especially near electrical infrastructure" in order to do something proactively to

---

[56] Hawaiian Electric, *Committed to Wildfire Mitigation*, YouTube (Nov. 6, 2019), https://www.youtube.com/watch?v=I-f8ro9Lumk.

reduce the dry brush those areas, when in fact, the Company's actual policy, as stated in its Wildfire Mitigation Plan, was against "proactive" management of vegetation in dry grass and brush areas, as it recommended against trimming of low-lying vegetation and creating fire breaks due to their purported cost inefficiency; (2) the Company told at best a half-truth in stating that "installing heavier, insulated conductors . . . [is] done as part of our proactive plan to reduce risks of wildfires," because in fact, the Company's wildfire mitigation program declined to take recommended mitigation steps to address conductor wires.

164.    On December 19, 2019, Hawaiian Electric issued a press release titled "Jan. 2 – Feb. 10: Maui Electric upgrading poles, insulated power lines along Lahainaluna Road."  In discussing the Company's efforts in maintaining its utility poles along Lahainaluna Road in West Maui, the press release stated, in relevant part:

> **Maui Electric Company will be upgrading utility poles and installing insulated power lines along Lahainaluna Road in West Maui** from Thursday, Jan. 2 to Monday, Feb. 10, from 8:30 a.m. to 2 p.m.  The work is part of continued efforts to make the island's electrical grid more resilient while also enabling more private residential rooftop solar to be installed on the island.[57]

165.    The statements in ¶ 164 were materially false and misleading because:  (1) the Company did not "upgrad[e] utility poles and install[] insulated power lines along Lahainaluna Road in West Maui," because the power line along Lahainaluna Road in West Maui where the August 8, 20203 Lahaina wildfire disaster started were not upgraded or insulated.

**B.    Defendants' False and Misleading Statements in 2020**

166.    On February 28, 2020, HEI filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2019 (the "2019 10-K").  In discussing the Company's compliance with environmental regulations, the 2019 10-K stated, in relevant part:

---

[57] Hawaiian Electric, *Jan. 2 – Feb. 10: Maui Electric upgrading poles, insulated power lines along Lahainaluna Road*, Press Release (Dec. 19, 2019), https://www.hawaiianelectric.com/documents/about_us/news/2019_maui_electric/20191219_maui_electric_maui_electric_installs_new_insulated_lines_along_lahainaluna.pdf.

1
2
3
4
5

Hawaiian Electric, Hawaii Electric Light and Maui Electric, like other utilities, are subject to periodic inspections by federal, state and, in some cases, local environmental regulatory agencies, including agencies responsible for the regulation of water quality, air quality, hazardous and other waste and hazardous materials. These inspections may result in the identification of items needing corrective or other action. Except as otherwise disclosed in this report (see "Risk Factors" in Item 1A, and Notes 1 and 3 of the Consolidated Financial Statements, which are incorporated herein by reference), *the Utilities believe that each subsidiary has appropriately responded to environmental conditions*.

6
7
8

167.    The statements in ¶ 166 were materially false and misleading because the Company knew that it had not responded appropriately to environmental conditions needing action, including dry vegetation, outdated poles, and conductor wires in need of replacement.

9
10
11

168.    On February 28, 2020, HEI filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2019 (the "2019 10-K").  In discussing the Company's environmental, social and governance ("ESG") risks and opportunities, the 2019 10-K stated, in relevant part:

12
13
14

The [Hawaiian Electric] Board of Directors is responsible for the oversight of **the Company's enterprise risk management (ERM) programs, which are designed to address all material risks** and opportunities, **including ESG considerations**.

15
16
17
18
19
20

169.    The statements in ¶ 168 were materially false and misleading because the Company knew that its wildfire mitigation program did not adequately address all material risks for wildfires—the Company's program declined to take recommended mitigation steps to address dry vegetation, outdated poles, conductor wires, and deenergizing power lines during red-flag events. Accordingly, the Company's risk management programs were not "designed to address all material risks."

21
22
23

170.    On June 1, 2020, Hawaiian Electric posted a video on YouTube titled "Critical Resilience Work Resumes."  In discussing the Company's mitigation and resilience initiatives, the video stated, in relevant part:

24
25
26
27

**We have an ongoing maintenance program that, um, where we identify poles that need attention and that could be upgrades or replacement.  And that's something that our crews, I would say that's 90% of our work.  And we'll go, we'll, we'll identify the poles that need, um, attention and we'll schedule our crews to either upgrade them, change out equipment, cross arms, um, rusted boats or, um, damage insulators.  But majority of, of our jobs is we replace,**

28

**suppose entirely. It happens year round, but we step it up during, you know, the months between June and November, I mean, in preparation for upcoming storms, if they should arise.** Covid is interesting. It's been a challenge for us, but the crew's been very flexible. They understand that we are essential workers and we need to be here. So we just, everybody's been doing their part to, um, to get through this.[58]

171. The statements in ¶ 170 were materially false and misleading because: (1) the Company did not have an effective "ongoing maintenance program . . . where [it] identif[ied] poles that need attention and that could be upgrades or replacement" and then routinely replaced them, as it was in fact far behind schedule at all relevant times in upgrading and replacing poles, conductor wire, and maintaining vegetation in a safe state.

172. On September 15, 2020, HEI released its first ESG report (the "2019 ESG Report"). The 2019 ESG Report stated, in relevant part:

**Safety is our number one priority at Hawaiian Electric**. Our goal is to provide a safe and healthy work environment, where every employee makes safety a central part of his or her job.

Our safety commitment is to provide and support:

- Managerial responsibility for health and safety issues

- Procedures for hazard identification and safety risk assessment

- Operating health and safety guidelines, procedures, and policies

- *Emergency planning and preparedness procedures*

- Safety performance monitoring, measurement, and reporting

- Internal and external health and safety audits

173. The statements in ¶ 172 were materially false and misleading because, as a matter of written policies, safety was not always Hawaiian Electric's "number one priority." The Company's Wildfire Mitigation Plan set forth its policy of not "preemptively turning off circuits," despite the fact that such deenergizing was the safest reasonable policy to prevent wildfires, because the policy "was not well received by certain customers affected." Also, the Company

---

[58] Hawaiian Electric, *Critical Resilience Work Resumes*, YouTube (June 1, 2020), https://www.youtube.com/watch?v=2tOOlAlS3xc.

underspent its budgets for vegetation management and failed to complete its planned wildfire

mitigation programs for years because "its yearly spending [was] curtailed in order to counter

overspends elsewhere to meet the overall budget in Energy Delivery," according to a PUC audit.

### C.    Defendants' False and Misleading Statements in 2021

174.    On February 26, 2021, HEI filed an Annual Report on Form 10-K with the SEC,

reporting the Company's financial and operating results for the year ended December 31, 2020

(the "2020 10-K"). In discussing the Company's compliance with environmental regulations, the

2020 10-K stated, in relevant part:

> Hawaiian Electric, Hawaii Electric Light and Maui Electric, like other utilities, are
> subject to periodic inspections by federal, state and, in some cases, local
> environmental regulatory agencies, including agencies responsible for the
> regulation of water quality, air quality, hazardous and other waste and hazardous
> materials. These inspections may result in the identification of items needing
> corrective or other action. Except as otherwise disclosed in this report (see "Risk
> Factors" in Item 1A, and Notes 1 and 3 of the Consolidated Financial Statements),
> *the Utilities believe that each subsidiary has appropriately responded to
> environmental conditions requiring action and that, as a result of such actions,
> such environmental conditions will not have a material adverse effect on the
> capital expenditures, earnings and competitive position of the Utilities*.

175.    The statements in ¶ 174 were materially false and misleading because the Company

knew of environmental conditions, including dry vegetation, outdated poles, conductor wires in

need of replacement, that required action and that could have a material adverse effect on the

Company.

176.    The 2020 10-K also stated:

> Hawaiian Electric is committed to maintaining a strong safety culture. Due to the
> nature of its operations, safety is of paramount importance.

177.    The statements in ¶ 176 were materially false and misleading because, as a matter

of written policies, safety was not always "of paramount importance" to Hawaiian Electric. The

Company's Wildfire Mitigation Plan set forth its policy of not "preemptively turning off circuits,"

despite the fact that such deenergizing was the safest reasonable policy to prevent wildfires,

because the policy "was not well received by certain customers affected." Also, the Company

underspent its budgets for vegetation management and failed to complete its planned wildfire

mitigation programs for years because "its yearly spending [was] curtailed in order to counter overspends elsewhere to meet the overall budget in Energy Delivery," according to a PUC audit.

178.    On April 22, 2021, HEI issued a consolidated ESG report (the "2020 ESG Report"). The 2020 ESG Report stated in relevant part:

> We continually maintain and upgrade our transmission and distribution system to ensure seamless delivery of power to our customers.  Day-to-day maintenance is a key part of keeping the grid resilient.  We regularly inspect our poles, lines, and other equipment, and work to replace and upgrade aging and faulty equipment before failures happen.  We regularly trim the vegetation around our equipment, as many power outages during high winds and storms are due to tree branches or other vegetation falling onto power lines.

179.    The statements in ¶ 178 were materially false and misleading because:  (1) the Company did not "continually maintain and upgrade [its] transmission and distribution system" as it was in fact far behind schedule at all relevant times in upgrading and replacing poles, conductor wire, and maintaining vegetation in a safe state; (2) the Company told at best only a half-truth in stating that it "regularly inspect[s its] poles, lines and other equipment" and that it "work[s] to replace and upgrade aging and faulty equipment before failures happen" because in fact the Company was far behind schedule at all relevant times in upgrading and replacing poles and conductor wire; (3) the Company told at best only a half-truth in stating that it "regularly trim[s] the vegetation around [its] equipment," because in fact the Company did not maintain vegetation around its equipment in a safe state.

180.    The 2020 ESG Report also stated:

> **The utility engaged Exponent**, a leading consulting firm in electric utility resilience, **to perform an independent assessment to identify key vulnerabilities to severe natural events. Following this assessment, Exponent outlined a set of recommendations** to ensure quick restoration of critical customers, reduce total restoration time and minimize the total amount of damage from a severe natural event. **This included recommendations for system hardening**, substation flood monitoring, **enhanced vegetation management**, emergency restoration, damage prediction modeling and additional in-depth studies. **The utility is currently developing work plans based on Exponent's recommendations**, climate risk analysis and ongoing IGP efforts.
>
> [. . .]
>
> **The utility is using the Exponent** and Jupiter Intelligence **analyses to inform its IGP process and planning**.  The IGP process also includes a Resilience Working

Group composed of stakeholders representing critical infrastructure providers, emergency management agencies, state and local government energy, planning, climate change and resilience officials, the hospitality and healthcare industries, the military, solar and other renewable energy providers and other stakeholders.

181.    The statements in ¶ 180 were materially false and misleading because the statement gave the misleading impression that the Company was adopting "enhanced vegetation management" and so taking further steps to cut down vegetation in high risk areas, when in fact, the Company expressly declined in its Wildfire Mitigation Plan to take further steps to cut down vegetation.

182.    On October 27, 2021, Hawaiian Electric's communications manager reflected on the Company's fire prevention efforts in a blog post titled, "Fire prevention is everyone's business."  In discussing the Company's wildfire mitigation and vegetation management, the Hawaiian Electric spokesperson stated, in relevant part:

Even more so, recent reports indicated Maui County, where I live, is currently experiencing the worst drought conditions in the state. **Because such drought conditions make our islands especially vulnerable to wildfires, our company continues to do its part to reduce such risks, which can threaten an island's electrical system.**

**Such resilience work starts with proactive vegetation management around our electrical infrastructure and facilities on the five islands we serve.**  Other efforts include **installing heavier, insulated conductors in areas prone to trees and large branches falling during high winds and preventing power lines from coming down**.

[…] With climate change producing drier and hotter weather patterns and longer fire seasons, **Hawaiian Electric will continue to prioritize resilience to uphold our commitment to powering our communities safely and reliably**.[59]

183.    The statements in ¶ 182 were materially false and misleading because the Company's actual policy, as stated in its Wildfire Mitigation Plan, was against "proactive . . . management" of vegetation in dry grass and brush areas, as it recommended against trimming of low-lying vegetation and creating fire breaks due to their purported cost inefficiency; and (2) and the Company's wildfire mitigation program declined to take recommended steps to insulate

---

[59] Shayna Decker, *Fire prevention is everyone's business*, Medium (Oct. 27, 2021), https://poweringhawaii.medium.com/fire-prevention-is-everyones-business-f71c5a9dcb9.

conductor wires, and the Company failed to insulate conductor wires in areas at high risk of wildfires.

**D.    Defendants' False and Misleading Statements in 2022**

184.    On February 25, 2022, HEI filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2021 (the "2021 10-K"). In discussing the Company's compliance with environmental regulations, the 2021 10-K stated, in relevant part:

> Hawaiian Electric, Hawaii Electric Light and Maui Electric, like other utilities, are subject to periodic inspections by federal, state and, in some cases, local environmental regulatory agencies . . . . These inspections may result in the identification of items needing corrective or other action. Except as otherwise disclosed in this report (see "Risk Factors" in Item 1A, and Notes 1 and 3 of the Consolidated Financial Statements) **the Utilities believe that each subsidiary has appropriately responded to environmental conditions requiring action and that, as a result of such actions, such environmental conditions will not have a material adverse effect on the capital expenditures, earnings and competitive position of the Utilities.**

185.    The statements in ¶ 184 were materially false and misleading because the Company knew of environmental conditions, including dry vegetation, outdated poles, conductor wires in need of replacement, that required action and that could have a material adverse effect on the Company.

186.    On April 12, 2022, HEI issued a consolidated ESG report (the "2021 ESG Report"). The 2021 ESG Report stated:

> The utility continues its work to assess resilience threats and prioritize improvements to enhance resilience. This has included an independent review of potential resilience vulnerabilities, using climate risk analytics to refine and prioritize specific needs and engaging with stakeholders to incorporate their perspectives. These considerations are part of our Integrated Grid Planning (IGP) process, which is our in-progress planning effort to determine future generation, transmission and distribution needs for our system.
>
> • The utility engaged a leading consulting firm in electric utility resilience to perform an independent assessment to identify key vulnerabilities to severe natural events. Following this assessment, the consultant report outlined a set of recommendations to ensure quick restoration of power to critical customers, reduce total restoration time and minimize the total amount of damage from a severe natural event. **This included recommendations for system hardening**, substation flood monitoring, **enhanced vegetation**

1    **management**, emergency restoration, damage prediction modeling and
2    additional in-depth studies.

- The utility is also using these analyses to inform its IGP process and
3    planning.  The IGP process includes a Resilience Working Group composed
4    of stakeholders representing critical infrastructure providers, emergency
     management agencies, state and local government energy, planning, climate
5    change and resilience officials, the hospitality and healthcare industries, the
     military, solar and other renewable energy providers and other stakeholders.
6    Thus far, the Resilience Working Group has identified key resilience threats
     and associated scenarios; developed recommendations for:  1) the IGP
7    process, 2) utility work outside of the IGP process and 3) key customer and
     infrastructure partners to improve resilience; developed a taxonomy for
     categorizing and prioritizing critical customers; and assessed the
     capabilities and needs of key customers and infrastructure.

187.    The statements in ¶ 186 were materially false and misleading because the statement
gave the misleading impression that the Company was adopting "enhanced vegetation
management" and so taking further steps to cut down vegetation in high risk areas, when in fact,
the Company expressly declined in its Wildfire Mitigation Plan to take further steps to cut down
vegetation.

188.    The 2021 ESG Report also stated:

We continually maintain and upgrade our transmission and distribution system to
ensure seamless delivery of power to our customers.  Day-to-day maintenance is a
key part of keeping the grid resilient.  We regularly inspect our poles, lines, and
other equipment, and work to replace and upgrade aging and faulty equipment
before failures happen.  We regularly trim the vegetation around our equipment, as
many power outages during high winds and storms are due to tree branches or other
vegetation falling onto power lines.  We have also replaced traditional power lines
with insulated conductor systems to improve reliability and resilience in targeted
areas prone to vegetation-related outages.

[. . .]

We have also completed distribution protection studies to improve safety and
mitigate risk on each of the five islands we serve.

189.    The statements in ¶ 188 were materially false and misleading because:  (1) the
Company did not "continually maintain and upgrade [its] transmission and distribution system" as
it was in fact far behind schedule at all relevant times in upgrading and replacing poles, conductor
wire, and maintaining vegetation in a safe state; (2) the Company told at best only a half-truth in
stating that it "regularly inspect[s its] poles, lines and other equipment" and that it "work[s] to
replace and upgrade aging and faulty equipment before failures happen" because in fact the

55
AMENDED COMPLAINT

Company was far behind schedule at all relevant times in upgrading and replacing poles and conductor wire; (3) the Company told at best only a half-truth in stating that it "regularly trim[s] the vegetation around [its] equipment," because in fact the Company did not maintain vegetation around its equipment in a safe state; (4) the Company told at best only a half-truth in stating that it had "replaced traditional power lines with insulated conductor systems to improve reliability and resilience in targeted areas prone to vegetation-related outages," because in fact the Company was far behind schedule at all relevant times in upgrading and replacing poles and conductor wire.

190.    Finally, in discussing wildfire prevention and mitigation, the 2021 ESG Report stated, in relevant part:

> Episodic drought, a warming climate and **the expansion of nonnative fire-prone grasses and shrubs** has led to an increase in wildfires in Hawai'i. 98% of wildfires in Hawai'i are human caused and the threat to communities is high year-round. **In addition to the utility's own wildfire mitigation plans, we have joined with community members and wildfire collaborators to help prevent and mitigate wildfires in known hot spots across our service areas**. As members of the Wai'anae Wildfire Hui in West O'ahu and Pacific Fire Exchange on Maui, we meet monthly to share ideas and discuss priority projects. We support the Hawai'i Wildfire Management Organization on Hawai'i Island, which works with communities across the state on wildfire planning, prevention and mitigation activities. By raising awareness, implementing key land management practices and collaborating on projects, these organizations are working to reduce the wildfire risk in Hawai'i and build strong, resilient communities.

191.    The statements in ¶ 190 were materially false and misleading because it gave the misleading impression that the Company had adopted the advice of community wildfire collaborators to mitigate wildfires, when in fact the Company's program declined to take recommended mitigation steps to address dry vegetation, outdated poles, conductor wires, and deenergizing power lines during red-flag events.

192.    On April 12, 2022, Hawaiian Electric issued a 2021-2022 Sustainability Report (the "2021-2022 Sustainability Report"). The 2021-2022 Sustainability Report stated in relevant part:

> Increasing reliability and resilience on the five islands Hawaiian Electric serves is a year-round commitment. Projects include:
>
> […]
>
> Maui County

56
AMENDED COMPLAINT

■ Replacing more than 400 poles on Maui, Lānaʻi and Molokaʻi to **maintain strength and safety standards based on inspections and testing.** [60]

193.    The statements in ¶ 192 were materially false and misleading because the Company's poles did not "maintain strength and safety standards," as the majority of the Company's poles were not in compliance with national NESC standards.

194.    On August 22, 2022, Hawaiian Electric's communications manager discussed the Company's wildfire mitigation and prevention efforts in a blog post titled, "Protecting West Maui from wildfires."   In discussing the Company's fire prevention efforts, the Hawaiian Electric spokesperson stated, in relevant part:

> **Now, I take pride in knowing our company takes extra steps to protect areas like West Maui that are more prone to wildfires through ongoing vegetation management, restoration and prevention efforts.**
>
> […] **Throughout the years, Hawaiian Electric has worked with the state's Division of Forestry and Wildlife (DOFAW) on Maui to identify specific parts of the island susceptible to wildfires to help with vegetation management and roadside maintenance to act as a firebreaks.** [61]

195.    The statements in ¶ 194 were materially false and misleading because the Company's actual policy, as stated in its Wildfire Mitigation Plan, was against "proactive . . . management" of vegetation in dry grass and brush areas, as it recommended against trimming of low-lying vegetation and creating fire breaks due to their purported cost inefficiency.

196.    On November 23, 2022, Hawaiian Electric posted a video on YouTube titled "What's on a Utility Pole?".   In providing an explanation of the Company's utility poles, Hawaiian Electric Supervising Engineer Mehana Hoʻopiʻi stated in relevant part:

> Utility poles support equipment for various utilities, telecommunications, and streetlights.  In Hawaiʻi, **our poles follow standards set by the National Electric**

---

[60] Hawaiian Electric, *2021–2022 Sustainability Report*, HECO (Apr. 12, 2022) at 14, https://view.hawaiianelectric.com/2021-2022-sustainability-report/page/1.

[61] Shayna Decker, *Protecting West Maui from Wildfires*, Medium (Aug. 22, 2022), https://poweringhawaii.medium.com/protecting-west-maui-from-wildfires-b0dc52e6790d.

**Safety Code to ensure they are safe for our employees to work on and can withstand impact of severe weather.**[62]

197.    The statements in ¶ 196 were materially false and misleading because the Company's poles did not "follow standards set by the National Electric Safety Code to ensure they . . . can withstand impact of severe weather," as the majority of the Company's poles were not in compliance with national NESC standards and could not withstand severe weather.

### E.    Defendants' False and Misleading Statements in 2023

198.    On March 1, 2023, Hawaiian Electric's digital communications and social media specialist reflected on the Company's utility poles in a blog post titled, "What's on a utility pole?". In discussing the safety and reliability of the Company's utility poles, the Hawaiian Electric specialist stated, in relevant part:

> When visiting my parents' home in Waimalu, I often notice the utility poles lining the streets of the older subdivision where they live.  You may notice it's more common to see overhead utility lines in older communities.  While overhead lines are vulnerable to adverse weather conditions, vegetation, and motor vehicle accidents, they're also more easily accessible and less costly to repair than underground lines.  **To ensure safety and reliability, Hawaiian Electric's utility poles follow standards set by the National Electric Safety Code (NESC)**.

199.    The statements in ¶ 198 were materially false and misleading because the Company's poles did not "follow standards set by the National Electric Safety Code" as the majority of the Company's poles were not in compliance with national NESC standards and could not withstand severe weather.

200.    On April 4, 2023, HEI issued its 2022 ESG report (the "2022 ESG Report").  The 2022 ESG Report stated:

> Episodic drought, a warming climate and the expansion of nonnative fire-prone grasses and shrubs has led to an increase in wildfires in Hawai'i. Over 98% of wildfires are human caused and the threat to communities is high year-round. **We joined with community members and wildfire collaborators to help prevent and mitigate wildfires in known hot spots across our service areas**.

> As members of the Wai'anae Wildfire Hui in West O'ahu and Pacific Fire Exchange on Maui, we meet monthly to share ideas and discuss priority projects.

---

[62] Hawaiian Electric, *What's on a Utility Pole?*, YouTube (Nov. 23, 2022), https://www.youtube.com/watch?v=VCpS6VDLmV4.

We support the Hawai'i Wildfire Management Organization on Hawai'i Island, which works with communities across the state on wildfire planning, prevention and mitigation activities. By raising awareness, implementing key land management practices and collaborating on projects, these organizations are working to reduce the wildfire risk in Hawai'i and build strong, resilient communities.

201.    The statements in ¶ 200 were materially false and misleading because it gave the misleading impression that the Company had adopted the advice of community wildfire collaborators to mitigate wildfires, when in fact the Company's program declined to take recommended mitigation steps to address dry vegetation, outdated poles, conductor wires, and deenergizing power lines during red-flag events.

202.    The 2022 ESG Report also stated:

We constantly work to maintain and upgrade our transmission and distribution infrastructure to ensure that power gets to our customers.  Vegetation impacts during high winds and storms are the cause of many power outages and so we regularly trim vegetation around our equipment and replace traditional power lines with insulated conductor systems in areas that are especially prone to vegetation-related outages.

203.    The statements in ¶ 202 were materially false and misleading because:  (1) the Company stated at best only a half-truth when it stated that it "constantly work[s] to maintain and upgrade [its] transmission and distribution system," as it was in fact far behind schedule at all relevant times in upgrading and replacing poles, conductor wire, and maintaining vegetation in a safe state; (2) the Company told at best only a half-truth in stating that it "regularly trim[s] vegetation around [its] equipment," because in fact the Company did not maintain vegetation around its equipment in a safe state; (3) the Company told at best only a half-truth in stating that it regularly "replace[s] traditional power lines with insulated conductor systems," because in fact the Company was far behind schedule at all relevant times in upgrading and replacing poles and conductor wire.

204.    On April 4, 2023, Hawaiian Electric issued a 2022-2023 Sustainability Report (the "2022-2023 Sustainability Report").  The 2022-2023 Sustainability Report stated in relevant part:

Building Resilience

Hawaiian Electric works year-round to build resilience into its power systems so they are better able to withstand severe events, including those fueled by climate

change.  The company also is seeking regulatory approval for a five-year resilience action plan focusing on critical grid assets that are the most vulnerable to the impact of climate change.  Among recent work:

[…]

**Maui County**

- **Replaced more than 330 poles on Maui, Lānaʻi and Molokaʻi to maintain strength and safety standards.**[63]

205.   The statements in ¶ 204 were materially false and misleading because the Company's poles did not "maintain strength and safety standards," as the majority of the Company's poles were not in compliance with national NESC standards.

206.   On April 13, 2023, Hawaiian Electric provided an update on Maui's renewable energy transition and recent developments on the status of the island's existing power generation resources during an in-person community meeting.  When asked whether Hawaiian Electric had observed California and its "numerous blackouts," and what, if anything, had Hawaiian Electric "learned" from the California utilities, Hawaiian Electric Director of Generation for Maui County John Mauri responded in relevant part:

> […] the fires in California, we have looked at that, we have seen issues and I think those of us in Maui did see say several years ago there was a fire in the Central Valley.  **So if you want to take, looking at California and learning lessons, the fires have actually had us take a look at the plants and harden them in a sense. We, you know, make sure that the areas are clear around them.**  I know there's a lot of work being done with the energy delivery people as far as, you know, the poles, infrastructure, those types of things.  And then really looking at, so to speak, hardening them for when their fire comes through so that we don't lose all the poles in those areas.  And so, I mean, if there's a lesson learned that's, that's really the one that comes to mind for me.[64]

207.   The statements in ¶ 206 were materially false and misleading because the Company's actual policy, as stated in its Wildfire Mitigation Plan, was against "proactive . . . management" of vegetation in dry grass and brush areas, as it recommended against trimming of

---

[63] Hawaiian Electric, *2022–2023 Sustainability Report*, HECO (Apr. 4, 2023) at 9, https://view.hawaiianelectric.com/2022-2023-sustainability-report/page/1.

[64] Hawaiian Electric, *Meeting Maui's Energy Needs – A Community Engagement*, YouTube (Apr. 25, 2023), https://www.youtube.com/watch?v=A7d4coZrqVk.

low-lying vegetation and creating fire breaks due to their purported cost inefficiency, and expressly *declined* to follow California's wildfire prevention actions.

## IX.    ADDITIONAL SCIENTER ALLEGATIONS

208.    The Individual Defendants possessed the power and authority to control the contents of HEI's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of HEI's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with HEI, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

### A.    Defendants Knew that Certain of Their Statements Were False and Misleading Because Defendants Knew About Their Own Wildfire Mitigation Plan

209.    As noted above, Defendants made statements that created the impression that the Company had replaced uninsulated wires on its power lines, when in fact, as stated in HECO's Wildfire Mitigation Plan, Defendants had determined that replacing existing uninsulated conductors with insulated conductors would not be cost-effective. Defendants made statements that misled investors to believe that its Wildfire Mitigation Plan addressed risk of dry grasses and shrubs, when in fact HECO's Wildfire Mitigation Plan recommended against trimming of grasses around power lines. Defendants also told investors that HEI prioritized safety over customer convenience, when in fact, as memorialized in HECO's Wildfire Mitigation Plan, the Company prioritized customer convenience over safety in its written policy of not preemptively cutting off power during red-flag events because the policy "was not well received by certain customers affected" when PG&E implemented the policy in California.

210.    Defendants knew that each of these statements was false and misleading because Defendants were familiar with the Company's Wildfire Mitigation Plan.  As HECO CEO and President Shelee Kimura testified before Congress on September 28, 2023, "[i]n 2019, our team started developing a wildfire mitigation plan."  In written comments to Congress, Kimura repeatedly used first person plural pronouns in speaking about HEI "developing our wildfire mitigations strategy."  In discussing her development of the Wildfire Mitigation Plan, she stated, for example, "at the time, we concluded that wildfire risk in Hawaii did not justify the detrimental effects of preemptive shutoffs," to explain why she and HEI declined to deenergize power lines during red flag events.

211.    Indeed, HEI's own ESG reports, signed variously by Defendants Lau and Seu, and Chairman of the Board of Directors Thomas Fargo, specifically relied on the Company's Wildfire Mitigation Plan.  For example, as noted above, the 2021 ESG Report made representations about "the utility's own wildfire mitigation plans."  Defendants, at a minimum, were severely reckless in making representations about that plan if they were not familiar with its contents.

**B.    Defendants Knew, or Were Severely Reckless in Not Knowing, that Certain of Their Statements Implying that They Had Followed Consultant and Community Advice Were False and Misleading Because Defendants Knew About that Advice**

212.    Defendants made statements that suggested to a reasonable investor that the Company had joined with consultants and community groups and adopted common plans to mitigate wildfire risk, when in fact the Company's own policies in the Wildfire Mitigation Plan directly contradicted the advice of those groups.  For example, as noted above, the 2021 ESG Report stated:

> Episodic drought, a warming climate and **the expansion of nonnative fire-prone grasses and shrubs** has led to an increase in wildfires in Hawai'i. 98% of wildfires in Hawai'i are human caused and the threat to communities is high year-round. **In addition to the utility's own wildfire mitigation plans, we have joined with community members and wildfire collaborators to help prevent and mitigate wildfires in known hot spots across our service areas**. As members of the Wai'anae Wildfire Hui in West O'ahu and Pacific Fire Exchange on Maui, we meet monthly to share ideas and discuss priority projects. **We support the Hawai'i Wildfire Management Organization** on Hawai'i Island, which works with communities across the state on wildfire planning, prevention and mitigation

activities. By raising awareness, implementing key land management practices and collaborating on projects, these organizations are working to reduce the wildfire risk in Hawai'i and build strong, resilient communities.

213.    In fact, as explained above, the Company's Wildfire Mitigation Plan called for no additional action to be taken to address the "fire-prone grasses and shrubs," and so directly contradicted the advice of "wildfire collaborators" such as the "Hawai'i Wildfire Management Organization." As explained above, Defendants were familiar with their own Wildfire Mitigation Plan. Moreover, at a minimum, Defendants were severely reckless in representing the content of their Wildfire Mitigation Plan and its alignment with "wildfire collaborators" and the Hawai'i Wildfire Management Organization if they were unfamiliar with the content of the Wildfire Mitigation Plan or the positions and recommendations of those collaborators.

### C.    Mitigation of Environmental Risk Was a Core Part of Hawaiian Electric's Business, Defendants' Compensation Was Tied to Enterprise Risk Mitigation, and Board Members Were Expressly Apprised of Risks

214.    In its focus statements and in its compensation and risk management policies, and in its risk management, the Company made clear that it is highly focused on mitigating material risks, including wildfires. This Company focus on risk mitigation, including wildfire risk mitigation, further supports an inference of scienter on the part of Defendants.

215.    The Company has repeatedly told investors, in its Annual Reports, that environmental considerations are "explicitly woven into strategic planning efforts and enterprise risk management processes." For example, in the Company's 2022 Annual Report, the Company stated:

> The Company has also focused on ensuring that ESG considerations are appropriately integrated into governance structures, strategies and risk management. This includes: [. . .] ESG considerations explicitly woven into strategic planning efforts and enterprise risk management processes.

216.    Likewise, the Company repeatedly assured investors that compensation of its executives discouraged inappropriate risk:

> Hawaiian Electric's compensation policies and practices are designed to encourage executives to build value for all stakeholders, including shareholders, customers and employees, and to discourage decisions that introduce inappropriate risks.

217.    The HEI Board has assigned to the Audit & Risk Committee the responsibility of assisting in the oversight of the overall risk management strategy of the Company.  In providing such assistance, the Audit & Risk Committee is specifically required to discuss policies with respect to risk assessment and risk management, including the guidelines and policies governing the process by which risk assessment and risk management are undertaken at the Company, and to report to the Board the committee's discussion and findings so that the entire Board can consider changes (if any) in the Company's risk profile.  This review of policies certainly would have included review of the Company's policies with respect to wildfire mitigation, as outlined in the Company's Wildfire Mitigation Plan.

218.    Indeed, HECO's CFO Tayne S.Y. Sekimura also served as HECO's Chief Risk Officer.  In that role, she was responsible for identifying, assessing, managing, monitoring and reporting risks at the Utility, which included wildfire risks.  Sekimura was responsible for providing *regular reports* to the HEI Board and Audit & Risk Committee on the status of those risks, any changes to the risk catalog or management's assessment of those risks, and any other risk management matters that the Board may request from time to time.  The Board and Audit & Risk Committee are also supposed to receive reports from HEI's internal auditor evaluating the effectiveness of management's implementation of the approved ERM system.

219.    In fact, as a matter of policy, all of HEI's directors were apprised of risks that might materially affect the Company, as stated in the Company's Annual Reports:

> Hawaiian Electric's Enterprise Risk Management (ERM) function is principally responsible for identifying and monitoring risk at Hawaiian Electric and its subsidiaries, and for reporting on high risk areas to the Hawaiian Electric Board and Hawaiian Electric Audit & Risk Committee. Hawaiian Electric's ERM function is part of HEI's overall ERM function, which is responsible for identifying and monitoring risk throughout the HEI companies and for reporting on areas of significant risk to the HEI Board and designated board committees. As a result, **all Hawaiian Electric and HEI directors, including those who serve on or are representatives to the HEI Compensation & Human Capital Management Committee, are apprised of risks that could have a material adverse effect on Hawaiian Electric**.

220.    HEI also made clear in its Annual Reports that among the risks it believes could have a material adverse effect on its business include wildfires, specifically: "weather, natural

disasters . . . and wildfires, including their impact on the resilience and reliability and cost of the Company's and Utilities' operations."

221.    Indeed, as stated in the Company's 2020 ESG Report:

The Board provides oversight of climate-related and other risks through comprehensive and integrated ERM processes and regular reporting on the material risks that can potentially impact our operations, strategies and long-term financial performance. The Board also reviews and provides feedback on the company's ERM processes for identifying, monitoring, managing and mitigating risks to ensure these processes are effective. **Topics discussed at the board level include utility reliability and resilience,** technology innovation and integration, **increased frequency of natural disasters and extreme weather events and their potential impacts for our companies**, sea-level rise and its potential implications for physical assets and financial assets such as the bank's loan portfolio, and land use and community sentiment in the context of accelerated renewable energy development.

Each Board committee has responsibilities with respect to oversight of climate-related risks and opportunities, and reports on its activities and recommendations through our regular and, as necessary, special Board and/or committee meetings.

## X.    CLASS ACTION ALLEGATIONS

222.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired HEI securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

223.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, HEI securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by HEI or its transfer agent and may be notified of the

pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

224.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

225.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

226.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and prospects of HEI;

- whether the Individual Defendants caused HEI to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of HEI securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages, and, if so, what is the proper measure of damages.

227.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

228.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- HEI securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold HEI securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

229.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

230.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XI.    COUNT ONE

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

231.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

232.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

233.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions,

practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of HEI securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire HEI securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

234. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for HEI securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about HEI's finances and business prospects.

235. By virtue of their positions at HEI, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

236.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of HEI, the Individual Defendants had knowledge of the details of HEI's internal affairs.

237.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of HEI.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to HEI's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of HEI securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning HEI's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired HEI securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

238.    During the Class Period, HEI securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of HEI securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of HEI securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of HEI securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

239.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

240.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## XII.    COUNT TWO

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

241.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

242.    During the Class Period, the Individual Defendants participated in the operation and management of HEI, and conducted and participated, directly and indirectly, in the conduct of HEI's business affairs.  Because of their senior positions, they knew the adverse non-public information about HEI's misstatement of income and expenses and false financial statements.

243.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to HEI's financial condition and results of operations, and to correct promptly any public statements issued by HEI which had become materially false or misleading.

244.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which HEI disseminated in the marketplace during the Class Period concerning HEI's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause HEI to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of HEI within the meaning of Section

20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of HEI securities.

245.    Each of the Individual Defendants, therefore, acted as a controlling person of HEI. By reason of their senior management positions and/or being directors of HEI, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, HEI to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of HEI and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

246.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by HEI.

**XIII.   PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

**XIV.   DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

71
AMENDED COMPLAINT

Dated:  March 8, 2024

Respectfully submitted,

POMERANTZ LLP

*/s/ Austin P. Van*

POMERANTZ LLP
Jeremy A. Lieberman
(*pro hac vice*)
Austin P. Van
(*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
avan@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Lead Counsel for Lead Plaintiff Daniel
Warren*

PORTNOY LAW FIRM
Lesley F. Portnoy, Esq.
1800 Century Park East, Suite 600
Los Angeles, California 90067
Telephone: (310) 692-8883
lesley@portnoylaw.com

*Attorneys for Additional Plaintiff
Bhapinderpal S. Bhangal*

LEVI & KORSINSKY LLP
Shannon L. Hopkins
Gregory M. Potrepka
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: 203/992-5423
212/363-7171 (fax)
shopkins@zlk.com
gpotrepka@zlk.com

*Attorneys for Additional Plaintiff Emaad
Kuhdear*

72
AMENDED COMPLAINT

**CERTIFICATE OF SERVICE**

I, Austin P. Van, hereby certify that a true and correct duplicate copy of the foregoing Amended Class Action Complaint for Violations of the Federal Securities Laws was filed electronically on March 8, 2024.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

*/s/ Austin P. Van*
Austin P. Van