1  **POMERANTZ LLP**
   Jeremy A. Lieberman
2  Austin P. Van
   600 Third Avenue, 20th Floor
3  New York, NY 10016
   Telephone: (212) 661-1100
4  jalieberman@pomlaw.com
   avan@pomlaw.com
5
   Jennifer Pafiti (SBN 282790)
6  1100 Glendon Avenue, 15th Floor
   Los Angeles, California 90024
7  Telephone: (310) 405-7190
   jpafiti@pomlaw.com
8
   *Lead Counsel for Lead Plaintiffs*
9
   *Additional Counsel on Signature Page*
10

11               **UNITED STATES DISTRICT COURT**

12             **NORTHERN DISTRICT OF CALIFORNIA**

13                   **SAN FRANCISCO DIVISION**

14

15  BHAPINDERPAL S. BHANGAL,          CASE NO.  3:23-cv-04332-JSC
    Individually and on Behalf of All Others
16  Similarly Situated,               **OPPOSITION TO DEFENDANTS' MOTION
                                       TO DISMISS THE AMENDED COMPLAINT
17                  Plaintiff,         FOR VIOLATIONS OF THE FEDERAL
                                       SECURITIES LAWS**
18          v.
                                       **CLASS ACTION**
19  HAWAIIAN ELECTRIC INDUSTRIES,
    INC., CONSTANCE H. LAU, SCOTT W. H.  Hearing Date:  September 12, 2024
20  SEU, GREGORY C. HAZELTON, and       Time:  10:00AM
    PAUL K. ITO,                        Judge:  Hon. Jacqueline Scott Corley
21                                      Courtroom:  8—19th Floor
                   Defendants.
22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................... 1

II.     FACTUAL BACKGROUND ............................................................................. 3

    A.      HEI Provides Electricity to Hawaiian Residents Through Hazardous Utility Poles ................................................................................................................. 3

    B.      HEI Was Aware for Years of the Risk of Severe Wildfires that Required Appropriate Mitigation Efforts ................................................................. 4

    C.      HEI Repeatedly Misled Investors To Believe That It Was Taking Steps To Mitigate Wildfire Risk that It Was Not Taking ................................................ 5

    D.      August 8, 2023 Lahaina Wildfire Disaster ................................................. 6

    E.      The Response to the August 8, 2023 Lahaina Wildfire Disaster ..................... 6

III.    LEGAL STANDARDS ...................................................................................... 6

IV.     HEI REPEATEDLY MISLED INVESTORS TO BELIEVE IT WAS TAKING APPROPRIATE ACTION TO MITIGATE WILDFIRE RISK, WHEN IT KNEW IT WAS FAILING TO DO SO ............................................................................. 7

    A.      HEI Misled Investors To Believe It Had Replaced Exposed Power Lines with Insulated Conductor Wires ..................................................................... 7

    B.      HEI Misled Investors To Believe That Its Poles Were Regularly Maintained and Complied with National NESC Safety Standards ................................. 10

        1.      HEI Falsely Assured Investors that It Was Regularly Maintaining Its Poles ................................................................................................... 10

        2.      HECO Misled Investors By Falsely Claiming their Poles Followed NESC Safety Standards ......................................................................... 12

    C.      HEI Misled Investors To Believe Its Mitigation Plans Addressed Risk of Dry Grasses and Shrubs, When In Fact Its Plans Recommended *Against* Trimming of Grasses Around Power Lines .................................................................. 13

    D.      HEI Misled Investors To Believe That It Had Followed Advice Given To It Concerning Fire Mitigation, When In Fact It Went Against The Central Components Of That Advice .................................................................... 15

    E.      HEI Misled Investors To Believe That It Prioritized Safety Over Other Considerations, When In Fact, As an Objective Matter of Written Policy, It Prioritized Customer Convenience and Cost-Saving .................................... 17

V.      DEFENDANTS ARE LIABLE FOR STATEMENTS MADE BY THE ENTITIES THEY WHOLLY CONTROLLED AND OPERATED THROUGH .......................... 18

VI.    THE AC ADEQUATELY PLEADS SCIENTER ........................................................... 20

    1.    Defendants Knew that Certain of Their Statements Were False and Misleading Because Defendants Knew About Their Own Wildfire Mitigation Plan .................................................................................................. 20

    2.    Even If (Counterfactually) Defendants Had Not Had Access to the Wildfire Mitigation Plan, They Were Severely Reckless in Making Statements Implying They Were Familiar with the Company's Wildfire Mitigation Policies and Efforts ............................................................... 22

    3.    Mitigation of Environmental Risk Was a Core Part of Hawaiian Electric's Business, Defendants' Compensation Was Tied to Enterprise Risk Mitigation, and Board Members Were Expressly Apprised of Risks ...... 23

    4.    A Holistic Review Supports Scienter ....................................................... 25

VII.    CONCLUSION ............................................................................................................ 25

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| **10-K** | Annual Report on SEC Form 10-K |
| **10-Q** | Quarterly Report on SEC Form 10-Q |
| **AC or Amended Complaint** | Amended Complaint for Violations of the Federal Securities Laws (March 8, 2024) (ECF No. 70) |
| **Company** | Hawaiian Electric Industries, Inc. |
| **DB** | Defendants' Notice of Motion and Motion to Dismiss the Amended Complaint; Memorandum of Points and Authorities in Support (May 7, 2024) (ECF No. 81) |
| **Def. Ex.** | Exhibit to Declaration of Raza Rasheed in Support of Defendants' Motion to Dismiss the Amended Class Action Complaint (May 7, 2024) (ECF No. 82) |
| **Defendants** | Hawaiian Electric Industries Inc., Constance H. Lau, Scott W. H. Seu, Gregory C. Hazelton and Paul K. Ito |
| **ESG Report** | Environmental, Social, and Governance Report |
| **FE** | former employee |
| **HECO** | Hawaiian Electric Company, Inc. |
| **HEI** | Hawaiian Electric Industries Inc. |
| **HWMO** | Hawaii Wildfire Management Organization |
| **Individual Defendants** | Constance H. Lau, Scott W. H. Seu, Gregory C. Hazelton and Paul K. Ito |
| **Lead Plaintiff** | Daniel Warren |
| **Motion or Mot.** | Defendants' Notice of Motion and Motion to Dismiss the Amended Complaint; Memorandum of Points and Authorities in Support (May 7, 2024) (ECF No. 81) |
| **Plaintiffs** | Daniel Warren, Bhapinderpal S. Bhangal and Emaad Kuhdear |
| **PSLRA** | Private Securities Litigation Reform Act of 1995 (15 U.S.C. § 78u–4) |
| **PUC** | Hawaii's Public Utilities Commission |
| **SEC** | United States Securities and Exchange Commission |
| **Van Decl.** | Declaration of Austin P. Van in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss the Amended Complaint for Violations of the Federal Securities Laws (July 8, 2024) |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ..........................................................................................7, 24

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   56 F. Supp. 3d 549 (S.D.N.Y. 2024) ...................................................................................19

*City of Roseville Emps. Ret. Sys. v. EnergySolutions, Inc.*,
   814 F. Supp. 2d 395 (S.D.N.Y. 2011) .................................................................................19

*Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*,
   620 F. Supp. 3d 603 (S.D. Tex. 2022) .................................................................................24

*Flynn v. Exelon Corp.*,
   No. 19 C 820, 2021 WL 1561712 (N.D. Ill. Apr. 21, 2021)..............................................19

*Howard v. Everex Sys.*,
   228 F.3d 1057 (9th Cir. 2000) .............................................................................................22

*In re Alphabet, Inc. Sec. Litig.*,
   1 F.4th 687 (9th Cir. 2021) ..................................................................................................20

*In re Amgen Inc. Sec. Litig.*,
   No. CV 07–2536 PSG, 2014 WL 12585809 (C.D. Cal. Aug. 4, 2014)...........................20, 24

*In re Atossa Genetics Inc. Sec. Litig.*,
   868 F.3d 784 (9th Cir. 2017) .................................................................................................6

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ...............................................................................................7

*In re MannKind Sec. Actions*,
   835 F. Supp. 2d 797 (C.D. Cal. 2011) .................................................................................22

*In re Syntex Corp. Sec. Litig.*,
   95 F.3d 922 (9th Cir. 1996) ...............................................................................................7, 8

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
   MDL No. 2672 CRB (JSC), 2017 WL 66281 (N.D. Cal. Jan. 4, 2017) ..............................19

*In re Zillow Grp., Inc. Sec. Litig.*,
   No. C17-1387-JCC, 2019 WL 1755293 (W.D. Wash. Apr. 19, 2019)..................................22

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011).......................................................................................................*passim*

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ........................................................................................6, 12

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)...............................................................................................................25

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ..........................................................................................21

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)................................................................................................................9

*Roberti v. OSI Sys., Inc.*,
    No. CV 13–9174–MWF, 2015 WL 1985562 (C.D. Cal. Feb. 27, 2015)...............................21

*S. Ferry LP #2 v. Killinger*,
    687 F. Supp. 2d 1248 (W.D. Wash. 2009)................................................................22, 24, 25

*S. Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) .............................................................................................20

*SEC v. Kameli*,
    Case No. 17-C-4686, 2020 WL 2542154 (N.D. Ill. May 19, 2020) .....................................19

*Shenwick v. Twitter, Inc.*,
    282 F. Supp. 3d 1115 (N.D. Cal. 2017) ..............................................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)........................................................................................................20, 25

*United States v. Laurienti*,
    611 F.3d 530 (9th Cir. 2010) .............................................................................................18

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009), *as amended* (Feb. 10, 2009).................................................10

**Statutes**

17 C.F.R. § 240.3b-7.........................................................................................................19

National Electric Safety Code ......................................................................................... *passim*

1

## I.    INTRODUCTION

2      During the Class Period, Defendants repeatedly misled investors to believe HEI was taking

3   appropriate action to mitigate wildfire risk, when they knew it was failing to do so.

4      *First*, HEI informed investors that it had successfully replaced uninsulated (traditional)

5   power lines with insulated wires, when it had not.  For example, in HEI's April 12, 2022 ESG

6   Report for 2021, it stated:

7      We have . . . replaced traditional power lines with insulated conductor systems to
       improve reliability and resilience in targeted areas prone to vegetation-related
8      outages.

9      In fact, as confirmed by multiple sources, Hawaiian Electric had not replaced uninsulated

10  power lines with insulated lines even in areas it recognized to be at high risk of wildfires due to

11  dry vegetation, including West Maui, and the power lines in West Maui were not insulated at the

12  time of the 2023 Maui fires.

13     *Second*, HEI repeatedly assured investors that it was regularly maintaining its utility poles

14  and that they complied with national safety standards, when in fact, sources confirm that HEI's

15  pole maintenance was severely deficient and the majority of its poles did not meet national

16  standards.  For example, on April 22, 2021, HEI issued its consolidated 2020 ESG Report, which

17  stated:

18     We continually maintain and upgrade our transmission and distribution system to
       ensure seamless delivery of power to our customers.  Day-to-day maintenance is a
19     key part of keeping the grid resilient.  We regularly inspect our poles, lines, and
       other equipment, and work to replace and upgrade aging and faulty equipment
20     before failures happen.

21     In fact, at all relevant times during the Class Period, HEI was failing to replace thousands

22  of severely outdated utility poles that posed a danger of falling and sparking during high winds.

23  Moreover, HEI's poles did not meet National Electric Safety Code ("NESC") national safety

24  standards.

25     *Third*, the Company repeatedly assured investors that it was actively trimming and

26  otherwise addressing dry grasses and brush beneath and around power lines.  In the Company's

27  2020 ESG Report, Defendants stated, for example, "[w]e regularly trim the vegetation around our

28

equipment." In fact, the Company's own written policy, set forth in its Wildfire Mitigation Plan since 2019, expressly recommended *against* trimming already low-lying vegetation, and *against* creating vegetation fire-breaks as part of the vegetation management program, on the grounds that the measures were too costly.

*Fourth*, HEI misled investors to believe that it was following advice regarding wildfire mitigation from a hired consultant, and that its wildfire mitigation plans aligned with recommendations from wildfire collaborators, when in fact, its wildfire mitigation policies went against that advice. For example, the 2020 ESG Report stated:

> The utility engaged Exponent, a leading consulting firm in electric utility resilience . . . to identify key vulnerabilities to severe natural events. [. . .] Exponent outlined a set of recommendations . . . includ[ing] . . . enhanced vegetation management.

In fact, Hawaiian Electric made no effort to "enhance" or otherwise "adjust" its vegetation management in light of the consultant's recommendations. As shown in the Company's Wildfire Mitigation Plan, the Company had determined that "the type of vegetation in the Hawaii wildfire areas are primarily grasses, shrubs, and few trees, which rarely grow into conductors," so "it [was] not recommended that vegetation management plans be adjusted in the wildfire areas."

*Fifth*, Defendants repeatedly misled investors to believe that the Company's policies prioritized safety over other considerations, when in fact, as an objective matter of written policy, Hawaiian Electric prioritized customer convenience. For example, the Company's 2019 ESG Report stated, in relevant part: "Safety is our number one priority at Hawaiian Electric." This statement of policy was objectively false in at least one critical respect—the Company's Wildfire Mitigation Plan set forth its policy of not "preemptively turning off circuits," despite the fact that such deenergizing was the safest reasonable policy to prevent wildfires, because the policy "was not well received by certain customers." Defendants also prioritized cost saving over safety.

Through these misrepresentations and omissions, in which Defendants assured investors that HEI was taking actions to mitigate wildfire risk that it was not in fact taking, Defendants concealed the actual, unmitigated risk of wildfires from the public. Defendants also concealed facts about HEI's own wildfire mitigation strategy, and with that, its risk of liability relating to

1  wildfires.   Defendants' own internal documents and public statements plainly show that
2  Defendants fully knew that they were taking no such actions.

3       Defendants' motion proceeds primarily by attempting to distract the Court from these
4  blatant misrepresentations of HEI's actual practices and policies.   In their opening statement,
5  Defendants invite the Court to misread the Complaint as a simplistic attempt to leverage the
6  Lahaina tragedy rather than to recover losses for misrepresentations under the federal securities
7  laws.   The Court should decline Defendants' invitation.   While the Lahaina fire was indeed tragic,
8  the Complaint, soberly read, in no way turns on the tragic nature of the wildfire.   Defendants would
9  be equally liable for misrepresenting the efforts they were taking to mitigate risk if the risk instead
10  concerned a wholly mundane subject, such as risk of accounting errors.   In the substantive sections
11  of their motion, Defendants likewise attempt to distract the Court from the most straightforwardly
12  actionable misstatements by not even mentioning them, and then by making arguments that do not
13  apply to those straightforward misstatements.

14       The Court should set aside Defendants' attempts at distraction.   Defendants are liable
15  because they blatantly misrepresented to investors that they were taking specific actions to address
16  a risk when in fact they were taking no such actions.

17  **II.     FACTUAL BACKGROUND**

18      **A.     HEI Provides Electricity to Hawaiian Residents Through Hazardous Utility
   Poles**

19       HEI is a holding company that wholly owns Hawaiian Electric Company, Inc.  ("Hawaiian
20  Electric" or "HECO").   Hawaiian Electric wholly owns Hawaiian Electric Light Company Inc.
21  and Maui Electric Company.  AC ¶ 29.   Through HECO, HEI engages in electric utility, banking,
22  and non-regulated renewable/sustainable infrastructure investment businesses in the state of
23  Hawaii.  *Id.*   The Company provides service to 95% of Hawaiian residents and operates in three
24  segments, including the Electric Utility segment, which engages in the production, purchase,
25  transmission, distribution, and sale of electricity in the islands of Maui, Oahu, Hawaii, Lanai, and
26  Molokai.  *Id.*   Hawaiian Electric provides electricity to customers through utility poles throughout
27  Hawaii, including on Maui.  AC ¶ 3.

28

These utility poles are extremely dangerous because, among other reasons, they may fall over into dry vegetation when energized and ignite a wildfire. *Id.* This danger was particularly heightened in Western Maui, where an invasive grass species prone to drying out had spread throughout the area by the start of the Class Period, in effect creating ubiquitous, naturally occurring, highly flammable haystacks all around a populated area. *Id.* Indeed, a former employee explained that while trees are widespread on Maui, the invasive cane grass "is the larger issue" because it "grows fastest during the wet periods" and "once it dries out it gets really tindery and any kind of spark can set it off." AC ¶ 96. According to this employee, vast lands that were formerly kept well-watered to cultivate sugar canes dried up once those cultivation activities stopped, which allowed invasive species like cane grass to fill in where the cane was growing. *Id.*

> **B.** **HEI Was Aware for Years of the Risk of Severe Wildfires that Required Appropriate Mitigation Efforts**

As early as 2014, a local wildfire community group, the Hawaii Wildfire Management Organization ("HWMO"), released a wildfire mitigation plan that explicitly warned that Lahaina was among the areas in Maui most vulnerable to fires due to its proximity to dry brush, steep grasslands, and the prevalence of strong winds. AC ¶¶ 37-41. HWMO outlined a plan for working with utilities to help reduce the risk of fires. *Id.* Over the next several years, numerous government and non-profit reports, including reports by the Hawaiian Public Utilities Commission ("PUC") and HWMO, reiterated the heightened fire danger in Lahaina, with subsequent reports in 2018, 2019 and 2020 from various agencies continuing to identify Lahaina as particularly vulnerable to wildfires due to factors like strong winds, proximity to brush and grasslands, presence of non-native vegetation, and substandard power infrastructure. AC ¶¶ 42-50.

Hawaiian Electric also was continuously apprised of Lahaina's exceptional wildfire vulnerability through its participation in a Resiliency Working Group ("RWG") with state regulators. AC ¶ 49. HECO meeting minutes show the working group specifically discussed in 2019 whether power lines should be de-energized proactively during severe winds to reduce fire ignition risks, as California utilities had implemented. *Id.* In 2019, HECO organized several

1  stakeholder working groups, including the RWG, to develop long-term strategies to protect the
2  grid from risks like wildfires.  AC ¶ 50.

3     On May 12, 2020, the PUC released an audit report on Hawaiian Electric that found, with
4  respect to Vegetation Management, the Company had not completed its planned mitigation
5  programs and had underspent its budget for years, increasing hazards.  AC ¶ 60.

6     In August 2020, the County of Maui formally adopted an Updated Hazard Mitigation Plan,
7  which labeled all of Lahaina as a "high" wildfire risk zone and warned that west Maui had greater
8  than 90% annual probability of experiencing wildfires based on climate and vegetation.  AC ¶ 61.

9     In the beginning of 2019, Hawaiian Electric drafted its own Wildfire Mitigation Plan, and
10 from 2019 onwards, that Plan represented HECO's internal wildfire mitigation policies.  AC ¶ 66.
11 Shockingly, considering the extensive warnings and recommendations they had received during
12 the time of drafting, the Wildfire Mitigation Plan explicitly recommended *against* many practices
13 necessary to mitigate wildfire risk, including installing insulated conductors, enhanced vegetation
14 management, and deenergizing power lines in red-flag events.  AC ¶¶ 68-71.  HECO CEO Shelee
15 Kimura confirmed to Congress that HECO followed the Plan's policies. AC ¶ 210.

16 **C.    HEI Repeatedly Misled Investors To Believe That It Was Taking Steps To Mitigate Wildfire Risk that It Was Not Taking**
17

18    Even though the Company held clear policies *against* wildfire mitigation measures such as
19 installing insulated conductors and trimming of fire-prone grasses in its Wildfire Mitigation Plan,
20 the Company nevertheless expressly and repeatedly misstated to investors throughout the Class
21 Period that it was taking such measures.  As described in detail below, HEI misled investors to
22 believe:  (1) that it had replaced exposed power lines with insulated conductor wires when it had
23 not, (2) that its poles were regularly maintained and complied with national NESC safety standards
24 when the majority of its poles were severely collapsing and out of compliance, (3) that its
25 mitigation plans called for removal of dry grasses and shrubs around power lines when in fact its
26 mitigation plans recommended *against* such removal, (4) that HEI had followed community advice
27 concerning fire mitigation when in fact it had acted contrary to the central components of that

28

1   advice, and (5) that HEI prioritized safety over customer convenience and cost-saving, when as a

2   matter of objective written policy, the opposite was true.

3           **D.      August 8, 2023 Lahaina Wildfire Disaster**

4           On the morning of August 8, 2023, a fire began in West Maui near the town of Lahaina

5   that became one of the deadliest wildfires in U.S. history. AC ¶ 113. Videos captured by local

6   residents showed that the most destructive of the fires were cause by uninsulated power lines

7   belonging to Hawaiian Electric falling onto dry, untrimmed and unmanaged grassy areas. AC ¶¶

8   13; 115; 119-20. The fires killed at least 101 people. AC ¶ 126. By that afternoon, winds had

9   knocked down approximately 30 utility poles throughout Maui, even though the top speed of those

10  winds was well below the top speeds poles can withstand if compliant with NESC safety standards.

11  AC ¶¶ 13, 86, 124-25.

12          **E.      The Response to the August 8, 2023 Lahaina Wildfire Disaster**

13          In the following days, weeks and months, on August 8-9, 12, 15-22, 25, and September 5,

14  the heightened, unmitigated risk of catastrophic wildfire Hawaiian Electric had concealed

15  materialized and was revealed through a series of events and corrective disclosures. AC ¶¶ 127-

16  57. Altogether, the disclosures on August 8-9, 12, 15-22, 25, and September 5, 2023 caused the

17  value of HEI's stock to lose over 60% of its value. AC ¶ 20.

18  **III.    LEGAL STANDARDS**

19          On a 12(b)(6) motion, the court "accept[s] the Plaintiffs' allegations as true and construe[s]

20  them in the light most favorable to Plaintiffs." *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784,

21  793 (9th Cir. 2017).[1] When ruling on a motion to dismiss a securities case, any "skepticism is best

22

23  _____

24  [1] The Court should only sparingly grant Defendants' excessive twenty-one part request for judicial
    notice, if at all. *See* Dkt. No. 83. The Ninth Circuit has strongly cautioned against the "concerning
25  pattern in securities cases" of "exploiting [judicial notice] improperly to defeat what would
    otherwise constitute adequately stated claims at the pleading stage." *Khoja v. Orexigen*
26  *Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). Indeed, "the unscrupulous use of extrinsic
    documents to resolve competing theories against the complaint risks premature dismissals of
27  plausible claims that may turn out to be valid after discovery. This risk is especially significant in
    SEC fraud matters, where there is already a heightened pleading standard, and the defendants
28  possess materials to which the plaintiffs do not yet have access." *Id*. Crucially, "a court cannot
    take judicial notice of disputed facts contained in . . . public records." *Id*. at 999.

1    reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary

2    grounds." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

3    **IV.    HEI REPEATEDLY MISLED INVESTORS TO BELIEVE IT WAS TAKING
         APPROPRIATE ACTION TO MITIGATE WILDFIRE RISK, WHEN IT KNEW
4        IT WAS FAILING TO DO SO**

5            A statement is misleading "if it would give a reasonable investor the 'impression of a state

6    of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal*

7    *Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).  Unless "the adequacy of the disclosure . . . is so

8    obvious that reasonable minds could not differ," the question of "[w]hether a statement is

9    misleading and whether adverse facts were adequately disclosed . . . should be left to the trier of

10   fact." *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 926 (9th Cir. 1996).

11           **A.    HEI Misled Investors To Believe It Had Replaced Exposed Power Lines with
                  Insulated Conductor Wires**
12

13           During the Class Period, HEI repeatedly misled investors to believe that it had replaced

14   uninsulated power lines with insulated wires to prevent wildfires from starting when poles fall and

15   exposed wires contact dry vegetation.  AC ¶¶ 158, 162, 164, 166, 168, 174, 178, 182, 184, 188,

16   202.  For example, in April 2022, HEI informed investors that it had successfully replaced

17   uninsulated (traditional) power lines with insulated wires.  On April 12, 2022, HEI issued its

18   consolidated 2021 ESG Report, which stated:

19           We have also replaced traditional power lines with insulated conductor systems to
             improve reliability and resilience in targeted areas prone to vegetation-related
20           outages.

21   AC ¶ 74.

22           In fact, Hawaiian Electric had not replaced uninsulated power lines with insulated lines

23   even in areas it recognized to be at high risk of wildfires due to dry vegetation, including West

24   Maui.  Multiple sources confirm that the power lines in West Maui were not insulated at the time

25   of the 2023 Maui fires.  The Associated Press analyzed videos and images of West Maui power

26   lines and found that Hawaiian Electric had left miles of electrical line "naked to the weather and

27   often-thick foliage."  AC ¶ 75.  According to the Associated Press, those videos and images show

28   that in the first moments of the Maui fires, when high winds brought down power poles, which

slapped electrified wires to the dry grass below, the flames erupted all at once in long, neat rows because those wires were bare, uninsulated metal that could spark on contact. *Id*. An expert in electrical systems, Michael Ahern, who served as a director of power systems at Worcester Polytechnic Institute in Massachusetts, has stated that it is "very unlikely" a fully-insulated cable would have sparked and caused a fire in dry vegetation. AC ¶ 76. Other experts who watched videos showing downed power lines agreed that insulated wire would not have arced and sparked, igniting a line of flame. *Id*.

Indeed, the Company's *own policy*, stated in its Wildfire Mitigation Plan, was *against* "replacing existing overhead conductors with insulated conductors such as tree wire," purportedly because even though "[t]hese technologies are excellent in preventing sparks if tall vegetation is in or adjacent to the line right-of-way . . . the type of vegetation in the Hawaii wildfire areas are grasses, shrubs with few tall trees," so "[insulated] tree wire . . . would not be cost-effective." AC ¶ 77. Accordingly, the Company's own internal policy directly contradicted its public statements in which it assured the public it had "replaced traditional power lines with insulated conductor systems." *Id*.

In their Motion, Defendants fail to address head on their blatantly false statement that HEI had "replaced traditional power lines with insulated conductor systems." AC ¶ 74; DB 15-17. Defendants argue only that Plaintiffs have failed to plead that this misstatement was false because "Plaintiffs fail to plead that HECO actually had a policy against installing insulated wiring on its utility poles." DB 16.

As an initial matter, Defendants' argument fails even to address two of the three separate bases in the Complaint for the allegation that HEI had not in fact "replaced traditional power lines with insulated conductor systems" in "areas prone to vegetation-related outages." *First*, as noted above, the Complaint pleads that the Associated Press investigated and found that HEI had left miles of electrical line "naked to the weather and often-thick foliage." AC ¶ 75. This investigation alone is an independently sufficient basis to plead that HEI had not successfully installed insulated conductor systems in all areas prone to vegetation-related outages, as it claimed. *Second*, the Complaint pleads that multiple experts agree that the downed power lines in Maui were not

insulated because of the way they sparked.  AC ¶ 76.  These facts likewise show, contrary to Defendants argument, DB 17, that Maui Electric had not installed insulated wiring along Lahainaluna Road in early 2020.  Defendants' suggestion that Maui Electric installed insulated wiring, then replaced that wiring again with uninsulated wiring prior to the Lahaina wildfires in 2023, contradicts these allegations in the Complaint and is facially implausible.

In any event, HEI's Wildfire Management Plan itself provides a *third* basis on which the Complaint pleads that HEI had not "replaced traditional power lines with insulated conductor systems."  As noted above, the Company opposed a general policy of "replacing existing overhead conductors with insulated conductors such as tree wire" because it "would not be cost-effective."  AC ¶ 77.  HEI's statement in the Wildfire Management Plan that "tree wire" "should be considered" "if there are wildfire areas with tall trees adjacent to the line," Def. Ex. 1 at 39, is clear evidence that HEI had *not* already "replaced traditional power lines with insulated conductor systems"—had HEI already made these replacements, there would be no need for a policy that such replacements should be considered.

Defendants also argue that HEI's statements that it believed that "each subsidiary has appropriately responded to environmental conditions requiring action," AC ¶¶ 158, 166, 174, 184, were inactionable statements of opinion.  DB 9-10.  While these particular statements are opinions statements, they are actionable under *Omnicare* because they "omit[] material facts about the issuer's . . . knowledge," and "those facts conflict with what a reasonable investor would take from the statement itself."  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189 (2015).  Reasonable investors would take from these statements that HEI's subsidiaries had taken the actions to mitigate wildfires that HEI contemporaneously claimed they had taken, including installing insulated conductor wire, replacing aging poles, and clearing fire-prone grasses, yet Defendants omitted from these statements that they knew that the subsidiaries in fact had not taken such actions.  *See infra* Part VI.

**B.    HEI Misled Investors To Believe That Its Poles Were Regularly Maintained and Complied with National NESC Safety Standards**

**1.    HEI Falsely Assured Investors that It Was Regularly Maintaining Its Poles**

Relatedly, during the Class Period, HEI repeatedly assured investors that it was regularly maintaining its poles, when in fact, HEI's pole maintenance was severely deficient. AC ¶¶ 158, 164, 166, 168, 170, 174, 178, 184, 188, 202. For example, on April 22, 2021, HEI issued its consolidated 2020 ESG Report, which stated:

> We continually maintain and upgrade our transmission and distribution system to ensure seamless delivery of power to our customers. Day-to-day maintenance is a key part of keeping the grid resilient. We regularly inspect our poles, lines, and other equipment, and work to replace and upgrade aging and faulty equipment before failures happen.

AC ¶ 7.

In fact, throughout the Class Period, HEI was failing to replace thousands of severely outdated utility poles that posed a danger of falling and sparking during high winds. A former employee of Hawaiian Electric ("FE1") has confirmed that the majority of the Company's poles were leaning and approaching the end of their lifespan. FE1 was the Director of Regional Transmission and Distribution Operations for Hawaiian Electric from October 2018 to July 2020. AC ¶ 82. FE1 was based in Honolulu and reported to Vice President of Energy Delivery Cecily Barnes, who reported to a Senior Vice President who reported to Hawaiian Electric's CEO. *Id*. FE1's role was to serve as a managing director over the electric grid on all five islands. *Id*. According to FE1, "Hawaiian Electric is powered by a grid that uses large wooden poles that are largely uninsulated, leaning, and nearing the end of their lifespan and are strung with vegetation over miles of rugged terrain."[2] AC ¶ 82. Indeed, during the Class Period, thousands of Hawaiian Electric's poles were more than 40 years old, and so were at high risk of breaking down. AC ¶ 83.

---

[2] These detailed allegations from the AC make clear that, contrary to Defendants' suggestion, DB 16 n.4, FE1 was in a position to know the information ascribed to FE1. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009), *as amended* (Feb. 10, 2009) (confidential witness statements may be relied upon where the confidential witnesses are described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."). Regardless, Defendants appear to concede the substance of FE1's assertions, DB 16 n.4, and other allegations corroborate FE1's account, *see* AC ¶¶ 83, 87.

10

1   Utility poles on the islands have an average service life of 40 to 45 years or less before they need

2   replacing.  *Id*.  In 2016, a consultant wrote that of some 24,000 poles on Maui, the consultant

3   determined about 7,700, almost one-third, were at least 40 years old.  AC ¶ 84.

4         In their Motion, Defendants do not dispute that HEI's poles were outdated and in dire need

5   of replacement.  Instead, Defendants argue *first* that the Company had disclosed that it was behind

6   on replacing poles, so its statement that it was "continually maintain[ing]" its poles could not have

7   led investors to believe that this was true.  DB 15.  Not so.  Defendants point to a statement by a

8   subsidiary in a December 2013 regulatory filing that the HECO's goal at that time was to replace

9   1,300 poles per year, and then point to HECO's statement a decade later in the 2022 Sustainability

10  Report that it was replacing 400 poles per year in Maui, Lana'i and Moloka'i to argue that the

11  Company had disclosed that it was behind this December 2013 goal.  DB 15.  Even accepting

12  Defendants' premises, HECO's disclosure that it was replacing 400 poles per year on *three* islands

13  does not reveal that HECO was not replacing 1,300 poles per year across all *five* Hawaiian islands

14  where it operated, including Hawaii Island.  In any event, investors were entitled to take HEI at its

15  word when it stated each year that it was "continually maintain[ing]" its poles, and so to trust that

16  HEI's poles were, at the time those statements were made, generally in order and not widely in

17  need of maintenance, regardless of any statements buried in a decade-old regulatory filing.

18  Moreover, Defendants statements in the same December 2013 regulatory filing that "[f]ailed poles

19  could pose a serious public hazard" in no way render HEI's assurances (almost a decade later) that

20  it was "continually maintain[ing]" its poles (the majority of which were falling over) not

21  misleading.

22        *Second*, Defendants argue that HEI's disclosures "said nothing about timing"—that is, they

23  said nothing "about whether the Company was hitting any particular planning benchmarks."

24  DB 16.  Defendants are mistaken.  HEI's statements that it was "continually maintain[ing]" its

25  distribution system were statements about the Company's present operations and the current status

26  of those operations—i.e., that the poles were, as of the writing, "maintain[ed]," and the Company

27  was maintaining them "continually."  AC ¶ 178.

28

1

2

### 2. HECO Misled Investors By Falsely Claiming their Poles Followed NESC Safety Standards

3

4

The Company blatantly misled the public to believe that its poles were in compliance with

5

national safety standards designed to prevent them from falling and sparking in severe weather.

6

AC ¶¶ 192, 196, 198, 204.  For example, on November 23, 2022, the Company stated:  "[O]ur

poles follow standards set by the National Electric Safety Code ("NESC") to ensure they are safe

7

for our employees to work on and can withstand impact of severe weather."  AC ¶ 85.

8

In fact, the majority of the Company's poles were outdated and did not comply with current

9

NESC standards to withstand severe weather.  Even setting aside the number of poles 40 years or

10

older, the majority of HEI's poles were built to a 1960s standard that did not account for hurricane-

11

strength winds.  AC ¶ 86.  The 1960s standard required only that the poles be able to resist a

12

minimum of 56 mph sustained winds, weaker than a Category 1 hurricane.  *Id*.  A 2007 generally

13

accepted, national standard under the NESC required all poles to be able to withstand 105 mph

14

winds.  *Id*.  Accordingly, the majority of Hawaiian Electric's poles were not in compliance with

15

NESC standards and were in dire need of upgrade to prevent falling and sparking during weather

16

event even less severe than a Category 1 hurricane.  Indeed, that the majority of Hawaiian

17

Electric's poles were out of compliance was proved by the August 8, 2023 weather—according to

18

Shelee Kimura, CEO of Hawaiian Electric, at least sixty percent of the utility poles on West Maui

19

were unable to withstand the weather events on August 8, 2023 and were still down as of August

20

14, 2023.  AC ¶ 87.  On the day of the Lahaina fire, the National Weather Service recorded wind

speeds of only 62 mph on Maui, only modestly above the 1960's standards.  *Id*.

21

In their Motion, Defendants do not dispute that the majority of HEI's poles failed to comply

22

with NESC standards.  Instead, Defendants argue that HECO's blatant misstatements during the

23

Class Period that its poles "follow standards set by . . . NESC" could not have misled investors

24

because in unspecified regulatory filings, HECO had previously disclosed that its utility poles were

25

outdated.  DB 18.  Under Defendants' reading of the securities law, companies may flatly lie to

26

investors so long as they can point to truthful contradictory information buried elsewhere.  That is

27

not the law.  *See Khoja*, 899 F.3d at 1014 (finding it "far from obvious" that a prior disclosure

28

rendered a subsequent disclosure not misleading and holding that "[o]nly if the adequacy of the disclosure . . . is so obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of law."). Even if, implausibly, investors did know about statements buried in HECO's regulatory filings that many of its poles were old, investors were entitled to take HECO at its word when it *subsequently* stated specifically that its poles "follow standards set by . . . NESC," and to allow that more recent, more specific statement to trump any prior, more general statements. *Id*. Defendants also argue that investors must have known that HECO was wrong when it assured investors that its poles "follow standards set by . . . NESC" because HECO informed investors it was replacing poles on Maui and two other islands. DB 18. Yet HECO's statement that it was replacing poles "to maintain strength and safety standards," AC ¶ 192, itself falsely implied that its poles already met safety standards, as it implied that the replacement poles would "maintain" those standards rather than achieve them for the first time.

### C.     HEI Misled Investors To Believe Its Mitigation Plans Addressed Risk of Dry Grasses and Shrubs, When In Fact Its Plans Recommended *Against* Trimming of Grasses Around Power Lines

During the Class Period, the Company repeatedly created the misleading impression that it was actively trimming and otherwise addressing dry grasses and brush beneath and around power lines, when in fact, the Company's own written policy, expressed in its Wildfire Mitigation Plan since 2019, expressly recommended *against* trimming already low-lying vegetation, and *against* creating vegetation fire-breaks as part of the vegetation management program, on the ground that the measures were too costly. AC ¶¶ 158, 160, 162, 166, 168, 174, 178, 180, 182, 184, 186, 188, 194, 202, 206.

For example, in the 2020 and 2021 ESG Reports, Defendants stated straightforwardly: "We regularly trim the vegetation around our equipment . . ." AC ¶¶ 178, 188. These statements naturally misled investors to believe that Hawaiian Electric "regularly trim[med] the vegetation around [its] equipment," including the grasses and shrubs in the immediate vicinity of its power lines. Similarly, the 2021 and 2022 ESG Reports stated:

> Episodic drought, a warming climate and **the expansion of nonnative fire-prone grasses and shrubs has led to an increase in wildfires** in Hawai'i. 98% of wildfires in Hawai'i are human caused and the threat to communities is high year-

1
2

round.  **In addition to the utility's own wildfire mitigation plans, we have joined with community members and wildfire collaborators to help prevent and mitigate wildfires in known hot spots across our service areas**.

3

AC ¶¶ 190, 200.  These statements further led the public to believe that Hawaiian Electric's "own

4

wildfire mitigation plans" took affirmative steps to address "the expansion of nonnative fire-prone

5

grasses and shrubs" that had led to an increase in wildfires.

6

In fact, Hawaiian Electric's express internal policy, written in its Wildfire Mitigation Plan,

7

was certainly not to "regularly trim the [grass and brush] vegetation around its equipment," and

8

indeed not to take any action with respect to "nonnative fire-prone grasses and shrubs."  Rather,

9

the Wildfire Mitigation Plan stated:

10
11
12

[T]he type of vegetation in the Hawaii wildfire areas are primarily grasses, shrubs, and few trees, which rarely grow into conductors.  Thus, **it is not recommended that vegetation management plans be adjusted in the wildfire areas.  Further trimming of the already low-lying vegetation will not likely produce any appreciable results in the potential wildfire areas**.

13

AC ¶ 71.  Indeed, the May 12, 2020 audit of Hawaiian Electric by PUC confirmed that the

14

Company was regularly behind schedule in vegetation maintenance, had failed to complete

15

planned vegetation work for years, and had underspent its budget.  AC ¶ 94.

16

A former employee ("FE2") confirmed that utility poles, including those near Lahaina,

17

were "consumed by brush," and that FE2 was repeatedly instructed by superiors ***not*** to trim the

18

brush at the bases of the poles.  AC ¶ 95.  FE2 was a Troubleman for Hawaiian Electric in the

19

Lahaina area from 2014 to 2021.  *Id*.  FE2 reported to Troubleman Supervisor Gunther Taua, who

20

reported to T&D Construction Superintendent Rod Morton.  *Id*.  FE2's duties were standard

21

troubleman duties, including responding to "trouble" calls from HECO dispatchers.  *Id*.  FE2

22

stated, "I have pictures of me driving through grass that's so high . . . it grows six, seven feet tall."

23

*Id*.  FE2 cleared about 40 poles before a supervisor instructed him to stop in 2016 or 2017.  *Id*.

24

Another former employee ("FE3") likewise confirmed that HECO "neglected" keeping

25

invasive grasses "under control" due to cost.  AC ¶ 96.  FE3 was the Senior Environmental

26

Specialist for Hawaiian Electric from May 2004 to January 2023.  *Id*.  His job responsibilities

27

included addressing environmental hazards, including spill hazards from electric transformers on

28

1    poles.  *Id*.  FE3 explained that "[i]t is costly to maintain that land, keep that vegetation down low,"

2    and as a result, Hawaiian Electric neglected maintaining the grasses down low.  *Id*.

3        Defendants argue first that the Wildlife Mitigation Plan did not recommend against

4    trimming of low-lying vegetation.  DB 12.  Defendants are mistaken.  Defendants point to the

5    statement in the Wildfire Mitigation Plan that "'vegetation management programs involve

6    trimming, removing, and herbicide spraying of vegetation."  *Id*.  But in the same paragraph, the

7    Plan recommends against such trimming in areas of low-lying vegetation when it states, "further

8    trimming of the already low-lying vegetation will not likely produce any appreciable results in the

9    potential wildfire areas."   Defendants argue that the Plan only recommends against "further

10   trimming," and so does not recommend against initial trimming of low-lying vegetation.  Yet that

11   reading of HEI's actions is facially implausible—Defendants suggest that HEI recommended

12   cutting low-lying grasses *a little bit*, but recommended against cutting low-lying grasses *a lot*.  The

13   only sensible reading of the Plan's statement about trimming is that any trimming of *naturally*

14   *trim*, low-lying vegetation is unnecessary because it is already low-lying.

15       *Second*, Defendants reflexively argue that the allegations from FE2 and FE3 are deficient.

16   However, the allegations in the AC concerning FE2 and FE3 easily satisfy the standard for

17   confidential witness statements described above, *see supra* Part IV.B.1, as they specifically name

18   their job titles, dates of employment, to whom they reported, and their duties, and so provide an

19   ample basis to make it likely that they possessed the information ascribed to them.  Additionally,

20   their statements are supported by other allegations, such as the PUC's 2020 audit of Hawaiian

21   Electric.  AC ¶ 94.

22       **D.    HEI Misled Investors To Believe That It Had Followed Advice Given To It**

23       **Concerning Fire Mitigation, When In Fact It Went Against The Central**
            **Components Of That Advice**

24       During the Class Period, HEI misled investors to believe that it was following advice

25   regarding wildfire mitigation from a hired consultant, and that its wildfire mitigation plans aligned

26   with recommendations from wildfire collaborators, when in fact, its wildfire mitigation policies

27   went against that advice.  AC ¶¶ 180, 186, 190, 200.  For example, HEI's 2020 ESG Report stated:

28       The utility engaged Exponent, a leading consulting firm in electric utility resilience,

15

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (CASE NO. 3:23-cv-04332-JSC)

1

2

3

> to perform an independent assessment to identify key vulnerabilities to severe natural events.   Following this assessment, Exponent outlined a set of recommendations . . . .  This included recommendations for system hardening [and] enhanced vegetation management.  The utility is currently developing work plans based on Exponent's recommendations . . . .

4

5

6

7

8

9

10

11

AC ¶¶ 98, 180.   This statement misled investors to believe that HEI was adopting the recommendations of the consulting firm it hired, Exponent, including recommendations to "enhance[] vegetation management."  In fact, as shown in the Company's Wildfire Mitigation Plan, the Company had determined that "the type of vegetation in the Hawaii wildfire areas are primarily grasses, shrubs, and few trees, which rarely grow into conductors," so "it is not recommended that vegetation management plans be adjusted in the wildfire areas."  That is, contrary to its public statement, HEI made no effort to "enhance" or otherwise "adjust" its vegetation management in light of the consultant's recommendations.

12

Similarly, the 2021 and 2022 ESG Reports stated, in substantially similar statements:

13

14

15

16

17

18

19

> Episodic drought, a warming climate and **the expansion of nonnative fire-prone grasses and shrubs** has led to an increase in wildfires in Hawai'i. 98% of wildfires in Hawai'i are human caused and the threat to communities is high year-round. **In addition to the utility's own wildfire mitigation plans, we have joined with community members and wildfire collaborators to help prevent and mitigate wildfires in known hot spots across our service areas**. As members of the Wai'anae Wildfire Hui in West O'ahu and Pacific Fire Exchange on Maui, we meet monthly to share ideas and discuss priority projects. **We support the Hawai'i Wildfire Management Organization** on Hawai'i Island, which works with communities across the state on wildfire planning, prevention and mitigation activities.

20

21

22

The Hawaii Wildfire Management Organization recommended reduction of fuels, such as grasses and shrubs.  Its reports recommended, for example, "**fuels reduction and firebreaks around power infrastructure** in 'hotspot' areas."  AC ¶ 100.

23

24

25

26

27

28

Yet contrary to its statements suggesting that its wildfire mitigation plan aligned with the recommendations and concerns of community organizations, Hawaiian Electric held as a matter of policy that the vegetation in wildfire areas required no special attention or additional mitigation efforts.  As noted above, it stated that "the type of vegetation in the Hawaii wildfire areas are primarily grasses, shrubs, and few trees, which rarely grow into conductors," so "it is not recommended that vegetation management plans be adjusted in the wildfire areas."

In their Motion, Defendants first argue incorrectly that these statements "did not state or imply that HEI had 'adopted' any particular 'advice of wildfire collaborators.'"  DB 14.  As noted above, HEI's 2020 and 2021 ESG Reports directly implied that HEI was adopting the recommendations of the consulting firm it hired, Exponent, to "enhance[] vegetation management."  Likewise, the 2021 and 2022 ESG Reports specifically mentioned that "the expansion of nonnative fire-prone grasses and shrubs has led to an increase in wildfires" immediately before claiming that HEI had "joined . . . wildfire collaborators to help prevent and mitigate wildfires."  These statements read together create the impression in the mind of a reasonable investor that HEI was taking steps with those collaborators to address "fire-prone grasses and shrubs."  In fact, the opposite was true, as HEI had a written policy against cutting such low-lying grasses and shrubs.  Defendants attempt to deny that HEI had such a policy, DB 14, but as explained above, *supra* Section IV(C), Defendants are conveniently misreading their own Wildfire Mitigation Plan.

### E.    HEI Misled Investors To Believe That It Prioritized Safety Over Other Considerations, When In Fact, As an Objective Matter of Written Policy, It Prioritized Customer Convenience and Cost-Saving

Finally, during the Class Period, Defendants repeatedly misled investors to believe that the Company's policies prioritized safety over other considerations, such as customer convenience, when in fact, as a matter of written policy, Hawaiian Electric prioritized customer convenience and cost-saving.  AC ¶¶ 172, 176.

For example, on September 15, 2020, HEI released its first ESG report (the "2019 ESG Report").  The 2019 ESG Report stated, in relevant part:  "Safety is our number one priority at Hawaiian Electric."  Likewise, the 2020 10-K stated:  "Due to the nature of its operations, safety is of paramount importance."

These statements were objectively false because, as a matter of written policies, safety was not Hawaiian Electric's "number one priority."  The Company's Wildfire Mitigation Plan set forth its policy of not "preemptively turning off circuits," despite the fact that such deenergizing was the safest and most reasonable policy to prevent wildfires, because the policy "was not well received by certain customers affected."  AC ¶ 106.  Also, the Company underspent its budgets

for vegetation management and failed to complete its planned wildfire mitigation programs for years "in order to counter overspends elsewhere to meet the overall budget in Energy Delivery." AC ¶ 173.  Indeed, PUC found that HEI skimped on fire mitigation work "based purely on the expenditure on the program" and that "[t]his [wa]s an unacceptable approach that must be remediated urgently."  AC ¶¶ 60, 68, 71, 77, 89, 93, 96.

Defendants argue first that these statements are not limited to wildfire risk.  DB 19.  That is true, but these statements are nevertheless misleading because they are at best only half-truths— even if the Company prioritized safety in other areas, the Company did not prioritize safety in its wildfire mitigation plans, so the Company's statements that safety was its number one priority were at best only half-true.  *See United States v. Laurienti*, 611 F.3d 530, 539 (9th Cir. 2010) (Section 10(b) "prohibits the telling of material half-truths").  Defendants also argue that these statements are merely statements of "corporate optimism," that are "inherently subjective" and cannot "be true or false on an objective standard."  DB 19.  Not so.  As explained above, whether safety is HEI's "number one priority" in HEI's wildfire mitigation plans is a falsifiable statement of fact.  The statement is demonstrably false because, as a matter of written policy, the Company's wildfire mitigation plans prioritized customer convenience, as well as costs, over safety, so safety was objectively not HEI's "number one priority."  AC ¶ 105-08.  In no case cited by Defendants did plaintiffs allege, like here, that the company touting its safety had a written policy prioritizing customer convenience over safety.

## V.   DEFENDANTS ARE LIABLE FOR STATEMENTS MADE BY THE ENTITIES THEY WHOLLY CONTROLLED AND OPERATED THROUGH

Defendants argue that they are not liable for 11 of the 25 challenged statements under *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011).  Defendants' attempt to distance HEI from HECO to argue that HEI did not have ultimate authority over certain statements here is unavailing.  DB 6-8.  In contrast to *Janus*, HEI wholly owns HECO, files SEC forms together as one "registrant," and during the relevant period shared the same address.  AC ¶ 29; *see, e.g.*, Def. Ex. 4 at ECF pp. 2, 8; Def. Exs. 5-6 at ECF pp. 2, 7.  HEI was a "holding company with no significant operations of its own" and derived about 91% of its revenues from HECO.  *See, e.g.*,

1   Def. Ex. 6 at ECF p. 11; AC ¶ 30.  HEI was therefore not only a parent, but a veritable alter ego

2   of HECO, and wholly controlled, and had ultimate authority over, its actions and statements.  In

3   any event, "whether a defendant in fact exercised the requisite control over the content of the

4   statement is 'an inherently fact-bound inquiry.'" *SEC v. Kameli*, Case No. 17-C-4686, 2020 WL

5   2542154, at *13 (N.D. Ill. May 19, 2020) (*quoting Glickenhaus & Co. v. Household Int'l, Inc.*,

6   787 F.3d 408, 427 (7th Cir. 2015)).

7        Ample case law supports attributing HECO's statements to the entity that wholly controlled

8   it, HEI.  *See, e.g., In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,

9   MDL No. 2672 CRB (JSC), 2017 WL 66281, at *18 (N.D. Cal. Jan. 4, 2017) (rejecting argument

10  that parent was not liable under *Janus* for statements issued by subsidiaries where parent exercised

11  power and control over subsidiaries including by appointing their boards and officers); *City of

12  Roseville Emps. Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 417-18 (S.D.N.Y. 2011)

13  (defendant that wholly owned subsidiary liable for statements in subsidiary's SEC filings under

14  *Janus*); *see also Flynn v. Exelon Corp.*, No. 19 C 820, 2021 WL 1561712, at *6 (N.D. Ill. Apr. 21,

15  2021) (denying dismissal where parent and controlled subsidiary both made statements, as

16  "Plaintiff is not bringing claims against Exelon only as the corporate parent of ComEd, but because

17  Exelon also made allegedly false and misleading statements").

18       Additionally, HEI's SEC filings state regarding HECO CEO Shelee Kimura—who made

19  and/or authorized HECO's statements—that "Mss. Kimura [and another sub's CEO] are officers

20  of HEI subsidiaries rather than of HEI, but *are deemed to be executive officers of HEI* under SEC

21  Rule 3b-7."  *See, e.g.*, Van Decl. Ex. 1 (HEI 2021 10-K at 35) (emphasis added).  Under SEC Rule

22  3b-7, "Executive officers of subsidiaries may be deemed executive officers of the registrant if they

23  perform [] policy making functions for the registrant."  17 C.F.R. § 240.3b-7.  As an "executive

24  officer" of HEI, the statements Kimura made (*e.g.*, in the Sustainability Reports) and authorized

25  (*e.g.*, in the press releases, blog posts and YouTube videos) are imputed to HEI.  *See Carpenters

26  Pension Tr. Fund of St. Louis v. Barclays PLC*, 56 F. Supp. 3d 549, 558-59 (S.D.N.Y. 2024) (*Janus

27  "does not imply that there can be only one 'maker' of a statement in the case of express or implicit

28

1   attribution" and "did not alter the well-established rule that a corporation can act only through its

2   employees and agents.")

3   **VI.     THE AC ADEQUATELY PLEADS SCIENTER**

4          The relevant inquiry in considering scienter is "whether *all* of the facts alleged, taken

5   collectively, give rise to a strong inference of scienter." *Tellabs, Inc. v. Makor Issues & Rights,*

6   *Ltd.*, 551 U.S. 308, 323 (2007).  The inference "need not be irrefutable . . . or even the most

7   plausible." *Id.* at 324.  An inference of scienter is "strong," and a motion to dismiss must be

8   denied, where "a reasonable person would deem [it] cogent and at least as compelling as any

9   opposing inference." *Id.* "[A] tie goes to the Plaintiff." *In re Amgen Inc. Sec. Litig.*, No. CV 07–

10  2536 PSG (PLAx), 2014 WL 12585809, at *8 (C.D. Cal. Aug. 4, 2014).  Scienter may be pled by

11  alleging facts showing defendants had actual knowledge of, or "access to," information

12  contradicting the challenged statements, or were in a position where they would be likely to know

13  facts regarding operational issues that affect a significant portion of the company's revenue.  *See*

14  *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008); *In re Alphabet, Inc. Sec.*

15  *Litig.*, 1 F.4th 687, 706 (9th Cir. 2021); *Amgen*, 2014 WL 12585809, at *9, 11.  The required

16  inference of scienter "need not be irrefutable . . . or even the most plausible," and no "smoking-

17  gun" is required.  *See Tellabs*, 551 U.S. at 324.

18                    **1.     Defendants Knew that Certain of Their Statements Were False and
                              Misleading Because Defendants Knew About Their Own Wildfire**
19                    **Mitigation Plan**

20          During the Class Period, Defendants repeatedly assured investors that they were taking

21  specific steps to mitigate wildfire risk, when in fact, they knew they were not, as the Company's

22  Wildfire Mitigation Plan, which it followed, specifically stated as a matter of policy that the

23  Company would not take such actions, and Defendants were demonstrably familiar with that Plan.

24  *First*, Defendants informed the market that they had replaced uninsulated wires on their power

25  lines, while, as stated in their Wildfire Mitigation Plan, Defendants actually had determined that

26  replacing uninsulated conductors with insulated conductors would "not be cost-effective."

27  AC ¶¶ 68, 77, 209.  *Second*, Defendants assured investors that HEI "regularly trim[ed] the

28  vegetation around [its] equipment," when the Company's policy in its Wildfire Mitigation Plan

expressly recommended *against* trimming low-lying vegetation, and *against* creating vegetation fire-breaks on a regular basis because such measures were too costly. AC ¶¶ 9, 70, 89-97.  *Third*, Defendants implied that they had joined in the recommendations of wildfire collaborators to address "fire-prone grasses and shrubs" when, as noted above, the Wildfire Mitigation Plan expressly recommended *against* taking action to address such low-lying vegetation.  *Fourth*, Defendants assured investors that they prioritized safety over other considerations, even though their Wildfire Mitigation Plan set forth their policy of not "preemptively turning off circuits"—the recommended way to prevent wildfires in times of danger—because the policy "was not well received by certain customers affected" in California. AC ¶¶ 11, 69, 103-06, 132, 143, 172-73, 209-10.

Defendants both knew of and had access to the Wildfire Mitigation Plan demonstrating that their statements were false and misleading.  For example, in submissions and testimony to Congress, HECO CEO Kimura stated that Defendants had developed their Wildfire Mitigation Plan in 2019, and stressed that the reason Defendants did not deenergize during the dangerous weather preceding the Maui wildfires was that they were following policy decisions that had been made years before.  AC ¶ 210 (acknowledging that "*at the time* [of developing the Plan], we concluded that wildfire risk in Hawaii did not justify the detrimental effects of preemptive shutoffs") (emphasis added).  Defendant Seu attended the RWG meetings debating and adopting the 2019 decision not to deenergize as part of the Company's Plan. AC ¶¶ 49-55.  Moreover, HEI's own ESG Reports were signed by Defendants Lau and Seu and expressly relied on and invoked the Company's Wildfire Mitigation Plan.  *See e.g.*, AC ¶ 190 (2021 ESG Report, signed by Seu, discussing "the utility's own wildfire mitigation plans").  Thus, Defendants clearly had access to the Wildfire Mitigation Plan, and indeed had knowledge of it and its contents.  Such access and knowledge suffice to allege scienter.  *See Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004) ("The most direct way to show . . . that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement."); *Roberti v. OSI Sys., Inc.*, No. CV 13–9174–MWF (VBKx), 2015 WL 1985562, at *12 (C.D. Cal. Feb. 27, 2015) ("scienter can be established by the fact that the

Defendants touched on the specific issue . . . in their public statements"); *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 815 (C.D. Cal. 2011) (finding scienter "based on . . . defendants' access to information contradicting [their] statements").

Defendants seek to sow doubt about when the Wildfire Mitigation Plan was created and implemented, DB 22, but HECO CEO Kimura indicated it was created in 2019, prior to all of HEI's alleged misstatements at issue, AC ¶ 210.  Moreover, in her written comments to Congress, Kimura repeatedly used first person plural pronouns ("we" and "our") in speaking about HEI's and her actions in 2019:  she spoke of "developing *our* wildfire mitigations strategy" and noted that "*we* concluded . . . " decisions about that strategy.  *Id*. (emphasis added).  These statements confirm that she and her colleagues were aware of the Plan as of 2019.  The Plan was immediately put to use by the Company, and well prior to 2023, as Defendant Seu discussed the Plan in the 2021 ESG Report.  AC ¶ 211.  For the same reason, Defendants' argument that the Complaint fails to plead "that the Individual Defendants had actual access to the Plan . . . when any of the challenged statements were made" also fails.  DB 22.  Defendants made many of the false statements at issue in the Company's ESG Reports, the very same report in which Defendants Seu discussed the Company's "wildfire mitigation plans."  AC ¶ 190.

### 2.    Even If (Counterfactually) Defendants Had Not Had Access to the Wildfire Mitigation Plan, They Were Severely Reckless in Making Statements Implying They Were Familiar with the Company's Wildfire Mitigation Policies and Efforts

Even if, contrary to the allegations of the complaint and common sense, Defendants somehow had not had actual knowledge of or access to the Plan, then Defendants were severely reckless in falsely implying they had knowledge of that Plan and of their policies and actions regarding wildfire mitigation.  *See S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1258 (W.D. Wash. 2009) (court can infer at least deliberate recklessness where the statements themselves suggest actual knowledge); *In re Zillow Grp., Inc. Sec. Litig.*, No. C17-1387-JCC, 2019 WL 1755293, at *20 (W.D. Wash. Apr. 19, 2019) (defendants were "at least deliberately reckless in continuing to make statements that the co-marketing program was legally compliant" given their statements evincing familiarity with the program); *see also Howard v. Everex Sys.*, 228 F.3d 1057,

1    1062, 1064 (9th Cir. 2000) (corporate officers cannot claim ignorance where they "failed to obtain

2    and disclose [contrary] facts although [they] could have done so without extraordinary effort.")

3          Here, Defendants' misleading statements themselves would have led reasonable investors

4    to believe that Defendants had actual knowledge of the Company's policies and actions supporting

5    wildfire mitigation, so Defendants were at a minimum deliberately reckless if they made those

6    statements without first learning about those policies and actions.  Defendants' representations to

7    investors that HEI had replaced exposed power lines with insulated conductor wire, that HEI's

8    poles were regularly maintained and complied with NESC safety standards, and that it regularly

9    trimmed grasses and shrubs around its equipment, would lead reasonable investors to believe that

10   Defendants had some basis for stating that the Company had taken those actions and adopted those

11   policies.  Likewise, Defendants' statements suggesting that HEI's policies aligned with those of

12   wildfire collaborators, and that it prioritized customer safety over customer convenience, would

13   have led reasonable investors to believe that, at a minimum, Defendants were aware of those

14   policies.  Defendants acted deliberately recklessly when they made these statements, and implied

15   their knowledge of these matters to investors, if in fact they had made no effort to learn about the

16   Company's actual policies and actions and so had no idea what they were talking about.

17             **3.    Mitigation of Environmental Risk Was a Core Part of Hawaiian**
                       **Electric's Business, Defendants' Compensation Was Tied to**
18                     **Enterprise Risk Mitigation, and Board Members Were Expressly**
                       **Apprised of Risks**
19

20         The Company's intense focus on mitigating material risks like wildfires further supports

21   an inference of scienter.  Defendants repeatedly emphasized that they were highly focused on

22   wildfire risk mitigation.  *See, e.g.*, AC ¶¶ 5-11, 214-16.  HEI specifically required regular reports

23   on the material risks affecting HECO, including wildfire risks, through, *inter alia*, HEI's Audit &

24   Risk Committee, HECO's CFO/Chief Risk Officer, and HECO's "Enterprise Risk Management"

     function which is responsible "for reporting on areas of significant risk to the HEI Board."
25
     AC ¶¶ 215-19.  As a result, Defendants, including Seu and Lau, were apprised of risks like
26
     "wildfires" that could have a material adverse effect, and "[t]opics discussed at the board level"
27
     included "weather events and their potential impact on [HEI]."  AC ¶¶ 218-21.  Likewise, the
28

1   Company assured investors that compensation of its executives was designed to encourage them

2   to minimize risk.  AC ¶ 216 ("Hawaiian Electric's compensation policies . . . are designed . . . to

3   discourage decisions that introduce inappropriate risks").

4          HEI's focus on wildfire risk mitigation further supports an inference of scienter.  Through

5   the above channels, Defendants were directly and routinely provided information about the

6   Company's wildfire risks, so the inference that they were aware of HEI's wildfire mitigation plan

7   is highly compelling.  Indeed, the potential catastrophic impact of wildfires on HEI's core

8   operations supports scienter.  *See Berson*, 527 F.3d at 988-89 (scienter is more easily shown when

9   subject affects core operations).  Risk and hazard information "fall squarely within" upper

10  management's "bailiwick."  *Amgen*, 2014 WL 12585809, at *12 (finding "compelling" that VP of

11  Clinical Development would be aware of reports regarding potential hazards of drug).  Moreover,

12  91% of HEI's revenues came from HECO's operations in the power industry, a heavily regulated

13  industry requiring close attention, particularly on matters of wildfire mitigation.  *See Del. Cnty.*

14  *Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, 620 F. Supp. 3d 603, 630, 632 (S.D. Tex. 2022) (that

15  company operated in highly regulated industry, requiring vigilant monitoring of compliance, and

16  past events should have put defendants on notice of dangers, supported scienter); *S. Ferry LP #2*,

17  687 F. Supp. 2d at 1258 ("repeatedly assur[ing] the public that [the company] was adequately

18  managing its risk" supports scienter).

19         Defendants argue that the Court should not consider the importance of wildfire mitigation

20  in HEI's core operations in determining whether scienter has adequately been pleaded because,

21  according to Defendants, risk mitigation did not concern "prominent facts."  DB 23.  Yet as

22  explained above, the AC pleads in detail how the Company's risks and mitigation strategies were

23  centrally considered by Defendants and the members of the board.  Defendants argue that the

24  Complaint's allegations concerning risk management are "vague," but their argument simply

25  mischaracterizes the particularized allegations above that detail the specific channels through

26  which Defendants were routinely apprised of risks including wildfires.

27

28

### 4.    A Holistic Review Supports Scienter

A holistic review of the allegations above gives rise to an unavoidable inference of knowledge or deliberate recklessness on the part of Defendants.  Defendants were familiar with an internal document, the Company's Wildfire Mitigation Plan, which the Company admittedly followed, that directly contradicted their statements to investors.  AC ¶¶ 209-11.  Defendants even cited that Plan in the same ESG reports in which they made many of their misleading statements.  *Id*.  Defendants were routinely apprised of risks including wildfires, and their compensation was even tied in part to the mitigation of such risks.  AC ¶¶ 214-21.  Indeed, at a minimum, Defendants' misleading statements were made with deliberate recklessness if, as Defendants claim, they actually had no knowledge of the Company's wildfire mitigation plans and actions.  Considered holistically, these allegations more than suffice to raise a strong inference of scienter.  *See Tellabs,* 551 U.S. at 325.  Contrary to Defendants' arguments, DB 23-24, the law is clear that allegations of motive (such as insider selling) are wholly unnecessary to plead scienter, and a theory of scienter is not somehow "nonsensical" simply because it does not rely on allegations of motive.  *See Tellabs,* 551 U.S. at 325; *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 49-50 (2011) (finding scienter despite no "motive" allegations); *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1149 (N.D. Cal. 2017) (no negative inference from lack of stock sales where that was not part of plaintiffs' theory of scienter).

## VII.    CONCLUSION

Defendants' Motion should be denied.

Dated:  July 8, 2024

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Austin P. Van*
Jeremy A. Lieberman (admitted *pro hac vice*)
Austin P. Van (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (917) 463-1044
E-mail:  jalieberman@pomlaw.com
avan@pomlaw.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California  90024
Telephone:  (310) 405 7190
Facsimile:  (917) 463 1044
jpafiti@pomlaw.com

*Attorneys for Lead Plaintiffs*

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (CASE NO. 3:23-cv-04332-JSC)

1

**CERTIFICATE OF SERVICE**

2      I, Austin P. Van, hereby certify that a true and correct duplicate copy of the foregoing

3  Second Amended Class Action Complaint for Violations of the Federal Securities Laws was filed

4  electronically on July 8, 2024.  Notice of this filing will be sent by e-mail to all parties by operation

5  of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as

6  indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's

7  CM/ECF System.

8                                          */s/ Austin P. Van*
                                           Austin P. Van
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28