**Pages 1 - 44**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Judge

BHAPINDERPAL S. BHANGAL,          )
                                  )
          Plaintiff,              )
                                  )
   VS.                            )          NO. 23-CV-04332-JSC
                                  )
HAWAIIAN ELECTRIC INDUSTRIES,     )
INC., ET AL.,                     )
                                  )
          Defendants.             )
_____   )

                              San Francisco, California
                              Thursday, September 26, 2024

                    **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                    POMERANTZ LLP
                    600 Third Avenue, Floor 20
                    New York, NY 10016
               BY:  **AUSTIN VAN, ATTORNEY AT LAW**

For Defendants:
                    SKADDEN ARPS SLATE MEAGHER & FLOM LLP
                    525 University Avenue, Suite 1400
                    Palo Alto, CA 94301
               BY:  **MARK R.S. FOSTER, ATTORNEY AT LAW**

                    SKADDEN ARPS SLATE MEAGHER & FLOM LLP
                    300 South Grand Avenue, Suite 3400
                    Los Angeles, CA 90071
               BY:  **PETER B. MORRISON, ATTORNEY AT LAW**


          **(APPEARANCES CONTINUED ON THE NEXT PAGE.)**


REPORTED BY:  Kendra A. Steppler, RPR, CRR
                    Official United States Reporter

APPEARANCES (Continued):

                    SKADDEN ARPS SLATE MEAGHER & FLOM LLP
                    One Manhattan West, 395 9th Avenue
                    New York, NY 10001
              BY:   SUSAN L. SALTZSTEIN, ATTORNEY AT LAW

**Thursday - September 26, 2024**                    **10:32 a.m.**

P R O C E E D I N G S

---oOo---

**THE COURTROOM DEPUTY:**  Calling Civil Action C 23-4332, Bhangal v. Hawaiian Electric Industries, et al.

**MR. VAN:**  Good morning, Your Honor.  Austin Van on behalf of lead plaintiffs.

**THE COURT:**  Good morning.

**MR. FOSTER:**  Good morning, Your Honor.  Mark Foster from Skadden Arps.  I'm with my partners, Peter Morrison and Susan Saltzstein.  We represent defendants, Hawaiian Electric Industries, which I'll refer to as "HEI," and its former executives, Greg Hazelton and Paul Ito, who both served as CFOs; Scott Seu, who's the current CEO; and Connie Lau, who is HEI's former CEO.

**THE COURT:**  All right.  Welcome and good morning.

Okay.  This is the PSLRA motion to dismiss that you get in every one of these cases.

Let's start with the 11 statements that, on their face, were made by the subsidiaries.  I don't think that's disputed. And I'm having troubles finding allegations that plausibly support an inference that HEI actually participated in and had authority over those statements.

**MR. VAN:**  So we have what seems to be a knockdown allegation that seems to be to resolve this issue about *Janus*

entirely.  In *Janus*, the parent entity didn't own any of the subsidiary.  It was a 0 percent ownership interest.  It was an independent entity.  They didn't have any ultimate authority.  They had no actual control.  All they could do is make suggestions.

This is the opposite.  HEI wholly owns Hawaiian Electric and Maui Electric and all the other subsidiaries, 100 percent.  And we scoured all cases that we could find across the universe of cases and found exactly one.  I think it's the Western District of Virginia -- or District of Western Virginia -- that found that an entity that wholly owns a subsidiary doesn't satisfy *Janus*.  So that's an outlier.

All the other cases, including another case in this district that dealt with the same entity at issue in that District of West Virginia case, found that where you have ownership of -- by a parent of a subsidiary -- that constitutes ultimate authority and it stands to reason.

**THE COURT:**  How much ownership?

**MR. VAN:**  100 percent.

**THE COURT:**  But that, as a matter of law, means that the parent -- or at least as a matter of plausible inference -- that the parent had actual control and participation in the statement.

**MR. VAN:**  Well, ultimate authority is a standard, Your Honor.  And absolutely.  That's what ownership means.  It means

that you have ultimate control.

THE COURT:  Why is it, then, in all my other cases, when we're talking about parent-subsidiary relationships, I'm required to treat them as separate entities and the plaintiffs have to plead very specific facts to ever get the parent liable for things the subsidiaries do?  In other words, in all the other contexts, the assumption you're asking me to make, we don't make.

MR. VAN:  Well, so I can't speak to the other contexts.  Here, we're really just talking about the makers of statements.  And *Janus* is -- it's a very simple rule in *Janus*.  It has to do with ultimate authority.  And *Janus* had nothing to do with the facts of this case.  Because, there, you -- there really was a question about whether the parent had ultimate authority over the statements being made by the subsidiary.  And it didn't.  It didn't own any of it.  It was just making suggestions.

Here, if Hawaiian Electric wanted to, they could do anything they want to with these subsidiaries, because they completely own them.  They are their play things.

THE COURT:  So what -- so which -- which case are you referring to in this district?  The *Rocket Fuel* case?

MR. VAN:  No.  It's the *Volkswagen* case -- *"Clean Diesel."*  So I mention that case only because this -- the one case we found where there was complete ownership that

contradicts this principle that total ownership certainly means ultimate authority --

THE COURT:  Well, but, in that case, there was an allegation that the parent company was involved in day-to-day operations of its subsidiaries, including directing their public statements and developing, reviewing, and improving the marketing and advertising campaigns.

MR. VAN:  That's right.  I only mention this because of the entity Volkswagen.  It was the same entity -- to show that there's tension even with this one --

THE COURT:  No.  But tell me why -- that this case -- but those allegations that were in the *VW* here in Judge Breyer's case -- those allegations aren't here.

MR. VAN:  So you're right about that.  And, again, I mention this case just to show that there's tension even with this one case from Western -- the only case that we found -- that defeats the rule, which should be the rule, that total ownership by a parent of its subsidiary means ultimate authority.  There's only --

THE COURT:  Well, so then tell me what case -- so -- you said "defeats that rule."  What case gives me that rule?  That's what I'm looking for --

MR. VAN:  Well, so I think -- so I think it very seldomly comes up, just because it seems obvious that total ownership satisfies the standard for ultimate authority.  But

the case --

**THE COURT:**  Let me stop you there.  Let me stop you there.

**MR. VAN:**  Sure.

**THE COURT:**  Because what I said is that's not obvious. Because we have separate ownership.  And I'm required -- right? -- because this is like basic contracts from law school -- they're separate entities.  They're separate.  We treat them as separate.  So when you say it's obvious total ownership gives them ultimate authority over the statements, I -- give me some law that says that.

**MR. VAN:**  That's -- so *City of Roseville* is a case in which you had ownership of the subsidiary by the parent entity. That's cited in our briefs.  And that was found as one of the bases for finding that the subsidiary's statements were made by the parent.

**THE COURT:**  City of Roswell?

**MR. VAN:**  *City of Roswell* [sic] *Employees' Retirement System.*

**THE COURT:**  Is that Roswell, New Mexico?  No.

**MR. VAN:**  You know, I'm not sure.  It's an SDNY case, so --

**THE COURT:**  Oh.

**MR. VAN:**  -- so I'm thinking probably not.

Oh, Roseville.  Maybe I had that wrong.  Yeah, okay.  It's

814 F.Supp. 2d 395.

THE COURT:  Okay.  So you are, then, as I thought, relying, essentially, 100 percent, on the 100 percent ownership.

MR. VAN:  So that should be the end of the story.  But, here, even if you want to go beyond that and look at the closeness of the relationship between the parent and the subsidiary, there, too, we should have no questions.  The -- HEI owned 91 percent of HECO.  It was just kind of an umbrella -- you know -- it was just a shell company.  And all the actual operations were being done by Hawaiian Electric.  And the CEO of Hawaiian Electric was a de jure CEO of HEI, the parent company.

THE COURT:  But, again, in all the other contexts -- alter ego and all those things -- I'm told that overlapping directorship positions does not make the parent liable for the sub and vice versa.

MR. VAN:  I think we should be very careful of just extrapolating to all other situations in which you have parent-subsidiary relationships.  Here, we're focused just on this rule of ultimate authority -- authority.  Could they -- do they have the power to change that statement if they wanted to?  And if you totally owned an entity --

THE COURT:  Okay, wait.  I'm going to stop you.  Let's be careful.  Let's look at the language of *Janus*.  I don't see

that language in *Janus*.  *Janus* is actually participated in and had authority over.  Where does it say if you could have done it, then that means you made the statement?  Where's that in *Janus*?

MR. VAN:  Well, I don't have *Janus* before me.  But it seemed clear to me that the central concern of the Court in *Janus* was the fact that this entity wasn't owned, at all, by the parent.  There was zero actual control of the subsidiary by the parent.  So, there, you really had this important question of what degree of control -- let's get into the weeds here and look at the relationships between this parent and the subsidiary and how they are related.  This question never would have arisen had it been the case that the subsidiary was wholly owned by the parent.  And I think --

THE COURT:  You're just saying that.  You don't know that.  Did the Supreme Court say that in *Janus*?

MR. VAN:  They didn't have occasion to.

THE COURT:  Well, of course they had occasion to.  I mean, you're interpreting *Janus* that way and saying that.  But let me hear from Mr. Foster on this question.

MR. FOSTER:  Your Honor, you're right on about *Janus*. *Janus* expressly declined the invitation to disregard corporate form.  It says that in the opinion.  The test is not some control test about anybody who controls somebody else, whether it's another individual or another company, is automatically

liable for that person's false statements.  That's not the test.

The test is oriented to the speaker.  The whole analysis is who spoke, who controlled each word, each statement that's made.  And that's particularly important in a case where you have 25 challenged statements; right?  14 of which are attributed to HEI and the HEI defendants, 11 of which are attributed to the subsidiaries as expressly laid out in the complaint, as Your Honor alluded to at the start.  It says, "Hawaiian Electric made, Hawaiian Electric made, Hawaiian Electric said."

The complaint is very clear who they are attributing those statements to.  *Janus* is very clear that it's all about who made it.  *Janus* says substantial assistance is not enough.  Significant influence is not enough.  What you have to look at is who participated in making each statement.

The case that he cited from the Southern District of New York, *EnergySolutions*, didn't adopt the test that he's advocating in front of you today.  It said, on the allegations before, the parent had, quote, "control over content of the message, the underlying subject matter of the message, and the ultimate decision of whether to communicate the message."

The *Janus* test, as applied by his case and every other case that looks at it, looks at the statements and who made them.  You want a controlling case in this circuit?  Look at

*Reese*.  The Ninth Circuit, in that case, looked at a situation arising out of an environmental disaster, like this case, and said the operating entity was not going to be liable there because there were no allegations that it had a role in the statement.

And that is notwithstanding corporate documents that actually said it had control over those statements.  Because, in that case, there were no allegations that the specific statements at issue were controlled by that entity.

THE COURT:  All right.

MR. FOSTER:  The Ninth Circuit's clear on this.

THE COURT:  Anything further on this issue?

MR. VAN:  The Ninth Circuit certainly has not found, and neither has any other court found, what defendants are asking this Court to adopt, which is a finding that an entity that wholly controls another lacks ultimate authority over that entity.  And that would be --

THE COURT:  Not the entity.  It's the statements.

MR. VAN:  Including the statements.  That's what ownership is.  You know, every aspect of an entity, including, certainly, statements.

THE COURT:  All right.  Okay.

Let's move on, because we still have 14 statements anyway.

MR. VAN:  Sure.

THE COURT:  I don't know if it makes a difference,

really, whether you have those additional 11.  And let me just sort of summarize my tentative view, and then you guys can argue as you want.

So I've sort of divided them, I think, as the complaint divides them, into six categories.  There's statements about the replacement of exposed power lines with insulated wire conductors -- and there's some overlap between them -- statements about utility pole maintenance; statements about trimming vegetation; statements about advice from wildfire collaborators; and statements about prioritization of safety; and, finally, statements about HEI's oversight of subsidiaries.

So we have falsity and we have scienter.  As to falsity -- in looking at it is -- I think, that plaintiffs have plausibly and with particularity alleged the falsity of the replacement lines with insulated conductors, utility pole maintenance, and trimming vegetation, not the other statements.  But I don't think they've alleged facts that give a strong inference of scienter into any of them.  So that's my -- and I grant leave to amend.  But that's my tentative view.  So stuff for both of you to argue.

MR. VAN:  Sure.  So I guess I should start with scienter then, Your Honor, if that's the Court's concern.

So, here -- here, we have what every securities class action dreams of.  That is a smoking gun document.  We have the Wildfire Mitigation Plan that has been publically made

available that shows that -- that defendants had, in their possession and access and even contributed to the creation of, a document that contradicts their public statements.

THE COURT:  So what is -- where are the allegations that the individual defendants contributed to the creation of the Wildfire Mitigation Plan?

MR. VAN:  Well, so, actually, it would have been Kimura, who's not a defendant.  But she, in her testimony to Congress --

THE COURT:  Okay.  She's not a defendant.  Okay.  So --

MR. VAN:  Well, but she is a de jure CEO of HEI.

THE COURT:  Right.  But where is the allegation that the individual defendants that you named -- right -- that they -- I know there's an allegation, I think, that two of them -- maybe only two of the four -- were aware of it.  But what I didn't see were any allegations of what their involvement was, what their knowledge was, their participation in it, any of that.

MR. VAN:  Right.  So Seu and -- the two CEOs during the -- and Lau both signed the ESG reports.  And those reports specifically mention the Wildfire Mitigation Plan.  So they were signing off --

THE COURT:  They do mention the Wildfire Mitigation Plan.  But we're talking about the PSLRA and a strong inference

of scienter.  And, again, I'm looking for allegations that they did more than sign a document that mentions the Wildfire Mitigation Plan.  What case would tell me that would give me a strong inference --

MR. VAN:  Sure.  So you have *Nursing Home Pension Fund, Local 144* -- this is the Ninth Circuit -- 380 F.3d 1226.  It's in our brief.  It states:  The most direct way -- the most direct way -- to show that the party making the statement knew that it was false is via contemporaneous reports or data available to that party.  Its access -- access -- should be sufficient.

And, here, we have more than just access.  We have the fact that Seu and Lau specifically reference it.  And so you have additional cases saying that where a company -- where an individual makes statements evincing familiarity with certain facts, it's severely reckless, at a minimum, if they don't know what they're talking about.  If they were to make references to the contents of the Wildfire Mitigation Plan and hadn't read it, that would be, at a minimum, severely reckless.

So not only did they clearly have access, they also would have been, at a minimum, severely reckless in referencing it. And those cases are -- are *South Ferry LP #2 v. Killinger*, 687 F.Supp.2d 1248 and *In Re Zillow Group*.  That's --

THE COURT:  In *Killinger*, the individual defendants discussed the defendant -- the issue -- with a high degree of

specificity on more than one occasion.  You don't have any allegation that these individual defendants ever discussed the wild mitigation -- the Wildfire Mitigation Plan -- or ever discussed even wildfire risk.  You don't have any allegations as to that.

MR. VAN:  Well, so we do have allegations that they were specifically informed.  The HEI board was reported to on enterprise risk management and that that reporting included things like severe weather events.  So we do have evidence that -- and, you know, it's certainly at least as plausible an inference that they -- that those reportings would have included their policies, as evidenced in the Wildfire Mitigation Plan, as it is that they didn't.  But, you know, even setting aside --

THE COURT:  Wait a minute.  But "at least as plausible that they didn't" doesn't get you over the line --

MR. VAN:  It does actually.  A tie goes to plaintiffs.

THE COURT:  Oh, I actually think, after *Iqbal/Twombly*, the tie goes the other way, particularly if the inference has to be, in a PSLRA case, strong.

MR. VAN:  Your Honor, respectfully, the law is clear.  You have, quote, "A tie goes to the plaintiff."  That's 2014 Westlaw 12585809, Central District of California.  There are many cases that say as much.

THE COURT:  Can you give me a Ninth Circuit case that

says that?

**MR. VAN:** So I think the controlling language is "at least as plausible," which means that if it is at least as plausible -- if they're equally plausible -- those inferences -- then a tie goes to the plaintiff.

**THE COURT:** And even if the plaintiff is required to plead a strong inference?

**MR. VAN:** Absolutely, yes.

**THE COURT:** How does "as [sic] least as plausible" equal a strong inference?

**MR. VAN:** Well, so, I think you would have to have a strong inference -- you know -- strong inferences on both sides, as -- you know -- where you have a tie between two equal -- equally strong inferences, is where this would arise. But you're right that the standard is that you have to have a strong inference. It's also very clear in the case law, though, that where you have two competing theories, and they're equally plausible, a tie goes to the plaintiff.

But, Your Honor, I want to note that even setting aside these individual defendants -- Lau and Seu -- Defendant Kimura does state -- does suggest -- in her testimony to Congress, that she had a hand in drafting the Wildfire Mitigation Plan. And she was a de jure CEO of HEI. So surely she had knowledge. She helped craft the Wildfire Mitigation Plan.

**THE COURT:** Okay. All right.

Mr. Foster, on the scienter issue.

MR. FOSTER:  First, I have scienter and then I'll try to turn you around on the falsity point.

Scienter -- let's just be clear what the test is.  Under the PSLRA, the quote is, "A Court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing inference."

That's in the *Nguyen* case, the *Zucco* case.  It's in every Ninth Circuit case.  So that's the law we're dealing with. It's not even close to a tie here, Your Honor.

If you start with -- with cases like *Prodanova*, the plaintiffs start out with a situation where there is no motive alleged, when there's no incentive alleged, no benefit to the individual defendants.  Only where a complaint, quote, "otherwise asserts compelling and particularized facts showing fraudulent intent or deliberate recklessness will we overlook a lack of a motive."

So they need particularized facts.  It says nothing about two of the defendants by name -- Hazelton and Ito -- zero. Nothing in the opposition brief; nothing today.  He invokes Kimura, the CEO of Hawaiian Electric, the subsidiary -- calls her a de jure CEO.  There's nothing in that -- in the complaint on that.  That's something they tried to assert in their

opposition brief.  That's not how you amend a complaint.  There's nothing in the complaint saying that.  There's no basis to infer her scienter from any facts.

All they allege here is that the individual defendants -- Lau and Seu -- had access to reports.  They quote that -- ESG reports that they signed that mentioned the fire -- mitigation reports -- the problem with that is a contemporaneous issue.  Those reports were signed before 2023.  The fire mitigation plan was January 2023.  So they don't line up.  That's a very basic and obvious problem.

But even more fundamental, the fire mitigation plan is not inconsistent with any of the public statements at issue in this case.  The challenged statements in this case do not -- there's not a single challenged statement in this case that is directed towards fire mitigation.  There's statements relating to the company's plans to upgrade its infrastructure in general terms.  But they're not targeted to fire mitigation plan.

So they're trying to compare apples to oranges in that sense.  Because, obviously, a utility has a lot to do, on a daily basis, to maintain its infrastructure to provide power to its customers, regardless of any environmental issues.  And those are the statements that are in issue in this case.

The cases that they invoke, like *South Ferry*, you have situations where the individual defendants had specific admissions of intimate involvement in the issues in this case.

That's the test under the corroborations theory that they're tacitly invoking -- specific admissions.  There are no specific admissions giving rise to any inference that any defendant knew anything that HEI said was false or misleading when made over a four-year class period.

What they're asking this Court to do is assuming that Connie Lau, when she was CEO, decided to start fraud.  And then, when she left, she decided to pass it on to Scott Lau [sic].  And he decided, without any alleged facts, that they decided to continue this fraud.  And the same is true with Greg Hazelton, the CFO.  During his tenure, he decided to participate in a fraud, and then his successor decided to carry it on.

There are no facts supporting that.  And it's completely implausible.  This falls within the framework of *Webb* and *Prodanova* that says if it doesn't align with common sense, that's a problem.  It also doesn't resonate with common sense, because this is a four-year class period.  Over 20 years ago, in the *Vantive* case, the Ninth Circuit was suspicious and said a four-year class period was unusually long.  Why is that?  Because it really requires some kind of coordination and, implicitly, some kind of conspiracy to decide to lie to investors that long.

Where are the facts?  All we have here is just some supposition that, in hindsight, these defendants decided to

mislead investors about the nature of its infrastructure when the status of its infrastructure was fully disclosed in its regulatory filings, which makes this case very similar to cases that plaintiffs avoided in their opposition.

Cases that his firm brought and lost asserting the same game plan that they're making here against *Sempra* and *Southern Edison*, both cases arising out of similar circumstances here. In *Sempra*, a valve leak that caused environmental disaster. *Edison*, two wildfires that resulted. And they challenged the same types of statements. They go around and look for public statements about safety, upgrading infrastructure. And both of those courts -- Judge Marshall and Judge Benitez -- looked at the same types of statements, applied the same Ninth Circuit law that we're invoking, and rejected all of the claims across the board on falsity grounds and scienter grounds.

There is no basis for plaintiffs to ask this Court to infer that each of those individuals and then, derivatively, HEI, engaged in intentional fraud to deceive investors for four years. There is a reason Congress enacted stringent pleading standards. Because it's so easy to call somebody a liar. That's what they're doing. They have no basis for it. That's my response on scienter.

MR. VAN: So let me take those points as best I can.

So there should be no dispute that Kimura, the CEO of HECO and de jure CEO of HEI, knew about the Wildfire Mitigation

Plan.  Because she stated to Congress, "At the time of developing the plan, we concluded that wildfire risk in Hawaii did not justify the detrimental effects of preemptive shutoffs."  That's the amended complaint, paragraph 210.  She speaks about --

THE COURT:  But she's not a defendant.

MR. VAN:  No.  But she -- her scienter should be imputed to the corporation.  At a minimum, the corporate entity has scienter.

THE COURT:  But, usually, when -- when that -- when that is done, it's usually -- what they're talking about is sort of the core subject or the core of what the company does.

MR. VAN:  So this has nothing to do with core operations.  This is just whether the defendant entity -- HEI -- has scienter.  It could have been named as a sole defendant, let's say.

Now, to figure out whether that entity has scienter, we have to ask who, you know, at a sufficiently high level, had scienter.  And the de jure CEO of the company having scienter, because she's personally had a hand in crafting the Wildfire Mitigation Plan --

THE COURT:  Point me to the --

MR. VAN:  -- is as good as it gets.

THE COURT:  Point me to the allegations of the complaint that would support that.

MR. VAN:  Paragraph 210.

So here, again, is says, "As HECO's CEO and President, Shelee Kimura testified before Congress on" such and such.  "In 2019, our team started developing a Wildfire Mitigation Plan."

THE COURT:  Okay.  And so what statement, then, does that mean that she knew the statement was false when made?  Just give me one example.

MR. VAN:  It means that -- okay.  So the three that you found to -- for which we've pled falsity -- certainly, all of those.

THE COURT:  Well, no.  Be specific.

MR. VAN:  Absolutely.

THE COURT:  Spell it out, because you have to do it with particularity.

MR. VAN:  I'm happy to walk through it.

THE COURT:  How did she know, for example, that they weren't replacing the wires with insulated conductors?

MR. VAN:  Right.  So --

THE COURT:  How does her knowledge of the Wildfire Mitigation Plan show that she knew they -- when HEI said they were doing so, they were not?

MR. VAN:  That's -- okay.  So -- because the policy was we're not going to, across the board, replace insulated conductors, because it would, quote, "not be cost-effective."

And defendants come back and point to some other provision

of the Wildfire Mitigation Plan that say that when you have tall trees, re-conductoring should be considered.  That just proves the point.  If they were still considering whether or not to re-conductor some lines, that means that they hadn't done what they said that they did.  That they hadn't replaced all of the lines with insulated wires.  So, certainly -- for the power lines.  For the vegetation, as well.

THE COURT:  So when -- when -- when was the statement about replacing made?  Was she the CEO at the time -- of the sub?

MR. VAN:  Yes.  Yes.  From 2019, onwards, throughout the entirety of the existence of this Wildfire Mitigation Plan, she was in control and knew about it.  So, certainly, for the power lines.

For the vegetation, the -- there are statements that it is not recommended that vegetation management programs be adjusted in wildfire areas.  It's remarkable that the statement exists in a document that we can show and allege in the complaint.

THE COURT:  No.  But all that statement says is that the plan that we have at the moment, we're not going to adjust it in wildfire areas.  We think it's sufficient in those areas, as well.  It's not that we're not going to do anything.  We're not going to do more.

MR. VAN:  Right.  But that's inconsistent with the impression that they gave the investing public, where they

said -- we have gone off -- let me try to find -- there are multiple misstatements, I should note, regarding --

THE COURT:  Don't --

MR. VAN:  -- the grasses.

THE COURT:  You need to be precise.

MR. VAN:  Absolutely.  Absolutely.

So, here, in amended complaint paragraphs 190 to 200 in the ESG reports, there are statements.  "The expansion of nonnative, fire-prone grasses and shrubs has led to an increase in wildfires.  In addition to the utility's own Wildfire Mitigation Plans, we have joined with community members to help prevent, mitigate wildfires."

Focus only on the first part of that, where they're talking about the utility's own Wildfire Mitigation Plans. There, they're saying, in the same breath, the problem in Hawaii for wildfires is tall grasses, and we have a mitigation plan to deal with that.  The impression that that gives in the mind of a reasonable investor is that they were doing something -- something -- to mitigate -- specifically to address grasses --

THE COURT:  Okay.

MR. VAN:  -- to mitigate wildfires.

THE COURT:  That's not your best one.  Do you have a different one?

MR. VAN:  Okay.  Then we regularly trim the vegetation

around our equipment.  They weren't doing that.  The Wildfire Mitigation Plan --

**THE COURT:**  I understand the falsity arguments.  But the scienter -- let's tie it in --

**MR. VAN:**  Right.  Right.

**THE COURT:**  -- to the scienter.

**MR. VAN:**  Yeah.  So --

**THE COURT:**  So -- but with respect to the four individual defendants that you have named.  Any of that, or are you just going to focus on Ms. Kimura right now?

**MR. VAN:**  I'm going to focus on the corporate entity.

**THE COURT:**  Okay.

**MR. VAN:**  Now, recall, though, that Seu and Lau both signed a document stating -- specifically referencing we have a Wildfire Mitigation Plan.  If they didn't know anything about that Wildfire Mitigation Plan, then they were, at a minimum, severely reckless in telling investors about that plan.

   But let's focus only on the corporate entity for now.  So, for grasses, the Wildfire Mitigation Plan states, "The type of vegetation in Hawaii wildfire areas are primarily grasses, shrubs, and few trees, which rarely grow into conductors."  This is amended complaint paragraph 71.  "Thus, it is not recommended that vegetation management plans be adjusted in the wildfire areas.  Further trimming of the already low-lying vegetation will not likely produce any appreciable results in

the potential wildfire areas."

What they're saying is that we don't need to cut the grasses.

THE COURT:  No.

MR. VAN:  Grasses don't grow into trees.  That -- the type of vegetation in the Hawaii wildfire areas are primarily grasses, shrubs, and few trees, which rarely grow into conductors.  Grasses aren't a problem.  Grasses are already low-lying vegetation.  We don't have to cut them.  And that's consistent with what we know on the ground.  We know from multiple former employees that, as a matter of fact, they weren't cutting grasses.

We even know from photos -- there are photos in the complaint showing grasses yay-high that clearly had just never been trimmed and certainly weren't being trimmed regularly.  So we know that this is a correct statement of their actual policy.  That we're just not going to bother -- we're not going to bother cutting grasses, because they don't grow into conductors.

And FE2, the trouble man, who was there, by the way, not from 2016 to 2017, as defendants mistakenly say, but from 2014 to 2021, was told don't -- stop cutting the grasses.  He was even told to stop cutting them.  And that policy is enshrined in the Wildfire Mitigation Plan that Defendant Kimura, from 2019 onwards, knew about and had a hand in writing.  Scienter

is seldom clearer than it is in this case, at least for corporate entry.

THE COURT:  All right.

MR. VAN:  We --

THE COURT:  Anything further?  Let's focus on Ms. Kimura.

MR. FOSTER:  Well, she's not a defendant.  He's not cited a single case where any court, anywhere, has looked to the state of mind of a subsidiary's parent to draw an inference that executives at the parent company or the parent company itself is liable for securities fraud.  So they've got a legal problem right there.  He's got a contemporaneous problem, as well, just as a factual basis.

He keeps talking about the fire -- we'll get to it -- but the Fire Mitigation Plan is not inconsistent with any public statement.  Let me just say that.  I'll get to it later.  But while we're focused on scienter, let me just say this:  He keeps talking about 2019 until the end.  The Fire Mitigation Plan wasn't finalized until January 23, under their own allegations.  So how is that supposed to support anybody's scienter for any statement that is challenged in this case before January 2023?

THE COURT:  Well, what about that?

MR. VAN:  Yeah.  So we know that the policies that were looking to the mitigation plan for evidence of didn't

change.  And -- so we know that at no time was it the company's policy, for example, to re-conductor all the lines, because they simply weren't re-conductored by the time of the fire.

THE COURT:  Right.  But we're talking about -- but we're mixing up falsity and scienter.

MR. VAN:  Well, not quite.  We're talking about what we -- what we can reasonably infer about the Wildfire Mitigation Plan and whether the key policies that were focused on for purposes of scienter ever changed from 2019 onwards. And we know that they didn't, because the company acted according to those policies.  And it's clear that the company never had a policy of re-conductoring all of its wires and never had a policy of cutting low-lying grasses.  It also never had a policy for preemptive shutoff.

I know that Your Honor isn't as interested in the safety misstatement, but I'd love to tell you about that.

THE COURT:  I -- I think that's too general to --

MR. VAN:  So -- so there is a case that found such a statement to be actionable.  And I might just read it into the record in case it -- you have any interest.  2021 Westlaw 2561895.  It concerns the Grenfell Tower fires in London.

THE COURT:  Was it cited in your papers?

MR. VAN:  It's not, unfortunately.

Okay.  Well --

THE COURT:  Next round, you can cite it.

MR. FOSTER:  I'll just add this on the safety statements since we're there.  They were about employee safety.  All you have to do is look at it and, in the context, in the ESG report -- that's Exhibit 7, page 48 -- the header is "Employee Safety."  They're under hard hats, the same for the --

THE COURT:  When you read them themselves, it's employee.  But let's talk about falsity and the three areas where I thought maybe it was plausibly alleged.

MR. FOSTER:  Sure.  So let's start with the infrastructure -- the upgrades -- because these statements are nearly identical from the ESG reports year after year.  And those statements say, in the context, mind you, of resilience -- it's not speaking about wildfire mitigation, specifically -- it's talking about resilience.  Providing power to customers, when they need it, when it's hot; responding to natural disaster situations; and ordinary situations where there need to be upgrades.  That's the context of these statements in the ESG reports.  And it says, "We continually maintain and upgrade our transmission and distribution systems to ensure seamless delivery of power to our customers."

THE COURT:  But what they say is -- in the 2021 ESG report -- it replaced traditional power lines with insulated conductor systems.

MR. FOSTER:  It says, "We have replaced traditional

power lines with insulated conductor systems to improve reliability and resilience" -- and this is the important part -- "in targeted areas prone to vegetation-related outages."

What does the last part of that mean?  "Targeted to areas prone to vegetation-related outages."  Common sense, first.  He said "yay-high" -- his height.  Well, power lines are much higher than his height when he said "yay-high."

Vegetation-related outages typically happen when branches fall into the wires themselves.  You don't have to take my word for it.  Look at the ESG report itself.  Immediately above is a picture of a power line with trees, not grasses growing 6 feet high, 4 feet high.

"Areas prone -- areas prone" -- let me -- words are important.  I'm not going to characterize them.  I'm not going to distort them as the other side has.  I'm going to quote them.  It says, "In targeted areas prone to vegetation-related outages."

He has not connected the dots to show all the bases for why he thinks that's false based on relying on the Fire Mitigation Plan, which talks about grasses.  He's not alleged any facts connecting the dots to that to the Fire Mitigation Plan.  And so --

THE COURT:  So what you're saying is, is that -- because they do allege that the area was prone to vegetation-related wildfires.  But you're saying that's not the

same thing or you can't plausibly infer that if it's -- if it's prone to vegetation-related wildfires, that means it's prone to vegetation-related outages.

MR. FOSTER:  That's right.

THE COURT:  Okay.

MR. FOSTER:  I think that's an -- I don't think you can draw that inference --

THE COURT:  Okay.  Okay.  I understand that.

MR. VAN:  Sure.  So we have connected the dots.  So these targeted areas prone to vegetation-related outages absolutely include Lahainaluna Road.

THE COURT:  Okay.  Show me -- just point to the complaint.

MR. VAN:  Okay.  So amended -- the -- paragraph 164, I think, mentions their promise, which was false, that they were going to install insulated power lines along Lahainaluna Road. So that was clearly a targeted area.

And if you go look at that actual article, which I think defendants included potentially as an exhibit, that article states that the re-conductored lines were installed to withstand, quote, "the force of falling branches from large trees along Lahainaluna Road."

So the whole focus of this litigation is on one of these areas that clearly, by their own admission, was a targeted area prone to vegetation-related outages --

THE COURT:  Okay.  Let's stop --

MR. VAN:  -- from falling trees.

THE COURT:  -- because let's be specific.  Is your allegation that what this press release said -- they did not do that?  They did not upgrade those poles?

MR. VAN:  They clearly did not.  And we have clear evidence of that from multiple sources.  Because that's where the fire started and that's how it started.  We have videos, photographs, experts all saying the same thing.  You look at these wires.  They were not insulated.

THE COURT:  So on Lahainaluna Road, they did not --

MR. VAN:  They did not.

THE COURT:  -- upgrade the poles.

MR. VAN:  They did not.

THE COURT:  Okay.

MR. FOSTER:  I can respond to that.

Number one, that's a statement made by MECO, an indirect subsidiary of HEI.

THE COURT:  That's one of the other statements.

MR. FOSTER:  Exactly.  So that statement really shouldn't be included.  But let's just take it at face value for what he's trying to go with.  That press release says they're going to replace lines on 15 spans on 14 poles on Lahainaluna Road between Mill and Kalena Streets, which is .5 miles from where the fire happened at -- near Lahaina

Intermediate School.

Now, he is -- he has allegations that says an AP press release -- press report -- which quotes the expert -- it's not their expert -- it's an AP -- AP article quoting some professor who said he reviewed drone footage and suspects that the fire could not have started from insulated lines.  So he's speculating in that news article.  And that is assuming that those are wires on Lahainaluna Road.  It's not like there aren't power lines on adjacent streets or beyond Lahainaluna Road.

So it's two levels of speculation saying just because they replaced the lines in one area, that everything in the surrounding area was necessarily replaced.  And he's just drawing some inference based on his view of video footage where he says that couldn't have happened from insulated wires.  So those aren't facts.  That's speculation.  The PSLRA requires facts.

And we've cited District Court decisions that says when you talk about quoting from newspaper articles, counsel has to do independent, corroborative work and has to have independent corroboration to support those allegations.  Otherwise, the Court can treat newspaper articles the same way it treats copying allegations from another complaint.

THE COURT:  Well, I think it depends on the newspaper articles and the level of detail and the -- and specificity.  I

don't think there's a hard-and-fast rule that you can't rely on them.

MR. FOSTER: The key, ultimately, is facts. You need facts. And what they have is a newspaper article quoting a professor who is ultimately just surmising with his opinion what might have been the case. It's not a fact that shows any direct inconsistency there whatsoever. It doesn't mean that they didn't insulate wires there. And it certainly doesn't show that they didn't install insulated wires or conductors anywhere else.

He said, in front of this Court just a few minutes ago -- which is consistent with the way the plaintiffs have conducted this case -- he said that we replaced, quote, "all the lines." That's not what the statement says. So where's the inconsistency? What is the threshold that would be required here? If they didn't say we replaced all the lines -- we have 60,000 poles throughout multiple islands on Oʻahu -- big island -- Maui. Like, at what point -- what's the threshold to say we didn't replace any lines? Where's the inconsistency?

There has to be a direct contradiction. The *Twitter* case from the Ninth Circuit requires there has to be facts pled showing a direct contradiction at the time each statement was made. What we're having is allegations about some speculation after the fire and drawing some kind of conclusions and asking this Court to assume that was contemporaneous with the

challenged statements.  It just doesn't work that way.  They need more facts.

THE COURT:  Well, what I'm trying to figure out is have they plausibly alleged that the area where they allege the fire started was a target -- was a targeted area -- prone to vegetation -- prone to --

MR. FOSTER:  Vegetation outages.

THE COURT:  Vegetation outages -- yes.

MR. FOSTER:  And I don't think they've connected those dots.

THE COURT:  That's what I -- okay.

MR. VAN:  Yes.  And, again, we absolutely have. Because they came out, in 2019, and said, we're installing insulated power lines along Lahainaluna Road.  That's where the fire happened.

THE COURT:  Well, it happened --

MR. VAN:  They targeted --

THE COURT:  -- in one part of the road.  You're not saying --

MR. VAN:  That's not what they -- they say lines along Lahainaluna Road.  They should have -- you know -- if -- and that's not --

THE COURT:  You're saying they --

MR. VAN:  That's not the -- we're only focused on this to see whether or not this was a targeted area.  Whether it --

plausibly, they were targeting Lahainaluna as an area prone to vegetation-related outages.

And the fact that they told the public that they were going to go install insulated cables along Lahainaluna Road specifically to withstand the force of falling branches from trees along Lahainaluna Road, surely that shows that it's a targeted area prone to vegetation-related outages, by the company's own admission.

**THE COURT:**  Okay.  What about the utility pole maintenance?

**MR. FOSTER:**  So the utility pole maintenance issues -- again, there are statements -- most of the utility pole statements are statements made by HECO, Hawaiian Electric, the subsidiary.  And, again, you can look at the same statement, because this is where these statements come from, is that we work to upgrade our aging and faulty equipment before failures happen.  There's no question that they -- that that's the way a utility works.  It's the way HEI worked.

And, in the record, in Exhibit 27, page 1, HEI's regulatory submission to the Hawaii Public Utilities Commission discusses how it has 60,000 poles.  It planned to replace 1,300 poles per year.  And it sets forth its plan, its need for the money to be allocated towards that.  And there's no allegation that they didn't actually upgrade and replace poles as necessary.  There's just nothing in the complaint that says

that we didn't replace poles.

If they're going to say that they didn't replace all the poles, well, then, there's nothing that -- there's no statement at issue in this case where the company said we're replacing all of our poles.

THE COURT:  But what they allege is that it was well behind schedule.  That they had -- they had set aside a certain amount of money.  They weren't spending it.  And they were way behind schedule.  And therefore, when they told the public that they were continually maintaining and upgrading its transmission and distribution system, that was false, because they did have a plan, but they weren't following it.

MR. FOSTER:  Yeah.  Well, they don't allege any particularized facts showing that they were behind schedule. In what way were they behind?

And this is sort of like the *Sempra* and *Edison* cases, where the courts there considered similar allegations about infrastructure upgrades and said you've given us no facts to compare A to B with.  The challenged statement doesn't say we're going to upgrade 50,000 poles.  And they don't allege contrary facts, for instance, saying, well, you only did 1,000. It says we're going to continually upgrade our aging and faulty infrastructure.

That's the challenged statement.  Those are the types of vague statements that are very -- are not necessarily

objectively verifiable.  And that's why, in the *Edison* and *Sempra* cases, the courts said these are not actionable statements, because you can't show that they were false. There's nothing that we can compare the truth of the matter with the statement.  So there can be no contradictory facts alleged here.

And, certainly, going back to what they call their smoking gun -- the Fire Mitigation Plan -- that's a specific plan for a specific thing:  Fire mitigation.  These challenged statements in the ESG reports relate to their overall holistic maintenance of their whole infrastructure for the whole -- for every purpose of -- that they're conducting the utilities operation. There's nothing in that plan that is inconsistent.  It's very specific.

If you look at that plan, it's geographically based.  It goes island by island, zone to zone, discussing what makes sense for each region.  The statement that they're challenging -- it's just a global statement about their overall plans in an ESG report just describing that they maintain their infrastructure, as you would expect a utility to do.

And with respect to -- with respect to the conductors, as Your Honor recognized, I think, a few minutes ago, when it spoke about the poles and the conductors, that mitigation plan says the technologies are excellent if tall vegetation is in or adjacent to the line right of way.  But, as noted previously,

this type of vegetation in the wildfire areas -- the grasses, shrubs, with few tall trees -- thus, tree wire or spacer cable would not be cost-effective in most Hawaii wildfires; however, if there are wildfire areas with tall trees adjacent to the line and rights of way, tree wire or spacer cables should be considered.

Everything is fact-specific, geographically specific.  You can't take these general statements and then say they are false because of some other general statement that applies in a different context.  There's no inconsistency.  And the PSLRA and Ninth Circuit precedent requires that plaintiffs plead particularized facts showing a necessary inconsistency with the challenged statement.  That's just not here.

THE COURT:  All right.  Do you want to respond?

MR. VAN:  Oh, yes.  I think Your Honor has it exactly correct.  The statement here that we're focused on for the poles -- and that's my understanding -- what we're focused on here are the poles -- is that we continually maintain and upgrade our distribution system.  We regularly inspect our poles, lines, and other equipment and work to replace and upgrade aging and faulty equipment before failures happen.

We have the director of regional transmission and distribution operations saying over half the majority of the poles were leaning and at the end of their lifespans.

THE COURT:  No, approaching the end of their

lifespans.

MR. VAN:  Approaching the end of their lifespans.

THE COURT:  But they didn't fail.  In other words, you said, well, we replace and upgrade before failure happens. There's no allegation that there was a big power outage and that the failure happened.

MR. VAN:  So I think the question is whether or not there were thousands of poles that needed -- that needed replacement.  And I don't think there's any unclarity that there were.

There were -- there was a consultant looking at Maui alone that said that 7,700 of the poles on Maui were at least 40 years old.  That's the replacement age.  That was, you know, a third of the poles just on Maui alone.

THE COURT:  How's it tethered to the fire?

MR. VAN:  I'm sorry?

THE COURT:  How's it tethered to the fire?  I understand if there was a massive power outage because the poles were old and they failed.  That's what they're talking about here.

MR. VAN:  Well, I think that's a loss of causation issue.  And defendants haven't raised loss of causation.

But I think -- I think it's clear --

THE COURT:  Okay.  I think it's probably a pretty good loss of causation issue.  But, okay.

**MR. VAN:**  Okay.

So, yeah, I think it's clear that they weren't continually maintaining their poles.  In fact, I don't even understand defendants to challenge the fact that we adequately alleged that the poles were not being continually maintained.  I think their point that they try to make is their briefs, at least, is that the company somehow disclosed and made clear to the public that these poles weren't being maintained.  And that's just not the case.  They --

**THE COURT:**  No, I understand that argument.

**MR. VAN:**  Okay.

**THE COURT:**  On the motion to dismiss, I don't accept that argument.

**MR. FOSTER:**  But I will be very clear on this, Your Honor.  He just invoked the allegations of Former Employee Number 1.  There is no daylight between what FE1 says and what Hawaiian Electric Company disclosed in its regulatory filings.  And you can compare those allegations of FE1 to Exhibit 27, page 1.  Because, there, the Hawaiian Electric Company discloses the status of its poles, the median age of its poles.  It says its poles were old.  That's why I go back to the point, they have a pole replacement plan that was disclosed.  1,300 a year.

And it makes it exactly like the *Sempra* case, where the court there said there was public disclosure in the public

utility filing saying that they were doing 5 percent replacement of their valves, the valves that allegedly caused the leak.  And investors would have known, based on those regulatory filings, the status of the aged infrastructure and the pace at which it was being replaced.

So there really should be no doubt that investors knew about that.  We have controlling law.  The Ninth Circuit's *Rubke* case says there's no point --

THE COURT REPORTER:  I'm sorry.  Which case?

MR. FOSTER:  *Rubke* -- R-U-B-K-E.  The Ninth Circuit said there's no point to make public companies disclose what's already in the public domain and right-on-point cases in *Sempra* and *Edison* that said we looked at utility filings and said investors know about that.  So the status of our poles and our plans for replacing them were totally disclosed.  There's no -- there's no basis for them to claim that everything was updated.  And there's no claim for them to compare why certain poles -- that the status of our pole replacements was somehow false and misleading --

THE COURT:  But the 2008 filing you referred to didn't say we're behind replacing outdated utility poles.  You're saying that a reasonable investor would have looked in there and read, oh, they're replacing 300 to 400.  But, earlier, they said they had a target of replacing 1,300 -- we're talking about on Maui -- and therefore they're behind.  It's not --

they would have to, like, do all that research and draw all those inferences.  They didn't say we're behind.

MR. FOSTER:  But there are no facts actually pled showing that we were behind; right?  What are the facts?  What are the numbers that said we said we're going to do this and we did that?  Where are the actual facts comparing the plan to the execution?  There are no facts.  There are just conclusory allegations that we're behind.

THE COURT:  All right.  Anything further?  I have, like, 30 lawyers out there waiting for me.

MR. VAN:  I would just invite -- if you have anything that you think that we could -- if you have any questions that you think I could answer that could, you know, sway you --

THE COURT:  If I dismiss, I would grant you leave to amend; right?  That always happens.

MR. VAN:  Sure.  Well, so if you do dismiss and grant leave to amend, we would welcome the Court's input on what you'd like to see.

THE COURT:  I don't do that.  I will tell you what I don't see.

MR. VAN:  Fair enough.

THE COURT:  If I don't think it's sufficient, I'll tell you.

MR. VAN:  Of course.

THE COURT:  And I'll write something.  No worries

about that.  But I'm not going to tell you how to amend the complaint.

MR. VAN:  Fair enough.

MR. FOSTER:  The only final word I have is just a point I didn't have a chance to address that I'll address quickly in response to the allegations of FE2, a former lineman.  He said he was not told to cut grasses in an unspecified location in 2016 before the class period.  That neither establishes that they didn't cut grasses during the class period, nor that they never cut grasses anywhere where it needed to be cut.  So I just don't think that their allegations go anywhere with that.  I just wanted to make that clear. Thank you, Your Honor.

THE COURT:  All right.  Thank you for the argument.

MR. VAN:  Thank you, Your Honor.

(Proceedings adjourned at 11:28 a.m.)

---oOo---

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Monday, October 14, 2024

_____

Kendra A. Steppler, RPR, CRR

Official Reporter, U.S. District Court