UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BHAPINDERPAL S. BHANGAL,

         Plaintiff,

    v.

HAWAIIAN ELECTRIC INDUSTRIES, INC., et al.,

         Defendants.

Case No.  23-cv-04332-JSC

**ORDER RE: MOTION TO DISMISS**

Re: Dkt. Nos. 81, 83

      On August 8, 2023, a deadly wildfire swept through the town of Lahaina in Maui, Hawaii. Plaintiffs filed a federal securities class action on behalf of individuals who purchased Hawaiian Electric Industries, Inc.'s ("HEI") securities, alleging HEI and its top officials misled investors to believe the utility was taking appropriate action to mitigate wildfire risk.  (Dkt. No. 70.)  Now pending before the Court is Defendants' motion to dismiss and Defendants' request for incorporation by reference and judicial notice.  (Dkt. Nos. 81, 83.)  Having carefully considered the briefing, and with the benefit of oral argument on September 26, 2024, the Court GRANTS Defendants' request for incorporation by reference and judicial notice and GRANTS Defendants' motion to dismiss with leave to amend for the reasons explained below.

## BACKGROUND

### A.    Factual Allegations

      Defendant Hawaiian Electric Industries, Inc. ("HEI") is a Hawaiian corporation and publicly traded company.[1]  (Dkt. No 70 ¶¶ 23, 28.)  HEI wholly owns Hawaiian Electric Company, Inc. ("HECO").  (*Id.* ¶ 28.)  HECO, in turn, wholly owns Hawaiian Electric Light

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

1    Company Inc. and Maui Electric Company.  (*Id.* ¶ 29.)  "Through HECO, HEI engages in electric

2    utility, banking, and non-regulated renewable/sustainable infrastructure investment businesses,"

3    providing services to 95% of Hawaiian residents.  (*Id.*)  The Electric Utility segment provides

4    electricity to customers through utility poles throughout Hawaii.  (*Id.* ¶¶ 3, 29.)

5        In the years preceding the 2023 wildfire, officials were aware Lahaina faced "extreme

6    wildfire risk."  (*Id.* ¶ 36.)  In 2014, the Hawaii Wildfire Management Organization released a

7    wildfire mitigation plan warning Lahaina was among the areas in Maui most vulnerable to fires.

8    (*Id.* ¶ 37.)  "Subsequent reports in 2018, 2019 and 2020 from various agencies continued to

9    identify Lahaina as particularly vulnerable to wildfires due to factors like strong winds, proximity

10   to brush and grasslands, presence of non-native vegetation, and substandard power infrastructure."

11   (*Id.* ¶ 42.)  In August 2018, there was a wildfire in Lahaina—to that point "the largest wildfire

12   event in Maui History."  (*Id.* ¶ 45.)

13       In 2019, HECO drafted a Wildfire Mitigation Plan outlining the utility's approach to

14   vegetation management, installation of insulated conductors, deenergizing power lines, and other

15   mitigation efforts.  (*Id.* ¶¶ 66-71.)  While HECO did not finalize the plan until January 2023, the

16   plan represented HECO's internal wildfire mitigation policies from 2019 onwards.  (*Id.* ¶ 66.)

17       On August 8, 2023, a wildfire broke out in Lahaina.  (*Id.* ¶ 113.)  Videos captured by

18   residents "show that flames broke out in the vicinity of a broken power line operated by Hawaiian

19   Electric."  (*Id.* ¶ 115.)  "Despite initial efforts to put the fire out, the fire reemerged along the edge

20   of the neighborhood and began rapidly churning down the hillside."  (*Id.* ¶ 118.)  The fire resulted

21   in the death of at least 101 people and the destruction of the historic town of Lahaina.  (*Id.* ¶ 126.)

22       In the following days, news outlets reported on Defendants' lack of policies and

23   procedures to mitigate the impact of wildfires.  (*Id.* ¶ 127.)  For example, an August 12, 2023

24   Washington Post article stated "Hawaiian Electric was aware that a power shut-off"—intentionally

25   cutting off electricity to areas where big wind events could spark fires—"was an effective strategy,

26   . . . but had not adopted it as part of its fire mitigation plans."  (*Id.* ¶ 132.)  An August 17, 2023

27   Wall Street Journal article "reported that Hawaiian Electric had for years been aware of the threat

28   posed by wildfire but waited years to act."  (*Id.* ¶ 140.)  "Altogether, the disclosures on August 8-

United States District Court
Northern District of California

2

1    9, 12, 15-22, 25, and September 5, 2023 caused the value of HEI's stock to lose over 60% of its

2    value."  (*Id.* ¶ 20.)

3        **B.    Procedural History**

4        On August 24, 2023, Bhapinderpal S. Bhangal filed a complaint alleging claims under

5    Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("the Exchange Act").  (Dkt. No.

6    1 ¶ 1.)  In response to the notice his Counsel published, the Court received six motions for

7    appointment of lead plaintiff and lead counsel.  (Dkt. Nos. 13, 16, 21, 28, 32, 38.)  The Court

8    granted Daniel Warren's motion to be lead plaintiff and appointed Pomerantz LLP as lead counsel.

9    (Dkt. No. 58.)

10        In March 2024, lead plaintiff Warren and additional plaintiffs Bhangal and Emaad

11    Kuhdear filed an amended complaint on behalf of individuals who purchased or acquired HEI

12    stock between February 28, 2019 and September 4, 2023 ("the Class Period").  (Dkt. No. 70 ¶ 1.)

13    In addition to HEI, Plaintiffs named four individual officers as defendants (collectively,

14    "Individual Defendants"):

15            •  Constance H. Lau, who served as HEI's President and CEO
16               from prior to the start of the Class Period until January 2022
           (*id*. ¶ 31);

17            •  Scott W. H. Seu, who has since served as HEI's President,
           CEO, and Director (*id*. ¶ 32);
18

19            •  Gregory C. Hazelton, who served as HEI's Executive Vice
           President, CFO, and Treasurer from prior to the start of the
20               Class Period until July 2022 (*id*. ¶ 33); and

21            •  Paul K. Ito, who served as HEI's Interim CFO from July 2022
           until January 2023 and has served as the Company's
22               Executive V.P., Treasurer, and CFO since January 2023 (*id*. ¶
           34).

23    Count One, alleging violations of Section 10(b) of the Exchange Act and Rule 10b-5, is brought

24    against all defendants.  Count Two, alleging violations of Section 20(a) of the Exchange Act, is

25    brought against Individual Defendants.

26        HEI and Individual Defendants (collectively, "Defendants") move to dismiss on the

27    grounds that (1) Defendants are not legally responsible for certain alleged misstatements, (2)

28    Plaintiffs failed to plead any statement was false or misleading, and (3) Plaintiffs failed to plead

United States District Court
Northern District of California

facts giving rise to a strong inference of scienter.  (Dkt. No. 81.)  Defendants also request the Court consider 29 documents outside the complaint via the doctrines of incorporation by reference and judicial notice.  (Dkt. No. 83.)

## C.     Challenged Statements

Plaintiffs allege 25 statements were false and misleading when made.  The challenged statements fall into six categories: (1) replacement of exposed power lines with insulated wire conductors, (2) utility pole maintenance and safety, (3) vegetation management, (4) collaboration with a consultant, (5) advice from wildfire collaborators, and (6) oversight of subsidiaries.  The allegedly false and misleading statements are summarized below.[2]

### 1.     Replacement of Exposed Power Lines with Insulated Wire Conductors

First, Plaintiffs allege HEI led investors to believe it had replaced exposed power lines with insulated conductors—which "stop lines from slapping and sparking in areas prone to high wind"—when in fact, HEI's power lines "were totally bare and uninsulated" at the time of the 2023 Lahaina wildfire.  (Dkt. No. 70 ¶¶ 72-73.)  Plaintiffs identify the following statements:

- "**Other resilience initiatives such as installing heavier, insulated conductors and applying fire retardants on poles are also done as part of our proactive plan to reduce risks of wildfires**."[3]  (*Id.* ¶ 162, November 6, 2019 YouTube video).

- "**Maui Electric Company will be upgrading utility poles and installing insulated power lines along Lahainaluna Road in West Maui.**"  (*Id.* ¶ 164, December 19, 2019 press release).

- The Company's resilience efforts include "**installing heavier, insulated conductors in areas prone to trees and large branches falling during high winds and preventing power lines from coming down**."  (*Id.* ¶ 182, October 27, 2021 blog post.)

- "We have also replaced traditional power lines with insulated conductor systems to improve reliability and resilience in targeted areas prone to vegetation-related outages."  (*Id.* ¶ 188, 2021 Environmental, Social, and Governance ("ESG") Report.)

---

[2] For ease of analysis, the Court lists the statements thematically rather than chronologically.  Some statements fall into more than one category.  In these instances, the Court has excerpted the relevant portion of the statement, the result being that some statements appear more than once.
[3] In this recitation of challenged statements, the Court retains formatting (bold text and italic font) from the complaint.  In the subsequent analysis, the Court lists the challenged statements without bold text or italic font except where otherwise indicated.

United States District Court
Northern District of California

- The Company "replace[s] traditional power lines with insulated conductor systems in areas that are especially prone to vegetation-related outages."  (*Id.* ¶ 202, 2022 ESG Report.)

### 2. Utility Pole Maintenance and Safety

Second, Plaintiffs allege HEI led investors to believe it was regularly maintaining its utility poles when in fact, "HEI's pole maintenance was severely deficient" and the poles did not comply with safety code standards.  (*Id.* ¶¶ 78, 86.)  Plaintiffs identify the following statements:

- **"We continually maintain and upgrade our transmission and distribution system to ensure seamless delivery of power to our customers. Day-to-day maintenance is a key part of keeping the grid resilient. We regularly inspect our poles, lines, and other equipment, and work to replace and upgrade aging and faulty equipment before failures happen**."  (*Id.* ¶ 178, 2020 ESG Report; ¶ 188, 2022 ESG Report.)

- Projects to "increase[e] reliability and resilience" include "[r]eplacing more than 400 poles on Maui, Lānaʻi and Molokaʻi to **maintain strength and safety standards based on inspections and testing**."  (*Id.* ¶ 192, 2021-2022 Sustainability Report.)

- **"[O]ur poles follow standards set by the National Electric Safety Code to ensure they are safe for our employees to work on and can withstand impact of severe weather."** (*Id.* ¶ 196, November 23, 2022 YouTube video.)

- **"To ensure safety and reliability, Hawaiian Electric's utility poles follow standards set by the National Electric Safety Code (NESC)."**  (*Id.* ¶ 198, March 1, 2021 blog post.)

- **"We constantly work to maintain and upgrade our transmission and distribution infrastructure to ensure that power gets to our customers**."  (*Id.* ¶ 202, 2022 ESG Report.)

- Hawaiian Electric "[r]eplaced **more than 330 poles on Maui, Lānaʻi and Molokaʻi to maintain strength and safety standards"**  (*Id.* ¶ 204, 2022-2023 Sustainability Report.)

### 3. Vegetation Management

Third, Plaintiffs allege HEI led investors to believe it was actively trimming and otherwise addressing dry grasses and brush beneath and around power lines when in fact, an internal policy recommended against such trimming.  (*Id.* ¶ 89.)  Plaintiffs identify the following statements:

- The drone surveys Hawaiian Electric conducted were "part of the companies' **proactive assessment and management of vegetation** near their electrical infrastructure, especially **in** drought-prone or **dry brush areas**."  That many utility lines in Hawaiʻi run through tropical areas "makes it easier to **concentrate on mapping drought-prone areas where**

5

sparks could ignite dry grass and brush beneath power lines." (*Id.* ¶ 160, November 5, 2019 press release.)

- **"We have an ongoing maintenance program . . . where we identify poles that need attention and that could be upgraded or replacement. … I would say that's 90% of our work…. It happens year round, but we step it up during, you know, the months between June and November, I mean, in preparation for upcoming storms, if they should arise."** (*Id.* ¶ 170, June 1, 2020 YouTube video.)

- "The Hawaiian Electric Companies use drone, or unmanned aircraft system, surveys to **assess drought-prone or dry brush areas especially near electrical infrastructure**." (*Id.* ¶ 162, June 1, 2020 YouTube video.)

- "**We regularly trim the vegetation around our equipment, as many power outages during high winds and storms are due to tree branches or other vegetation falling onto power lines**." (¶ 178, 2020 ESG Report; ¶ 188, 2021 ESG Report.)

- "**Because such drought conditions make our islands especially vulnerable to wildfires, our company continues to do its part to reduce such risks, which can threaten an island's electrical system.  Such resilience work starts with proactive vegetation management around our electrical infrastructure and facilities on the five islands we serve."** (¶ 182, October 27, 202 blog post.)

- The utility engaged a leading consulting firm, whose recommendations "**included recommendations for system hardening**,…[and] **enhanced vegetation management**." (*Id.* ¶ 186, 2021 ESG Report.)

- "**Now, I take pride in knowing our company takes extra steps to protect areas like West Maui that are more prone to wildfires through ongoing vegetation management, restoration and prevention efforts.** […] **Throughout the years, Hawaiian Electric has worked with the state's Division of Forestry and Wildlife (DOFAW) on Maui to identify specific parts of the island susceptible to wildfires to help with vegetation management and roadside maintenance to act as a firebreaks**." (*Id.* ¶ 194, August 22, 2022 blog post.)

- "**Vegetation impacts during high winds and storms are the cause of many power outages and so we regularly trim vegetation around our equipment** and replace traditional power lines with insulated conductor systems in areas that are especially prone to vegetation-related outages." (*Id.* ¶ 202, 2022 ESG Report.)

- "**So if you want to take, looking at California and learning lessons, the fires have actually had us take a look at the plants and harden them in a sense.  We, you know, make sure that the areas are clear around them.**"  (*Id.* ¶ 206, April 25, 2023 YouTube video.)

### 4.    Advice from Wildfire Collaborators

Fourth, Plaintiffs allege HEI led investors to believe it had followed advice concerning fire

mitigation from a hired consultant and wildfire collaborators when in fact, HEI's "wildfire mitigation policies went *against* that advice." (*Id.* ¶ 98.) Plaintiffs identify the following statements:

- The Utility "engaged…a leading consulting firm in electric utility resilience[] **to perform an independent assessment to identify key vulnerabilities to severe natural events. Following this assessment, [the consultant] outlined a set of recommendations**" including for "system hardening, [and] …enhanced vegetation management." "**The utility is currently developing work plans based on [the consultant's] recommendations**" and is using the consultant's analyses "**to inform its [Integrated Grid Planning] process and planning.**" (*Id.* ¶ 180, 2020 ESG Report.)

- "Episodic drought, a warming climate and **the expansion of nonnative fire-prone grasses and shrubs** has led to an increase in wildfires in Hawai'i. 98% of wildfires in Hawai'i are human caused and the threat to communities is high year-round. **In addition to the utility's own wildfire mitigation plans, we have joined with community members and wildfire collaborators to help prevent and mitigate wildfires in known hot spots across our service areas.**" (*Id.* ¶ 190, 2021 ESG Report.)

- "**We joined with community members and wildfire collaborators to help prevent and mitigate wildfires in known hot spots across our service areas**." (*Id.* ¶ 200, 2022 ESG Report.)

### 5. Prioritization of Safety

Fifth, Plaintiffs allege HEI misled investors to believe it prioritized safety when in fact, the company prioritized customer convenience. (*Id.* ¶ 104.) Plaintiffs identify the following statements:

- "**Safety is our number one priority at Hawaiian Electric**." (*Id.* ¶ 172, 2019 ESG Report.)

- "Hawaiian Electric is committed to maintaining a strong safety culture. Due to the nature of its operations, safety is of paramount importance." (*Id.* ¶ 176, 2020 Form 10-K.)

### 6. HEI's Oversight

Finally, Plaintiffs allege HEI misled investors to believe its subsidiaries were taking proper actions. Plaintiffs identify the following statements:

- "[T]*he Company believes that each subsidiary has appropriately responded to environmental conditions requiring action and that, as a result of such actions, such*

United States District Court
Northern District of California

*environmental conditions will not have a material adverse effect on the Company or Hawaiian Electric*." (*Id.* ¶ 158, 2018 Form 10-K.)

- HEI's Annual Report on Form 10-K, reporting the Company's financial and operating results for the year ending December 31, 2019, stated "***the Utilities believe that each subsidiary has appropriately responded to environmental conditions***. (*Id.* ¶ 166, 2019 Form 10-K.)

- "The [Hawaiian Electric] Board of Directors is responsible for the oversight of **the Company's enterprise risk management (ERM) programs, which are designed to address all material risks** and opportunities, **including ESG considerations**." (*Id.* ¶ 168, 2019 Form 10-K.)

- "[T]*he Utilities believe that each subsidiary has appropriately responded to environmental conditions requiring action and that, as a result of such actions, such environmental conditions will not have a material adverse effect on the capital expenditures, earnings and competitive position of the Utilities*." (*Id.* ¶ 174, 2020 Form 10-K).

- "**[T]he Utilities believe that each subsidiary has appropriately responded to environmental conditions requiring action and that, as a result of such actions, such environmental conditions will not have a material adverse effect on the capital expenditures, earnings and competitive position of the Utilities.**" (*Id.* ¶ 184, 2021 Form 10-K.)

## INCORPORATION BY REFERENCE AND JUDICIAL NOTICE

Defendants ask the Court to consider 29 exhibits in ruling on its motion to dismiss. (Dkt. No. 83 at 4.) While district courts generally "may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6)," the doctrines of incorporation-by-reference and judicial notice are two exceptions to this rule. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). In a footnote, Plaintiffs warn the Court "should only sparingly grant" Defendants' request, "if at all." (Dkt. No. 84 at 12 n.1.) But Plaintiffs do not object to any specific request or contest the authenticity of the documents.

### A.    Incorporation by Reference

While "mere mention of the existence of a document is insufficient to incorporate the contents of a document, the document is incorporated when its contents are described and the document is integral to the complaint." *Tunac v. United States*, 897 F.3d 1197, 1207 (9th Cir. 2018) (internal citation and quotation marks omitted). Both conditions are satisfied as to the documents containing the challenged statements. (Dkt. Nos. 82-3-6 (Form 10-Ks); 82-7-10 (ESG

Reports); 82-11-12 (Sustainability Reports); 82-13-15 (screenshots and transcripts of YouTube videos); 82-16 (screenshot of video of Community Engagement Meeting); 82-17-18 (press releases); 82-19-21 (blog posts).)  The Court thus incorporates these documents by reference. Under this rationale, the Court also incorporates by reference HECO's Wildfire Mitigation Plan (Dkt. No. 82-1), which Plaintiffs describe in the complaint and rely on to allege falsity and scienter.

**B.     Judicial Notice**

Judicial notice permits courts to notice an adjudicative fact if it is "not subject to reasonable dispute," meaning the fact is "generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonable be questioned."  *Khoja*, 899 F.3d at 999 (quoting Fed. R. Evid. 201).  While a court may take judicial notice of matters of public record, "a court cannot take judicial notice of disputed facts contained in such records."  *Id.*

Because "[c]ourts routinely take judicial notice of SEC filings in securities cases where authenticity is not disputed," *In re Apple Inc. Sec. Litig.*, No. 19-CV-02033-YGR, 2020 WL 2857397, at *6 (N.D. Cal. June 2, 2020), the Court takes notice of HEI's SEC filings.  (Dkt. Nos. 82-3-6.)  Likewise, because "websites and their contents may be judicially noticed," *Threshold Enterprises Ltd. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 146 (N.D. Cal. 2020), the Court notices the screenshots of HEI and HECO's corporate pages, provided for the purpose of distinguishing the companies' logos.  (Dkt. Nos. 82-22-26.)

Defendants also request the Court judicially notice HECO press releases and submissions to Hawaii's Public Utilities Commission, which they use to argue Defendants publicly disclosed the risk of wildfire and thus none of the challenged statements are misleading.  This veers toward Defendants "present[ing] their own version of the facts at the pleading stage," *id.*, and doing so to defeat Plaintiffs' claims in one fell swoop.  Moreover, Defendants do not provide persuasive authority for judicially noticing submissions to public utility commissions, as the Ninth Circuit cases they cite involved judicial notice of public utility commission *orders*.  *See W. Radio Servs. Co. v. Qwest Corp.*, 530 F.3d 1186, 1192, n.4 (9th Cir. 2008); *Nugget Hydroelectric, L.P. v. Pac. Gas & Elec. Co.*, 981 F.2d 429, 435 (9th Cir. 1992).  That said, Plaintiffs do not contest the

1  authenticity or accuracy of the documents.  So, while the Court takes judicial notice of Docket

2  Numbers 82-2 and 82-27-29, it does so "not for the truth of their contents, but to determine the

3  information available to the market." *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 872 (N.D.

4  Cal. 2023).

5  <center>**LEGAL STANDARD**</center>

6      Section 10(b) of the Exchange Act makes it unlawful "to use or employ, in connection

7  with the purchase or sale of any security, … any manipulative or deceptive device or contrivance"

8  in contravention of SEC regulations.  15 U.S.C. § 78j(b).  Under Rule 10b-5, promulgated under

9  the authority of section 10(b), it is unlawful "[t]o make any untrue statement of fact or to omit to

10  state a material fact necessary in order to make the statements made, in the light of the

11  circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b–5(b).  "To be

12  viable, a claim brought under § 10(b) and Rule 10b–5 must contain six essential elements:

> (1) a material misrepresentation or omission by the defendant;
> (2) scienter;
> (3) a connection between the misrepresentation or omission and the purchase or sale of a security;
> (4) reliance upon the misrepresentation or omission;
> (5) economic loss; and
> (6) loss causation."

17  *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d

18  1268, 1274 (9th Cir. 2017).

19      To survive a motion to dismiss, a Section 10(b) claim must satisfy three pleading

20  standards.  First are the general pleading requirements of Federal Rule of Procedure 8(a),

21  mandating a short and plain statement of the claim.  Second, pursuant to Rule 9(b) of the Federal

22  Rules of Procedure 9(b), the complaint must "state with particularity the circumstances

23  constituting fraud."  The specificity is intended "to give defendants notice of the particular

24  misconduct which is alleged to constitute the fraud charged so that they can defend against the

25  charge and not just deny that they have done anything wrong."  *Neubronner v. Milken*, 6 F.3d 666,

26  671 (9th Cir. 1993).  Third, the complaint must satisfy the requirements of the Private Securities

27  Litigation Reform Act ("PSLRA"), which requires "plead[ing] with particularity both falsity and

28  scienter."  *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002) (internal quotation marks and

1  citation omitted).  To do so, the complaint must "specify each statement alleged to have been

2  misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding

3  the statement or omission is made on information and belief, the complaint shall state with

4  particularity all facts on which that belief is formed." *Id.* (quoting 15 U.S.C. 78u–4(b)(1).)

5                                              **DISCUSSION**

6  **I.      STATEMENTS BY HEI'S SUBSIDIARIES**

7          As an initial matter, Defendants contend they are not liable for 11 of the challenged

8  statements as a matter of law because HEI's subsidiaries—not HEI—made the statements.  To be

9  liable under Rule 10b–5, in addition to the elements described above, the defendant "must have

10 'made' the material misstatements."  *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S.

11 135, 141 (2011) (quoting 17 C.F.R. § 240.10b-5).  "[T]he maker of a statement is the person or

12 entity with ultimate authority over the statement, including its content and whether and how to

13 communicate it."  *Id.* at 142.  An entity without ultimate authority "can merely suggest what to

14 say, not 'make' a statement in its own right."  *Id.*

15         Plaintiffs fail to sufficiently allege facts that plausibly support an inference HEI made the

16 11 challenged statements attributable to its subsidiaries.  Three such statements are in blog posts

17 with HECO's logo.  (Dkt. No. 70 ¶¶ 182, 194, 198; *see also* Dkt. Nos. 82-22 (HECO logo); 82-23

18 (HEI logo).)  The four YouTube videos containing challenged statements are posted on an account

19 with HECO's logo that links to HECO's website.  (Dkt. No. 70 ¶¶ 162, 170, 196, 206.)  One of the

20 press releases containing an allegedly false statement is linked to HECO's website.  (*Id.* ¶ 160;

21 Dkt. No 82-17.)  The other press release has "Maui Electric" in the header and footer and links to

22 HECO's social media accounts.  (Dkt. Nos. 70 ¶ 164; 82-18.)  Finally, the statements in the

23 sustainability reports contain HECO's logo, include an introduction from HECO's President and

24 CEO, and link to HECO's website.  (Dkt. Nos. 70 ¶¶ 192, 204; 82-11, 12).  Such "attribution

25 within [the] statements[s] [and] implicit from surrounding circumstances is strong evidence" the

26 statements were "made by—and only by—the party to whom it is attributed" —in this case,

27 HECO (and HECO's subsidiary, Maui Electric).  *See Janus,* 564 U.S. 135 at 142-43.

28         Plaintiffs do not contest the 11 statements are attributable to HECO and Maui Electric.

United States District Court
Northern District of California

1   Instead, Plaintiffs argue HEI is "a veritable alter ego of HECO, and wholly controlled, and had

2   ultimate authority over, its actions and statements."  (Dkt. No. 84 at 25.)  Specifically, the

3   amended complaint alleges HEI wholly owns HECO, that "HECO is the operating company

4   through which HEI conducts the vast majority of its business," and that HECO's revenues and net

5   income amounted to a significant percentage of HEI's revenues and net income.  (Dkt. No. 70 ¶¶

6   29-30.)

7           These allegations are insufficient to plausibly support an inference HEI "actually

8   participated in and had authority over" statements made by HECO.  *See Reese v. BP Expl.*

9   *(Alaska) Inc.*, 643 F.3d 681, 694, n.8 (9th Cir. 2011).  "[I]t is undisputed that the corporate

10  formalities were observed here"—HEI and HECO are "legally separate entities."  *Janus*, 564 U.S.

11  at 145-46.  Accepting as true HEI wholly owned HECO, HEI's ownership alone does not

12  plausibly support an inference that HEI had ultimate authority over HECO's statements, and

13  Plaintiffs have pled no other facts to establish as much.  The Court cannot "disregard the corporate

14  form" by holding HEI liable for HECO's statements based solely on the presence of a parent-

15  subsidiary relationship.  *Id.* at 145.

16          The cases upon which Plaintiffs rely do not persuade the Court otherwise.  In *In re*

17  *Volkswagen "Clean Diesel" Marketing, Sales Practices, & Product Liability Litigation*, the

18  plaintiffs alleged the parent company "was involved in day-to-day operations" of its subsidiaries,

19  including "directing their public statements" and "develop[ing], review[ing], and approv[ing] the

20  marketing and advertising campaigns."  No. 2672 CRB (JSC), 2017 WL 66281, at *18 (N.D. Cal.

21  Jan. 4, 2017).  These allegations were "sufficient to satisfy *Janus*'s requirement."  *Id.*; *see also In*

22  *re Rocket Fuel, Inc. Sec. Litig.*, No. 14-CV-3998-PJH, 2015 WL 9311921, at *10 (N.D. Cal. Dec.

23  23, 2015) (finding ultimate authority when the plaintiffs alleged the defendants "possessed the

24  power and authority to control the contents of the Company's press releases [and] investor and

25  media presentations"); *cf. In re Volkswagen AG Sec. Litig.*, 661 F. Supp. 3d 494, 522 (E.D. Va.

26  2023) (no ultimate authority when the plaintiffs "merely alleg[ed] a daily monitoring function and

27  participation in the preparation of public statements" without allegations the parent company

28  "provided final approval over the press release and its details").  The amended complaint here

does not include similar allegations; indeed, it includes no allegations about HEI's alleged involvement in the challenged statements.

Plaintiffs also cite *Flynn v. Exelon Corporation*, but there the court was not deciding whether a subsidiary's statements should be attributed to a parent company.  No. 19 C 8209, 2021 WL 1561712, at *6-7 (N.D. Ill. Apr. 21, 2021).  Rather, the parent and subsidiary each filed a form attaching an agreement containing the alleged misstatements, and the court concluded both could be liable.  *Id.*  Further, the agreement stated it was made "pursuant to authority granted by the Board of Directors of [the parent company]."  *Id.*  And in *City of Roseville Employees' Retirement System. v. EnergySolutions, Inc.*, the attribution dispute involved a registration statement, which "made clear" the defendant controlled the stock sales of the company that signed the statement.  814 F. Supp. 2d 395, 417-18 (S.D.N.Y. 2011).  As to statements akin those at issue here—statements "made at press conferences or in press releases"—there was no dispute as to attribution.  *Id.* at 418.

Plaintiffs' argument that statements of HECO's CEO, Shelee Kimura, can be imputed to HEI by way of SEC Rule 3b-7 is without support.  Rule 3b-7 states "[e]xecutive officers of subsidiaries may be deemed executive officers of the registrant if they perform such policy making functions for the registrant."  17 C.F.R. § 240.3b-7.  Plaintiffs have not alleged Ms. Kimura performed policy functions for HEI.  Nor have Plaintiffs alleged Ms. Kimura made the challenged statements or that those statements are attributable to Ms. Kimura.  Even had Plaintiffs alleged these facts, they cite no legal support for the proposition that Rule 3b-7 operates as an exception to *Janus*.

* * *

In sum, Plaintiffs fail to plausibly allege HEI had authority over the challenged statements made in HECO and Maui Electric's blog posts, YouTube videos, sustainability reports, and press releases.  (Dkt. No. 70, ¶¶ 160, 162, 164, 170, 182, 192, 194, 196, 198, 204, 206.)  So, the Court GRANTS Defendants' motion to dismiss as to these statements.

## II.      FALSE OR MISLEADING STATEMENTS

Under the PSLRA, "plaintiffs must allege a misrepresentation or a misleading omission with particularity and explain why it is misleading." *Hewlett-Packard*, 845 F.3d at 1274.  A statement is false if it "directly contradict[s] what the defendant knew at that time." *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022).  "Even if a statement is not false, it may be misleading if it omits material information." *Khoja*, 899 F.3d at 1008–09.  Put another way, "a statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Hewlett-Packard,* 845 F.3d at 1275.

Defendants begin with an overarching argument that no challenged statement was false or misleading because HEI disclosed the risk Plaintiffs allege they concealed.  Defendants highlight five excerpts from 79- and 142-page submissions to Hawaii's Public Utility Commission, which they contend disclosed the risk HECO's equipment could spark a wildfire.  (Dkt. Nos. 82-2 at 22, 26, 55, 108; 27 at 22.)  The excerpts reference wildfire risk in Maui given its vegetation and note the possibility of "failing poles," but they do not spell out the risk that HECO's equipment could spark a wildfire.  More importantly, the disclosures are not "abundant and specific" so as to neutralize the possible misleading nature of every challenged statement in the amended complaint. *See Ikeda v. Baidu, Inc.*, No. 20-CV-02768-LHK, 2021 WL 1299046, at *11 (N.D. Cal. Apr. 7, 2021).  In *Ikeda*, the disclosure the defendant relied on appeared "right before" the challenged statements.  *Id.* at *10.  In this case, Defendants rely on short phrases lifted from lengthy regulatory filings, which are separate from the documents containing the challenged statements.  As the Court is required to draw all reasonable inferences in Plaintiffs' favor, the Court cannot dismiss Plaintiffs' claims on this ground.

Defendants also contend Plaintiffs failed to plead any individual statement was false or misleading.  The Court turns to this argument next, analyzing HEI's statements by category.

### A.      Replacement of Exposed Power Lines with Insulated Wire Conductors

In its 2021 ESG Report, HEI stated it "replaced traditional power lines with insulated conductor systems to improve reliability and resilience in targeted areas prone to vegetation-

related outages." (Dkt. No. 70 ¶ 188.) HEI made a similar statement in its 2022 ESG Report. (*Id.* ¶ 202.)

Plaintiffs have not plausibly alleged these statements were false or misleading. The challenged statements are not that HEI replaced *every* traditional power line with insulated conductor systems. Rather, the ESG Reports state replacements occurred "in targeted areas prone to vegetation-related outages." (*Id.* at ¶¶ 188, 202.) Plaintiffs do not allege Lahaina was an area "prone to vegetation-related outages." And even if this allegation appeared in the amended complaint, it might not be sufficient given there are over 20,000 utility poles on Maui alone. (*Id.* at ¶ 84.) To allege falsity, Plaintiffs must plausibly allege HEI did not install *any* insulated conductors, or Plaintiffs must identify the "*targeted* areas prone to vegetation-related outages" and plausibly allege HEI did not install insulated conductors there. Plaintiffs have done neither.

The factual allegations Plaintiffs rely on fall short of a plausible inference of falsity. First, Plaintiffs point to an Associated Press article that "analyzed videos and images of West Maui power lines and found that Hawaiian Electric had left miles of electrical line 'naked to the weather and often-thick foliage.'" (*Id.* ¶ 75.) But, as described above, Plaintiffs do not allege those miles of electrical line were in "targeted areas prone to vegetation-related outages." Second, Plaintiffs allege the Wildfire Mitigation Plan establishes falsity. That Plan states insulated conductors "would not be cost-effective" because "the type of vegetation in the Hawaii wildfire areas are grasses, shrubs with few tall trees" but "if there are wildfire areas with tall trees adjacent to the line rights-of-way," insulated conductors "should be considered." (*Id.* ¶ 68; Dkt. No 82-1 at 39.) As Plaintiffs allege, the Plan expresses a general policy against "replacing existing overhead conductors with insulated conductors." (Dkt. No. 70 ¶ 68.) But it does so in the context of wildfire mitigation. Plaintiffs do not explain why a general determination that insulated conductors were unnecessary to mitigate wildfire risk renders false HEI's statement about installing insulated conductors to "ensure that power gets to our customers." (Dkt. No. 82-1 at 10.) Put another way, it is plausible HEI installed insulated conductors on thousands of poles throughout Hawaii to decrease power outage risk while determining such installation was not a cost-effective way to reduce wildfire risk. *See Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir.

United States District Court
Northern District of California

15

1   2001) (plaintiffs did not allege fraud where "the circumstances [were] not inconsistent with the

2   statements so as to show that the statements must have been false or misleading when made").

3          Because none of Plaintiffs factual allegations support a plausible inference HEI did not

4   install insulated conductors in targeted areas prone to vegetation-related outages, Plaintiffs have

5   not adequately pled falsity as to these statements (Dkt. No. 70 ¶¶ 188, 202).

6          **B.      Utility Pole Maintenance**

7          In its 2020, 2021, and 2022 ESG Reports, HEI described working to continually "maintain

8   and upgrade [its] transmission and distribution system." (Dkt. No. 70 ¶¶ 178, 188, 202.)  The

9   2020 and 2021 Reports continue: "We regularly inspect our poles… and work to replace and

10  upgrade aging and faulty equipment before failures happen." (*Id.* ¶¶ 78, 86).

11         Plaintiffs fail to plausibly allege these statements were false or misleading when made.

12  The Court accepts as true Plaintiffs' allegations that (1) prior to the Class period, more than one-

13  third of the poles on Maui whose age could be determined were nearing the end of their lifespan,

14  (2) HEI "spent millions of dollars less on upgrades than it planned in the years leading up to the

15  Lahaina fire," and (3) HEI "replaced fewer poles than anticipated." (*Id.* ¶¶ 79-80, 83-84.)  But

16  these allegations do no not render false Defendants' statements about "continually maintain[ing]

17  and upgrad[ing] [its] transmission and distribution system to ensure seamless delivery of power to

18  [its] customers." (*Id.* ¶¶ 178, 188.)  That statement contains no benchmarks, no spending

19  commitment, and no deadline for completing the upgrade.  It is plausible HEI is spent less than

20  anticipated *and* continually maintained and upgraded its poles—and Plaintiffs have not pled

21  anything to the contrary.   Moreover, Plaintiffs do not allege Defendants did not regularly inspect

22  their poles.  And while many of the poles were nearing the end of their lifespan, (*see id.* ¶¶ 83-84),

23  Plaintiffs do not allege any poles failed.  Thus, Plaintiffs have not plausibly alleged Defendants'

24  statement about replacing "faulty equipment before failures happen" was false.

25         So, Plaintiffs have not sufficiently pled falsity as to Defendants' statements about

26  performing regular maintenance on utility poles.  (Dkt. No. 70 ¶¶ 178, 188, 202.)

27         **C.      Trimming Vegetation**

28         HEI's 2020, 2021, and 2022 ESG Reports state "We regularly trim the vegetation around

United States District Court
Northern District of California

16

our equipment."  (Dkt. No 70 ¶¶ 178, 188, 202.)  Defendants assert Plaintiffs failed to plausibly allege these statements are false, that is, that Defendants do not engage in regular trimming of vegetation.  The Court agrees.

Contrary to Plaintiffs' assertions, HECO's Wildfire Mitigation Plan does not establish a policy against trimming.  The Plan describes "trimming, removing, and herbicide spraying of vegetation on prescribed cycles" as part of the company's vegetation management plan to prevent outages.  (*Id.* ¶ 93.)  As to whether this plan should be adjusted in wildfire areas, the Plan recommends against it because "[f]urther trimming of the already low-lying vegetation will not likely produce any appreciable results."  (*Id.*)  So, the Plan cannot reasonably be read as establishing a policy against trimming; it recommended against additional "[f]urther" trimming in wildfire areas.  (*Id.*)

The statements from former employees also fail to establish falsity.  According to the complaint, confidential witness FE2 was instructed by his supervisor to stop clearing vegetation from poles "in 2016 or 2017."  (*Id.* ¶ 95.)  Because "[t]he Class Period begins on February 28, 2019," (*Id.* ¶ 158), FE2 does not provide an inconsistent contemporaneous statement.  The other allegation from FE2 that he "was repeatedly instructed by superiors *not* to trim the brush at the base of the poles" without specifying a time period or how those instructions were communicated is also insufficient.  (*Id.* ¶ 95.)  *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009) (rejecting confidential source statements that contain only "conclusory allegations of fraud"); *In re Tibco Software, Inc.*, No. C 05-2146 SBA, 2006 WL 1469654, at *25 (N.D. Cal. May 25, 2006) (rejecting confidential witness statement that did not specify "*when* [the alleged issues] occurred").)  For this same reason, the vague statement by FE3 that HECO "'neglected' keeping invasive grasses 'under control' due to cost" is insufficient.  (Dkt. No. 70 ¶ 96.)

Plaintiffs also rely on an audit report issued on May 12, 2020 to establish falsity.  (*Id.* ¶ 60 (stating "Vegetation Management has not been able to complete its planned mitigation programs over the last few years and has underspent its budgets. . . . [T]he impact . . . is showing up in increased Distribution trouble calls as a result of vegetation interference with overhead lines.").)  To conclude Plaintiffs have plausibly alleged falsity, the Court must infer (1) Vegetation

1   Management's underspending precluded regular trimming, and (2) the vegetation management

2   issues identified in the May 2020 audit report were present in April 2021, April 2022, and April

3   2023 when the challenged statements were made.  *See Fecht v. Price Co.*, 70 F.3d 1078, 1083 (9th

4   Cir. 1995) (statements must be "false when made").  While the Court must draw all reasonable

5   inferences in Plaintiffs' favor, the multiple inferences Plaintiffs' allegations require are not

6   reasonable, particularly where the standard is alleging a misrepresentation with particularity.  *See*

7   *Hewlett-Packard*, 845 F.3d at 1274.

8          Thus, Plaintiffs failed to plead falsity as to Defendants' statements about trimming

9   vegetation.  (Dkt. No 70 ¶¶ 178, 188, 202.)

10          **D.**     **Advice from Wildfire Collaborators**

11          In its 2020 ESG Reports, HEI stated:

12                 **The utility engaged Exponent**, a leading consulting firm in electric
                   utility resilience, **to perform an independent assessment to identify**
13                 **key vulnerabilities to severe natural events. Following this**
                   **assessment, Exponent outlined a set of recommendations** to ensure
14                 quick restoration of critical customers, reduce total restoration time
                   and minimize the total amount of damage from a severe natural event.
15                 **This included recommendations for system hardening**, substation
                   flood monitoring, **enhanced vegetation management**, emergency
16                 restoration, damage prediction modeling and additional in-depth
                   studies. **The utility is currently developing work plans based on**
17                 **Exponent's recommendations**…

18   (Dkt. No. 70 ¶ 180 (emphasis in complaint); *see also id.* ¶ 186 (2021 ESG Report containing

19   substantially the same language).)  This statement would be false or misleading if HEI had not

20   hired a consultant and did not develop work plans based on the consultant's recommendations.

21   But Plaintiffs have pled no such facts.  Plaintiffs argue the statement is misleading because it

22   implies HEI would adopt the consultant's advice regarding vegetation management, which

23   Defendants did not do.  But the challenged statement does not state HEI committed to adopt any

24   or every recommendation from the consultant.  Nor does the challenged statement specify what

25   the consultant's recommendations to "enhance[] vegetation management" entailed, particularly in

26   the wildfire mitigation context.

27          Plaintiffs also challenge HEI's statements in its 2021 ESG Report:

28                 Episodic   drought,   a   warming   climate   and   **the   expansion   of**

United States District Court
Northern District of California

18

**nonnative fire-prone grasses and shrubs** has led to an increase in wildfires in Hawai'i. 98% of wildfires in Hawai'i are human caused and the threat to communities is high year-round. **In addition to the utility's own wildfire mitigation plans, we have joined with community members and wildfire collaborators to help prevent and mitigate wildfires in known hot spots across our service areas.** As members of the Wai'anae Wildfire Hui in West O'ahu and Pacific Fire Exchange on Maui, we meet monthly to share ideas and discuss priority projects. We support the Hawai'I Wildfire Management Organization on Hawai'i Island, which works with communities across the state on wildfire planning, prevention and mitigation

(Dkt. No. 70 ¶ 190 (emphasis in complaint).)  According to Plaintiffs, because HEI identified "the expansion of nonnative fire-prone grasses and shrubs" in the same paragraph it described working with wildfire collaborators, a reasonable investor would assume "HEI was taking steps with those collaborators *to address 'fire-prone grasses and shrubs.'*"  (Dkt. No. 84 at 23 (emphasis added).) The Court declines to adopt this strained reading; instead, the paragraph is only plausibly read as HEI representing it is collaborating "to help prevent and mitigate wildfires."  And, by Plaintiffs' own allegations, HEI did collaborate with community organizations.  (*See, e.g.*, Dkt. No. 70 ¶ 49 (describing HEI's participation in a Resilience Working Group); *id.* ¶ 50 (describing HEI's organization of stakeholder working groups).)  So, Plaintiffs have not plausibly alleged HEI's statement about "join[ing] with community members and wildfire collaborators to help prevent and mitigate wildfires in known hot spots across our service areas" was false or misleading.  (*Id.* ¶ 200.)

Thus, Plaintiffs failed to sufficiently allege HEI's statements about working with community members and wildfire collaborators were false or misleading.  (*Id.* ¶ 180, 186, 190, 200.)

### E.    Prioritization of Safety

In its 2019 ESG Report, HEI stated "Safety is our number one priority at Hawaiian Electric."  (Dkt. No. 70 ¶ 172.)  Similarly, HEI's 2020 10-K stated "Hawaiian Electric is committed to maintaining a strong safety culture.  Due to the nature of its operations, safety is of paramount importance."  (*Id.* ¶ 176.)  Defendants contend HEI's statements about safety are not actionable because they constitute immaterial corporate puffery.  The Court agrees.

"[V]ague statements of optimism like 'good,' 'well-regarded,' or other feel good

monikers" are inactionable puffery." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010). The statements are inactionable because "professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *Id.*

Courts considering statements resembling HEI's have concluded such "generalized, vague and unspecific assertions" were inactionable. *See, e.g.*, *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003) (statements "generally describing the 'high priority' the defendant placed on product development" were inactionable); *Barnes v. Edison Int'l*, No. CV 18-09690 CBM, 2021 WL 2325060, at *9 (C.D. Cal. Apr. 27, 2021), *aff'd*, No. 21-55589, 2022 WL 822191 (9th Cir. Mar. 18, 2022) (statement that "Safety is the company's top priority" was inactionable puffery); *Sterling Fin. Corp.*, 47 F. Supp. 3d at 1220 ("the term 'safe and sound' is too general and would not cause investors to rely upon it"); *Plumley v. Sempra Energy*, No. 316CV00512 BENAGS, 2017 WL 2712297, at *7 (S.D. Cal. June 20, 2017) (statements regarding the defendant's "commitment to or prioritization of safety, and all similarly alleged statements, are too nonspecific and unmeasurable to state a claim for securities fraud").

Plaintiffs argue "safety was objectively not 'HEI's number one priority'" because HECO's Wildfire Mitigation Plan prioritized customer convenience over safety, pointing to the Plan's recommendation as to de-energizing. The Plan recommended against a California utility's "practice to preemptively turn off circuits in certain areas if conditions were ripe for a wildfire," noting this practice "was not well received by certain customers affected" in California. (Dkt. No ¶ 69.) Plaintiffs assert "turning off circuits…was the safest reasonable policy to prevent wildfires." (*Id.* ¶ 106.) Accepting this allegation as true, it does not follow HEI failed to make safety its number one priority. In total, HEI's other mitigation efforts could have elevated safety above customer convenience. And the complaint focuses solely on HEI's prioritization of safety in the wildfire context. As a company that engages in "electric utility, banking, and non-regulated renewable/sustainable infrastructure investment businesses," (*id.* ¶ 2), with many employees, all HEI's operations would have to be considered to determine the company's number one priority. As this inquiry demonstrates, HEI's statements about safety are "not capable of objective verification" and therefore constitute inactionable puffery. *Oregon Pub. Emps. Ret. Fund v.*

1    *Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014).

2    **F.    HEI's Oversight of Subsidiaries**

3           For fiscal years 2018 through 2021, HEI's Form 10-K annual reports contained the

4    following or similar language: "the Company believes that each subsidiary has appropriately

5    responded to environmental conditions requiring action and that, as a result of such actions, such

6    environmental conditions will not have a material adverse effect on the Company or Hawaiian

7    Electric." (Dkt. 70 ¶¶ 158, 166, 174, 184.) Defendants contend these constitute opinion

8    statements and Plaintiffs failed to meet the demanding standard set forth in *Omnicare, Inc. v.*

9    *Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015). Plaintiffs concede

10   "these particular statements are opinions" but argue they are actionable under *Omnicare*. (Dkt.

11   No. 84 at 15.)

12          *Omnicare* established three standards for pleading falsity of opinion statements: (1) a

13   theory of material misrepresentation, (2) a theory that a statement of fact contained within an

14   opinion statement is materially misleading; and (3) a theory of omission. *City of Dearborn*

15   *Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615–16 (9th Cir. 2017)

16   (quoting *Omnicare*, 575 U.S. at 1327). The complaint suggests Plaintiffs are proceeding under a

17   theory of material misrepresentation. (Dkt. No. 70 ¶ 159 (describing the challenged statements as

18   "materially false and misleading because the Company knew of environmental conditions…that

19   required action and that could have a material adverse effect on the Company.").) Yet in the

20   opposition, Plaintiffs appear to pivot to a theory of omission, arguing the Form 10-K statements

21   "omit[] material facts about the issuer's . . . knowledge." (Dkt. No. 84 at 15.) Under either

22   theory, Plaintiffs have failed to state a claim.

23          Under the theory of material misrepresentation, a plaintiff "must allege both that 'the

24   speaker did not hold the belief she professed' and that the belief is objectively untrue." *Dearborn*,

25   856 F.3d at 615-16. Plaintiffs fail to meet the first hurdle of plausibly alleging subjective falsity.

26   Plaintiffs point to the Wildfire Mitigation Plan to argue HEI knew its subsidiaries were not

27   responding appropriately to environmental conditions. (Dkt. No. 70 ¶ 209.) But that Plan is

28   consistent with Defendants' belief its subsidiaries were taking appropriate actions to mitigate risk.

United States District Court
Northern District of California

The Plan evaluates wildfire risks and lists recommendations.  (Dkt. No. 82-1 at 2.)  While noting HECO would not pursue certain remedial actions that were not "cost-effective as opposed to other…solutions" and unlikely to "produce any appreciable results in the potential wildfire areas," (Dkt. No. 70 ¶ 68), the Plan recommended other actions to reduce wildfire risk such as installing weather stations and cameras and smart fuses on certain circuits.  (Dkt. No. 82-1 at 7, 10.)  Whether HECO's judgments proved to be sound, the Plan would lead Defendants to believe its subsidiaries were appropriately responding to environmental conditions—in this case, wildfires—by prioritizing the mitigation efforts it deemed most effective.

Plaintiffs fare no better under a theory of omission, in which the plaintiff "must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."  *Dearborn*, 856 F.3d at 615 (quoting *Omnicare*, 575 U.S. at 194); *see also Ikeda*, 2021 WL 1299046 at *9 ("In order to claim that an opinion statement was misleading because it omitted material information, the plaintiff must allege facts showing that the company knew undisclosed information that seriously undermined the basis for its opinion.").  Proceeding under the omission theory is "no small task for an investor."  *Omnicare,* 575 U.S. at 194.

Plaintiffs appear to rely on the Wildfire Mitigation Plan as the undisclosed information, but as described above, the Plan is consistent with HEI's belief its subsidiaries were taking appropriate actions to mitigate wildfire risk.  Having premised the complaint on a theory of material misrepresentation rather than omission, Plaintiffs do not otherwise identify "particular (and material) facts going to the basis for the issuer's opinion," such as "facts about [HEI's] inquiry" into its subsidiaries actions HEI "did or did not conduct."  *Id.*  Thus, as to the HEI's statements expressing an opinion about the appropriateness of its subsidiary's actions, (Dkt. 70 ¶¶ 158, 166, 174, 184), Plaintiffs have failed to plausibly allege a material misrepresentation or omission.

The same is true for HEI's statement "[t]he [Hawaiian Electric] Board of Directors is responsible for the oversight of the Company's enterprise risk management (ERM) programs, which are designed to address all material risks and opportunities, including ESG considerations."

1   (*Id.* ¶ 168.)  Plaintiffs contend this statement is materially false and misleading because the

2   Company "knew that its wildfire mitigation program did not adequately address all material risks"

3   such as the risk of dry vegetation and outdated poles.  (*Id.* ¶ 169.)  But the challenged statement

4   says the board oversees a risk management program *designed to address* all material risks, not that

5   the board oversees a system *guaranteed to eliminate* all material risks, including the risks created

6   by outdated poles, exposed power lines, and dry vegetation.  Thus, Plaintiffs have failed to prove

7   the statement in paragraph 168 was false or misleading.

8   **III.   SCIENTER**

9       Defendants argue Plaintiffs do not plausibly allege Individual Defendants knew

10  information contradicting the challenged statements and thus, Plaintiffs fail to plead scienter.

11      "[A] securities fraud complaint must 'state with particularity facts giving rise to a strong

12  inference that the defendant acted with the required state of mind.'"  *New Mexico State Inv.*

13  *Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011) (quoting 15 U.S.C. § 78u–

14  4(b)(2)(A)).  "A complaint can plead scienter by raising a strong inference that the defendant

15  possessed actual knowledge or acted with deliberate recklessness."  *Id.*  The Court first determines

16  whether any allegations, standing alone, "are sufficient to create a strong inference of scienter."

17  *Zucco*, 552 F.3d at 992.  If no individual allegations are sufficient, the Court "conduct[s] a

18  'holistic' review of the same allegations to determine whether the insufficient allegations combine

19  to create a strong inference of intentional conduct or deliberate recklessness."  *Id.*  In reviewing

20  the sufficiency of the complaint, the Court must "take into account plausible opposing inferences."

21  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323 (2007).  "A complaint will survive…

22  only if a reasonable person would deem the inference of scienter cogent and at least as compelling

23  as any opposing inference one could draw from the facts alleged.  *Id.*  "Where, as here, the

24  Plaintiffs seek to hold individuals and a company liable on a securities fraud theory," Plaintiffs

25  must "allege scienter with respect to each of the individual defendants."  *Apollo Grp.*, 774 F.3d at

26  607.

27      Plaintiffs allege Individual Defendants knew HEI made false and misleading statements

28  "[b]ecause of their positions with HEI, and their access to material information available to them

but not to the public." (Dkt. No. ¶ 208.)  Generally, where scienter is premised on "corporate management's general awareness of the day-to-day workings of the company's business," the complaint must contain allegations "of specific information conveyed to management and related to the fraud."  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008); *see also S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008) (requiring "detailed and specific allegations about management's exposure to factual information within the company").  Plaintiffs' allegations fall below the requisite level of specificity.

In part, Plaintiffs rely on the Wildfire Mitigation Plan as the information contradicting the challenged statements.  (Dkt. No. 70 ¶¶ 209-10.)  Plaintiffs allege Defendants Seu and Lau knew of the Plan because the 2021 ESG Report they signed references "the utility's own wildfire mitigation plans."  (*Id.* ¶ 211.)  But the complaint contains no allegations supporting an inference Defendants Hazelton and Ito knew of or had access to the Plan.  *See Swartz v. KPMG LLP*, 476 F.3d 756, 764–65 (9th Cir. 2007) ("Rule 9(b) does not allow a complaint to merely lump multiple defendants together but requires plaintiffs to differentiate their allegations when suing more than one defendant.") (internal quotation marks and citation omitted).

Even accepting as true that all four defendants had access to HECO's Wildfire Mitigation Plan, Plaintiffs fail to explain why knowledge of the Plan's existence meant HEI's top officers were familiar with the ins and outs of the 77-page document.  The cases Plaintiffs cite involve misrepresentations that went to the core of the defendant company's business.  *See*, *e.g.*, *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 814 (C.D. Cal. 2011) (the challenged statements involved an insulin product that was the defendant company's "only advanced-stage product" and "by an overwhelming margin the most important product in the Company"); *In re Amgen Inc. Sec. Litig.,* No. CV072536PSGPLAX, 2014 WL 12585809, at *11 (C.D. Cal. Aug. 4, 2014) (the information defendants allegedly concealed "concerned the *sin qua non* of [defendant's] business").  In contrast, the allegedly false and misleading statements here involved one aspect of HEI's subsidiary's plan to mitigate wildfire risk, which is one environmental condition that could affect the Electric Utility segment—one of three businesses HEI engages in through HECO.

Plaintiffs also cite cases where the individual defendants displayed thorough familiarity

with the topic the alleged misrepresentation references, which contributed to a finding of scienter. *See, e.g.*, *S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1259 (W.D. Wash. 2009) (noting the defendant discussed the company's "technology and integrations with a high degree of specificity on more than one occasion"); *In re Zillow Grp., Inc. Sec. Litig.*, No. C17-1387-JCC, 2019 WL 1755293, at *19 (W.D. Wash. Apr. 19, 2019) (noting the individual defendants "made numerous "statements displaying their familiarity with how the co-marketing program was designed and operated"); *Amgen*, 2014 WL 12585809 at *12 (defendant was Vice President of Oncology Clinical Development and monitoring the data contradicting the challenged statement "fell squarely within his bailiwick"). In this case, aside from an allegation that Defendant Seu attended a Resiliency Working Group meeting, the amended complaint is silent on HEI's top officers' involvement in HECO's wildfire mitigation efforts.

At oral argument, Plaintiffs insisted Ms. Kimura, the CEO of HECO, knew about the Wildfire Mitigation Plan and her scienter should be imputed to HEI. But Ms. Kimura is not a named defendant. Plaintiffs identify no complaint allegations to support the assertion made at oral argument that Ms. Kimura is a "de jure CEO of HEI." Regardless, Plaintiffs also provide no legal support for their assertion that the mental state of a subsidiary's CEO can be imputed to a parent company for purposes of establishing the requisite strong inference of scienter.

Plaintiffs also allege Individual Defendants received information contradicting the challenged statements via reports on environmental risks. Specifically, Plaintiffs allege HECO's Chief Risk Officer "was responsible for providing *regular reports* to the HEI Board and Audit & Risk Committee on the status of [the] risks" to the Utility." (Dkt. No. 70 ¶ 217-18.). One inference is through these reports, Individual Defendants learned HECO had not taken certain actions—such as installing insulated conductors, replacing aging utility poles, regularly trimming grasses—and chose to conceal this information from stockholders. But Plaintiffs fail to allege these topics were the subject of the Audit & Risk Committee's reports. *See Nguyen v. Endologix, Inc.*, 962 F.3d 405, 417 (9th Cir. 2020) (declining to credit confidential witness statement referencing "incident reports" where the complaint "d[id] not plead any details about these reports"); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir.

2014) (declining to credit confidential witness statements that "d[id] not detail the actual contents of the reports the executives purportedly referenced or had access to").  And Plaintiffs' allegations fail to establish this inference is stronger than the competing inference posed by Defendants: "that the Lahaina Wildfire happened despite HECO's best efforts to prevent it and without Defendants trying to hide that risk." (Dkt. No. 81 at 33).  Or even: while HECO's efforts to mitigate wildfire risk proved insufficient, there was no attempt by Individual Defendants to misrepresent HECO's efforts.

This is especially so given the lack of alleged motive, which tips the scale in favor of Defendants on scienter.  Plaintiffs do not allege why Individual Defendants concealed information regarding the company's wildfire mitigation efforts and do not allege any Individual Defendant benefited from the alleged fraud by selling stock at an inflated price.  Plaintiffs do not explain why Defendants would perpetuate a fraudulent scheme regarding wildfire mitigation efforts over the four-plus-year class period; why Defendant Seu would continue a fraudulent scheme initiated by his predecessor to the CEO role, Defendant Lau; and why Defendant Ito would continue a fraudulent scheme initiated by his predecessor to the CFO role, Defendant Hazelton.  Rather, Plaintiffs argue "the law is clear that allegations of motive (such as insider selling) are wholly unnecessary to plead scienter." (Dkt. No. 84 at 31.)  True, but "[o]nly where a complaint otherwise asserts compelling and particularized facts showing fraudulent intent or deliberate recklessness will [the court] overlook the failure to allege a plausible motive." *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1108 (9th Cir. 2021).  The complaint lacks particularized facts indicating Individual Defendants knew the challenged statements were false.  The complaint also lacks particularized facts indicating Individual Defendants were deliberately reckless; that is, Plaintiffs fail to allege the Individual Defendants "had reasonable grounds to believe" HECO was not installing insulated conductors, replacing utility poles, and trimming vegetation. *See In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010); *see also Zucco*, 552 F.3d at 991 (to plead deliberate recklessness, a plaintiff must establish an "extreme departure from the standards of ordinary care").  Courts have found deliberate recklessness where the defendant was privy to "potentially alarming information" or "red flags" contradicting the defendant's statement. *See*

26

*Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000); *In re Software Toolworks Inc.*, 50 F.3d 615, 623 (9th Cir. 1994).  Plaintiffs plead no such facts.

Because Plaintiffs fail to plead a strong inference of scienter on behalf of any Individual Defendant, Plaintiffs fail to allege a 10(b) violation.  "In most cases, the most straightforward way to raise [an inference of scienter] for a corporate defendant will be to plead it for an individual defendant."  *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 743 (9th Cir. 2008).  Only where "a company's public statements [are] so important and so dramatically false" can a corporation be liable for false and misleading statements even when none of the named officers and directors had the requisite intent.  *Id.*; *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435 (9th Cir. 1995) (finding it was impossible to allege corporate scienter without also implicating the directors and officers).  The statements here, which appeared in 70-plus page ESG Reports, were not so fundamental to HEI's business the Court can infer HEI as a corporate entity had scienter. *Compare Glazer*, 549 F.3d at 744 (plaintiff had to plead an individual defendant had the scienter when securities fraud claim rested on three statements, "all of which appear in a sixty-page legal document"), *with In re Volkswagen*, 2017 WL 66281 at *14 (permitting collective scienter when "it [was] reasonable to infer that at least some corporate officials knew Volkswagen was falsely touting the emissions compliance of 11 million vehicles worldwide (including 580,000 in the United States) when in fact none of the vehicles were in compliance").

Because no individual allegation has the requite specificity to establish scienter, and viewed holistically, the complaint fails to establish a strong inference of scienter, *see Zucco*, 552 F.3d at 992, the Court dismisses Count I.

## IV.    SECTION 20(A)

Plaintiffs also allege Individual Defendants are liable under section 20(a) of the Exchange Act.  (Dkt. No. 70 ¶¶ 241-46.)  To state a prima facie section 20(a) claim, a plaintiff must plead: (1) "a primary violation of federal securities laws"; and (2) "that the defendant exercised actual power or control over the primary violator."  *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).  "Because Plaintiffs did not adequately allege violations of section 10(b), the Court dismisses the Section 20(a) claims."  *See Apollo Grp.*, 774 F.3d at 610; *see also Zucco*, 552

United States District Court
Northern District of California

F.3d at 990 ("Section 20(a) claims may be dismissed summarily… if a plaintiff fails to adequately plead a primary violation of section 10(b).").

## CONCLUSION

For the reasons stated above, the Court GRANTS Defendants' Request for Incorporation by Reference and Judicial Notice and GRANTS Defendants' motion to dismiss. Given Plaintiffs' claims are not implausible as a matter of law, the Court GRANTS Plaintiffs leave to amend the complaint. Plaintiffs shall file their amended complaint by November 12, 2024.

This order disposes of Docket Nos. 81, 83.

**IT IS SO ORDERED.**

Dated: October 15, 2024

_____
JACQUELINE SCOTT CORLEY
United States District Judge