POMERANTZ LLP
Jeremy A. Lieberman (pro hac vice)
Austin P. Van (pro hac vice)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
jalieberman@pomlaw.com
avan@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Lead Counsel for Lead Plaintiff*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BHAPINDERPAL S. BHANGAL, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>HAWAIIAN ELECTRIC INDUSTRIES, INC., HAWAIIAN ELECTRIC COMPANY, INC., CONSTANCE H. LAU, SCOTT W. H. SEU, GREGORY C. HAZELTON, PAUL K. ITO, and SHELEE KIMURA,<br><br>Defendants. | Case No. 3:23-cv-04332-JSC<br><br>**CLASS ACTION**<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Hon. Jacqueline Scott Corley |

SECOND AMENDED COMPLAINT

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     JURISDICTION AND VENUE .......................................................................... 6

III.    PARTIES ............................................................................................................. 7

        A.      Plaintiffs .................................................................................................. 7

        B.      Defendants ............................................................................................... 7

IV.     HEI KNEW FOR YEARS FROM NUMEROUS SOURCES THAT THE RISK OF SEVERE WILDFIRES ON MAUI WAS EXTREME AND REQUIRED APPROPRIATE MITIGATION EFFORTS ........................................................ 9

        A.      Local Wildfire Community Group Warned Early on of Ongoing Wildfire Hazards and Offered HEI Recommendations To Mitigate the Risk .......................................................................................................... 9

        B.      August 2018 Lahaina Wildfire and Aftermath ..................................... 11

        C.      Maui Resiliency Working Group Studies Wildfire Risk ...................... 13

        D.      May 2020 Hawaiian Public Utilities Commission Audit ..................... 16

        E.      Maui County Hazard and Wildfire Mitigation Plans ........................... 19

        F.      Hawaiian Electric Wildfire Mitigation Plan ........................................ 22

V.      HEI REPEATEDLY MISLED INVESTORS TO BELIEVE IT WAS TAKING APPROPRIATE ACTION TO MITIGATE WILDFIRE RISK, WHEN IT KNEW IT WAS FAILING TO DO SO ................................................................ 25

        A.      HEI Created The Impression That It Was Regularly Maintaining Its Poles and Had Replaced Uninsulated Wire, When In Fact It Had Fallen Behind ............... 25

                1.      HEI Misled Investors To Believe It Had Replaced Exposed Power Lines with Insulated Conductor Wires ............................... 25

                2.      HEI Misled Investors To Believe It Regularly Maintained Its Poles ....... 31

        B.      HEI Misled Investors To Believe Its Mitigation Plans Addressed Risk of Dry Grasses and Shrubs, When In Fact Its Plans Recommended *Against* Trimming of Grasses Around Power Lines ........................................ 42

        C.      HEI Misled Investors To Believe That It Had Followed Advice Given To It Concerning Fire Mitigation, When In Fact It Went Against The Central Components Of That Advice ........................................ 51

        D.      HEI Misled Investors To Believe That It Prioritized Safety Over Customer Convenience, When In Fact, As an Objective Matter of Written Policy, It Prioritized Customer Convenience ........................................ 54

VI.     AUGUST 8, 2023 LAHAIANA WILDFIRE DISASTER ................................. 55

VII.    LOSS CAUSATION .......................................................................................... 60

        A.      August 8-9, 2023 .................................................................................. 60

        B.      August 12, 2023 ................................................................................... 61

        C.      August 15, 2023 ................................................................................... 62

        D.      August 16, 2023 ................................................................................... 63

i
SECOND AMENDED COMPLAINT

E.      August 17, 2023. ................................................................................................ 63

F.      August 19, 2023 to August 21, 2023. ................................................................ 65

G.      August 22-23, 2023 ............................................................................................ 66

H.      August 25, 2023. ................................................................................................ 67

I.      September 5, 2023. ............................................................................................. 68

VIII.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................................... 69

A.      Defendants' False and Misleading Statements in 2019 ..................................... 69

B.      Defendants' False and Misleading Statements in 2020 ..................................... 73

C.      Defendants' False and Misleading Statements in 2021 ..................................... 75

D.      Defendants' False and Misleading Statements in 2022 ..................................... 78

E.      Defendants' False and Misleading Statements in 2023 ..................................... 83

IX.     ADDITIONAL SCIENTER ALLEGATIONS ............................................................... 86

A.      Defendants Knew that Certain of Their Statements Were False and Misleading
        Because Defendants Knew the Contents of the May 2020 Audit Report and ATF
        Report .................................................................................................................. 86

B.      Defendants Knew that Certain of Their Statements Were False and Misleading
        Because Defendants Knew About Their Own Wildfire Mitigation Plan, Which
        Instructed Against Replacing Uninsulated Conductors and Trimming Vegetation
        ............................................................................................................................. 90

C.      Defendants Knew of, But Ignored Consultant and Community Advice ............. 94

D.      Mitigation of Environmental Risk Was a Core Part of Hawaiian Electric's
        Business, Defendants' Compensation Was Tied to Enterprise Risk Mitigation, and
        Board Members Were Expressly Apprised of Risks ........................................... 94

X.      CLASS ACTION ALLEGATIONS ............................................................................. 97

XI.     COUNT ONE ............................................................................................................ 99

(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
Against All Defendants) ............................................................................................................ 99

XII.    COUNT TWO .......................................................................................................... 102

(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants) ............. 102

XIII.   PRAYER FOR RELIEF ........................................................................................... 103

XIV.    DEMAND FOR TRIAL BY JURY ............................................................................ 103

Lead Plaintiff Daniel Warren ("Lead Plaintiff" or "Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Hawaiian Electric Industries, Inc. ("HEI" or the "Company"), the October 1, 2024 Origin and Cause Report issued by the County of Maui Department of Fire and Public Safety ("MFD") about the Lahaina Fire ("Maui Fire Department Report" or "MFD Report"), the September 19, 2024 report issued by the U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, National Response Team ("ATF"), on the Lahaina Fire ("ATF Report"), investigatory files of the Hawaii Public Utilities Commission ("PUC"), analysts' reports and advisories about the Company, interviews of former employees, and information readily obtainable on the Internet.

## I.    INTRODUCTION

1.    This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired HEI securities between February 28, 2019 and September 4, 2023, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.    HEI, the holding company of Hawaiian Electric Company, Inc., the subsidiary through which HEI operates, engages in the electric utility, banking, and non-regulated renewable/sustainable infrastructure investment businesses in the state of Hawaii.  The Company provides service to 95% of Hawaiian residents and operates in three segments, including the Electric Utility segment, which engages in the production, purchase, transmission, distribution,

and sale of electricity in the islands of Maui, Oahu, Hawaii, Lanai, and Molokai. During the Class Period, Hawaiian Electric accounted for approximately 91% of HEI's revenues.

3.     Hawaiian Electric provides electricity to customers through utility poles throughout Hawaii, including on Maui.  These utility poles are extremely dangerous, among other reasons, because they may fall over into dry vegetation when energized and ignite a wildfire.  This danger was particularly heightened in Western Maui, where an invasive grass species prone to drying out had spread throughout the area by the start of the Class Period, in effect creating ubiquitous, naturally occurring, highly flammable haystacks all around a populated area.

4.     Plaintiff brings this Action because, throughout the Class Period, HEI repeatedly misled investors to believe that the Company was taking appropriate action to mitigate this wildfire risk, when in fact, HEI was failing to do so.  In fact, in some cases, HEI's own written policies were not to take the very actions it assured investors it was taking.

5.     *First*, HEI informed investors that it had successfully replaced uninsulated (traditional) power lines with insulated wires, when it had not.  For example, in HEI's April 12, 2022 ESG Report for 2021, it stated:

> We have also replaced traditional power lines with insulated conductor systems to improve reliability and resilience in targeted areas prone to vegetation-related outages.

6.     In fact, Hawaiian Electric had not replaced uninsulated power lines with insulated lines even in areas it recognized to be at high risk of wildfires due to dry vegetation, including West Maui.  Multiple sources confirm that the power lines in West Maui were not insulated at the time of the 2023 Maui fires, and that the August 8, 2023 Lahaina wildfire was caused by electrical poles with uninsulated wires falling into overgrown and unmaintained dry brush.  Multiple sources also confirm that Lahaina and Lahainaluna Road were targeted areas that were prone to vegetation related outages.

7.     *Second*, HEI repeatedly assured investors that it was regularly maintaining its utility poles and that they complied with national safety standards, when in fact, HEI's pole maintenance

was severely deficient and the majority of its poles did not meet national standards.  For example, on April 22, 2021, HEI issued its consolidated 2020 ESG Report, which stated:

> We continually maintain and upgrade our transmission and distribution system to ensure seamless delivery of power to our customers.  Day-to-day maintenance is a key part of keeping the grid resilient.  We regularly inspect our poles, lines, and other equipment, and work to replace and upgrade aging and faulty equipment before failures happen.

8.      In fact, at all relevant times during the Class Period, HEI was failing to replace thousands of severely outdated utility poles that posed a danger of falling and sparking during high winds.  Multiple sources also confirmed downed poles were a common occurrence in West Maui and the targeted Lahaina area, and the pole that snapped in half and apparently caused the Lahaina fire was 43 years old, and broke "right at the termite damage."  That fallen pole, in turn, pulled on old, uninsulated wires connected to other, nearby old poles, and the uninsulated wires sparked and fell by those poles into the "unmaintained," "overgrown," "thick" and "unkempt" vegetation below, setting it ablaze.  Likewise, at all relevant times, HEI's poles did not meet National Electric Safety Code ("NESC") national safety standards.

9.      *Third,* the Company repeatedly assured investors that it was actively trimming and otherwise addressing dry grasses and brush beneath and around power lines.  In the Company's 2020 ESG Report, Defendants stated, for example, "[w]e regularly trim the vegetation around our equipment."  In fact, the Company's own written policy, expressed in its Wildfire Mitigation Plan since 2019, expressly recommended *against* trimming already low-lying vegetation, and *against* creating vegetation fire-breaks as part of the vegetation management program, on the grounds that the measures were too costly.  As multiple witnesses and reports concerning the Company's wildfire mitigation practices indicated, the primary consideration for the Company's decisions to not trim vegetation further was not safety, but cost.  The October 1, 2024 Maui Fire Department Report investigating the Lahaina fire concluded that "[t]he origin of the fire was the overgrown vegetation at and surrounding utility pole 25 off of Lahainaluna Road…. The …  re-energization

of broken utility lines … caused the ejection of molten metallic material (sparks) to fall to the base of pole 25, igniting the unmaintained vegetation below."

10.     *Fourth*, HEI misled investors to believe that it was following advice regarding wildfire mitigation from a hired consultant, and that its wildfire mitigation plans aligned with recommendations from wildfire collaborators, when in fact, its wildfire mitigation policies went *against* that advice.  For example, the 2020 ESG Report stated:

> The utility engaged Exponent, a leading consulting firm in electric utility resilience . . . to identify key vulnerabilities to severe natural events. [. . .] Exponent outlined a set of recommendations . . . includ[ing] . . . enhanced vegetation management.

11.     *Fifth*, Defendants repeatedly misled investors to believe that the Company's policies prioritized safety over other considerations, when in fact, as an objective matter of written policy, Hawaiian Electric prioritized customer convenience and cost.  For example, the Company's 2019 ESG Report stated, in relevant part:  "Safety is our number one priority at Hawaiian Electric." This statement of policy was objectively false in at least one critical respect—the Company's Wildfire Mitigation Plan set forth its policy of not "preemptively turning off circuits," despite the fact that such deenergizing was the safest reasonable policy to prevent wildfires, because the policy "was not well received by certain customers affected."

12.     Through these misrepresentations and omissions, in which HEI assured investors that it was taking actions to mitigate wildfire risk that it was not in fact taking, HEI concealed the true, heightened and unmitigated risk of wildfires from the public.  It also concealed facts about its own wildfire mitigation strategy, and with that, its risk of liability relating to wildfires.  Over a series of events and disclosures, the true, heightened and unmitigated risk of wildfires—the unmitigated risk that HEI had obfuscated and concealed from investors—materialized in the deadliest U.S. wildfire since 1918.

13.     In early August 2023, a series of severe wildfires broke out in Hawaii, predominantly on the island of Maui.  The most destructive fire began in West Maui near the town of Lahaina on the morning of August 8, 2023.  By that afternoon, intense winds had knocked down

approximately 30 utility poles throughout Maui, resulting in at least 15 separate outages impacting more than 12,400 customers.  Videos captured by local residents showed that the most destructive of the fires were cause by uninsulated power lines belonging to Hawaiian Electric falling onto dry, untrimmed and unmanaged grassy areas.  Multiple investigations and reports confirm that a utility pole (Pole 7A)—which was riddled with termite damage and over 40 years old at the time of the fire—snapped as a result of the extensive termite damage, which put pressure on, and eventually snapped, uninsulated and energized power lines connected to Poles 24 and 25, which contacted the ground and ignited the "overgrown" and "unmaintained vegetation below." The origin of the fire was concluded to be "overgrown vegetation at and surrounding utility pole 25 off of Lahainaluna Road", and the "cause of the fire was the re-energization of broken utility lines which caused the ejection of molten metallic material (sparks) to fall to the base of pole 25, igniting the unmaintained vegetation below" and "the arcing and severing of the energized overhead power line between pole 25 and 24 resulted in that line falling to the ground, subsequently igniting vegetation below."[1]  This same fire was reignited from "smoldering" aftereffects of the morning fire.

14.    The fires killed at least 101 people.

15.    In the following days, weeks and months, on August 8-9, 12, 15-22, 25, and September 5, the heightened, unmitigated risk of catastrophic wildfire Hawaiian Electric had concealed materialized in the tragic Lahaina fire and subsequent events revealing the full scope of that concealed risk.  Moreover, the truths about Hawaiian Electric's operations that it had obscured were revealed.

16.    For example, on August 12, 2023, news outlets began reporting that Hawaiian Electric lacked the proper policies and procedures to mitigate the impact of the wildfires. Specifically, it was revealed that, at the time the wildfires began, the Company did not maintain a

---

[1] ATF Report at 1.

public power shutoff plan—i.e., a plan in which electricity is intentionally cut off to areas where strong wind events could cause the fires to spread.

17.    On this news, HEI's stock price fell $10.94 per share, or 33.76%, to close at $21.46 per share on August 14, 2023.

18.    Similarly, on August 16, 2023, the Wall Street Journal ("WSJ") reported that Hawaiian Electric was meeting with firms that specialize in restructuring advisory work, exploring options for the various financial and legal challenges that the Company faces as a consequence from the Maui wildfires.  On August 17, 2023, the WSJ reported that Hawaiian Electric had for years been aware of the threat posed by wildfire but waited years to act.  Indeed, the WSJ stated that between 2019 and 2022 the Company spent less than $245,000 on wildfire-specific projects on Maui and did not seek state approval to raise utility rates to pay for broad wildfire safety improvements until 2022.

19.    On this news, HEI's stock price fell $2.54 per share, or 17.43%, to close at $12.03 per share on August 17, 2023.

20.    Altogether, the disclosures on August 8-9, 12, 15-22, 25, and September 5, 2023 caused the value of HEI's stock to lose over 60% of its value.  Plaintiff and other Class members sue to recover these losses.

## II.    JURISDICTION AND VENUE

21.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

22.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

23.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Pursuant to HEI's most recently filed Quarterly Report with the SEC, as of July 18, 2023, there were 109,611,599 shares of the Company's common stock outstanding.  HEI's securities trade on the New York Stock Exchange ("NYSE").

Accordingly, there are presumably hundreds, if not thousands of investors in HEI securities located within the U.S., some of whom undoubtedly reside in this Judicial District. Moreover, Lead Plaintiff resides in this Judicial District.

24.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.     PARTIES

### A.     Plaintiffs

25.     Lead Plaintiff Daniel Warren, as set forth in his certification filed herewith as Exhibit A, acquired HEI securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

26.     Additional Plaintiff Bhapinderpal S. Bhangal, as set forth in his previously filed certification (ECF No. 12-1), acquired HEI securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

27.     Additional Plaintiff Emaad Kuhdear, as set forth in his certification filed herewith as Exhibit B, also acquired HEI securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

### B.     Defendants

28.     Defendant Hawaiian Electric Industries Inc. ("HEI") is a Hawaiian corporation with principal executive offices located at 1001 Bishop Street, Suite 2900, Honolulu, Hawaii 96813. HEI's common stock trades in an efficient market on the NYSE under the ticker symbol "HE".

29.     HEI is a holding company that wholly owns Hawaiian Electric Company, Inc. ("Hawaiian Electric" or "HECO"). Hawaiian Electric wholly owns Hawaiian Electric Light Company Inc. and Maui Electric Company, which operate as one company through a common management structure under HECO and under the auspices and control of HEI. Through HECO, HEI engages in electric utility, banking, and non-regulated renewable/sustainable infrastructure

investment businesses in the state of Hawaii. The Company provides service to 95% of Hawaiian residents and operates in three segments, including the Electric Utility segment, which engages in the production, purchase, transmission, distribution, and sale of electricity in the islands of Maui, Oahu, Hawaii, Lanai, and Molokai.

30.    Defendant HECO is the operating company through which HEI conducts the vast majority of its business. In 2019, HECO's revenues and net income amounted to approximately 89% and 72% respectively, of HEI's consolidated revenues and net income. In 2020, HECO's revenues and net income amounted to approximately 88% and 86% respectively, of HEI's consolidated revenues and net income. In 2021, HECO's revenues and net income amounted to approximately 89% and 72% respectively, of HEI's consolidated revenues and net income. In 2022, HECO's revenues and net income amounted to approximately 91% and 78% respectively, of HEI's consolidated revenues and net income.

31.    Defendant Constance H. Lau ("Lau") served as HEI's President and Chief Executive Officer ("CEO") from prior to the start of the Class Period until January 2022. She also served as a director of HECO from May 2006 to May 2019.

32.    Defendant Scott W. H. Seu ("Seu") has served as HEI's President, CEO, and Director since January 2022. From February 2020 to January 2022, Seu was President and CEO of HECO. Prior to that, Seu was Senior Vice President, Public Affairs (2017-February 2020) and Vice President of Operation (2014-2016) of HECO, and had worked at HECO in various capacities since 1993.

33.    Defendant Gregory C. Hazelton ("Hazelton") served as HEI's Executive Vice President ("V.P."), Chief Financial Officer ("CFO"), and Treasurer from prior to the start of the Class Period until July 2022.

34.    Defendant Paul K. Ito ("Ito") served as HEI's Interim CFO from July 2022 until January 2023, and has served as the Company's Executive V.P., Treasurer, and CFO since January 2023. Ito has been with HEI since 2018 and during the Class Period he served as Vice President of Tax, Controller and Treasurer and led the accounting, financial reporting, tax and treasury

functions, and provided support in the enterprise risk management, investment analysis, and strategic and operating plan function.

35.     Defendant Shelee Kimura ("Kimura") has served as CEO of HECO since January 2022. Prior to that, Kimura served as HECO's Vice President of Customer Service and Public Affairs (March 2021-December 2021), Customer Service (February 2019-March 2021) and Senior Vice President of Business Development and Strategic Planning (January 2017 - February 2019), and led HECO's 2015-2020 Strategic Transformation Plan. From August 2009 to May 2014, Kimura was HEI's Manager of Investor Relations & Strategic Planning, and from August 2004 to October 2009 she was HEI's Director of Corporate Finance and Investments.  In its SEC filings, HEI states that "are deemed to be *executive officers of HEI* under SEC Rule 3b-7." SEC Rule 3b-7 provides the basic, universal definition of what constitutes an executive officer for purposes of SEC reporting and the securities laws. Under SEC Rule 3b-7, "Executive officers of subsidiaries may be deemed executive officers of the registrant *if they perform [] policy making functions for the registrant*." 17 C.F.R. §240.3b-7. HEI's acknowledgment that Kimura was an "executive officer[] of HEI" under SEC Rule 3b-7 was thus, a fortiori, an acknowledgment that she "perform[ed] [] policy making functions for" HEI. Kimura is also listed under "Executive Management" on HEI's website, her capacity as HECO CEO.

36.     Defendants Lau, Seu, Hazelton, Ito and Kimura are sometimes referred to herein collectively as the "Individual Defendants."

## IV.   HEI KNEW FOR YEARS FROM NUMEROUS SOURCES THAT THE RISK OF SEVERE WILDFIRES ON MAUI WAS EXTREME AND REQUIRED APPROPRIATE MITIGATION EFFORTS

### A.     Local Wildfire Community Group Warned Early on of Ongoing Wildfire Hazards and Offered HEI Recommendations To Mitigate the Risk

37.     For years leading up to the August 2023 wildfires, officials were acutely aware that the historic town of Lahaina on the island of Maui faced an extreme wildfire risk.

38.     As early as 2014, the Hawaii Wildfire Management Organization released a wildfire mitigation plan that explicitly warned that Lahaina was among the areas in Maui most

vulnerable to fires due to its proximity to dry brush, steep grasslands, and the prevalence of strong winds.  The group outlined a plan for working with utilities to help reduce the risk of fires.[2]

39.    The 2014 Wildfire Mitigation Plan included a map of communities at risk from wildfires for each island in the State of Hawai'i and identified Lahaina as a "Zone 1" community with a high fire risk rating ascribed to those communities at the greatest risk from wildfires.[3]

40.    With firefighting agencies and landowners, the Hawaii Wildfire Management Organization assessed specific areas—designated as high priorities for protection based on their personal and community value and overall risk of wildfire—for relative risk of wildfire and assigned a hazard ranking of low, moderate, high, or extreme for certain categories including vegetation and fire environment.  The majority of Lahaina, including the Lahaina Water Plant and Lahaina North Mauka Shops, was assigned an extreme hazard ranking in the Fire Environment Hazard category, which rates the fire environment by rainfall, wind, slope, topography, seasonal conditions and ignition risk.[4]

41.    The 2014 Wildfire Mitigation Plan outlined the agency's wildfire concerns and recommended actions in order of priority.  The agency listed "Pre-Suppression", and specifically vegetation management and maintenance by the utilities, as a leading priority wildfire concern for fire protection.  Recommended actions for pre-suppression included that the utilities "must adhere to fire prevention standards" and be "held accountable for starting fires."[5]

42.    The agency also conducted public outreach and yielded public-prioritized input regarding wildfire-related concerns and recommended actions.  The majority of the public's

---

[2] Elizabeth Pickett & Ilene Grossman, *Western Maui Community Wildfire Protection Plan*, Hawaii Wildfire Management Organization (Jan. 2014), https://dlnr.hawaii.gov/forestry/files/2024/01/Western-Maui-CWPP.pdf (hereinafter the "2014 Wildfire Mitigation Plan").

[3] *See* 2014 Wildfire Mitigation Plan at 60, Communities at Risk from Wildfires Map (Fig. 24).

[4] *Id.* at 55, Fire Environment Hazard Rating Map (Fig. 21).

[5] *Id.* at 63, Agency and Resource Manager Priorities: Pre-Suppression (Table 10).

concerns and recommended actions were within the pre-suppression category (53%).[6]  The public similarly prioritized fuels management and reduction around and within communities as a foremost wildfire concern and recommended that "Utility companies must manage vegetation and powerline-cause ignitions" as the first line of action to address this concern.[7]

43.    Over the next several years, numerous government and non-profit reports reiterated the heightened fire danger in Lahaina.  Subsequent reports in 2018, 2019 and 2020 from various agencies continued to identify Lahaina as particularly vulnerable to wildfires due to factors like strong winds, proximity to brush and grasslands, presence of non-native vegetation, and substandard power infrastructure.  Former employees ("FEs"), other witnesses and other public reports indicated that it was well-known that the Western side of Maui, where Lahaina is located, in particular was vulnerable to wildfires as it is traditionally the drier side of the island due to east-to-west trade winds, and the salty air was quick to damage utility structures such as utility poles.

**B.    August 2018 Lahaina Wildfire and Aftermath**

44.    On July 26, 2018, a Hawaii Wildfire Fact Sheet published by the Hawaii Wildfire Management Association warned that over the prior decade, Hawaii averaged 1,000 wildfires burning 17,000 acres annually.[8]

45.    Then, on August 6, 2018, the Hawaii Emergency Management Agency published the 2018 State of Hawai'i Hazard Mitigation Plan Update, which detailed a multitude of wildfire events that occurred in Lahaina over the past decade and designated all of Maui as occupying a "high" wildfire hazard zone based on multiple risk factors.[9]

---

[6] *Id.* at 66, Percentage of Public Recommendations Organized by Fire Protection Category (Fig. 29).

[7] *Id.* at 68.

[8] Hawai'i Wildfire Management Association, *Wildfire in Hawaii Fact Sheet* (July 26, 2018), https://www.hawaiiwildfire.org/fire-resource-library-blog/wildfire-in-hawaii-factsheet.

[9] Hawai'i Emergency Management Agency, *2018 State of Hawai'i Hazard Mitigation Plan Update*, at 4-337, 4-374, and Appendix E (Aug. 6, 2018), https://dod.hawaii.gov/hiema/files/2020/06/2018-State-HI-HMP-Update-100218.pdf.

46.     On August 24, 2018, a wildfire in Lahaina destroyed more than 2,100 acres and caused $4.3 million in damage—what was then the largest wildfire event in Maui history.[10] Maui's top emergency management official stated that the fire nearly jumped Lahainaluna Road, which would have reached Lahaina's town center and been catastrophic.  Many residents demanded answers from county officials at the time as they "inquired about the lack of a shutoff system for power lines.  Others reported problems accessing water to help firefighting efforts and complained of failures to reduce overgrown brush and to better irrigate drought-prone fields.  Some raised concerns about problems with evacuation routes, planning and communications, among other issues."[11]

47.     At a heated town hall on August 29, 2018, for three hours, residents peppered Mayor Alan Arakawa and other state and county officials with questions in the aftermath of the 2018 Lahaina wildfire.  They specifically asked why Maui Electric (part of Hawaiian Electric) failed to shut off power given the high winds and the fact that their equipment had previously caused other fires.  According to residents in the 2018 meeting, the Company's wires were seen whipping around due to extreme winds and had caused the fire.  In response, the utility's then-director of government and community relations, Mahina Martin, confirmed that as of August 2018, Hawaiian Electric "did not have a protocol to shut down power ahead of high winds."[12]

48.     On November 2, 2018, the Public Utilities Commission ("PUC") approved an agreement that would transfer ownership of 120,000 utility poles from Hawaiian Telcom to Hawaiian Electric, effectively granting Hawaiian Electric sole ownership of the poles on Oahu,

---

[10] Brianna Sacks & Justine McDaniel, *A terrifying fire struck Maui in 2018. Officials were warned of a repeat*, Wash. Post (Aug. 22, 2023), https://www.washingtonpost.com/weather/2023/08/22/maui-fire-2018-lahaina-warning/.

[11] Lewis Kamb & Evan Bush, *Maui dodged catastrophe in wildfires five years ago but missed an opportunity to prevent future disaster, residents say*, NBC NEWS, (Aug. 24, 2023, 12:00 PM), https://www.nbcnews.com/news/us-news/maui-officials-warned-lahaina-wildfires-2018-critics-rcna101515.

[12] Brianna Sacks & Justine McDaniel, *A terrifying fire struck Maui in 2018. Officials were warned of a repeat*, Wash. Post (Aug. 22, 2023), https://www.washingtonpost.com/weather/2023/08/22/maui-fire-2018-lahaina-warning/.

Maui, Molokai, Lanai, and Hawaii island. PUC stated in its press release that the "agreement aims to administer a more efficient and effective servicing of pole infrastructure, which includes the removal of 14,000 double poles."[13]

49.     In June 2019, the Hawaii Wildfire Management Organization released a report titled "A Collaborative, Landscape-Level Approach to Reduce Wildfire Hazard Across Hawai'i", which included maps of vulnerable areas in Maui in 2018 and 2019 and findings that Lahaina was of particular concern due to the level of invasive grass that blankets the old plantation lands above the town. The report found at the time that vegetation in the area, around where the current fire ignited, needed to be a priority for maintenance.[14]

### C.    Maui Resiliency Working Group Studies Wildfire Risk

50.     Hawaiian Electric also was continuously apprised of Lahaina's exceptional wildfire vulnerability through its participation in a Resiliency Working Group ("RWG") with state regulators. HECO meeting minutes show the working group specifically discussed in 2019 whether power lines should be de-energized proactively during severe winds to reduce fire ignition risks, as California utilities had implemented.

51.     In 2019, HECO organized several stakeholder working groups, including the RWG, to develop a long-term Integrated Grid Planning ("IGP") process. HECO retained energy business advisory Siemens Industry, Inc., and collaborative meeting facilitator Where Talk Works, Inc., to facilitate a series of six RWG meetings and to assist the RWG in reaching consensus around the definition of resilience of the grid, its importance to its customers, the vulnerability of the grid to severe events, and utility and customer options for mitigating these vulnerabilities. Some of these

---

[13]Hawaii Public Utilities Commission, *PUC Approves Joint Pole Agreement Between Hawaiian Telcom and Hawaiian Electric Companies* (Nov. 2, 2018), https://puc.hawaii.gov/news-release/puc-approves-joint-pole-agreement-between-hawaiian-telcom-and-hawaiian-electric-companies/.

[14] Hawai'i Wildfire Management Organization, *A Collaborative, Landscape-Level Approach to Reduce Wildfire Hazard Across Hawai'i* (June 30, 2019), https://static1.squarespace.com/static/5254fbe2e4b04bbc53b57821/t/5dbf80628fc82a626b9dc2e2/1572831359536/Kaua%CA%BBi_compressed.pdf.

meetings were attended by Defendants.  For example, Defendant Seu attended the November 22, 2019 RWG meeting.

52.    Starting on July 22, 2019, HECO held its first Resiliency Working Group meeting, consisting of high-level Hawaiian Electric officials as well as various state and local officials, for the purpose of developing grid resilience, identifying critical threats for the island, and planning.[15]

53.    On August 29, 2019, HECO held its second Resilience Working Group meeting that included objectives such as threat prioritization.  During the meeting, attendees ranked wildfires as the third highest threat for Maui, ranking behind hurricanes and tsunamis.[16]

54.    On September 17, 2019, HECO held its third Resilience Working Group meeting in which attendees defined severe event priorities, identified potential impact areas of all hazards, and discussed mitigation options.  During the meeting, HECO Director Lisa Dangelmaier noted Maui wildfires "have been an issue this year," while further assessments on Maui's threat scenarios included comments such as:  "Wildfire is a threat now.  Someday, if lands are planted and irrigated, the threat may be reduced."[17]  When the working group was asked to provide recommendations for mitigation strategies to improve reliance from the priority threats and power outages, attendees replied that "County, State, Federal grant funding mitigation plans are already in place & expanding," and recommended "coordination between mitigation plans & utility," noting that up until that point, this would be the Company's "1st instance to do that."[18]

55.    On October 28, 2019, meeting minutes from HECO's fourth Resilience Working Group meeting showed the Company discussed with state officials, among other things, whether HECO's power lines should be de-energized proactively if wildfires threatened equipment, as

[15] HECO, *Integrated Grid Planning (IGP) Resilience Working Group: Kick-off Meeting* (July 22, 2019), https://www.hawaiianelectric.com/a/6499.

[16] HECO, *Resilience Working Group (RWG) Meeting Notes*, at 5 (Aug. 29, 2019), https://www.hawaiianelectric.com/a/6738.

[17] HECO, *Resilience Working Group (RWG) Meeting Notes*, at 3-4, 6 (Sept. 17, 2019), https://www.hawaiianelectric.com/a/6833.

[18] HECO, *Resilience Working Group: Breakout Session Results*, at 15 (Sept. 17, 2019), https://www.hawaiianelectric.com/a/6834.

California utilities had implemented.  While the meeting concluded without a definitive answer to the question, RWG attendees discussed understanding "the threat impact to grid and customers" and how that relates to a "wildfire threat scenario."[19]

56.     On November 22, 2019, HECO's Resilience Working Group met again to discuss the group's final report on its findings regarding resilience threats and impacts to grid and customers, and its proposed mitigation strategies.[20]  HECO presentation slides during the meeting showed that wildfire impact risks were high in Maui, Oahu, Hawai'i Island and Moloka'i.[21]

57.     On December 16, 2019, the HECO Resiliency Working Group met for the final time before publishing its report the following year.[22]

58.     On April 29, 2020, HECO's Resiliency Working Group released its report titled the "Resilience Working Group Report for Integrated Grid Planning."[23]  Produced by Hawaiian Electric and a group of state and local government officials, the report discussed wide-ranging plans to strengthen Hawaiian Electric's grids.  They included plans regarding five priority critical threats, among them wildfires.

59.     Wildfires were deemed most important regarding grid impacts on Maui and O'ahu. "The frequency and impacts of wildfires have increased recently," the report noted.  The report went on to explain that this increase in wildfires "may be attributable in some parts of the islands to the decline of the sugarcane industry" which "historically managed wildfire risks on the islands,

---

[19] HECO, *Resilience Working Group (RWG) Meeting Notes*, at 8 (Oct. 28, 2019), https://www.hawaiianelectric.com/a/7097.

[20] HECO, *Resilience Working Group (RWG) Meeting Notes*, at 8 (Nov. 22, 2019), https://www.hawaiianelectric.com/a/7210.

[21] HECO, *Integrated Grid Planning - Resilience Working Group Meeting: Presentation Slides*, at 29 (Nov. 22, 2019), https://www.hawaiianelectric.com/a/7098.

[22] HECO, *Resilience Working Group (RWG) Meeting Notes*, at 8 (Dec. 16, 2019), https://www.hawaiianelectric.com/a/7212.

[23] HECO, *Resilience Working Group Report for Integrated Grid Planning* (Apr. 29, 2020), https://www.hawaiianelectric.com/a/7883.

including responding to fires" but, "today these areas present vast amounts of vegetation that can burn longer and with less ability and resources to control them."[24]

60.    The report went on to state that "Maui presents unique wildfire risks" which are "highest along the saddle road due in part to existence of an invasive grass species prone to drying out."  The main power plant island at Maalaea was specifically indicated as a high-risk area for wildfire.[25]

### D.    May 2020 Hawaiian Public Utilities Commission Audit

61.    On May 12, 2020, the PUC released an audit report on Hawaiian Electric that found, inter alia, existing operational inefficiencies including excessive overtime costs.  In addition, the Audit Report found that, with respect to Vegetation Management, the Company had not completed its planned mitigation programs and had underspent its budget for years, increasing hazards.  Among other things, the audit's findings on HECO's Vegetation Management program revealed that:

> When we reviewed vegetation management, ***we found that there was no recording or measurement of what total length of line had been cleared***. ***Vegetation Management has not been able to complete its planned mitigation programs over the last few years and has underspent its budgets.*** This may in part be a result of its yearly spend being curtailed in order to counter overspends elsewhere to meet the overall budget in Energy Delivery. ***Regardless, the impact of not completing vegetation management work is showing up in increased Distribution trouble calls as a result of vegetation interference with overhead lines.*** It also means that some scheduled distribution work has to be delayed until Vegetation Management crews can make work sites ready for T&D Operations to commence its routine work, increasing costs.
>
> The other impact is that when Vegetation crews are required to divert to respond to specific sites to clear work areas for crews, this delays the program and creates a higher unit cost for T&D Operations. Without a strategy to complete the annual work program as well as catch up on the overdue work, these results will continue and will increase the negative impact on the Company and costs for T&D Operations, as well as impacting reliability and increasing fault outages.
>
> ***We were surprised to discover that management and monitoring of vegetation management work by the Company was based purely on the expenditure on the program***.  There were zero metrics identifying the volume of work performed and line miles cleared. When this issue was raised with the Company, they appeared to

---

[24] *Id.* at 35.

[25] *Id.*

SECOND AMENDED COMPLAINT

have little understanding that unit measurements are essential in order to provide feedback as to whether the spend is effective and to estimate the scale of the backlog. It is concerning that they would budget $22.6m in 2020 for vegetation management with no supporting metrics or unit costs, *only considering historic spend against budget*. *This is an unacceptable approach that must be remediated urgently* [26]… Vegetation management should be moved to T&D [Transmission & Distribution] Operations with a *focus on catching up on its backlog of work* and ensuring they also complete the work identified in each upcoming year *based on measured Units, not just historical spend*. [Last italics in original.][27]

62.    The Audit Report was highly critical of HECO overall for placing emphasis on costs over other interests such as value or output achieved, including as it related to safety issues such as vegetation and pole maintenance.  Thus, for example, the Executive Summary of the Audit Report stated:

> From a financial control lens, *the Company has been managed on a top down basis with aggregation of costs across business units, as well as delaying some Capital expenditures, to meet financial objectives. … [F]inancial controls appear to only focus on spend against budget at the business unit level. There is little meaningful executive review of the correlation between O&M [Operations and Maintenance] and Capital expenditures versus achievements and outputs. As a result, in most business units there is little management attention paid to efficiency of expenditure; units of output; cost controls; or value delivered by Capital investment. As long as spending is within budget, it is regarded as satisfactory. This apparent lack of measurement of outputs versus expenditures was one of the most disconcerting findings of our audit team*. We recommend as an *urgent priority* that Finance leadership modifies their current approach to include more effective business unit financial oversight and more effective controls, as well as tracking and reporting of what has been delivered."

The Audit Report thus recommended that executive reporting to the HECO Board "include [] details of deliverables, unit costs and *performance achievements delivered* by capital investments *as opposed to just spend versus budget analysis*."

63.    The Audit Report went on to discuss the Corporate Finance team's "phasing or delaying capital investments to align with budgets," stating:

---

[26] Management Audit of the Hawaiian Electric Company (HECO) Final Report dated May 12, 2020 ("Audit Report") filed on May 13, 2020 in Docket No. 2019-0085, at 156.

[27] All emphases are added unless otherwise indicated.

> While this approach is effective for external financial reporting showing the Company on track with earnings and managing within budgets, it *also has a material downside*. While overall spending is being managed, we *observed minimal correlation between expenditures and achievements in financial reporting. Overall budget targets - both at Corporate and at Business Unit level - are managed where necessary by delaying projects and reallocating funds across projects to manage cash flow and earnings. **Where Capital budgets have been allocated for programs - for example pole replacement - we found no evidence of any correlated tracking at the Finance or Business Unit levels to confirm that predicted volumes of work and business outcomes were actually being achieved. The only apparent measurement of success is whether overall spend is within budget**…. As a result, there is no apparent pressure for effective cost controls and *output measurement of the value of expenditures* to see if costs are being prudently managed…. **This is in our view a business-critical shortcoming** as it means that managers who have the most impact to control costs have little or no ownership of these costs.*

The Audit Report added that, "While HEI provides budget guidelines, the HECO Board is responsible for approving the budget."

64.    With respect to vegetation management, the Audit Report later reiterated:

> [W]hen we reviewed vegetation management, we found that *there was no recording or measurement of what total length of line had been cleared, only what dollars had been spent. The only metric for "achievement" we observed in Energy Delivery was overall spend versus budget at Division level*. This observation applies to both O&M and Capital. **This is a glaring weakness in effective management of capital expenditure** in Energy Delivery which has the major proportion of Capital spend.

65.    Relatedly, with respect to HECO's management of operational risks, the Audit Report stated, "We recommend that the Company reviews the current risk heat map to ensure that it *reflects a more holistic view of risks, including material Operational risks, not just financial risks*."

66.    In particular, the Audit Report stated:

> The CFO is also the Chief Risk Officer. A key element in the Company's risk management framework *is the Risk "Heat Map" that is prepared for review by the Executive team and the Audit and Risk Committee.* We reviewed the Heat Map as currently constituted to better understand the Company's approach to risk management.

Our review showed *the current Heat Map is focused principally on financial risks with **only limited consideration of operational and business risk***.

\*      \*      \*

The ***current Finance focus on spend versus budget appears to have cascaded down to the business unit leaders, resulting in a similar focus on simply meeting budgets without an appropriate correlation to results, unit costs and outputs***.

\*      \*      \*

We ***recommend as an urgent priority*** that Corporate Finance leadership modifies their current approach…. In particular this *must include clear financial leadership and direction to the businesses to include tracking and reporting of what has been delivered both in terms of planned outputs and unit costs*. Without this metric financial controls and internal executive reporting are ***meaningless if all that is tracked is spend versus budget*…** [and this new approach] must become a key performance metric for the Finance leadership team. It must also be incorporated into KPIs for both the Business Units and Finance to ensure alignment of incentives and behaviours.

67.    Defendant Seu was CEO of HECO when the Audit Report was issued and discussed with HECO management, and Kimura was Senior Vice President of Customer Service and Senior Vice President of Strategic Planning.  These individuals, as well as the remainder of HECO's and HEI's senior management, were on clear notice of HECO's problems concerning vegetation management and pole maintenance (as well as those of HEI, which, as the Audit Report noted, set these budgets), and of the PUC's admonitions about these problems.

**E.    Maui County Hazard and Wildfire Mitigation Plans**

68.    In August of 2020, the County of Maui formally adopted its Updated Hazard Mitigation Plan.  The 2020 Maui County Hazard Mitigation Plan labeled all of Lahaina as a "high" wildfire risk zone and warned that west Maui had greater than 90% annual probability of experiencing wildfires based on climate and vegetation.[28]

69.    In July 2021, the County of Maui's Cost of Government Commission released a Report on Wildfire Prevention and Cost Recovery on Maui ("Wildfire Prevention Report").  The July 2021 Wildfire Prevention Report, effectively a wildfire mitigation plan following Maui's

---

[28] Maui Emergency Management Agency, County of Maui, Hawai'i, *Hazard Mitigation Plan Update*, at 489, 503 (Aug. 2020),
https://www.mauicounty.gov/DocumentCenter/View/125977/2020-Maui-County-Hazard-Mitigation-Plan-Final.

unprecedented wildfire season in 2019, warned county and state officials of the growing fire threat and emphasized that not enough was being done to address the concerns.[29]

70.     The July 2021 Wildfire Prevention Report warned about the wildfire threats to the State of Hawai'i and, specifically, to Maui, including:

• "[T]he number of incidents from a combination of wild/brush/forest fires appears to be increasing, and that this increase poses an increased threat to citizens, properties, and sacred sites;"

• "Importantly, Hawaii's and Maui's fire problem is more extreme than on the U.S. mainland;" and

• "As of June 22, 2021, the U.S. Drought Monitor designated all of Maui Island as either in a 'moderate drought' or 'severe drought.'"[30]

71.     The Wildfire Prevention Report included data showing that fires will continue increasing in frequency and severity, exhibits depicting which Maui communities were the most vulnerable to wildfires (including Lahaina), and the activities that increase wildfire risk (such as power lines):[31]

[The remainder of this page is deliberately left blank.]

---

[29] Cost of Government Commission, County of Maui, *Report on Wildfire Prevention and Cost Recovery on Maui* (July 2021),
https://www.mauicounty.gov/DocumentCenter/View/129493/Report-on-Wildfire-Prevention--Cost-Recovery-on-Maui---Part-1-Report--Exhibits-A-B-33-MB/.

[30] *Id.* at 1–3.

[31] Hawaii Wildfire Management Association*, A Collaborative Landscape-Level Approach to Reduce Wildfire Hazard Across Hawai'i: 2018–2019 Vegetation Management — Rapid Mapping Assessment and Collaborative Action Planning — Maui Report*, at 2, 7–8 (2018),
https://www.mauicounty.gov/DocumentCenter/View/129491/Report-on-Wildfire-Prevention--Cost-Recovery-on-Maui--Part-4-Exhibit-D-25-MB.

20
SECOND AMENDED COMPLAINT

★ Maui Areas of Concern

## Where To Start First for Addressing Wildfire Hazard?
As Determined by Maui Participants at Workshop Held September 27, 2018 in Wailuku

### Collective Areas of Concern
**Collaborative Mapping Process**

1. First, Collaborative Action Planning Workshop participants identified and drew areas that contain "Values at Risk" on a map of Maui.
2. Next participants identified areas where there are *hazardous fire conditions* due to **fuel load, fire weather, and a history of ignitions.**
3. Once all of these areas were drawn on the map, each participant was asked to use stickers to identify their priorities for **where to start first for hazard reduction activities.**

This process generated the heat map to the right.

### Collaborative Prioritization Process

1. Participants discussed their concerns related to priority areas and brainstormed possible solutions/ actions.
2. After discussing next step actions and solutions, participants voted on their **priority actions.**

The following *Maui Priorities* are summaries of priority actions voted on by workshop participants.

Achievability of priorities was not evaluated and any specific planning effort should include additional place-based input and best practices.

All concerns, proposed actions, and number of votes can be found in *Appendix A: Participant Input Lists.*

Maui Collaborative Action Planning Workshop 2018 Areas of Concern.

*Values at Risk* is fire jargon for the things that matter to us, resources or areas that we want to protect from wildfire. These include:
- **Community areas** e.g. homes, hospitals, schools, parks
- **Municipal infrastructure** e.g. roads, power, water

- **Natural resource areas** e.g. watersheds, makai reefs, water resources, species and ecosystems
- **Cultural resources** e.g. places of cultural heritage, substance gathering areas, significant ecosystems, water resources, soil resources, makai reefs
- **Livelihood areas** e.g. tourism, businesses, agricultural lands (grazing lands/ forestry, farming)

2018 Collaborative Action Planning — **Maui Report** — 7

---

★ Maui Priorities: 1 of 3

## 2018 Collaborative Action Planning: Concerns and Priorities
As Determined by Maui Participants at Workshop Held September 27, 2018 in Wailuku, Maui

## What's the Issue?
**There Are 'Hotspot Areas' with Recurring Fire Starts that Threaten Critical Infrastructure**

## What Can We Do?
**Protect Infrastructure and Prevent Wildfires**

**Power lines are critical infrastructure for our communities.**

Aboveground power lines are vulnerable to wildfire and can even provide the ignition (sparks) that could start a wildfire, particularly in windy or stormy conditions.

There are long-term solutions for **reducing power line-related wildfire hazards** such as infrastructure upgrades. More immediate solutions include fuels reduction and firebreaks around power infrastructure in "hotspot" areas whichever the source of ignition.

During the Collaborative Action Planning Workshop, participants identified long-term and immediate actions to reduce wildfire starts near power lines including:

- **Clear around transformers and under power lines** to address the frequent ignitions and **protect important infrastructure** in Ukumehame/Māʻalaea.
- **Update/improve/bury power lines to address power line-related ignitions,** particularly in dry and windy areas such as Ukumehame/Māʻalaea.
- Use **strategic grazing** such as "West Maui Goat" herds (available across West Maui) to **reduce fuels in high ignition areas** including near power lines in Ukumehame/Māʻalaea.
- Increase enforcement for homeless camps in the area.



Maui Fire History 2002-2012

■ Ignition Density
○ Size of Fire

Ukumehame/ Māʻalaea

Area prone to fire weather conditions: Dry! Windy! Hot!



2018 Action Planning Workshop Highest Concern Areas

2018 Collaborative Action Planning — **Maui Report** — 8

21
SECOND AMENDED COMPLAINT

72.    Additionally, the Wildfire Prevention Report identified several problems and actionable solutions that would have lessened the risk of the August 8, 2023 Lahaina fire, such as the "[r]eduction of alien plant life that serves as fuel" through the implementation of "an aggressive plan to replace these hazardous fuel sources with native plants to reduce combustible fuel while increasing water retention."  The Wildfire Prevention Report also explained that "[a]boveground power lines that fail, short, or are low hanging can cause fire ignition (sparks) that could start a wildfire, particularly in windy or stormy conditions," which "is exacerbated by overgrown areas in the rights of way beneath the lines."  The Wildfire Prevention Report identified responsive action to the problems posed by power lines, which included routine inspections of "power transmission lines and rights of way" and tasking both the County and "electric utility companies with corrective actions," like "fuels reduction and firebreaks around power infrastructure in 'hotspot' areas whichever the source of ignition."[32]

### F.    Hawaiian Electric Wildfire Mitigation Plan

73.    In the beginning of 2019, Hawaiian Electric drafted a Wildfire Mitigation Plan of its own.[33]  From 2019 onwards, the Wildfire Mitigation Plan represented HECO's internal wildfire mitigation policies.

74.    In January 2023, HECO finalized the Wildfire Mitigation Plan after four years, but did not release it publicly.[34]

75.    In HECO's October 23, 2023 written response to the U.S. Congress House Subcommittee on Oversight and Investigations, CEO Shelee Kimura stated that "The WMP [Wildfire Mitigation Plan] was considered an internal working document" and that "[e]ven before

---

[32] Cost of Government Commission, County of Maui, *Report on Wildfire Prevention and Cost Recovery on Maui*, at 11–12 (July 2021),
https://www.mauicounty.gov/DocumentCenter/View/129493/Report-on-Wildfire-Prevention--Cost-Recovery-on-Maui---Part-1-Report--Exhibits-A-B-33-MB/.

[33] HECO, *Hawaiian Electric Wildfire Mitigation Plan* (Jan. 2023),
https://www.hawaiianelectric.com/documents/about_us/our_vision_and_commitment/resilience/20230101_wildfire_mitigation_plan.pdf.

[34] *Id.*

it was finalized, it was used to inform and align internal work plans and programs in various divisions of the company."  Kimura also acknowledged that the 2019 Wildlife Mitigation Plan "working document" utilized by HEI and HECO was "the same Wildfire Mitigation Plan document that Hawaiian Electric informed the Committee that it finalized in January 2023," and that no changes had been made thereto until after the August 8, 2023 wildfires.

76.     The Wildfire Mitigation Plan recommended against installing insulated conductors. The Plan noted that "major California utilities are replacing existing overhead conductors with insulated conductors such as tree wire or spacer cable" and that "[t]hese technologies are excellent in preventing sparks if tall vegetation is in or adjacent to the line right-of-way."  Yet the plan determined that "the type of vegetation in the Hawaii wildfire areas are grasses, shrubs with few tall trees" and "[t]hus, tree wire or spacer cable would not be cost-effective in the Hawaii wildfire areas as opposed to other hardening solutions."[35]

77.     With respect to deenergizing power lines in red-flag events, Hawaiian Electric's mitigation plan stated:

> Based on news reports, Pacific Gas & Electric's practice to preemptively turn off circuits in certain areas if conditions were ripe for a wildfire **was *not well-received* by certain customers affected**. For Hawaii, **it is *not recommended*** that Hawaiian Electric adopt this practice. As noted previously, the type of vegetation in the potential wildfire areas in Hawaii would not likely cause the same catastrophic level of wildfires that California has experienced. In addition, a lot of the Hawaiian Electric distribution circuits meander through non-wildfire areas and then through potential wildfire areas. Thus, preemptively turning off circuits would impact customers that may not be in potential wildfire areas.[36]

78.     The Wildfire Mitigation Plan recommended *against* enhanced vegetation management, such as clearing grasses and brush under power lines.  The plan emphasized that "the type of vegetation in the Hawaii wildfire areas are primarily grasses, shrubs, and few trees, which

---

[35] *Id.* at 6.

[36] *Id.* at 11.

rarely grow into conductors. Thus, adjusting vegetation management plans in the wildfire areas will not likely produce any appreciable results."[37]

79.     The Wildfire Mitigation Plan stated further:

As noted previously, the type of vegetation in the Hawaii wildfire areas are primarily grasses, shrubs, and few trees, which rarely grow into conductors. Thus, it is not recommended that vegetation management plans be adjusted in the wildfire areas. Further trimming of the already low-lying vegetation will not likely produce any appreciable results in the potential wildfire areas. The exception would be creating fire breaks in the vegetation areas…. However, creating a fire break would require agreement from landowners and stakeholders and would be very costly. If this strategy is pursued, then it should be done outside of the vegetation management programs.[38]

80.     The true reason Defendants resisted replacing uninsulated conductors, and enhanced vegetation management (or replacing poles that were damaged, old and in need of replacement), was not that it was superfluous, unnecessary or ineffective (indeed, Defendants later acknowledged such practices were effective by their remediation efforts after the Lahaina fire), but because they foremost wanted to keep costs down (as the Audit Report had forewarned and FEs confirmed) and thus (shortsightedly) boost profits. This constituted a reckless gamble by Defendants that they would not be caught skimping and cutting corners in such critical areas of safety to make more money, but indeed they were caught, and the consequences were devasting. In the case of de-energization, Defendants also put short-term interests over safety, not wanting to alienate customers by turning power off (and forego revenues), even if this meant incurring substantial safety risks. Yet, Defendants falsely reassured the investing public that they were taking appropriate action to mitigate wildfire risk, when they knew they were failing to do so.

---

[37] *Id.* at 32-33.

[38] *Id.* at 36-37.

**V.     HEI REPEATEDLY MISLED INVESTORS TO BELIEVE IT WAS TAKING APPROPRIATE ACTION TO MITIGATE WILDFIRE RISK, WHEN IT KNEW IT WAS FAILING TO DO SO**

   **A.     HEI Created The Impression That It Was Regularly Maintaining Its Poles and Had Replaced Uninsulated Wire, When In Fact It Had Fallen Behind**

      **1.     HEI Misled Investors To Believe It Had Replaced Exposed Power Lines with Insulated Conductor Wires**

81.     During the Class Period, HEI repeatedly misled investors to believe it had replaced uninsulated power lines with insulated wires to prevent wildfires from starting when poles fall and exposed wires contact dry vegetation.  In fact, HEI's power lines, like those in Lahaina that fell and caused the August 8, 2023 Lahaina wildfires, were totally bare and uninsulated.

82.     HEI promised to conduct such replacements as early as 2019.  On November 5, 2019, Hawaiian Electric released a press release titled, "Hawaiian Electric Companies to conduct drone surveys as part of overall wildfire mitigation planning."  In that release, the Company stated:

> Other resilience initiatives launched by the companies to prevent wildfires include: Installing heavier, insulated conductors on Maui and Oʻahu to stop lines from slapping and sparking in areas prone to high winds. The companies are identifying more areas where it makes sense to install these conductors.

83.     This promise was echoed by a press release issued by Hawaiian Electric on December 19, 2019, titled "Jan. 2 – Feb. 10: Maui Electric upgrading poles, insulated power lines along Lahainaluna Road."  In discussing the Company's efforts in installing insulated power lines along Lahainaluna Road in West Maui, and describing the system the cables would consist of, the press release stated, in relevant part:

> **Maui Electric Company will be upgrading utility poles and installing insulated power lines along Lahainaluna Road in West Maui** from Thursday, Jan. 2 to Monday, Feb. 10, from 8:30 a.m. to 2 p.m.  The work is part of continued efforts to make the island's electrical grid more resilient while also enabling more private residential rooftop solar to be installed on the island.[39]
>
> Known as the Hendrix Aerial Cable System, the cables consist of three coated conductors supported by a heavy-gauge wire that provides structural support. The

---

[39] Hawaiian Electric, *Jan. 2 – Feb. 10: Maui Electric upgrading poles, insulated power lines along Lahainaluna Road*, Press Release (Dec. 19, 2019), https://www.hawaiianelectric.com/documents/about_us/news/2019_maui_electric/20191219_ma ui_electric_maui_electric_installs_new_insulated_lines_along_lahainaluna.pdf.

cables are cinched into polyethylene spacers placed every 30 feet along the spans **to prevent the cables from touching and are designed to withstand high winds or the force of falling branches from large trees along Lahainaluna Road**.

84.　　Later, in April 2022, HEI informed investors that it had successfully replaced uninsulated (traditional) power lines with insulated wires.　On April 12, 2022, HEI issued its consolidated 2021 ESG Report, which stated:

> We have also replaced traditional power lines with insulated conductor systems to improve reliability and resilience in targeted areas prone to vegetation-related outages.

85.　　In fact, Hawaiian Electric had not replaced uninsulated power lines with insulated lines even in areas it recognized to be at high risk of wildfires due to dry vegetation, including West Maui, and specifically Lahainaluna Road, which the December 19, 2019 press release claimed would take place.　Multiple sources confirm that the power lines in West Maui were not insulated at the time of the 2023 Maui fires.　The Associated Press analyzed videos and images of West Maui power lines and found that Hawaiian Electric had left miles of electrical line "naked to the weather and often-thick foliage."　According to the Associated Press, those videos and images show that in the first moments of the Maui fires, when high winds brought down power poles, which slapped electrified wires to the dry grass below, the flames erupted all at once in long, neat rows because those wires were bare, uninsulated metal that could spark on contact.

86.　　An expert in electrical systems, Michael Ahern, who served as a director of power systems at Worcester Polytechnic Institute in Massachusetts, has stated that it is "very unlikely" a fully-insulated cable would have sparked and caused a fire in dry vegetation.[40]　Other experts who watched videos showing downed power lines agreed that wire that was insulated would not have arced and sparked, igniting a line of flame.

---

[40] Jennifer McDermott, Bernard Condon, & Michael Scott, *Bare electrical wire and leaning poles on Maui were possible cause of deadly fires*, Associated Press (Aug. 27, 2023, 12:33 AM), https://apnews.com/article/hawaii-wildfires-maui-electricity-power-utilities-9f23f79821ea50256f0725ac9b0b3905.

87.    A former employee of Hawaiian Electric ("FE2") has confirmed that, despite Hawaiian Electric's 2019 press release saying they were going to install insulated wires in Lahaina, most of the power lines were not insulated when he left the company in May 2021, and that poles 24 and 25 were not insulated.  FE2 was a Troubleman for Hawaiian Electric in the Lahaina area from 2014 to 2021.  FE2 reported to Troubleman Supervisor Gunther Taua, who reported to T&D Construction Superintendent Rod Morton.   FE2's duties were standard troubleman duties, including responding to "trouble" calls from HECO dispatchers.   Another former employee ("FE4") has confirmed that almost all power lines in Lahaina were not insulated.  FE4 was a Troubleshooter/Troubleman for Hawaiian Electric from August 2017 to August 2021, a Trouble Dispatcher from August 2021 to May 2022, and a System Operator Shift Supervisor from May 2022 to March 2023.  As a Troubleman, FE4 reported to Troubleman Supervisor Gunther Taua, who reported to T & D Construction Superintendent Rod Morton.

88.    Another former employee ("FE5") also confirmed that none of the wires are insulated in Lahaina.  FE5 was a Troubleman for Hawaiian Electric in the Lahaina area from 2009 to 2019.  FE5's duties were standard troubleman duties, including being first on the scene to respond to "trouble" calls, fire calls, etc.  According to FE5, "it's all bare wire" and "throughout Lahaina, everything was bare."

89.    As noted above, remarkably, the Company's *own policy*, stated in its Wildfire Mitigation Plan, was *against* "replacing existing overhead conductors with insulated conductors such as tree wire . . . ."   The Company reasoned that "[t]hese technologies are excellent in preventing sparks if tall vegetation is in or adjacent to the line right-of-way.  But as noted previously, the type of vegetation in the Hawaii wildfire areas are grasses, shrubs with few tall trees," so "[insulated] tree wire . . . would not be cost-effective."  Accordingly, the Company's own internal policy directly contradicted its public statements in which it assured the public it had "replaced traditional power lines with insulated conductor systems."  This is true because had HEI actually installed the insulated conductors, HEI would have stated that it was not necessary to upgrade the wires because they had already been upgraded.  They did not, because they had not

27

(as confirmed by multiple sources).  Instead, they referenced this method of replacement in the Wildfire Mitigation Plan as an example of what *other* utilities are doing, and immediately refuted the need for it in the Hawaii wildfire areas:

> Some of the major California utilities are replacing existing overhead conductors with insulated conductors such as tree wire or spacer cable. These technologies are excellent in preventing sparks if tall vegetation is in or adjacent to the line right-of-way. But as noted previously, the type of vegetation in the Hawaii wildfire areas are grasses, shrubs with few tall trees. Thus, tree wire or spacer cable would not be cost-effective in the Hawaii wildfire areas as opposed to other hardening solutions.

90.    Multiple sources, including Hawaiian Electric itself, also confirmed that Maui, and specifically Lahaina and Lahainaluna Road were targeted areas that were prone to vegetation related outages.  On June 30, 2022, Hawaiian Electric submitted an application to the Public Utilities Commission requesting approval to commit funds for a Climate Adaption Transmission and Distribution Resilience Program ("Funding Application").[41]  In its Funding Application, Hawaiian Electric described the process it used to identify "wildfire risk areas":

> The Companies used a combination of ignition density maps developed by the Pacific Fire Exchange along with historical experience to identify initial wildfire risk areas. The Companies then conducted Unmanned Aerial System ("UAS" or "drone") and field inspections of the Companies' facilities and surrounding vegetation in these identified areas to evaluate risk and identify potential interventions.  The following qualitative criteria were then used to prioritize areas for which to develop prevention and mitigation plans:
>
> - Type of vegetation
> - Proximity to residents
> - Accessibility issues for fire response
> - Other lessons learned from California experiences
>
> The Companies have identified initial wildfire priority areas on Oʻahu, Maui, Molokaʻi, Lānaʻi, and Hawaiʻi Island. These priority areas are considered a starting point and other areas may be added as circumstances warrant.

91.    Hawaiian Electric identified the exact wildfire priority areas for each subset, including "[i]n Maui County, the current wildfire priority areas include: West Maui (Lahaina to

---

[41] Available                                                                      at https://www.hawaiianelectric.com/documents/about_us/our_vision_and_commitment/resilience/20220630_resilience_EPRM_application.pdf.

Kapalua), Maʻalaea, Olowalu, Molokaʻi (from west Molokaʻi to Kawela), and Lānaʻi.  The total

estimated program cost for Maui County is $6,243,000."  Therefore, by its own words, Lahaina

was a targeted "wildfire priority area," which it specifically identified through drone use, field

inspections, and qualitative criteria.  Notably, the estimated total program cost for "wildfire

mitigation and prevention" in Maui Country is significantly higher than the estimated total

program costs for wildfire mitigation and prevention in Oʻahu ($5,341,000) and Hawaiʻi Island

($2,517,000).

92.    The fact that Lahaina would be identified as a targeted area, and Maui Country

would require the most for program spending related to wildfires is unsurprising, due to the nature

of the vegetation in that area.  Multiple sources confirm that this area is prone to vegetation-related

outages.  "It was the firestorm that wildfire experts and residents on Maui had warned about for

years." NY Times, *Maui Knew Dangerous Wildfires Had Become Inevitable. It Still Wasn't Ready*,

(Aug. 21, 2023) (last accessed Oct. 19, 2024).  "The distinctive ecosystem of Maui is less resilient

to wildfires than the mainland, coupled with prolonged periods of drought, further heightening the

wildfire risk. The percentage of Hawaii wildfire acres burned is much higher than that typically

observed on the mainland according to a report by University of Hawaii researcher Clay

Trauernicht, PhD."  (County of Maui, Department of Fire and Public Safety, After-Action Report,

Maui Wildfires, August 7-11, 2023, p.8-9) ("After-Action Report").  The vegetation in Maui is

particularly susceptible to "larger and more destructive wildfires" (and therefore, outages), as

described in Appendix C of the After-Action Report:

> A historical review of Maui reveals that in the early 19th century, missionary
> settlements initiated the conversion of wetlands and fishponds into agricultural
> operations. Sugarcane and pineapple emerged as a major crop and prominent
> markets developed, particularly as the demand for whale oil diminished. These
> agriculture endeavors generated employment opportunities and contributed to the
> region's flourishing economy. During this period, wildfires were infrequent and
> were often handled by the land use manager's heavy equipment.
>
> During the 1970s to 1990s, the cost of farming soared, leading to the relocation of
> sugarcane and pineapple operations to other global locations. Consequently, the
> once lush forests, wetlands, and native shrubland failed to regenerate, and the land
> soon became fallow. The subsequent vegetation consisted of a mix of buffelgrass
> and Guinea grass, primarily used for grazing feedstock, along with remnants of old

agriculture crops. This combination of vegetation, coupled with the Kona and Trade winds, create a volatile fuel source for wildfires. The fallow lands now have less access, labor, and private heavy equipment, making them more susceptible to larger and more destructive wildfires, a situation exacerbated by changes in climate.

93.   And according to the After-Action Report, "[f]allow farmlands, generating annual grasses prone to rapid and wind-driven wildfires, necessitate annual mitigation efforts." After-Action Report, p.35. Additionally, in June 2014, "the Hawaii Wildfire Management Organization prepared a Western Maui Community Wildfire Protection Plan (CWPP) that warned that most of the Lahaina area was at extremely high risk for burning. The County's 2020 Hazard Mitigation Plan also identified Lahaina as a high-risk wildfire zone." After-Action Report, Appendix J, p.73. The After-Action Report also stated "Maui and the rest of Hawaii have a distinctive ecosystem, setting them apart from the continental United States. Many of Hawaii's plant species struggle to recover from wildfires, and downhill runoff exacerbates issues by causing soil erosion, negatively impacting ocean plant life and coral." The After-Action Report also listed some notable large wildfires seasons in Maui[42] and highlighted that "it's essential to note that Maui's ecosystems are far more sensitive and less resilient to wildfires." After-Action Report, Appendix E, p.65.

94.   This unique wildfire risk due to the vegetation in Maui was further acknowledged by Hawaiian Electric's own Resiliency Working Group, which in its April 29, 2020 Report noted, at page 35:

> The frequency and impacts of wildfires have increased recently. This may be attributable in some parts of the islands to the decline of the sugarcane industry. Sugarcane enterprises historically managed wildfire risks on the islands, including responding to fires. However, today these areas present vast amounts of vegetation that can burn longer and with less ability and resources to control them.

---

[42] Major wildfires in Maui include: 2003: 3,001 acres; 2005: 1,352 acres; 2006: 7,390 acres; 2007: 4,218 acres (Upper Waiohuli Fire (1,800 acres) destroyed 75% of the Forest Reserve); 2010: 5,535 acres; 2016: 10,908 acres; 2018: 4,601 acres (Hurricane Lane Fire (2,215 acres), Kaanapali Fire (294 acres), Both Hurricane Lane and Kaanapali fires were fueled by 70 mph winds. Before the 4 major wildfires in August of 2023, these wildfires were the most complex incidents in MFD history. 21 residences, 27 vehicles, and 150 acres of farmland were lost); 2019: 19,316 acres (Waiko Fire (7,908 acres)); 2023: 6,721 acres (Pulehu Fire (3,268 acres), Lahaina Fire (2,170 acres), Olinda Fire (1,081 acres), Kula Fire (202 acres)).

95.     The Report noted further:  "Maui presents unique wildfire risks.  Risk is highest along the saddle road due in part to existence of an invasive grass species prone to drying out."

96.     FE2 confirmed that Lahaina and Lahainaluna Road were targeted areas prone to vegetation-related outages.  FE2 was a Troubleman for Hawaiian Electric in the Lahaina area from 2014 to 2021.  FE2 reported to Troubleman Supervisor Gunther Taua, who reported to T&D Construction Superintendent Rod Morton.  FE2's duties were standard troubleman duties, including responding to "trouble" calls from HECO dispatchers.  FE2 said Lahainaluna Road only has about three trees but there is a lot of brush.  FE2 said they needed to stay on top of vegetation management because the "brush could grow up to six feet in a year."

## 2.     HEI Misled Investors To Believe It Regularly Maintained Its Poles

97.     Separately and relatedly, during the Class Period, HEI repeatedly assured investors that it was regularly maintaining its poles, when in fact, HEI's pole maintenance was severely deficient.  For example, on April 22, 2021, HEI issued its consolidated 2020 ESG Report, which stated:

> We continually maintain and upgrade our transmission and distribution system to ensure seamless delivery of power to our customers.  Day-to-day maintenance is a key part of keeping the grid resilient.  We regularly inspect our poles, lines, and other equipment, and work to replace and upgrade aging and faulty equipment before failures happen.

98.     In fact, at all relevant times during the Class Period, HEI was failing to replace thousands of severely outdated utility poles that posed a danger of falling and sparking during high winds.  As reported by the *WSJ*, generally, wooden poles that have deteriorated or were built to outdated standards are at risk of falling during high winds and dropping live wires that could spark wildfires. [43]  The *WSJ* reviewed regulatory records and found that Hawaiian Electric regularly fell behind on plans to replace tens of thousands of utility poles at risk of failure.  The regulatory filings

---

[43] Katherine Blunt & Dan Frosch, *Before Lahaina Burned, Hawaiian Electric Was Slow to Replace Poles That Posed Fire Risk*, Wall St. J. (Sept. 24, 2023), https://www.wsj.com/us-news/climate-environment/maui-fire-hawaiian-electric-power-lines-1eaef7cf.

show Hawaiian Electric frequently cited resource constraints and engineering challenges for not making as many upgrades as it intended.

99.    The *WSJ* review of the Company's regulatory filings also revealed that Hawaiian Electric spent millions of dollars less on upgrades than it planned in the years leading up to the Lahaina fire, including during the Class Period.  In 2022, Hawaiian Electric planned to spend at least $25 million to make its infrastructure on the island more resilient, but spent about $17 million and replaced fewer poles than anticipated.  The utility designated roughly $2.4 million for a program to bolster reliability on Maui in 2022, but spent $355,832.  After stating that it would spend $1.15 million last year to better prevent its high- and low-voltage lines from starting fires, Hawaiian Electric spent about $9,300 on the program.  The fact that HEI had spent so substantially less than anticipated in their budget is further evidence that they had not upgraded or maintained their poles.

100.    A former employee of Hawaiian Electric ("FE1") has confirmed that the majority of the Company's poles were leaning and approaching the end of their lifespan.  FE1 was the Director of Regional Transmission and Distribution Operations for Hawaiian Electric from October 2018 to July 2020.  FE1 was based in Honolulu and reported to Vice President of Energy Delivery Cecily Barnes, who reported to a Senior Vice President who reported to Hawaiian Electric's CEO.  FE1's role was to serve as a managing director over the electric grid on all five islands.  According to FE1, "Hawaiian Electric is powered by a grid that uses large wooden poles that are largely uninsulated, leaning, and nearing the end of their lifespan and are strung with vegetation over miles of rugged terrain."  FE1 further clarified that some poles during the class period were not merely nearing the end of their lifespan, but had reached it and needed to be replaced.  FE1 also confirmed that Hawaiian Electric's statement that HEI was "continually maintaining its poles" was misleading, and that some poles fell over during the class period due to lack of maintenance.

101.    Another former employee ("FE4") has confirmed that the majority of poles around Lahaina actively needed to be replaced.  FE4 was a Troubleshooter/Troubleman for Hawaiian

Electric from August 2017 to August 2021, a Trouble Dispatcher from August 2021 to May 2022, and a System Operator Shift Supervisor from May 2022 to March 2023. As a Troubleman, FE4 reported to Troubleman Supervisor Gunther Taua, who reported to T & D Construction Superintendent Rod Morton. According to FE4, "there was a significant amount of poles that needed to be replaced . . . percentage wise" on the west side, including "leaning" poles and "rotten" poles. FE4 also noted that FE4 turned in poles that needed replacement, and even created a spreadsheet that they "never did anything with," and by the time of the August 2023 fire, they still were not replaced. FE4 estimates that there were "at least 100" poles he documented that needed replacement, and "probably more than that."

102.    FE4 also stated Hawaiian Electric's statement that HEI was "continually maintaining its poles" was not true. FE4 stated that they were "way behind" in maintaining their poles, and that falling poles were a frequent occurrence and occurred during the Class Period. FE4 stated, "A larger number of poles would fall any time we had any kind of wind. That tells you something about maintenance. Good poles weren't shearing off. It was rotted poles that were falling over so that tells you something about it." FE4 said whenever this happened, FE4 tried to explain to FE4's bosses how dangerous the pole situation was, because "Lahaina is tinder dry. You get high winds," which caused "several fires" that "burnt several places down" while FE4 was there, but they "didn't listen." FE4 also explained that termites are a "huge problem" on the island and "a lot of the poles never got set with the termite guard," including older poles that are rotted. FE4 also stated that poles in Lahaina were not regularly inspected while FE4 was a troubleman. FE4 said Osmose had done an inspection process a few years prior to FE4's arrival on the island in August 2017, where they "did a full inspection on each pole," and had records of the poles that were rotting, and the "majority of the poles were rotten prior to the fire." Although Osmose left tags on poles that were rotted and needed to be replaced in Lahaina, they "never did anything with them" and FE4 never saw Osmose there the entire time FE4 was a troubleman.

103.    FE4 also stated that Hawaiian Electric was not spending enough money on pole maintenance and replacement, because the "management was taught by Sharon Suzuki to be very

33
SECOND AMENDED COMPLAINT

frugal", and there was "pressure on them to be that way."  FE4 further clarified that Maui Electric CEO Sharon Suzuki was "very, very conscious" about saving money and she "had lots of pats on the back for delivering large amounts of cash back to the mother ship, which was Hawaiian Electric. Because she wasn't spending money like she should have. They could have hired contractors. They could have done a lot of things to prevent their system from being in shambles." Her predecessors did not maintain the distribution system like they should have either, FE4 said, "and then as things changed hands Sharon was trying to look good and she didn't spend the money that needed to be spent."  FE4 further stated that, after being in the utility industry starting at 18 years old, "I'm 64 years old now and when I got there [in August 2017] I was appalled," and the "maintenance, the tree trimming, wasn't being done properly. When I showed up on the scene in 2017 there were trees overgrowing the transmission lines and I took it upon myself to clear quite a bit of the trees that were on the transmission lines just so they wouldn't wake me up in the middle of the night to have me go out and either find out where the trouble was, clear the lines in the middle of the night, or report  to a crew to put the wire back up."

104.    Another former employee ("FE5") also confirmed that many poles needed replacement that were never replaced.  FE5 was a Troubleman for Hawaiian Electric in the Lahaina area from 2009 to 2019.  FE5's duties were standard troubleman duties, including being first on the scene to respond to "trouble" calls, fire calls, etc.  According to FE5, there were poles that needed replacement when FE5 first began working at Hawaiian Electric that never were replaced in the ten years FE5 worked there.  FE5 estimates that "at least ten percent" of poles are "past their lifespan."  FE5 also stated that poles in Lahaina specifically were in "horrible, horrible" shape.

105.    Hawaiian Electric has admitted in regulatory filings that utility poles on the islands have an average service life of 40 to 45 years or less before they need replacing.  That useful lifespan is up to a decade shorter than other places across the U.S. because Hawaiian Electric operates in what the Company calls a "severe wood decay hazard zone," meaning the poles deteriorate faster.  The risk of failure is most acute when winds pick up.

106.    During the Class Period, thousands of Hawaiian Electric's poles were more than 40 years old, and so were at high risk of breaking down.  Some dated to the 1920s.  In Hawaiian Electric's most recent public accounting of infrastructure on Maui, from 2016, a consultant wrote that it could not determine the age of roughly 3,500 of the utility's poles.  Of the remaining 21,673, the consultant determined about 7,700, more than one-third, were at least 40 years old.

107.    Relatedly, the Company blatantly misled the public to believe that their poles were in compliance with national safety standards designed to prevent them from falling and sparking in severe weather.  For example, on November 23, 2022, the Company stated:  "[O]ur poles follow standards set by the National Electric Safety Code ("NESC") to ensure they are safe for our employees to work on and can withstand impact of severe weather."

108.    In fact, the *majority* of the Company's poles were outdated and did not comply with current NESC standards to withstand severe weather.  Even setting aside the number of poles 40 years or older, Hawaiian Electric repeatedly told regulators that *the majority* of its poles were built to a 1960s standard that did not account for hurricane-strength winds.  The 1960s standard required only that the poles be able to resist a minimum of 56 mph sustained winds, weaker than a Category 1 hurricane.  A 2007 generally accepted, national standard under the NESC, adopted and implemented as a rule by Hawaii's Public Utilities Commission, required all poles to be able to withstand 105 mph winds.[44]  Accordingly, the majority of Hawaiian Electric's poles were not incompliance with NESC standards and were in dire need of upgrade to prevent falling and sparking during weather event even less severe than a Category 1 hurricane.[45]

---

[44] The use of wood utility poles is guided by national standards, including ANSI 05.1 - Wood Poles, Specifications and Dimensions and the National Electrical Safety Code (NESC). North American Wood Pole Council, *National Wood Pole Standards Overview* (last accessed Feb. 29, 2024), https://woodpoles.org/Why-Wood-Poles/National-Standards.

[45] The Associate Press has likewise reported that "many" of Hawaiian Electric's utility poles "were leaning and near the end of their projected lifespan."  Jennifer McDermott, Bernard Condon, & Michael Scott, *Bare electrical wire and leaning poles on Maui were possible cause of deadly fires*, Associated Press (Aug. 27, 2023, 12:33 AM), https://apnews.com/article/hawaii-wildfires-maui-electricity-power-utilities-9f23f79821ea50256f0725ac9b0b3905.

109.    A former member of the Hawaii Public Utilities Commission, Jennifer Potter, personally confirmed many of Maui's wooden power poles were in poor condition.  Indeed, that the majority of Hawaiian Electric's poles were in dire need of upgrade and replacement was proved by the August 8, 2023 weather—according to Shelee Kimura, CEO of Hawaiian Electric, at least sixty percent of the utility poles on West Maui were unable to withstand the weather events on August 8, 2023 and were still down as of August 14, 2023.  On the day of the Lahaina fire, the National Weather Service recorded wind speeds of only 62 mph on Maui, only modestly above the 1960's standards.

110.    In addition to aging and outdated poles, Hawaiian Electric needed to replace thousands of hazardous "double poles," where a replacement pole was installed next to a damaged one yet both were left in place.  A 2019 audit by the Public Utilities Commission found a backlog of 9,400 double poles that need to be fixed by Hawaiian Electric.  As of 2023, Hawaiian Electric still had 6,500 double poles left to replace.[46]

111.    FE4 noted that double poles are a safety hazard because when they are left in place they are more susceptible to falling, and when there are utility lines on the poles they aren't built to hold that kind of weight.  "There's communication lines on some of those poles, too, which gives you a larger square inch of wind shear," and "has to be taken into consideration when you're maintaining the poles."  FE4 stated that they had four or six big telephone lines on some of the poles, and "those are poles that have been in place for years and they just kept adding more, more more."  "When the pole starts deteriorating and some wind comes along, it's going to blow those over because it doesn't have enough integrity to hold up to the wind shear. So that's what happened a lot."  FE4 said they had several poles weighted down by communication lines fall over right on the main highway, the Honoapiilani.  "We had a little bit of wind come up and we had six poles domino and fall over."  Hawaiian Electric allows the phone company to add the lines to the poles

---

[46] Catherine Cruz, *What happened to the plan to remove thousands of utility poles?*, Haw. Pub. Radio (Mar. 14, 2023), https://www.hawaiipublicradio.org/the-conversation/2023-03-14/removing-utility-poles-heco-energy-hawaiian-telcom.

without inspecting them or replacing them with a higher class of pole, FE4 said. "Class simply means the size it is around, how big it is, how beefy it is," he said. If the poles had been replaced with the proper class, they would have been able to withstand higher weather conditions. FE4 stated, "unless it's a full-gale hurricane it's not going to take it down if they put in the proper class of pole. That's a big deal too. No one was checking with the other utilities to see if they were within the parameters of what that pole could actually withstand."

112.    Hawaiian Electric has acknowledged that downed power lines caused a fire the morning of August 8, 2023 in the same spot where the blaze that destroyed Lahaina began.

113.    The Hawaii Attorney General commissioned the Fire Safety Research Institute ("FSRI") to conduct a comprehensive independent analysis of the Lahaina fire, called the Lahaina Fire Incident Analysis Report ("FSRI Report"). The FSRI Report concluded that "Many large utility poles supporting multiple lines broke." FSRI Report at 43. The FSRI Phase 2 report also noted that "Lahaina has a 98% higher risk [of wildfire] than the rest of the country."

114.    According to other investigators and insurance companies, Utility Pole 7A , which Defendants ultimately admitted was installed in 1980[47] and was thus 43 years old at the time of the fire, and which was riddled with termite damage, caused the chain reaction culminating in the fires by Utility Poles 24 and 25 on Lahainaluna Road. In testimony before the Hawaii House Finance Committee, Maui lawyer Jan Apo shared the detailed findings of his monthslong investigation at a hearing, during which he was recalled by lawmakers to elaborate on his testimony. After six months of efforts, Apo and his investigators were able to gain access to the warehouse where HECO was storing Pole 7A and other evidence. Apo testified that his investigation showed that the wooden pole was *riddled with termite damage*. Apo later produced photos of Pole 7A, showing the extensive termite damage:[48]

---

[47] PUC Case No. 2024-01872, PUC-HECO-IR-27 Response, p.2.

[48] Stewart Yerton, "The Most Detailed Account So Far Of The Lahaina Fire Points To One Termite-Damaged Utility Pole," *Honolulu Civil Beat* (April 7, 2024),



115.    As a result of that extensive damage, and consistent with the MFD and ATF Reports, Apo stated that Pole 7A broke in the night wind, snapping about halfway up, and ***"literally broke right at the termite damage*."**  The power lines attached to Pole 7A began pulling on other nearby lines, including those attached to nearby Pole 25.  A stretch of power line between those two poles eventually snapped, causing a flare of electrical arcing, and the severed lines fell to the ground, as the MFD and ATF Report concluded.

116.    Crucially, those reports concluded that re-energization of those power lines caused the exposed, uninsulated power lines to ignite the "overgrown" vegetation and set off the Lahaina fire.  Hawaii State Rep. Elle Cochran, who represents Lahaina, indicated that Apo's description was the widely accepted view in Lahaina of what happened, "it's out all over Lahaina. They all know. I hear it every day when I go home."

117.    Any purported inspection that left standing 43 year-old poles severely damaged by salt air, wind and termite infestation could not have been done with a principle of "safety-first" in mind, rather than a principle of "cost-savings" first.

---

https://www.civilbeat.org/2024/04/the-most-detailed-account-so-far-of-the-lahaina-fire-points-to-one-termite-damaged-utility-pole/

118.    Witnesses in the area spoke of poles "not repaired at [the] time of [the] morning fire" (FIWS003) and which "appeared damaged prior to this" (FIWS005). ATF Report, Fire Investigation Witness Statement ("FIWS") 003; 005.  Photos submitted in the MDF Report show, among other things, the equipment breakage prior to re-energization on Pole 7A at 05:12 hours, as well as the equipment breakage on Pole 25 at 07:53 hours, in which it "appears at least two conductors that possibly lead to Pole E-7A are either cut or broken."[49]



Photo 3 – IMG_8577 – Pole 7A at 0512 hours by MDF

---

[49] *See* November 7, 2024 Information Requests to Hawaiian Electric by the Public Utilities Commission, PUC Case 2024-01872, https://hpuc.my.site.com/cdms/s/puc-case/a2G8z000000I4IMEA0/pc189164?tabset-431dc=3.



Photo 4 – IMG_5872 – Pole 25 at 0753 hours by MFD

119.    FE4 stated that FE4 believes the wire that went down between the poles in Lahaina which caused the August 2023 fire because there was "very old," uninsulated copper wire in that section of the power line. "It was very well known that the copper was annealed," which FE4 further explained to mean "when copper wire or any metal wire is old and blowing in the wind and it flexes back and forth over the years and it's small, the smaller the worse it is, it can become very brittle to a point where if it's moved, it breaks. That particular wire had been down on the ground several times over the course of five years that I know of. They never changed it all out. FE4 also notes that FE4 "emailed several people and talked to them about shutting the line off, especially in the Lahaina area because it's tinder dry, but they wouldn't do it because of revenue. That's where all the resorts are." Then, besides that, "there's the corrosive nature of the salt air that's

continually eating away at the infrastructure," FE4 said. "In Hawaii things have to be upgraded, changed out, inspected more frequently than on the mainland that's away from the coast. They weren't doing that. They were trying to get away with doing as little as possible because number one, they didn't have the manpower probably and didn't want to spend the money." FE4 stated that the annealed wire situation was very well known within Hawaiian Electric, and that "they were very well aware of that annealing wire being bad."  Hawaiian Electric admitted that the "primary conductors" between Poles 24 and 25 were made of copper as of August 8, 2023, and "have subsequently been replaced and are now made of 336.4 AAC AL Conductor."[50]

120.    Consistent with this evidence, Hawaiian Electric admitted that it "did discover shortly after the Morning Fire appears to have ignited a broken pole near the line that had fallen to the ground" and the "a Hawaiian Electric Primary Troubleman responding to the scene reported that a distribution pole at the intersection of Lahainaluna Road and Hookahua Street, identified as Pole E-7A, had broken in half.  Conductors attached to that pole had snapped and were in contact with the ground."[51]

121.    There is also evidence suggesting that Hawaiian Electric may have tampered with or destroyed pole evidence that could have been used in the subsequent investigation.  "The Hawaii power utility believed to have started the deadly Lahaina fire removed damaged power poles and other equipment from a key fire scene, potentially affecting evidence that is part of an official investigation into how the blaze ignited.  Hawaiian Electric … hauled away fallen poles, power lines, transformers, conductors and other equipment from near a Lahaina substation starting around Aug. 12, documents show, before investigators from the federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) arrived on scene."  *The Washington Post*, Aug. 24, 2023, updated Aug. 26, 2023, https://www.washingtonpost.com/climate-environment/2023/08/24/maui-fires-power-utility-lahaina-investigation/.

---

[50] PUC Case No. 2024-01872, PUC-HECO-IR-26 Response, p. 3.

[51] PUC Case No. 2024-01872, PUC-HECO-IR-3 Response, p. 5-6.

B.    **HEI Misled Investors To Believe Its Mitigation Plans Addressed Risk of Dry Grasses and Shrubs, When In Fact Its Plans Recommended *Against* Trimming of Grasses Around Power Lines**

122.    During the Class Period, the Company repeatedly created the misleading impression that it was actively trimming and otherwise addressing dry grasses and brush beneath and around power lines, when in fact, the Company's own written policy, expressed in its Wildfire Mitigation Plan since 2019, expressly recommended *against* trimming already low-lying vegetation, and *against* creating vegetation fire-breaks as part of the vegetation management program, on the grounds that the measures were too costly.

123.    For example, on November 5, 2019, Hawaiian Electric released a press release in which it stated that it was conducting "drone surveys across their five-island territory to identify areas vulnerable to wildfire," and explained that "[t]hese aerial inspections are part of the companies' **proactive assessment and management of vegetation** near their electrical infrastructure, especially **in** drought-prone or **dry brush areas**." The press release also stated:

> Hawaiian Electric, Maui Electric and Hawaiʻi Electric Light earlier this year evaluated the wildfire mitigation plans filed by the major utilities in California and studied Hawaiʻi fire ignition maps to determine where the greatest risks are and to provide a basis for planning. Unlike California, many utility lines in Hawaiʻi run through tropical forests and areas that typically receive abundant rainfall. That makes it easier to **concentrate on mapping drought-prone areas where sparks could ignite dry grass and brush beneath power lines**.

These statements misled the public to believe that Hawaiian Electric "proactive[ly] manage[d]" vegetation, specifically including "dry grass and brush beneath power lines."

124.    Likewise, in the 2020 ESG Report, Defendants stated:

> **We regularly trim the vegetation around our equipment**, as many power outages during high winds and storms are due to tree branches or other vegetation falling onto power lines.

This statement likewise misled investors to believe that Hawaiian Electric "regularly trim[med] the vegetation around its equipment," including the grasses and shrubs in the immediate vicinity of its power lines. This statement also highlights that the issue of power outages and wildfires is

the same issue—trees falling on wires and making the wires fall down both cuts power (causing

power outages) and creates the risk of a wildfire.

125.    Similarly, the 2021 ESG Report stated:

Episodic drought, a warming climate and **the expansion of nonnative fire-prone grasses and shrubs has led to an increase in wildfires** in Hawai'i. 98% of wildfires in Hawai'i are human caused and the threat to communities is high year-round. **In addition to the utility's own wildfire mitigation plans, we have joined with community members and wildfire collaborators to help prevent and mitigate wildfires in known hot spots across our service areas**.

This statement further led the public to believe that Hawaiian Electric's "own wildfire mitigation

plans" took affirmative steps to address "the expansion of nonnative fire-prone grasses and shrubs"

that had led to an increase in wildfires.

126.    In fact, Hawaiian Electric was blatantly misleading the public about its trimming

of grasses and shrubs around its power lines.  Hawaiian Electric's express internal policy, written

in its Wildfire Mitigation Plan, was certainly not to "proactive[ly] manage" "dry grass and brush

beneath power lines," not to "regularly trim the [grass and brush] vegetation around its

equipment," and indeed not to take any action with respect to "nonnative fire-prone grasses and

shrubs."  Rather, the Wildfire Mitigation Plan stated:

Hawaiian Electric's vegetation management programs involve trimming, removing, and herbicide spraying of vegetation on prescribed cycles and is limited to the boundaries of the right-of-way and roadsides.  Due to plant species and rainfall amounts, certain areas will have more frequent maintenance cycles than other areas.  Vegetation management is critical to maintaining and improving system reliability performance for overhead systems by executing work plans to minimize the frequency and duration of vegetation-related outages.  As noted previously, the type of vegetation in the Hawaii wildfire areas are primarily grasses, shrubs, and few trees, which rarely grow into conductors.  Thus, **it is not recommended that vegetation management plans be adjusted in the wildfire areas.  Further trimming of the already low-lying vegetation will not likely produce any appreciable results in the potential wildfire areas**. The exception would be creating fire breaks in the vegetation areas . . . .  However, creating a fire break would require agreement from landowners and stakeholders and would be very costly. If this strategy is pursued, then it should be done outside of the vegetation management programs.[52]

---

[52] HECO, *Hawaiian Electric Wildfire Mitigation Plan* (Jan. 2023),
https://www.hawaiianelectric.com/documents/about_us/our_vision_and_commitment/resilience/
20230101_wildfire_mitigation_plan.pdf.

127.    Hawaiian Electric later admitted in response to Information Requests from the Public Utilities Commission that the Company "**generally does not clear any vegetation that does not encroach upon the overhead conductors, such as shrubs and grasses. Clearance around equipment such as poles or underground facilities typically is done only if access to the equipment is needed**."[53]

128.    Indeed, the May 12, 2020 audit of Hawaiian Electric by PUC, confirmed that the Company was regularly behind schedule in vegetation maintenance, had failed to complete planned vegetation work for years, and had underspent its budget:

> Vegetation Management has not been able to complete its planned mitigation programs over the last few years and has underspent its budgets. This may in part be a result of its yearly spend being curtailed in order to counter overspends elsewhere to meet overall budget in Energy Delivery. Regardless, the impact of not completing vegetation management work is showing up in increased Distribution trouble calls as a result of vegetation interference with overhead lines. It also means that some scheduled distribution work has to be delayed until Vegetation Management crews can make work sites ready for T&D Operations to commence its routine work, increasing costs.[54]

129.    The failure of Hawaiian Electric to trim vegetation around poles led to the Lahaina fire, as confirmed by multiple sources. On October 1, 2024, the County of Maui Department of Fire and Public Safety ("MFD") released its Origin and Cause Report about the Lahaina Fire ("Maui Fire Department Report" or "MFD Report"). The MFD Report concluded, *inter alia*, that "[t]he origin of the fire was *the overgrown vegetation at and surrounding utility pole 25 off of Lahainaluna Road*." (Emphasis added.) The Report went on to state, "The cause of the fire was the *re-energization of broken utility lines which caused the ejection of molten metallic material (sparks)* to fall to the base of pole 25, igniting *the unmaintained vegetation below*. Additionally, the arcing and severing of the energized overhead power line between pole 25 and 24 resulted in that line falling to the ground, subsequently igniting vegetation below." The Report further stated that "MFD investigators agree with those from the ATF [Bureau of Alcohol, Tobacco, Firearms

---

[53] *Id.*

[54] Management Audit of the Hawaiian Electric Company (HECO), Final Report dated May 12, 2020 ("Audit Report"), filed on May 13, 2020 in Docket No. 2019-0085, at 156.

and Explosives] that the area of origin for the Lahaina Wildfire was ***overgrown vegetation at or surrounding utility pole 25 on Lahainaluna Road***.  This was ***conclusively established through multiple witness statements, photographic and videographic evidence, as well as scene examination*** showing clear signs of ignition all pointing to the same specific origin area and multiple identified ignition areas within…. [T]he fire … resulted from sparking utility equipment following re-energization at utility pole 25 on Lahainaluna Road [] which ***ignited overgrown brush at the base of pole 25*** and moved into an unmaintained firebreak."

130.    The U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, National Response Team ("ATF") also issued a report, dated September 19, 2024, on the Lahaina Fire ("ATF Report"), which was "intended as an attachment to MFD's Origin and Cause Report."  The ATF Report stated that "On August 8, 2023, at approximately 0635 hours," the fire "ignited in an area located near the intersection of Ho'okahua Street and Lahainaluna Road, to the south and west of the Lahaina Intermediate School in Lahaina, Hawaii."  ATF Report at 22.  The ATF Report noted, *inter alia*, that at 6:34 a.m., a caller to 911 stated she was outside her house when she heard a "'a "boom,' observed sparks and saw fire at the base of Utility Pole 25."  The ATF Report stated that "*[t]he vegetation in this area consisted mostly of koa haole shrubs within thick and unkempt non-native grasses*, *specifically Guinea grass and possibly Buffelgrass*."  ATF Report at 16.  According to the ATF Report, this witness told investigators that "she observed bushes and grass in the vicinity of the pole [Utility Pole 25] catch on fire."  Another witness reported "the overhead powerline between Utility Pole 25 and Utility Pole 24 to the west was broken and 'crackling like fireworks' along the grass...." and seeing "the 2-3 ft tall grass around the base [of Utility Pole 25] on fire.  Multiple witnesses also said they saw another utility pole in the vicinity, Utility Pole 7A, "broken in half" or "snapped" and "hanging down" early that morning, with an [MPD] dispatch contacting [MECO] about this downed pole at 5:29, approximately an hour before the first report of the fire at Utility Pole 25.  Witnesses also observed "smoldering along the fence line on the west side of the gravel road" near Utility Pole 25 "which

served as a firebreak, to the east" and that "[v]egetation, in this case, grasses, along the *unmaintained* firebreak" in this area "had already been consumed by fire."

131.    The ATF Report also indicated that "While Utility Pole 25 would normally indicate a single utility pole, in this case, it involved two utility poles, both of which were marked Utility Pole 25. The taller pole, identified as Utility Pole 25 for purposes of this investigation, had overhead powerlines and transmission lines. The shorter pole was also labeled Utility Pole 25, but it had telecommunications lines only. Both poles were spaced approximately two feet from each other." The ATF Report concluded, "Witness statements, witness videos, witness photographs, [redacted] examination, and fire scene examination, all supported a cause of the fire being a broken energized overhead powerline contacting the ground and igniting the grasses in various locations. . . . The ignition of dried and *overgrown vegetation below Utility Pole 25* was caused by the ejection of molten metallic material that was ejected during the failure of the utility equipment and resulted in arcing and severing of the energized overhead powerline. The failure of the utility equipment at the top of Utility Pole 25, which resulted in "sparks" cascading down to the vegetation below, could have been *due to the strain, displacement of conductors, and movement* due to wind put on Utility Pole 25 and its equipment *by the breaking of Utility Pole 7A* that was located approximately 85-feet to the north of Utility Pole 25." ATF Report at 65.

132.    Like the Maui Fire Department Report, the ATF Report concluded that the Lahaina fire reignited in the afternoon in a nearby gully from smoldering aftereffects of the morning fire by Utility Poles 24 and 25. The ATF Report cited a firebreak near Utility Pole 25 and stated that "the investigation revealed the firebreak was covered *with dense and dry grasses (fuel load) that were not maintained prior to the Morning Fire*. Investigators also learned that shrubs and small trees had grown within the chain-link fence that separated houses from the north side of the firebreak. The Morning Fire consumed vegetation that covered the firebreak. A gully with a dry creek bed at its bottom existed on the eastside of the firebreak… Investigators learned the dry creek bed *contained a large amount of vegetation*, which consisted of dense grasses interspersed with haole koa shrubs, and large boulders." The ATF Report also concluded that arcing had occurred

SECOND AMENDED COMPLAINT

in the power lines between Utility Poles 24 and 25 on Lahainaluna Road, which broke, fell, and ignited overgrown grass, in addition to the ignition immediately below Utility Pole 25, and that "Contact between overhead circuit components, including connection points, conductors, jumpers, the speed sign, and trees in the area between Utility Pole 24 and Utility Pole 25 *due to wind related movement and tension and displacement created by the broken upper portion of Utility Pole 7A* can result in arcing and the production of ejected molten metallic material in the form of sparks after the circuit was re-energized."

133.    These findings, which repeatedly reference the overgrown vegetation in the area, conclusively show that HECO failed to keep up to date its vegetation management.

134.    On October 2, 2024, HECO issued a press release on its letterhead in response to the MFD and ATF reports, indicating that "even before these reports were released" it was making investments "strengthen electric infrastructure," "implement enhanced vegetation management that falls under the utility's purview," and "deploy devices to help prevent wildfires."  HECO also sought to point to the FSRI report's statement that "The *destruction* caused by the August 2023 fires … resulted from a complex interaction of contributing factors," although it neglected to recognize that the FSRI report expressly stated that "This report *does not include* an analysis of … *the fire's origin and cause*, which is being investigated by the County of Maui with assistance from the United States Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF)." Nonetheless, the FSRI Report (Sept. 13, 2024) did state, with respect to the state of "vegetative fuel" at the time of the Lahaina fire:  "*Vegetation played a crucial role in the Lahaina PM fire*. [. . .]  *The vegetation management, or lack thereof, leading up to August 8, 2023, left lands at high risk of ignition and rapid spread* . . . . With respect to HECO's vegetation management in the target areas specifically, the FSRI report stated: "*Highly ignitable vegetative fuels are also present under and around utility lines and substations across West Maui*. Management of aerial vegetation touching powerlines, growing into conductors, and growing within substation boundaries is important for reducing wildfire risk and for providing continued electrical service to Maui customers. These measures are part of Hawaiian Electric's wildfire safety plan. *The wildfire*

1   ***risk posed by downed lines onto unmanaged vegetative fuels, a plan for fuels management under

2   lines, and the opportunities for powerline vegetation management to serve as additional

3   emergency access or fuel breaks, do not appear to be effectively addressed in Hawaiian

4   Electric's previous or current wildfire safety plans***." (FSRI Report, Sept. 13, 2024, October 2,

5   2024, Revision 1, at 61.)

6          135.    FE2 confirmed that utility poles, including those near Lahaina, were "consumed

7   by brush," and that FE2 was repeatedly instructed by superiors ***not*** to trim the brush at the bases

8   of the poles.  FE2 asked FE2's first level supervisor to rent FE2 a backhoe to clear overgrown

9   vegetation in the Lahaina area.  FE2 stated, "I have pictures of me driving through grass that's so

10  high . . . it grows six, seven feet tall."  FE2 cleared about 40 poles before a new supervisor

11  expressly instructed FE2 to stop in 2016 or 2017.  FE2 added the poles in Lahaiana were "not in

12  good shape."  FE2 confirmed that throughout the entire time FE2 worked at Hawaiian Electric,

13  FE2's supervisor, Rod Morton, was "constantly telling [FE2] and [FE4] not to trim back trees on

14  the lines."  Both FE2 and FE4 confirmed that downed power lines are a wildfire concern.  This is

15  because "if they don't trim the branches off the lines and they fall, the lines just sit there, burning

16  the ground, burning the vegetation," according to FE2.  FE4 stated that FE4 "witnessed four fires

17  in the Lahaina area that were caused by downed power lines, whether it was directly down or

18  another conductor, guide wire . . . we're talking about a huge arc a lot of times, a big arc with lots

19  of heat that will light any fuel around it."

20         136.    FE4 confirmed that FE4 and FE2 were repeatedly told by their supervisor, Rod

21  Morton, not to trim back trees or vegetation at the bottom of poles during the entire time FE4 was

22  a troubleman at Hawaiian Electric.  FE4 further noted that the troublemen who came after FE4

23  once FE4 became a dispatcher in August 2021 were also told not to do so. As a result of this, FE4

24  stated that Hawaiian Electric was way behind schedule in vegetation management.  FE2 also noted

25  that Hawaiian Electric was "constantly behind schedule" on vegetation management the entire

26  time FE2 worked for them.

27

28

137.     Another former employee ("FE3") likewise has confirmed that HECO "neglected" keeping invasive grasses "under control" due to cost.  FE3 was the Senior Environmental Specialist for Hawaiian Electric from May 2004 to January 2023.  FE3's job responsibilities included addressing environmental hazards, including spill hazards from electric transformers on poles. FE3 stated that while trees are widespread on Maui, the invasive cane grass "is the larger issue." "It's more the cane grass that grows fastest during the wet periods but once it dries out it gets really tindery and any kind of spark can set it off."  According to FE3, land use in Hawaii changed when sugar cane became more expensive to grow in Hawaii than other areas like the Philippines and the sugar cane plantations began to shut down in the 1990s.  "So all that land that was formerly used to cultivate sugar canes—which was kept well-watered during the sugar cane cultivation—just kind of dried up once those cultivation activities stopped, and that just allows all the invasives like the cane grass and the California grass to fill in where the cane was growing."  FE3 explained, "[i]t is costly to maintain that land, keep that vegetation down low," and as a result, Hawaiian Electric neglected maintaining the grasses down low.

138.     Additionally, HECO was aware of dangerous trees known as "hazard trees" and expressly admitted that hazard trees were not being removed as part of the vegetation management program, in the Companies' June 30, 2022 Funding Application to the Public Utilities Commission:

> Hazard Tree Removal Hazard trees are trees that are not in the right-of-way that are dead, diseased, or structurally compromised, and are tall enough to fall into power lines. It is common for hazard trees to cause significant damage during severe events. As such, a hazard tree removal program can be very effective at reducing this type of damage. The Companies' current vegetation management programs do not include the removal of trees that are outside of the right-of-way, so this initiative represents an incremental increase in O&M that is not currently embedded in the target revenues approved for the Maui Electric 2018 test year rate case (Docket No. 2017-0150), Hawai'i Electric Light 2019 test year rate case (Docket No. 2018-0368), or Hawaiian Electric 2020 test year rate case (Docket No. 2019-0085), nor recovered through any recovery mechanism that is currently in effect. The Companies plan to complete surveys for each Company to identify and prioritize hazard trees for removal. This will also include the identification of invasive tree species that have weak root systems and/or are prone to failure during high winds. In order to begin removing hazard trees as soon as possible following Commission approval, the Companies will proceed with this survey work prior to approval of the Application. Without the benefit of the survey, the Companies estimate that

they will remove 800 hazard trees per Company over the five-year program for approximately $11,000,000 per Company, as shown in Exhibit A. Actual expenses will depend on the survey results as well as various factors such as location, size, and height as well as the method of removing the debris.

139.    FE4 and FE2 both confirmed that Hawaiian Electric did not remove hazard trees outside the right of way of the utilities.

140.    Additionally, ariel drone-captured images taken by Hawaiian Electric itself in 2019 and 2020 of its own power lines, and included in its Wildfire Mitigation Plan, confirm that the Company was not trimming low-lying vegetation surrounding its power lines at all.  The pictures on pages 20-26 of the Plan show grasses and shrubs below and around the power lines growing unabated in equal size to the surrounding vegetation.  For example, the following exhibits



*Figure 8 – Lahaina #2 Mauka 69kV Circuit and 1381 12kV Circuit, Kapalua, Maui 2020.*

show tall, untrimmed grasses surrounding power lines on Maui and Oahu:



*Figure 10 – Punaluu 12kV Circuit, Mauka of Honuapo Bay, Hawaii Island 2020.*

**C.    HEI Misled Investors To Believe That It Had Followed Advice Given To It Concerning Fire Mitigation, When In Fact It Went Against The Central Components Of That Advice**

141.    During the Class Period, the Company misled investors to believe that it was following advice regarding wildfire mitigation from a hired consultant, and that its wildfire mitigation plans aligned with recommendations from wildfire collaborators, when in fact, its wildfire mitigation policies went against that advice.  For example, the 2020 ESG Report stated:

> **The utility engaged Exponent**, a leading consulting firm in electric utility resilience, **to perform an independent assessment to identify key vulnerabilities to severe natural events. Following this assessment, Exponent outlined a set of recommendations** to ensure quick restoration of critical customers, reduce total restoration time and minimize the total amount of damage from a severe natural event. **This included recommendations for system hardening**, substation flood monitoring, **enhanced vegetation management**, emergency restoration, damage prediction modeling and additional in-depth studies. **The utility is currently developing work plans based on Exponent's recommendations**, climate risk analysis and ongoing IGP efforts.

[. . .]

**The utility is using the Exponent** and Jupiter Intelligence **analyses to inform its IGP process and planning**.  The IGP process also includes a Resilience Working Group composed of stakeholders representing critical infrastructure providers, emergency management agencies, state and local government energy, planning, climate change and resilience officials, the hospitality and healthcare industries, the military, solar and other renewable energy providers and other stakeholders.

This statement misled investors to believe that Hawaiian Electric was adopting the recommendations of the consulting firm it hired, Exponent, including recommendations to "enhance[] vegetation management."  In fact, as shown in the Company's Wildfire Mitigation Plan, the Company had determined that "the type of vegetation in the Hawaii wildfire areas are primarily grasses, shrubs, and few trees, which rarely grow into conductors," so "it is not recommended that vegetation management plans be adjusted in the wildfire areas."  That is, contrary to its public statement, Hawaiian Electric made no effort to "enhance" or otherwise "adjust" its vegetation management in light of the consultant's recommendations.

142.    Similarly, the 2021 ESG Report stated, in relevant part:

Episodic drought, a warming climate and **the expansion of nonnative fire-prone grasses and shrubs** has led to an increase in wildfires in Hawai'i. 98% of wildfires in Hawai'i are human caused and the threat to communities is high year-round. **In addition to the utility's own wildfire mitigation plans, we have joined with community members and wildfire collaborators to help prevent and mitigate wildfires in known hot spots across our service areas**. As members of the Wai'anae Wildfire Hui in West O'ahu and Pacific Fire Exchange on Maui, we meet monthly to share ideas and discuss priority projects. **We support the Hawai'i Wildfire Management Organization** on Hawai'i Island, which works with communities across the state on wildfire planning, prevention and mitigation activities. By raising awareness, implementing key land management practices and collaborating on projects, these organizations are working to reduce the wildfire risk in Hawai'i and build strong, resilient communities.

143.    Yet the Hawaii Wildfire Management Organization recommended reduction of fuels, such as grasses and shrubs.  The group produced a report entitled, "Collaborative Landscape-Level Approach to Reduce Wildfire Hazard Across Hawaii:  2018-19 Vegetation Management—

Rapid Mapping Assessment and Collaborative Action Planning—Maui Report."[55]  That report was a product of the Collaborative Action Planning Workshop, in which private companies, nonprofit organizations, landowners, and various fire research organizations identified numerous maintenance actions needed to reduce the spread of wildfires.  The recommendations included:

> Above ground power lines are vulnerable to wildfire and can even provide the ignition (sparks) that could start a wildfire, particularly in windy or stormy conditions.  There are long-term solutions for reducing power line related wildfire hazards such as infrastructure upgrades.  More **immediate solutions include fuels reduction and firebreaks around power infrastructure** in "hotspot" areas whichever the source of ignition.

144.     Indeed, the Resiliency Working Group for Integrated Grid Planning for Hawaiian Electric, described above, Hawaiian Electric recognized with community members that dry invasive grasses were a primary cause of wildfire risk on Maui.  Its April 29, 2020 Report noted, at page 35:

> The frequency and impacts of wildfires have increased recently. This may be attributable in some parts of the islands to the decline of the sugarcane industry. Sugarcane enterprises historically managed wildfire risks on the islands, including responding to fires. However, today these areas present vast amounts of vegetation that can burn longer and with less ability and resources to control them.

The Report noted further:  "Maui presents unique wildfire risks.  Risk is highest along the saddle road due in part to existence of an invasive grass species prone to drying out."

145.     Yet contrary to its statements suggesting that its wildfire mitigation planning aligned with the recommendations and concerns of community organizations, Hawaiian Electric held as a matter of policy that the vegetation in wildfire areas required no special attention or additional mitigation efforts.  As noted above, it stated that "the type of vegetation in the Hawaii wildfire areas are primarily grasses, shrubs, and few trees, which rarely grow into conductors," so "it is not recommended that vegetation management plans be adjusted in the wildfire areas."

---

[55] Hawai'i Wildfire Management Organization, *A Collaborative, Landscape-Level Approach to Reduce Wildfire Hazard Across Hawai'i* (June 30, 2019), https://static1.squarespace.com/static/5254fbe2e4b04bbc53b57821/t/5dbf80628fc82a626b9dc2e2/1572831359536/Kaua%CA%BBi_compressed.pdf.

146.    The Company also held a policy, stated in its Wildfire Mitigation Plan, that it would not deenergize power lines in the event of a red-flag event.  The practice of deenergizing power lines during fire weather conditions is commonplace in the Western United States.  California utilities, such as Southern California Edison Company, Pacific Gas & Electric, and San Diego Gas & Electric, all have implemented Public Safety Power Shutoffs ("PSPS") during Red Flag and High Wind conditions.  These utilities have been using PSPS for years to prevent wildfires.  The practice is broadly recommended, and would have been recommended by consultants and community groups, including Hawai'i Wildfire Management Organization.

**D.    HEI Misled Investors To Believe That It Prioritized Safety Over Customer Convenience, When In Fact, As an Objective Matter of Written Policy, It Prioritized Customer Convenience**

147.    Finally, during the Class Period, Defendants repeatedly misled investors to believe that the Company's policies prioritized safety over other considerations, such as customer convenience, when in fact, as a matter of written policy, Hawaiian Electric prioritized customer convenience.

148.    For example, on September 15, 2020, HEI released its first ESG report (the "2019 ESG Report").  The 2019 ESG Report stated, in relevant part:  "Safety is our number one priority at Hawaiian Electric."  Likewise, the 2020 10-K stated:  "Hawaiian Electric is committed to maintaining a strong safety culture.  Due to the nature of its operations, safety is of paramount importance."

149.    Yet as a matter of written policies, safety was not Hawaiian Electric's "number one priority."  The Company's Wildfire Mitigation Plan set forth its policy of not "preemptively turning off circuits," despite the fact that such deenergizing was the safest reasonable policy to prevent wildfires, because the policy "was not well received by certain customers affected."

150.    Also, according to the May 12, 2020 audit of Hawaiian Electric requested by Hawaii's PUC, the Company underspent its budgets for vegetation management and failed to complete its planned wildfire mitigation programs for years.  The audit stated:

Vegetation Management has not been able to complete its planned mitigation programs over the last few years and has underspent its budgets.

151.    Importantly, the audit found that "its yearly spending [was] curtailed in order to counter overspends elsewhere to meet the overall budget in Energy Delivery."  The May 12, 2020 audit also found that the Company was not sufficiently tracking safety risks, but rather prioritizing cost, and recommended "that the Company reviews the current risk heat map to ensure that it reflects a more holistic view of risks, including material Operational risks, not just financial risks."

## VI.    AUGUST 8, 2023 LAHAIANA WILDFIRE DISASTER

152.    The heightened risk of catastrophic wildfires caused by uninsulated wires, outdated poles, and unmanaged vegetation—a heightened risk that Hawaiian Electric's misstatements and omissions had concealed by repeatedly assuring the public it had mitigated the risk—tragically materialized in part on August 8, 2023 in the Lahaina wildfire disaster.

153.    On August 3, 2023, the National Weather Service ("NWS") began warning of dangerous fire conditions in Hawaii due in part to the approach of Hurricane Dora.

154.    On August 7 and 8, 2023, High Wind and Red Flag warnings for portions of the Hawaiian Islands, including West Maui, were issued by the weather service and extensively reported across media outlets.[56]  Per NWS, a Red Flag Warning "means that critical fire weather conditions are either occurring now or will shortly.  A combination of strong winds, low relative humidity, and warm temperatures can contribute to extreme fire behavior."

155.    On Monday, August 7, 2023, NWS issued an updated warning for the Hawaiian Islands, as reported in The Maui News.  This warning contained both a High Wind Watch and a Fire Warning for the leeward portions of the State, which included Lahaina.    The warning

---

[56] Michael Biesecker, Bernard Condon, & Jennifer McDermott, *Videos put scrutiny on downed power lines as possible cause of deadly Maui wildfires*, Associated Press (Aug. 16, 2023, 8:44 AM), https://apnews.com/article/hawaii-wildfires-maui-electricity-power-utilities-c46a106db3c5019ac835ddcb01fde25f.

cautioned that damaging winds could blow down power lines and that any fires that developed would likely spread rapidly.[57]

156.     On August 8, 2023, as predicted by numerous forecast warnings, power lines fell near one of the flammable fields above Lahaina's historic downtown, whipping fire down the hills, in a sequence of events that would lead to one of the deadliest wildfires in U.S. history (the "August 8, 2023 Wildfire").[58]  As determined by the ATF and MFD Reports, the fire "originated at Utility Pole 25" located on Lahainaluna Road after strain and displacement of conductors from the breaking of Utility Pole 7A—which broke due to severe termite damage—caused the failure of the utility equipment at the top of Pole 25, arcing and severing of the energized overhead powerline, which resulted in the ejection of molten metallic material and resulted in "sparks" cascading down to the "dried and overgrown" vegetation below.[59]  "Severing of the energized overhead powerline resulted in the ignition of vegetation, in the form of short grass between Utility Poles 25 and 24."[60]

157.     The initial fire was reported around 6:37 a.m. on August 8, 2023 near Lahainaluna Road, more than a mile above Lahaina's central business district.  Authorities ordered evacuations minutes later, at 6:40 a.m., in the area surrounding Lahaina Intermediate School and closed Lahainaluna Road between Kelawea Street and Kuialua Street.[61]

---

[57] *National Weather Service issues high wind watch, fire warning in effect through late Tuesday*, Maui News (Aug. 7, 2023), https://www.mauinews.com/news/local-news/2023/08/national-weather-service-issues-high-wind-watch-fire-warning-in-effect-through-late-tuesday/.

[58] Imogen Piper, *et al.*, *Maui's Neglected Grasslands Caused Lahaina Fire to Grow With Deadly Speed*, Wash. Post (Sept. 2, 2023), https://www.washingtonpost.com/investigations/interactive/2023/lahaina-wildfires-invasive-grass-destruction/.

[59] ATF Report at 65.

[60] *Id.*

[61] *Fire crews battling brush fire in Lahaina; residents in area evacuated*, Maui Now, (Aug 8, 2023, 8:13 AM), https://mauinow.com/2023/08/08/haleakala-highway-closure-due-to-brush-fire-evacuation-of-kula-200-off-auli%CA%BBi-dr/;
Serge F. Kovaleski & Mike Baker, *Lahaina Inferno Began After Firefighters Departed a 'Contained' Scene*, N.Y. Times (Aug. 23, 2023), https://www.nytimes.com/2023/08/23/us/hawaii-maui-lahaina-fire-contained.html.

158.    At 6:37 a.m., local resident Shane Treu took a video of the brush fire, which was near his home on Lahainaluna road in Lahaina, not far from a Maui Electric substation.  Video images show that flames broke out in the vicinity of a broken power line operated by Hawaiian Electric.

159.    Treu says he saw a wooden power pole snap with a spark, with the line falling to the dry grass below and quickly igniting a row of flames.

160.    The fire was already sweeping through dry grass, as firefighters arrived on the scene, and had grown serious enough that some residents were evacuated through thick smoke.[62] Power outages negatively impacted the ability of fire crews to pump water, so authorities asked the public to conserve water in West Maui.  The authorities kept Lahainaluna Road closed between Kelawea and Kuialua Streets, while Hawaiian Electric responded to a downed power line in the area.[63]

161.    Despite initial efforts to put the fire out, residents said that the fire reemerged along the edge of the neighborhood and began rapidly churning down the hillside.  Although fire crews raced back to the scene, the flames were well beyond containment with winds pushing the fire toward the dense residential neighborhoods below.[64]

162.    Treu's neighbor, Robert Arconado, also took videos.  His footage starts at 6:48 a.m. He has confirmed that around 2:00 p.m. the same area had reignited.  A video he filmed at 3:06 p.m. shows smoke and embers being carried toward town as howling winds continued to lash

---

[62] Michael Biesecker, Bernard Condon, & Jennifer McDermott, *Videos put scrutiny on downed power lines as possible cause of deadly Maui wildfires*, Associated Press (Aug. 16, 2023, 8:44 AM), https://apnews.com/article/hawaii-wildfires-maui-electricity-power-utilities-c46a106db3c5019ac835ddcb01fde25f.

[63] *Lahaina fire declared 100% contained; water conversation urged due to power outages*, Maui Now (Aug. 8, 2023, 9:55 AM), https://mauinow.com/2023/08/08/haleakala-highway-closure-due-to-brush-fire-evacuation-of-kula-200-off-auli%CA%BBi-dr/.

[64] Serge F. Kovaleski & Mike Baker, *Lahaina Inferno Began After Firefighters Departed a 'Contained' Scene*, N.Y. Times (Aug. 23, 2023), https://www.nytimes.com/2023/08/23/us/hawaii-maui-lahaina-fire-contained.html.

the island. Arconado continued to film for hours, as towering pillars of flame and smoke billowed from the neighborhoods downhill, forcing people to jump into the ocean to escape.

163.    Hawaiian Electric admitted in a press release on August 27, 2023 that sparks on dry grasses from downed power lines appears to have been the cause of the fire that morning.[65]  The Company stated, "A fire at 6:30 a.m. . . . appears to have been caused by power lines that fell in high winds."  As noted above, the same fire reemerged later in the day and caused the wildfire disaster.

164.    While Hawaiian Electric initially claimed that power to Lahaina was deenergized shortly before 7:00 a.m. on August 8, 2023, after the first fire, and was never reenergized, FE4 stated that a troubleman who was on duty during the Lahaina fire told FE4 that one of the three transmission lines was still energized after 7:00 a.m. on August 8, 2023.   FE4 also confirmed that "it was the same brush fire from the morning of August 8, 2023 that reignited later in the day, shortly after the firefighters left the area."

165.    The Google Earth map image below depicts the location where the August 8, 2023 Wildfire reportedly started.  One of the Hawaiian Electric power substations is located near where



---

[65] HECO, *Hawaiian Electric provides update on Lahaina fires, response* (Aug. 27. 2023), https://www.hawaiianelectric.com/documents/about_us/news/2023/20230827_lahaina_fires_update.pdf.

both the initial three-acre fire started and where authorities reported a downed power line early on August 8, 2023.

166.   The image below is an aerial view of the area:



167.   *Hawaii News Now* reported that "[m]ore than 30 downed power poles" were "reported on Maui" on August 8, 2023.[66]

168.   *Maui Now* reported that Hawaiian Electric was working to restore power to 12,400 customers and reminded residents that they should assume a downed power line "is energized and dangerous."   The same article included depictions of downed, leaning, and/or damaged power poles, many touching vegetation below them.[67]

---

[66] Kiana Kalahele, *More than 30 downed power poles reported on Maui; thousands without power*, Hawaii News Now (Aug. 8, 2023, 10:32 PM), https://www.hawaiinewsnow.com/2023/08/08/strong-winds-knock-out-power-thousands-statewide/.

[67] *High winds result in power outages to thousands in West Maui, Olinda Piʻiholo*, Maui Now, (Aug. 10, 2023), https://mauinow.com/2023/08/08/high-winds-result-in-power-outages-in-west-maui-olinda-pi%CA%BBiholo-and-moloka%CA%BBi/.

169.    The August 8, 2023 Wildfire resulted in the destruction of the historic town of Lahaina.  The wildfire killed at least 101 people.

170.    On August 2, 2024, HECO, HEI, the State of Hawaiʻi, the County of Maui, Kamehameha Schools, West Maui Land Co., Hawaiian Telcom and Spectrum/Charter Communications announced a proposed settlement of civil tort claims arising from the Lahaina fire collectively for over $4 billion, half ($1.99 billion) contributed by HEI and Hawaiian Electric, including 450 lawsuits filed by individuals, businesses and insurance companies in state and federal courts.

**VII.    LOSS CAUSATION**

171.    In news of the August 8, 2023 Lahaina wildfire, and in news emerging in the following days, weeks and months, on August 9, 12, 15-22, 25, and September 5, 2023, revealing the full scope of its consequences, the heightened risk of wildfire, and its attendant liabilities—that Hawaiian Electric had concealed from investors—materialized, and the truths about Hawaiian Electric's operations that it had obscured were revealed.

**A.    August 8-9, 2023.**

172.    On August 8 and 9, 2023, numerous news sources reported the devastating Lahaina wildfire and related wildfires.  For example, local news source KITV4 Island quoted Hawaiian Electric as a source that "[a]pproximately 12,400 Hawaiian Electric customers in West Maui are without power as crews work to repair about 30 downed power poles and multiple spans of power lines in various areas[.]"  The report also included a link to Hawaiian Electric's outage map for the county and a Hawaiian Electric tweet showing a photo of a destroyed electric pole, warning that customers may experience "possible overnight outages."

173.    On the same day, in a statement quoted by local news source Maui Now, Hawaiian Electric spokesperson Shayna Decker stated the Company was "responding to Maui communities affected by the outages, active wildfires, and sustained high wind damage . . . .  We continue to actively monitor the fluid wildfire situation and will move our restoration efforts to other areas if

and as they become safe and accessible.  We appreciate the continued understanding and ask customers to please prepare for possible extended outages as we conduct damage assessments and make extensive repairs."  On August 9, 2023, local news source KRON4 quoted Hawaiian State Senator Lynn Decoite as saying "[d]ue to some areas that electric is down, there is a hard time getting connections with [Maui Emergency Management Authority] would [sic] have emergency center set up."  The State Senator's quote for the first time indicated the materialization of the risk that Hawaiian Electric's unprepared infrastructure would hamper emergency response efforts, which could contribute to additional liability.

174.    The August 8, 2023 Wildfire was a materialization of the heightened risk of wildfires caused by uninsulated wires, outdated poles, and unmanaged vegetation, a heightened risk that Hawaiian Electric's misstatements and omissions had concealed.

175.    On this news and related news stories, HEI's stock price fell $1.78 per share, or 4.76%, to close at $35.58 per share on August 8, 2023, and $2.61 per share, or 7.38%, to close at $32.77 per share on August 10, 2023.

**B.    August 12, 2023.**

176.    On August 12, 2023, news outlets began reporting that Hawaiian Electric's wildfire mitigation had been inadequate.  For example, the *Washington Post* stated, in relevant part:

> Four days before fast-moving brush fires engulfed parts of Maui, weather forecasters warned authorities that powerful wind gusts would trigger dangerous fire conditions across much of the island and Hawaii.
>
> The state's electric utility responded with some preemptive steps but did not use what is widely regarded as the most aggressive but effective safety measure: shutting down the power.
>
> Hawaiian Electric, the utility that oversees Maui Electric and provides service to 95 percent of the state's residents, did not deploy what's known as a "public power shutoff plan," which involves intentionally cutting off electricity to areas where big wind events could spark fires. A number of states, including California, have increasingly adopted this safety strategy after what were then the nation's most destructive and deadliest modern fires, in 2017 and 2018.
>
> Hawaiian Electric was aware that a power shut-off was an effective strategy, documents show, but had not adopted it as part of its fire mitigation plans, according to the company and two former power and energy officials interviewed

61
SECOND AMENDED COMPLAINT

by The Washington Post. Nor, in the face of predicted dangerous winds, did it act on its own, utility officials said, fearing uncertain consequences.

The decision to avoid shutting off power is reflective of the utility's struggles to bolster its aging and vulnerable infrastructure against wildfires, said Jennifer Potter, who lives in Lahaina and was a member of the Hawaii Public Utilities Commission until just nine months ago.

"They were not as proactive as they should have been," Potter said about Hawaiian Electric's fire-prevention planning, adding that there had not been any real meaningful action to "address some of those inadequacies in terms of wildfire."

Doug McLeod, a former energy commissioner for Maui County, also said the utility was aware of the need for a regular shut-down system and to bury lines, especially given the "number of close calls in the past."

Earlier this week, high winds caused widespread damage to utility infrastructure. The intense gusts knocked down about 30 utility poles across the region, many onto trees and roads, complicating evacuations, according to Maui County Mayor Richard Bissen. He confirmed that some electrical lines were energized when they hit the ground.

177.    This news was a partial revelation that Hawaiian Electric's statements about its wildfire mitigation efforts were false and misleading.  The news was also a materialization of a risk of liability attendant to the heightened risk of wildfires caused by uninsulated wires, outdated poles, and unmanaged vegetation, a heightened risk that Hawaiian Electric's misstatements and omissions had concealed.

178.    On this news, HEI's stock price fell $10.94 per share, or 33.76%, to close at $21.46 per share on August 14, 2023.

**C.    August 15, 2023.**

179.    On August 15, 2023, the ratings agency S&P Global downgraded HEI to a rating of BB0, stating that the risk of legal and regulatory risks jeopardize the Company's credit rating.

180.    This downgrade was a materialization of a risk attendant to the heightened risk of wildfires caused by uninsulated wires, outdated poles, and unmanaged vegetation, a heightened risk that Hawaiian Electric's misstatements and omissions had concealed.  The downgrade was a materialization of a concealed heightened risk that the Company would have credit problems.

181.    On this news, HEI's stock price fell $6.67 per share, or 31.08%, to close at $14.79 per share on August 15, 2023.

**D.    August 16, 2023.**

182.    Then, on August 16, 2023, the *WSJ* published an article entitled "Hawaiian Electric Is in Talks With Restructuring Firms."  The article stated, in relevant part:

> Hawaiian Electric is speaking with firms that specialize in restructuring advisory work, exploring options to address the electric utility's financial and legal challenges arising from the Maui wildfires, said people familiar with the matter.

> Hawaiian Electric is facing a selloff in its stock and bonds, and has been hit with lawsuits alleging that its actions both before and during the wildfires exacerbated the devastation Maui residents have suffered.

> The company is in discussions over the strategies it can pursue and to determine whether it needs to hire legal and financial advisers, the people said.

> On Thursday evening, a day after the publication of this report, a company spokesperson said: "Like any company in this situation would do, and as we do in the normal course of business, we are seeking advice from experts—the goal is not to restructure the company but to endure as a financially strong utility that Maui and this state need."

> More customer lawsuits are expected in coming weeks to increase the costs of defending and settling claims for Hawaiian Electric just as its access to financing is being threatened.

> S&P Global Ratings downgraded Hawaiian Electric's credit rating to junk on Tuesday, saying the wildfires destroyed a significant segment of the company's customer base and will take many years to restore. S&P also said that wildfire lawsuits seeking compensation for injuries, deaths and property damage will weigh on the company's credit quality.

183.    This news of restructuring efforts was a materialization of a risk attendant to the heightened risk of wildfires caused by uninsulated wires, outdated poles, and unmanaged vegetation, a heightened risk that Hawaiian Electric's misstatements and omissions had concealed. The news was a materialization of a concealed heightened risk that the Company would have legal and financial problems.

**E.    August 17, 2023.**

184.    On August 17, 2023, the *WSJ* published an article entitled "Hawaiian Electric Knew of Wildfire Threat, but Waited Years to Act."  The article stated, in relevant part:

> During the 2019 wildfire season, one of the worst Maui had ever seen, Hawaiian Electric concluded that it needed to do far more to prevent its power lines from emitting sparks.

63
SECOND AMENDED COMPLAINT

The utility examined California's plans to reduce fires ignited by power lines, started flying drones over its territory and vowed to take steps to protect its equipment and its customers from the threat of fire.

Nearly four years later, the company has completed little such work. Between 2019 and 2022, it invested less than $245,000 on wildfire-specific projects on the island, regulatory filings show. It didn't seek state approval to raise rates to pay for broad wildfire-safety improvements until 2022, and has yet to receive it.

Now, the company is facing scrutiny, litigation and a financial crisis over indications that its power lines might have played a role in igniting the deadliest U.S. wildfire in more than a century. The blaze has caused at least 110 deaths, destroyed the historic town of Lahaina and resulted in an estimated billions of dollars in damage.

The fire's cause hasn't been determined, but mounting evidence suggests the utility's equipment was involved. One video taken by a resident shows a downed power line igniting dry grass along a road near Lahaina. A firm that monitors grid sensors reported dozens of electrical disruptions in the hours before the fire began, including one that coincided in time with video footage of a flash of light from power lines.

Hawaiian Electric said it would investigate any role its infrastructure may have played and cooperate with a separate probe into the fire launched last week by the Hawaii attorney general.

"We all believe it's important to understand what happened. And I think we all believe it's important to make sure it doesn't happen again," said Shelee Kimura, Hawaiian Electric's chief executive.

In response to questions about its wildfire-mitigation spending, a spokesman for Hawaiian Electric said the company reduces wildfire risk through its routine utility work, including trimming or removing trees and upgrading, replacing and inspecting equipment. It said it has spent about $84 million on maintenance and tree work in Maui County since 2018.

The utility has long been a force in Hawaii politics and business. In the wake of the fire, its finances are reeling. Its stock has plunged 49% this week, and its credit rating was downgraded to junk by S&P.

***

At the end of 2019, Hawaiian Electric issued a press release about wildfire risk. It said it would install heavier, insulated conductors on Maui and Oahu to minimize the risk of sparks when winds picked up, as well as technology to detect disruptions when the conductors came into contact with vegetation or each other. It said it would apply fire retardant on poles in risky areas and consider installing cameras and other devices to monitor weather conditions during fire season.

In filings over the next two years with the Hawaii Public Utilities Commission, which is tasked with approving utility projects and spending, the company made only passing reference to wildfire mitigation.

SECOND AMENDED COMPLAINT

185.    This news was a partial revelation that Hawaiian Electric's statements about its wildfire mitigation efforts were false and misleading.  The news was also a materialization of a risk of liability attendant to the heightened risk of wildfires caused by uninsulated wires, outdated poles, and unmanaged vegetation, a heightened risk that Hawaiian Electric's misstatements and omissions had concealed.

186.    Following publication of the *WSJ* articles, HEI's stock price fell $2.54 per share, or 17.43%, to close at $12.03 per share on August 17, 2023.

**F.    August 19, 2023 to August 21, 2023.**

187.    On Saturday, August 19, 2023, the *New York Times* issued a report with the headline "Hawaiian Electric Was Warned of Its System's Fragility Before Wildfire."   The report stated, in relevant part:

> Hawaiian Electric has known for years that extreme weather was becoming a bigger danger, but the company did little to strengthen its equipment and failed to adopt emergency plans used elsewhere, like being prepared to cut off power to prevent fires.
>
> Before the wildfire on Maui erupted on Aug. 8, killing more than 100 people, many parts of Hawaiian Electric's operations were showing signs of stress — and state lawmakers, consumer groups and county officials were saying that the company needed to make big changes.
>
> In 2019, Hawaiian Electric itself started citing the risk of fires. The company said that year that it was studying how utilities in California were dealing with similar threats.
>
> Two years later, in a report about Hurricane Lane in 2018, the Maui County government warned of the potential that "aboveground power lines that fail, short or are low-hanging can cause fire ignition (sparks) that could start a wildfire, particularly in windy or stormy conditions."
>
> But it wasn't until last year that the company asked state regulators to authorize it to spend $190 million to strengthen power poles and other equipment — a request that is still pending. Even when it is approved, the work will take several years to complete.
>
> Attention turned to the company after the emergence of a video recorded on Aug. 8 that appeared to show a power line in Lahaina throwing off sparks and igniting dry grass just hours before the fire devastated the city. In addition, data from sensors owned by a company called Whisker Labs appear to show major faults with the company's systems just as the wind picked up.

[. . . .]

Electric utilities in California have had to pay billions of dollars to fire victims in recent years. Hawaiian Electric might have to make big payouts, too. At least four lawsuits have been filed on behalf of Maui residents, and the company's shares and bond prices have plunged.

[ . . . . ]

[Michael Wara, a scholar focused on climate and energy policy at Stanford University] said that Hawaiian Electric could have established a power shut-off program in consultation with local authorities and emergency services. In California, after warning residents and local officials, utilities shut off power when high winds approach to reduce the chance that power lines will ignite fires.

Henry Curtis, executive director of Life of the Land, a Hawaii nonprofit group that represents consumers before the state Public Utilities Commission, said he "strongly supports" power shut-off programs. The utility, he said, has been dismissive of the idea.

"We've been raising climate change for more than two decades, and the utility has been really slow in dealing with it," Mr. Curtis said. "Certainly Hawaiian Electric knew that Lahaina was the most vulnerable place. They've known that for years."

188.    On Monday, August 21, 2023, Bank of America Global Research cut its price target on HEI from $10 to $8.50.  Bank of America Global Research noted that if utility was found liable for the wildfires, which they calculated could cost $5.4 billion, "we don't believe there would be any equity value" for shareholders.

189.    This news was a partial revelation that Hawaiian Electric's statements about its wildfire mitigation efforts were false and misleading.  The news was also a materialization of a risk of liability attendant to the heightened risk of wildfires caused by uninsulated wires, outdated poles, and unmanaged vegetation, a heightened risk that Hawaiian Electric's misstatements and omissions had concealed.

190.    Following the *New York Times* report and analyst report from Bank of America, on August 21, 2023, HEI's stock price fell $ 0.73 per share, or 5.30%, to close at $13.04 per share.

**G.    August 22-23, 2023.**

191.    On August 22, 2023, after trading, Hawaiian Electric announced that it was seeking advisory input from Guggenheim Securities, a company with experience in bankruptcy and restructuring.

192.    This further news of restructuring efforts was a materialization of a risk attendant to the heightened risk of wildfires caused by uninsulated wires, outdated poles, and unmanaged vegetation, a heightened risk that Hawaiian Electric's misstatements and omissions had concealed. The news was a materialization of a concealed heightened risk that the Company would face financial problems including possible restructuring and bankruptcy.

193.    On this news, on August 23, 2023, HEI's stock price fell $1.26 per share, or 9.42%, to close at $12.11 per share.

**H.    August 25, 2023.**

194.    On August 25, 2023, the *Washington Post* published an article titled "Hawaiian Electric may collapse after fires, forcing reckoning for utilities." The *Washington Post* wrote, in relevant part:

> The multibillion-dollar liabilities faced by Hawaiian Electric for the deadly wildfire in Maui—compounded by Maui County's lawsuit against the utility on Thursday—are reverberating through the electricity industry and are forcing a reckoning for power companies and their customers, nationwide.
>
> Hawaiian Electric, which serves nearly all of Hawaii's 1.4 million residents, is careening toward insolvency, much like Pacific Gas & Electric did in California in 2019. Investors in the company are scrambling to sell their shares, and bond rating agencies are downgrading the Hawaii utility's ratings because of its role in potentially causing or contributing to the most deadly U.S. wildfire in a century.
>
> [ . . . . ]
>
> In Hawaiian Electric's case, it did not power down its lines in advance of expected hurricane-force winds, a major focus of lawsuits filed against it by Maui County and other litigants.
>
> [ . . . . ]
>
> Hawaiian Electric is hardly an outlier in the power industry. Companies routinely put off acting on warnings of wildfire risk made by their own safety teams and government agencies. Like other companies, Hawaiian Electric did not follow through on recommendations to better fireproof systems. Nor did it follow the lead of California utilities implicated in tragic wildfires that have since installed technologies to stop the flow of electricity when extreme winds approach power lines vulnerable to ignition.
>
> [ . . . . ]
>
> The entire budget for "hardening" the grid against wildfires in Maui was $15 million.

"Even if this utility had done all that it proposed to do, Lahaina still would have burned down," said Michael Wara, an energy scholar at Stanford University's Woods Institute for the Environment. "The thing that would have kept people alive is a power shut-off program. The only costs involved are weather stations and paying people to interpret the data to determine when things should be shut off."

[. . . . ]

The problem, he said, is regulators and company executives in too many parts of the country are still gambling that fires won't come their way. In Maui, a place more frequently associated with hurricanes and cyclones, wildfire protection appeared to rank low on the utility's priority list.

"It is pretty clear just looking at the public record that the utility had identified wildfire as one of the risks they needed to manage," said Doug McLeod, the former energy commissioner in Maui. "There was some amount of argument being made that the risk was lower in Hawaii because we had no lightning. In hindsight, it is clear the risk was quite high."

195.    This news provided new information that Hawaiian Electric's decision not to de-energize the power lines would be a significant source of liability, that Hawaiian Electric was out-of-step with other energy companies in preventing wildfires, and that Hawaiian Electric was headed towards insolvency.

196.    This news was a partial revelation that Hawaiian Electric's statements about its wildfire mitigation efforts were false and misleading.  The news was also a materialization of a risk of liability attendant to the heightened risk of wildfires caused by uninsulated wires, outdated poles, and unmanaged vegetation, a heightened risk that Hawaiian Electric's misstatements and omissions had concealed.

197.    On this news, on August 25, 2023, HEI's stock price fell $2.20 per share, or 18.55%, to close at $9.66 per share.

**I.    September 5, 2023.**

198.    On September 5, 2023, the Hawaiian Public Utilities Commission ordered a moratorium on service disconnections by Hawaiian Electric through October 17, recognizing the financial hardship caused by the wildfires.  This news showed that Hawaiian Electric's unprepared infrastructure and policies would so damage its own customer base that it would be limited in its

ability to pursue collections, at a time when credit was tightening, the costs of repairs were high, and it was facing multibillion-dollar lawsuits.

199.    The news was a materialization of a risk of liability attendant to the heightened risk of wildfires caused by uninsulated wires, outdated poles, and unmanaged vegetation, a heightened risk that Hawaiian Electric's misstatements and omissions had concealed.

200.    On this news, on September 5, 2023, HEI's stock price fell $2.63 per share, or 17.48%, to close at $12.42 per share.

201.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## VIII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS[68]

### A.    Defendants' False and Misleading Statements in 2019

202.    The Class Period begins on February 28, 2019, when HEI filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by Defendants Lau and Hazelton. In discussing the Company's compliance with environmental regulations, the 2018 10-K stated, in relevant part:

> Hawaiian Electric, Hawaii Electric Light and Maui Electric [the "Utilities"], like other utilities, are subject to periodic inspections by federal, state and, in some cases, local environmental regulatory agencies, including agencies responsible for the regulation of water quality, air quality, hazardous and other waste and hazardous materials. These inspections may result in the identification of items needing corrective or other action. Except as otherwise disclosed in this report [. . .], **the Company believes that each subsidiary has appropriately responded to environmental conditions requiring action and that, as a result of such actions, such environmental conditions will not have a material adverse effect on the Company or Hawaiian Electric**.

203.    The above statements were materially false and misleading because the Company knew of environmental conditions, including dry vegetation, outdated poles, and conductor wires

in need of replacement, that required action and that could have a material adverse effect on the Company, but did not "respond[]" to fix these dangerous conditions, as evidenced by, *inter alia*:

a) Multiple witnesses and reports concerning the Company's wildfire mitigation practices prior to and throughout the Class Period indicated the primary consideration for the Company's decisions to not trim vegetation further was not safety, but cost, as confirmed by the Company's *own* Wildfire Mitigation Plan, which stated it was *against* "replacing existing overhead conductors with insulated conductors such as tree wire . . . .";

b) A May 12, 2020 PUC audit report on Hawaiian Electric found with respect to Vegetation Management, that the Company had not completed its planned mitigation programs and had underspent its budget ***for years***, increasing hazards;

c) FE4 and FE2 both confirmed that Hawaiian Electric did not remove hazard trees outside the right of way of the utilities;

d) The MFD Report concluded, *inter alia*, that "[t]he origin of the fire was ***the overgrown vegetation at and surrounding utility pole 25 off of Lahainaluna Road,*** " as established through multiple witness statements, photographic and videographic evidence;

e) The ATF Report concluded, "Witness statements, witness videos, witness photographs, [redacted] examination, and fire scene examination, all supported a cause of the fire being . . . The ignition of dried and ***overgrown vegetation below Utility Pole 25***;

f) FE2 also said that despite Hawaiian Electric's 2019 press release saying they were going to install insulated wires in Lahaina, most of the power lines were not insulated when FE2 left the company in May 2021, and that poles 24 and 25 were not insulated;

g) FE1 reported that the large wooden poles used were largely uninsulated, leaning, and nearing the end of their lifespan and are strung with vegetation over miles of rugged terrain where at least some poles during the Class Period were not merely nearing the end of their lifespan, but had reached it and needed to be replaced;

h) According to FE4, "there was a significant amount of poles that needed to be replaced . . . percentage wise" on the West side of Maui, including "leaning" poles and "rotten" poles. FE4 also noted that FE4 turned in poles that needed replacement, and even created a spreadsheet that they "never did anything with," and by the time of the August 2023 fire, they still weren't replaced.  FE4 estimates that there were "at least 100" poles FE4 documented that needed replacement, and "probably more than that;"

i) According to Shelee Kimura, at least sixty percent of the utility poles on West Maui were unable to withstand the weather events; and

j) Apo testified that his investigation showed that the wooden pole, which was ***laden with telecommunications and electrical lines***, should have been strong enough to withstand the prevailing winds, but was ***riddled with termite damage.***

204.    On November 5, 2019, Hawaiian Electric issued a press release in which it stated that it was conducting "drone surveys across their five-island territory to identify areas vulnerable to wildfire," and explained that "[t]hese aerial inspections are part of the companies' **proactive assessment and management of vegetation** near their electrical infrastructure, especially **in** drought-prone or **dry brush areas**."  The press release also stated:

> Hawaiian Electric, Maui Electric and Hawaiʻi Electric Light earlier this year evaluated the wildfire mitigation plans filed by the major utilities in California and studied Hawaiʻi fire ignition maps to determine where the greatest risks are and to provide a basis for planning. Unlike California, many utility lines in Hawaiʻi run through tropical forests and areas that typically receive abundant rainfall. That makes it easier to **concentrate on mapping drought-prone areas where sparks could ignite dry grass and brush beneath power lines**.

205.    The statements above were materially false and misleading because the Company's actual policy, as stated in its Wildfire Mitigation Plan, was against "proactive . . . management" of vegetation in dry grass and brush areas, as it recommended against trimming of low-lying vegetation and creating fire breaks due to their purported cost inefficiency, and Defendants did not trim low-lying vegetation.

206.   On November 6, 2019, Hawaiian Electric posted a video on YouTube titled "Committed to Wildfire Mitigation."   In discussing the Company's mitigation and resilience initiatives, the video stated, in relevant part:

> The Hawaiian Electric Companies use drone, or unmanned aircraft system, surveys to **assess drought-prone or dry brush areas especially near electrical infrastructure**.  **Other resilience initiatives such as installing heavier, insulated conductors and applying fire retardants on poles are also done as part of our proactive plan to reduce risks of wildfires.**[69]

207.   The statements above were materially false and misleading because:   (1) the statement gave the misleading impression that the Company was "assess[ing] drought-prone or dry brush areas especially near electrical infrastructure" in order to proactively reduce the dry brush in those areas, when in fact, the Company's actual policy, as stated in its Wildfire Mitigation Plan, was against "proactive" management of vegetation in dry grass and brush areas, as it recommended against trimming of low-lying vegetation and creating fire breaks due to their purported cost inefficiency; and (2) the Company told at best a half-truth in stating that "installing heavier, insulated conductors . . .  [is] done as part of our proactive plan to reduce risks of wildfires," because in fact, the Company's wildfire mitigation program declined to take recommended mitigation steps to address conductor wires.

208.   On December 19, 2019, Hawaiian Electric issued a press release titled "Jan. 2 – Feb. 10: Maui Electric upgrading poles, insulated power lines along Lahainaluna Road."   In discussing the Company's efforts in maintaining its utility poles along Lahainaluna Road in West Maui, the press release stated, in relevant part:

> **Maui Electric Company will be upgrading utility poles and installing insulated power lines along Lahainaluna Road in West Maui** from Thursday, Jan. 2 to Monday, Feb. 10, from 8:30 a.m. to 2 p.m.  The work is part of continued efforts to

---

[69] Hawaiian Electric, *Committed to Wildfire Mitigation*, YouTube (Nov. 6, 2019), https://www.youtube.com/watch?v=I-f8ro9Lumk.

make the island's electrical grid more resilient while also enabling more private residential rooftop solar to be installed on the island.[70]

209.    The statements above were materially false and misleading because:  (1) the Company did not "upgrad[e] utility poles and install[] insulated power lines along Lahainaluna Road in West Maui," because the power line along Lahainaluna Road in West Maui where the August 8, 20203 Lahaina wildfire disaster started were not upgraded or insulated.

## B.    Defendants' False and Misleading Statements in 2020

210.    On February 28, 2020, HEI filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2019 (the "2019 10-K").  The 2019 10-K was signed by Defendants Lau, Seu (as President and CEO of HECO), Hazelton and Ito.   In discussing the Company's compliance with environmental regulations, the 2019 10-K stated, in relevant part:

> Hawaiian Electric, Hawaii Electric Light and Maui Electric, like other utilities, are subject to periodic inspections by federal, state and, in some cases, local environmental regulatory agencies, including agencies responsible for the regulation of water quality, air quality, hazardous and other waste and hazardous materials. These inspections may result in the identification of items needing corrective or other action. Except as otherwise disclosed in this report (see "Risk Factors" in Item 1A, and Notes 1 and 3 of the Consolidated Financial Statements, which are incorporated herein by reference), **the Utilities believe that each subsidiary has appropriately responded to environmental conditions**.

211.    The statements above were materially false and misleading because the Company knew that it had not responded appropriately to environmental conditions needing action, including dry vegetation, outdated poles, and conductor wires in need of replacement.

212.    In discussing the Company's environmental, social and governance ("ESG") risks and opportunities, the 2019 10-K stated, in relevant part:

---

[70] Hawaiian Electric, *Jan. 2 – Feb. 10: Maui Electric upgrading poles, insulated power lines along Lahainaluna Road*, Press Release (Dec. 19, 2019), https://www.hawaiianelectric.com/documents/about_us/news/2019_maui_electric/20191219_maui_electric_maui_electric_installs_new_insulated_lines_along_lahainaluna.pdf.

The [Hawaiian Electric] Board of Directors is responsible for the oversight of **the Company's enterprise risk management (ERM) programs, which are designed to address all material risks** and opportunities, **including ESG considerations**.

213.    The statements above were materially false and misleading because the Company knew that its wildfire mitigation program did not adequately address all material risks for wildfires—the Company's program declined to take recommended mitigation steps to address dry vegetation, outdated poles, conductor wires, and deenergizing power lines during red-flag events. Accordingly, the Company's risk management programs were not "designed to address all material risks."

214.    On June 1, 2020, Hawaiian Electric posted a video on YouTube titled "Critical Resilience Work Resumes." In discussing the Company's mitigation and resilience initiatives, the video stated, in relevant part:

> **We have an ongoing maintenance program that, um, where we identify poles that need attention and that could be upgrades or replacement. And that's something that our crews, I would say that's 90% of our work. And we'll go, we'll, we'll identify the poles that need, um, attention and we'll schedule our crews to either upgrade them, change out equipment, cross arms, um, rusted boats or, um, damage insulators. But majority of, of our jobs is we replace, suppose entirely. It happens year round, but we step it up during, you know, the months between June and November, I mean, in preparation for upcoming storms, if they should arise.** Covid is interesting. It's been a challenge for us, but the crew's been very flexible. They understand that we are essential workers and we need to be here. So we just, everybody's been doing their part to, um, to get through this.[71]

215.    The statements above were materially false and misleading because:  (1) the Company did not have an effective "ongoing maintenance program . . . where [it] identif[ied] poles that need attention and that could be upgrades or replacement" and then routinely replaced them, as it was in fact far behind schedule at all relevant times in upgrading and replacing poles, conductor wire, and maintaining vegetation in a safe state.

---

[71] Hawaiian Electric, *Critical Resilience Work Resumes*, YouTube (June 1, 2020), https://www.youtube.com/watch?v=2tOOlAlS3xc.

216.    On September 15, 2020, HEI released its first ESG report (the "2019 ESG Report"), with an introductory message from Defendant Lau endorsing and presenting the report.  The 2019 ESG Report stated, in relevant part:

> **Safety is our number one priority at Hawaiian Electric**. Our goal is to provide a safe and healthy work environment, where every employee makes safety a central part of his or her job.
>
> Our safety commitment is to provide and support:
>
> - Managerial responsibility for health and safety issues
> - Procedures for hazard identification and safety risk assessment
> - Operating health and safety guidelines, procedures, and policies
> - **Emergency planning and preparedness procedures**
> - Safety performance monitoring, measurement, and reporting
> - Internal and external health and safety audits

217.    The statements above were materially false and misleading because, as a matter of written policies, safety was not always Hawaiian Electric's "number one priority."  The Company's Wildfire Mitigation Plan set forth its policy of not "preemptively turning off circuits," despite the fact that such deenergizing was the safest reasonable policy to prevent wildfires, because the policy "was not well received by certain customers affected."  Also, the Company underspent its budgets for vegetation management and failed to complete its planned wildfire mitigation programs for years because "its yearly spending [was] curtailed in order to counter overspends elsewhere to meet the overall budget in Energy Delivery," according to a PUC audit.

C.    **Defendants' False and Misleading Statements in 2021**

218.    On February 26, 2021, HEI filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2020 (the "2020 10-K").  The 2020 10-K was signed by Defendants Lau, Seu (as President and CEO of HECO), Hazelton and Ito.   In discussing the Company's compliance with environmental regulations, the 2020 10-K stated, in relevant part:

Hawaiian Electric, Hawaii Electric Light and Maui Electric, like other utilities, are subject to periodic inspections by federal, state and, in some cases, local environmental regulatory agencies, including agencies responsible for the regulation of water quality, air quality, hazardous and other waste and hazardous materials. These inspections may result in the identification of items needing corrective or other action. Except as otherwise disclosed in this report (see "Risk Factors" in Item 1A, and Notes 1 and 3 of the Consolidated Financial Statements), **the Utilities believe that each subsidiary has appropriately responded to environmental conditions requiring action and that, as a result of such actions, such environmental conditions will not have a material adverse effect on the capital expenditures, earnings and competitive position of the Utilities**.

219.    The statements above were materially false and misleading because the Company knew of environmental conditions, including dry vegetation, outdated poles, conductor wires in need of replacement, that required action and that could have a material adverse effect on the Company.

220.    The 2020 10-K also stated:

**Hawaiian Electric is committed to maintaining a strong safety culture. Due to the nature of its operations, safety is of paramount importance**.

221.    The statements in above were materially false and misleading because, as a matter of written policies, safety was not always "of paramount importance" to Hawaiian Electric.  The Company's Wildfire Mitigation Plan set forth its policy of not "preemptively turning off circuits," despite the fact that such deenergizing was the safest reasonable policy to prevent wildfires, because the policy "was not well received by certain customers affected."  Also, the Company underspent its budgets for vegetation management and failed to complete its planned wildfire mitigation programs for years because "its yearly spending [was] curtailed in order to counter overspends elsewhere to meet the overall budget in Energy Delivery," according to a PUC audit.

222.    On April 22, 2021, HEI issued a consolidated ESG report (the "2020 ESG Report"), with an introductory message from Defendant Lau endorsing and presenting the report.   The 2020 ESG Report stated in relevant part:

**We continually maintain and upgrade our transmission and distribution system** to ensure seamless delivery of power to our customers.   Day-to-day maintenance is a key part of keeping the grid resilient.   **We regularly inspect our poles, lines, and other equipment, and work to replace and upgrade aging and faulty equipment before failures happen**.   We regularly trim the vegetation

**around our equipment**, as many power outages during high winds and storms are due to tree branches or other vegetation falling onto power lines.

223.    The statements above were materially false and misleading because:  (1) the Company did not "continually maintain and upgrade [its] transmission and distribution system" as it was in fact far behind schedule at all relevant times in upgrading and replacing poles, conductor wire, and maintaining vegetation in a safe state; (2) the Company told at best only a half-truth in stating that it "regularly inspect[s its] poles, lines and other equipment" and that it "work[s] to replace and upgrade aging and faulty equipment before failures happen" because in fact the Company was far behind schedule at all relevant times in upgrading and replacing poles and conductor wire; (3) the Company told at best only a half-truth in stating that it "regularly trim[s] the vegetation around [its] equipment," because in fact the Company did not maintain vegetation around its equipment in a safe state.

224.    The 2020 ESG Report also stated:

> **The utility engaged Exponent**, a leading consulting firm in electric utility resilience, **to perform an independent assessment to identify key vulnerabilities to severe natural events. Following this assessment, Exponent outlined a set of recommendations** to ensure quick restoration of critical customers, reduce total restoration time and minimize the total amount of damage from a severe natural event. **This included recommendations for system hardening**, substation flood monitoring, **enhanced vegetation management**, emergency restoration, damage prediction modeling and additional in-depth studies. **The utility is currently developing work plans based on Exponent's recommendations**, climate risk analysis and ongoing IGP efforts.

> [. . .]

> **The utility is using the Exponent** and Jupiter Intelligence **analyses to inform its IGP process and planning**.  The IGP process also includes a Resilience Working Group composed of stakeholders representing critical infrastructure providers, emergency management agencies, state and local government energy, planning, climate change and resilience officials, the hospitality and healthcare industries, the military, solar and other renewable energy providers and other stakeholders.

225.    The statements above were materially false and misleading because the statement gave the misleading impression that the Company was adopting "enhanced vegetation management" and so taking further steps to cut down vegetation in high risk areas, when in fact,

the Company expressly declined in its Wildfire Mitigation Plan to take further steps to cut down vegetation.

226.    On October 27, 2021, Hawaiian Electric's communications manager (Shayna Decker, HECO spokesperson responsible for external media and internal communications) reflected on the Company's fire prevention efforts in a blog post titled, "Fire prevention is everyone's business."   In discussing the Company's wildfire mitigation and vegetation management, the Hawaiian Electric spokesperson stated, in relevant part:

> Even more so, recent reports indicated Maui County, where I live, is currently experiencing the worst drought conditions in the state. **Because such drought conditions make our islands especially vulnerable to wildfires, our company continues to do its part to reduce such risks, which can threaten an island's electrical system.**
>
> **Such resilience work starts with proactive vegetation management around our electrical infrastructure and facilities on the five islands we serve.** Other efforts include **installing heavier, insulated conductors in areas prone to trees and large branches falling during high winds and preventing power lines from coming down**.
>
> […] With climate change producing drier and hotter weather patterns and longer fire seasons, **Hawaiian Electric will continue to prioritize resilience to uphold our commitment to powering our communities safely and reliably**.[72]

227.    The statements above were materially false and misleading because the Company's actual policy, as stated in its Wildfire Mitigation Plan, was against "proactive . . . management" of vegetation in dry grass and brush areas, as it recommended against trimming of low-lying vegetation and creating fire breaks due to their purported cost inefficiency; and (2) and the Company's wildfire mitigation program declined to take recommended steps to insulate conductor wires, and the Company failed to insulate conductor wires in areas at high risk of wildfires.

### D.    Defendants' False and Misleading Statements in 2022

228.    On February 25, 2022, HEI filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2021

---

[72] Shayna Decker, *Fire prevention is everyone's business*, MEDIUM (Oct. 27, 2021), https://poweringhawaii.medium.com/fire-prevention-is-everyones-business-f71c5a9dcb9.

(the "2021 10-K").  The 2021 10-K was signed by Defendants Seu (as President and CEO of HEI),

Kimura (as President, CEO and a Director of HECO), Hazelton and Ito.  In discussing the

Company's compliance with environmental regulations, the 2021 10-K stated, in relevant part:

> Hawaiian Electric, Hawaii Electric Light and Maui Electric, like other utilities, are subject to periodic inspections by federal, state and, in some cases, local environmental regulatory agencies . . . .  These inspections may result in the identification of items needing corrective or other action.  Except as otherwise disclosed in this report (see "Risk Factors" in Item 1A, and Notes 1 and 3 of the Consolidated Financial Statements), **the Utilities believe that each subsidiary has appropriately responded to environmental conditions requiring action and that, as a result of such actions, such environmental conditions will not have a material adverse effect on the capital expenditures, earnings and competitive position of the Utilities.**

229.     The statements above were materially false and misleading because the Company

knew of environmental conditions, including dry vegetation, outdated poles, conductor wires in

need of replacement, that required action and that could have a material adverse effect on the

Company.

230.     On April 12, 2022, HEI issued a consolidated ESG report (the "2021 ESG Report"),

with an introductory message from Defendant Lau presenting and endorsing the report.  The 2021

ESG Report stated:

> The utility continues its work to assess resilience threats and prioritize improvements to enhance resilience.  This has included an independent review of potential resilience vulnerabilities, using climate risk analytics to refine and prioritize specific needs and engaging with stakeholders to incorporate their perspectives.  These considerations are part of our Integrated Grid Planning (IGP) process, which is our in-progress planning effort to determine future generation, transmission and distribution needs for our system.

> • The utility engaged a leading consulting firm in electric utility resilience to perform an independent assessment to identify key vulnerabilities to severe natural events.  Following this assessment, the consultant report outlined a set of recommendations to ensure quick restoration of power to critical customers, reduce total restoration time and minimize the total amount of damage from a severe natural event.  **This included recommendations for system hardening**, substation flood monitoring, **enhanced vegetation management**, emergency restoration, damage prediction modeling and additional in-depth studies.

> • The utility is also using these analyses to inform its IGP process and planning.  The IGP process includes a Resilience Working Group composed of stakeholders representing critical infrastructure providers, emergency

management agencies, state and local government energy, planning, climate change and resilience officials, the hospitality and healthcare industries, the military, solar and other renewable energy providers and other stakeholders. Thus far, the Resilience Working Group has identified key resilience threats and associated scenarios; developed recommendations for: 1) the IGP process, 2) utility work outside of the IGP process and 3) key customer and infrastructure partners to improve resilience; developed a taxonomy for categorizing and prioritizing critical customers; and assessed the capabilities and needs of key customers and infrastructure.

231.    The statements above were materially false and misleading because the statement gave the misleading impression that the Company was adopting "enhanced vegetation management" and so taking further steps to cut down vegetation in high risk areas, when in fact, the Company expressly declined in its Wildfire Mitigation Plan to take further steps to cut down vegetation.

232.    The 2021 ESG Report also stated:

**We continually maintain and upgrade our transmission and distribution system** to ensure seamless delivery of power to our customers. Day-to-day maintenance is a key part of keeping the grid resilient. **We regularly inspect our poles, lines, and other equipment, and work to replace and upgrade aging and faulty equipment before failures happen. We regularly trim the vegetation around our equipment,** as many power outages during high winds and storms are due to tree branches or other vegetation falling onto power lines. **We have also replaced traditional power lines with insulated conductor systems** to improve reliability and resilience in targeted areas prone to vegetation-related outages.

233.    The statements in above were materially false and misleading because: (1) the Company did not "continually maintain and upgrade [its] transmission and distribution system" as it was in fact far behind schedule at all relevant times in upgrading and replacing poles, conductor wire, and maintaining vegetation in a safe state; (2) the Company told at best only a half-truth in stating that it "regularly inspect[s its] poles, lines and other equipment" and that it "work[s] to replace and upgrade aging and faulty equipment before failures happen" because in fact the Company was far behind schedule at all relevant times in upgrading and replacing poles and conductor wire; (3) the Company told at best only a half-truth in stating that it "regularly trim[s] the vegetation around [its] equipment," because in fact the Company did not maintain vegetation around its equipment in a safe state; (4) the Company told at best only a half-truth in stating that it had "replaced traditional power lines with insulated conductor systems to improve reliability and

resilience in targeted areas prone to vegetation-related outages," because in fact the Company was far behind schedule at all relevant times in upgrading and replacing poles and conductor wire.

234.    Finally, in discussing wildfire prevention and mitigation, the 2021 ESG Report stated, in relevant part:

> Episodic drought, a warming climate and **the expansion of nonnative fire-prone grasses and shrubs** has led to an increase in wildfires in Hawai'i. 98% of wildfires in Hawai'i are human caused and the threat to communities is high year-round. **In addition to the utility's own wildfire mitigation plans, we have joined with community members and wildfire collaborators to help prevent and mitigate wildfires in known hot spots across our service areas**. As members of the Wai'anae Wildfire Hui in West O'ahu and Pacific Fire Exchange on Maui, we meet monthly to share ideas and discuss priority projects. We support the Hawai'i Wildfire Management Organization on Hawai'i Island, which works with communities across the state on wildfire planning, prevention and mitigation activities. By raising awareness, implementing key land management practices and collaborating on projects, these organizations are working to reduce the wildfire risk in Hawai'i and build strong, resilient communities.

235.    The statements in above were materially false and misleading because it gave the misleading impression that the Company had adopted the advice of community wildfire collaborators to mitigate wildfires, when in fact the Company's program declined to take recommended mitigation steps to address dry vegetation, outdated poles, conductor wires, and deenergizing power lines during red-flag events.

236.    On April 12, 2022, Hawaiian Electric issued a 2021-2022 Sustainability Report (the "2021-2022 Sustainability Report"), with an introductory message from Defendant Kimura presenting and endorsing the report.  The 2021-2022 Sustainability Report stated in relevant part:

> Increasing reliability and resilience on the five islands Hawaiian Electric serves is a year-round commitment.  Projects include:
>
> […]
>
> Maui County
> ▪ Replacing more than 400 poles on Maui, Lāna'i and Moloka'i to **maintain strength and safety standards based on inspections and testing.** [73]

---

[73] Hawaiian Electric, *2021–2022 Sustainability Report*, HECO (Apr. 12, 2022) at 14, https://view.hawaiianelectric.com/2021-2022-sustainability-report/page/1.

237.    The statements above were materially false and misleading because the Company's poles did not "maintain strength and safety standards," as the majority of the Company's poles were not in compliance with national NESC standards.

238.    On August 22, 2022, Hawaiian Electric's communications manager and spokesperson discussed the Company's wildfire mitigation and prevention efforts in a blog post titled, "Protecting West Maui from wildfires."   In discussing the Company's fire prevention efforts, the Hawaiian Electric spokesperson stated, in relevant part:

> **Now, I take pride in knowing our company takes extra steps to protect areas like West Maui that are more prone to wildfires through ongoing vegetation management, restoration and prevention efforts.**
>
> **[…] Throughout the years, Hawaiian Electric has worked with the state's Division of Forestry and Wildlife (DOFAW) on Maui to identify specific parts of the island susceptible to wildfires to help with vegetation management and roadside maintenance to act as a firebreaks.**[74]

239.    The statements above were materially false and misleading because the Company's actual policy, as stated in its Wildfire Mitigation Plan, was against "proactive . . . management" of vegetation in dry grass and brush areas, as it recommended against trimming of low-lying vegetation and creating fire breaks due to their purported cost inefficiency.

240.    On November 23, 2022, Hawaiian Electric posted a video on YouTube titled "What's on a Utility Pole?".  In providing an explanation of the Company's utility poles, Hawaiian Electric Supervising Engineer Mehana Hoʻopiʻi stated in relevant part:

> Utility poles support equipment for various utilities, telecommunications, and streetlights.  In Hawaiʻi, **our poles follow standards set by the National Electric Safety Code to ensure they are safe for our employees to work on and can withstand impact of severe weather.**[75]

---

[74] Shayna Decker, *Protecting West Maui from Wildfires*, Medium (Aug. 22, 2022), https://poweringhawaii.medium.com/protecting-west-maui-from-wildfires-b0dc52e6790d.
[75] Hawaiian Electric, *What's on a Utility Pole?*, YouTube (Nov. 23, 2022), https://www.youtube.com/watch?v=VCpS6VDLmV4.

241.    The statements above were materially false and misleading because the Company's poles did not "follow standards set by the National Electric Safety Code to ensure they . . . can withstand impact of severe weather," as the majority of the Company's poles were not in compliance with national NESC standards and could not withstand severe weather.

### E.    Defendants' False and Misleading Statements in 2023

242.    On March 1, 2023, Hawaiian Electric's digital communications and social media specialist Dan Kaneko, who served as a link between HECO's senior management and the public, reflected on the Company's utility poles in a blog post titled, "What's on a utility pole?".   In discussing the safety and reliability of the Company's utility poles, the Hawaiian Electric specialist stated, in relevant part:

> When visiting my parents' home in Waimalu, I often notice the utility poles lining the streets of the older subdivision where they live.  You may notice it's more common to see overhead utility lines in older communities.  While overhead lines are vulnerable to adverse weather conditions, vegetation, and motor vehicle accidents, they're also more easily accessible and less costly to repair than underground lines.  **To ensure safety and reliability, Hawaiian Electric's utility poles follow standards set by the National Electric Safety Code (NESC)**.

243.    The statements above were materially false and misleading because the Company's poles did not "follow standards set by the National Electric Safety Code" as the majority of the Company's poles were not in compliance with national NESC standards and could not withstand severe weather.

244.    On April 4, 2023, HEI issued its 2022 ESG report (the "2022 ESG Report"), with an introductory message from Defendant Seu (together with HEI Board Chair Thomas Fargo, and photos of Seu with HECO CEO Kimura) presenting and endorsing the report.  The 2022 ESG Report stated:

> Episodic drought, a warming climate and the expansion of nonnative fire-prone grasses and shrubs has led to an increase in wildfires in Hawai'i. Over 98% of wildfires are human caused and the threat to communities is high year-round. **We joined with community members and wildfire collaborators to help prevent and mitigate wildfires in known hot spots across our service areas**.

As members of the Waiʻanae Wildfire Hui in West Oʻahu and Pacific Fire Exchange on Maui, we meet monthly to share ideas and discuss priority projects. We support the Hawaiʻi Wildfire Management Organization on Hawaiʻi Island, which works with communities across the state on wildfire planning, prevention and mitigation activities. By raising awareness, implementing key land management practices and collaborating on projects, these organizations are working to reduce the wildfire risk in Hawaiʻi and build strong, resilient communities.

245.    The statements above were materially false and misleading because it gave the misleading impression that the Company had adopted the advice of community wildfire collaborators to mitigate wildfires, when in fact the Company's program declined to take recommended mitigation steps to address dry vegetation, outdated poles, conductor wires, and deenergizing power lines during red-flag events.

246.    The 2022 ESG Report also stated:

**We constantly work to maintain and upgrade our transmission and distribution infrastructure to ensure that power gets to our customers**. Vegetation impacts during high winds and storms are the cause of many power outages and **so we regularly trim vegetation around our equipment and replace traditional power lines with insulated conductor systems in areas that are especially prone to vegetation-related outages**.

247.    The statements above were materially false and misleading because:  (1) the Company stated at best only a half-truth when it stated that it "constantly work[s] to maintain and upgrade [its] transmission and distribution system," as it was in fact far behind schedule at all relevant times in upgrading and replacing poles, conductor wire, and maintaining vegetation in a safe state; (2) the Company told at best only a half-truth in stating that it "regularly trim[s] vegetation around [its] equipment," because in fact the Company did not maintain vegetation around its equipment in a safe state; (3) the Company told at best only a half-truth in stating that it regularly "replace[s] traditional power lines with insulated conductor systems," because in fact the Company was far behind schedule at all relevant times in upgrading and replacing poles and conductor wire.

248.    On April 4, 2023, Hawaiian Electric issued a 2022-2023 Sustainability Report (the "2022-2023 Sustainability Report"), with an introductory message from Defendant Kimura presenting and endorsing the report.  The 2022-2023 Sustainability Report stated in relevant part:

Building Resilience

Hawaiian Electric works year-round to build resilience into its power systems so they are better able to withstand severe events, including those fueled by climate change. The company also is seeking regulatory approval for a five-year resilience action plan focusing on critical grid assets that are the most vulnerable to the impact of climate change. Among recent work:

[…]

**Maui County**

- **Replaced more than 330 poles on Maui, Lānaʻi and Molokaʻi to maintain strength and safety standards.**[76]

249. The statements above were materially false and misleading because the Company's poles did not "maintain strength and safety standards," as the majority of the Company's poles were not in compliance with national NESC standards.

250. On April 13, 2023, Hawaiian Electric provided an update by several HECO executive representatives on Maui's renewable energy transition and recent developments on the status of the island's existing power generation resources during an in-person community meeting. When asked whether Hawaiian Electric had observed California and its "numerous blackouts," and what, if anything, had Hawaiian Electric "learned" from the California utilities, Hawaiian Electric Director of Generation for Maui County John Mauri responded in relevant part:

[…] the fires in California, we have looked at that, we have seen issues and I think those of us in Maui did see say several years ago there was a fire in the Central Valley. **So if you want to take, looking at California and learning lessons, the fires have actually had us take a look at the plants and harden them in a sense. We, you know, make sure that the areas are clear around them.** I know there's a lot of work being done with the energy delivery people as far as, you know, the poles, infrastructure, those types of things. And then really looking at, so to speak, hardening them for when their fire comes through so that we don't lose all the poles in those areas. And so, I mean, if there's a lesson learned that's, that's really the one that comes to mind for me.[77]

---

[76] Hawaiian Electric, *2022–2023 Sustainability Report*, HECO (Apr. 4, 2023) at 9, https://view.hawaiianelectric.com/2022-2023-sustainability-report/page/1.

[77] Hawaiian Electric, *Meeting Maui's Energy Needs – A Community Engagement*, YouTube (Apr. 25, 2023), https://www.youtube.com/watch?v=A7d4coZrqVk.

251.    The statements above were materially false and misleading because the Company's actual policy, as stated in its Wildfire Mitigation Plan, was against "proactive . . . management" of vegetation in dry grass and brush areas, as it recommended against trimming of low-lying vegetation and creating fire breaks due to their purported cost inefficiency, and expressly *declined* to follow California's wildfire prevention actions.

## IX.    ADDITIONAL SCIENTER ALLEGATIONS

252.    The Individual Defendants possessed the power and authority to control the contents of HEI's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of HEI's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with HEI, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

### A.    Defendants Knew that Certain of Their Statements Were False and Misleading Because Defendants Knew the Contents of the May 2020 Audit Report and ATF Report

253.    Prior to his role beginning in January 2022 as HEI's President, CEO, and Director, Defendant Seu was President and CEO of HECO, and had other senior roles at HECO since 1993. HECO had an audit report written in May 2020 for management, and interviewed Seu for that report.  This audit report was written for Seu as CEO to read and use, and therefore he was aware of the details of the report:

> During the Audit we conducted interviews with the CEO and Chairman of HEI, to better understand the true nature of the operating relationship between HECO and HEI.

As is outlined in Section 20 of this report *Company Initial Response to Audit*, it is apparent that the new CEO Mr. Scott Seu has been proactive in taking early actions based [ ] on our audit findings. . .

254.     The May 12, 2020 audit also makes clear that the three Companies should be treated as the same company:

The audit was commissioned to review in particular the Oaliu based Hawaiian Electric Company (HECO), the largest of 3 electric Utility Companies (along with Maui Electric (MECO) and Hawaii Electric Light Company (HELCO)) which are wholly owned by Hawaiian Electric Industries (HEI).  Increasingly the 3 companies have transitioned to a One Company Model with most services and functions being provided to all 3 Companies through a common management structure. During the course of the audit the Companies formally announced on December 23, 2019 the next stage of progression towards a more integrated One Company model where the Hawaiian Electric branding would be used across all three Companies although they would still remain as three legally separate and separately regulated entities.

* * *

As a logical outcome of this One Company initiative Hawaiian Electric announced on December 23, 2019 that all three utilities would now be united under the common name of Hawaiian Electric. https://www.hawaiianelectric.com/states-3-largest-utilities-to-be-united-under-one-name-hawaiian-electric.

255.     Seu knew from the May 12, 2020 audit that HECO was behind schedule in its vegetation management, had failed to complete planned vegetation work for years, had underspent its budget and needed to replace poles and remediate double poles.  For example, the May 12, 2020 audit stated:

***Vegetation Management has not been able to complete its planned mitigation programs over the last few years and has underspent its budgets.*** This may in part be a result of its yearly spend being curtailed in order to counter overspends elsewhere to meet overall budget in Energy Delivery.  Regardless, the impact of not completing vegetation management work is showing up in increased Distribution trouble calls as a result of vegetation interference with overhead lines. It also means that some scheduled distribution work has to be delayed until Vegetation Management crews can make work sites ready for T&D Operations to commence its routine work, increasing costs.

The other impact is that when Vegetation crews are. required to divert to respond to specific sites to clear work areas for crews, this delays the program and creates a higher unit cost for T&D Operations. Without a strategy to complete the annual work program as well as catch up on the overdue work, these results will continue

87
SECOND AMENDED COMPLAINT

and will increase the negative impact on the Company and costs for T&D Operations, as well as impacting reliability and increasing fault outages.

***We were surprised to discover that management and monitoring of vegetation management work by the Company was based purely on the expenditure on the program***. There were zero metrics identifying the volume of work performed and line miles cleared. When this issue was raised with the Company, they appeared to have little understanding that unit measurements are essential in order to provide feedback as to whether the spend is effective and to estimate the scale of the backlog. It is concerning that they would budget $22.6m in 2020 for vegetation management with no supporting metrics or unit costs, ***only considering historic spend against budget***. This is an unacceptable approach that must be remediated urgently.

\* \* \*

Vegetation management should be moved to T&D Operations with a ***focus on catching up on its backlog of work*** and ensuring they also complete the work identified in each upcoming year *based on measured Units, not just historical spend*.

256.    Vegetation management never was on schedule up until 2022 when Seu became CEO of HEI, and HECO was still behind at all relevant times as shown in the ATF Report, which, as detailed above, conclusively established through multiple witness statements, photographic and videographic evidence, as well as scene examination, that overgrown vegetation at or surrounding utility pole 25 on Lahainaluna Road was the origin of the Lahaina Wildfire.  Additionally, in his role as CEO of HECO, just as [Defendant] Kimora made clear, as further explained below, Seu would have been in charge of overseeing utilities on Hawaii's five islands, and therefore would have been aware of and should have read the Wildfire Mitigation Plan, which was an "internal working document" created during his time as CEO of HECO.

257.    The Audit Report likewise made clear to Seu that HECO did not even "track[]" its pole replacement activity to know whether they were replacing an appropriate number of poles in need of replacement:

*Where Capital budgets* have *been allocated for programs - for example pole replacement - we found no evidence of any correlated tracking at the Finance or Business Unit levels to confirm that predicted volumes of work and business outcomes were actually being achieved.*

258.    The Audit Report made clear that pole replacement was an "issue" that was not "properly prioritized" for HECO:

> PIE has brought structure and process around joint pole issues and successfully stabilized and improved the flow of revenues due to the Company. They do not perform any of the design or joint pole remediation themselves, Instead they pass the work across to T&D operations where our review indicated that it is not necessarily regarded as a high priority.

> * * *

> Remediation of double poles should become part of the maintenance program for T&D Operations and prioritized properly if the issue is to be contained and reduced.

259.    Further, Seu was involved with the Resiliency Working Group, which, among other things, focused on wildfires.  For example, Seu attended the November 22, 2019 meeting of the Resilience Working Group, which met to discuss the group's final report on its findings regarding resilience threats and impacts to grid and customers, and its proposed mitigation strategies.[78] HECO presentation slides during the meeting showed that wildfire impact risks were high in Maui, Oahu, Hawai'i Island and Moloka'i.[79]

260.    Seu also stated through the 2021 10-K SEC filing that he knew what actions the subsidiaries had taken to respond to environmental conditions requiring action, and believes that the subsidiaries had responded appropriately, and therefore should have looked into what the subsidiaries were doing to accurately make such a statement:

> Hawaiian Electric, Hawaii Electric Light and Maui Electric, like other utilities, are subject to periodic inspections by federal, state and, in some cases, local environmental regulatory agencies . . . . These inspections may result in the identification of items needing corrective or other action.  Except as otherwise disclosed in this report (see "Risk Factors" in Item 1A, and Notes 1 and 3 of the Consolidated Financial Statements), **the Utilities believe that each subsidiary has appropriately responded to environmental conditions requiring action and that, as a result of such actions, such environmental conditions will not have a material adverse effect on the capital expenditures, earnings and competitive position of the Utilities.**

---

[78] HECO, *Resilience Working Group (RWG) Meeting Notes*, at 8 (Nov. 22, 2019), https://www.hawaiianelectric.com/a/7210.

[79] HECO, *Integrated Grid Planning - Resilience Working Group Meeting: Presentation Slides*, at 29 (Nov. 22, 2019), https://www.hawaiianelectric.com/a/7098.

261.    HEI also "provided budget guidelines" to HECO.  May 12, 2020 Audit Report at 56.  This shows a substantial level of control, as HECO would have to follow HEI's guidelines in implementing any budget it put forward.  In addition, in the 2020 PUC report, it says Hawaiian Electric Company [HECO] is the largest of the three utility companies that are owned by Hawaiian Electric Industries [HEI].  On December 23, 2019, HEI announced the Hawaiian Electric branding would be used across all three electric companies – Hawaiian Electric, Maui Electric, and Hawaii Electric Light Company.  Hawaiian Electric also has a description of the ownership on its website, saying Maui Electric is owned by Hawaiian Electric but the three subsidiaries operate as three separate, legal entities.  Additionally, a Google search for Maui Electric takes you to the Hawaiian Electric website and on X, formerly known as Twitter, Maui Electric's account is named "Hawaiian Electric – Maui County," instead of Maui Electric, while Hawaiian Electric has its own account on X.  And on its Facebook account, Hawaiian Electric posts updates about Maui.

**B.    Defendants Knew that Certain of Their Statements Were False and Misleading Because Defendants Knew About Their Own Wildfire Mitigation Plan, Which Instructed Against Replacing Uninsulated Conductors and Trimming Vegetation**

262.    As noted above, Defendants made statements that created the impression that the Company had replaced uninsulated wires on its power lines, when in fact, as stated in HECO's Wildfire Mitigation Plan, Defendants had determined that replacing existing uninsulated conductors with insulated conductors would not be cost-effective.  Defendants made statements that misled investors to believe that its Wildfire Mitigation Plan addressed the risk of dry grasses and shrubs, when in fact HECO's Wildfire Mitigation Plan recommended against trimming of grasses around power lines.  Defendants also told investors that HEI prioritized safety over customer convenience, when in fact, as memorialized in HECO's Wildfire Mitigation Plan, the Company prioritized customer convenience over safety in its written policy of not preemptively cutting off power during red-flag events because the policy "was not well received by certain customers affected" when PG&E implemented the policy in California.

263.    Defendants knew that each of these statements was false and misleading because Defendants participated in the development and drafting of the Company's Wildfire Mitigation Plan.  As HECO CEO and President Shelee Kimura testified before Congress on September 28, 2023, "[i]n 2019, our team started developing a wildfire mitigation plan."  In written comments to Congress, Kimura repeatedly used first person plural pronouns in speaking about HEI "developing our wildfire mitigations strategy."  In discussing her development of the Wildfire Mitigation Plan, she stated, for example, "at the time, we concluded that wildfire risk in Hawaii did not justify the detrimental effects of preemptive shutoffs," to explain why she and HEI declined to deenergize power lines during red flag events.

264.    In CEO Shelee Kimura's October 27, 2023 written response to follow-up questions from the House subcommittee, she stated that the Wildfire Mitigation Plan is an "internal working document."  She stated no changes were made to the Wildfire Mitigation Plan until after the August 8, 2023 wildfires:[80]

> [Kimura:] "The WMP was developed voluntarily and was considered an internal working document that was intended to align and inform fire mitigation work across islands and program…. Even before it was finalized, it was used to inform and align internal work plans and programs in various divisions of the company."
>
> [Question:] Is this the same Wildfire Mitigation Plan document that Hawaiian Electric informed the Committee that it finalized in January 2023?
>
> Response: Yes.
>
> [Question:] What changes, if any, did Hawaiian Electric make to the Wildfire Mitigation Plan between January 2023 and October 2, 2023?
>
> Response: Between January and August 8, the WMP was used to inform and align internal work plans and programs in various divisions of the company, including the Climate Adaptation Transmission and Distribution Resilience Program Resilience Program. No changes were made to the WMP document during that time period. Since August 8, Hawaiian Electric has accelerated and intensified the implementation of this plan and has also taken other immediate action steps.

---

[80]    https://docs.house.gov/meetings/IF/IF02/20230928/116431/HHRG-118-IF02-Wstate-KimuraS-20230928-SD002.pdf

265.    Maui Electric Company, Hawaiian Electric Company and Hawaii Electric Company are subsidiaries of Hawaiian Electric Industries, but in January 2020, they were united under a common name: Hawaiian Electric.[81]  Shelee Kimura is the president and CEO of Hawaiian Electric, which "serves 95% of Hawaii's population on the island's of Oahu, Hawaii, Maui, Lanai, and Molakia," according to the description of her duties on Hawaiian Electric's website.[82]  Prior to becoming President and CEO in January 2022, Kimura "previously served as senior vice president of Customer Service & Public Affairs and senior vice president of Business Development & Strategic Planning."[83]  And before joining Hawaiian Electric, Kimura "led Investor Relations and Strategic Planning at Hawaiian Electric Industries (HEI), the parent company of Hawaiian Electric and the largest publicly traded company in Hawaii. She previously worked as HEI's director of corporate finance and investments."[84]

266.    Kimura's testimony before the House Energy and Commerce Subcommittee on September 28, 2023, beginning at minute 22:21, Kimura describes her role as overseeing utilities on Hawaii's five islands, totaling 470,000 customers, including 70,000 on Maui. And on her LinkedIn profile Kimura describes herself in the following way:  "As President and CEO of Hawaii's largest energy company, I lead Hawaiian Electric's strategy to provide safe, affordable, reliable clean energy for our customers on the islands of Oahu, Hawai'i, Maui, Lanai, and Molokai."

267.    By HEI's own SEC filings, Kimura was a CEO of HEI by virtue of SEC rules. HEI's SEC filings state regarding HECO CEO Shelee Kimura—who made and/or authorized HECO's statements—that "Mss. Kimura [and another sub's CEO] are officers of HEI subsidiaries rather than of HEI, but *are deemed to be executive officers of HEI* under SEC Rule 3b-7."[85]

---

[81] https://www.hawaiianelectric.com/about-us/our-history/2019-empowering-hawaii.

[82] https://www.hawaiianelectric.com/about-us/our-leadership-team.

[83] *Id.*

[84] *Id.*

[85] *See, e.g.*, HEI 2021 10-K at 35.

(Emphasis added).  SEC Rule 3b-7 provides: "The <u>term *executive* officer</u>, when used with reference to a registrant, means its president, any vice president of the registrant in charge of a principal business unit, division or function (such as sales, administration or finance), any other officer who performs a policy making function or any other person who performs similar policy making functions for the registrant.  <u>Executive officers of subsidiaries may be deemed executive officers of the registrant if they perform such policy making functions for the registrant</u>."  As an "executive officer" of HEI, the statements Kimura made (*e.g.*, in the Sustainability Reports) and authorized (*e.g.*, in the press releases, blog posts and YouTube videos) are imputed to HEI.  Kimura was deeply involved with HEI; for example, Kimura participated in HEI's investor calls, so had a formal role in reviewing key HEI statements made to investors.  Additionally, the 2021-22 and 2022-23 Sustainability Reports both contain an introduction from Kimura (with her picture) on the first page, stating, *inter alia*, "I'm pleased to present Hawaiian Electric's 2021-22 [and 2022-23] Sustainability Report." She also signed that introduction for both Reports.

268.    FE1 confirmed that Kimura oversees all of the subsidiaries, and stated that Hawaiian Electric began eliminating the outside autonomy of Maui Electric in 2018 or 2019.  FE1 stated, "they were centralizing a lot of their stuff during that period of time and probably my group was the first one of moving into centralizing the outside areas into one cohesive group by putting them all under one umbrella.  I was over the T & E group had they had directors at each of the islands that reported up to me."  It is also clear from the fact that Kimura was the one called to testify before the House subcommittee in September 2023 regarding the Maui fires, that she is responsible for overseeing Maui.

269.    Indeed, HEI's own ESG reports, signed variously by Defendants Lau and Seu, and Chairman of the Board of Directors Thomas Fargo, specifically relied on the Company's Wildfire Mitigation Plan.  For example, as noted above, the 2021 ESG Report made representations about "the utility's own wildfire mitigation plans."  Defendants, at a minimum, were severely reckless in making representations about that plan if they were not familiar with its contents.

**C.      Defendants Knew of, But Ignored Consultant and Community Advice**

270.     While representing to investors that the Company had joined with consultants and community groups to adopt common plans to mitigate wildfire risk, in fact and unbeknownst to investors, the Company's own policies in the Wildfire Mitigation Plan directly contradicted the advice of those groups.  For example, as noted above, the 2021 ESG Report stated:

> Episodic drought, a warming climate and **the expansion of nonnative fire-prone grasses and shrubs** has led to an increase in wildfires in Hawai'i. 98% of wildfires in Hawai'i are human caused and the threat to communities is high year-round. **In addition to the utility's own wildfire mitigation plans, we have joined with community members and wildfire collaborators to help prevent and mitigate wildfires in known hot spots across our service areas**. As members of the Wai'anae Wildfire Hui in West O'ahu and Pacific Fire Exchange on Maui, we meet monthly to share ideas and discuss priority projects. **We support the Hawai'i Wildfire Management Organization** on Hawai'i Island, which works with communities across the state on wildfire planning, prevention and mitigation activities. By raising awareness, implementing key land management practices and collaborating on projects, these organizations are working to reduce the wildfire risk in Hawai'i and build strong, resilient communities.

271.     In fact, as explained above, the Company's Wildfire Mitigation Plan called for no additional action to be taken to address the "fire-prone grasses and shrubs," and so directly contradicted the advice of "wildfire collaborators" such as the "Hawai'i Wildfire Management Organization."  As explained above, Defendants were familiar with their own Wildfire Mitigation Plan.  At a minimum, Defendants were severely reckless in representing the content of their Wildfire Mitigation Plan was aligned with "wildfire collaborators" and the Hawai'i Wildfire Management Organization if they were unfamiliar with the content of the Wildfire Mitigation Plan or the positions and recommendations of those collaborators.

**D.      Mitigation of Environmental Risk Was a Core Part of Hawaiian Electric's Business, Defendants' Compensation Was Tied to Enterprise Risk Mitigation, and Board Members Were Expressly Apprised of Risks**

272.     In its focus statements and in its compensation and risk management policies, and in its risk management, the Company made clear that it is highly focused on mitigating material risks, including wildfires.  This Company focus on risk mitigation, including wildfire risk mitigation, further supports an inference of scienter on the part of Defendants.

273.    The Company has repeatedly told investors, in its Annual Reports, that environmental considerations are "explicitly woven into strategic planning efforts and enterprise risk management processes." For example, in the Company's 2022 Annual Report, the Company stated:

> The Company has also focused on ensuring that ESG considerations are appropriately integrated into governance structures, strategies and risk management. This includes: [. . .] ESG considerations explicitly woven into strategic planning efforts and enterprise risk management processes.

274.    Likewise, the Company repeatedly assured investors that compensation of its executives discouraged inappropriate risk:

> Hawaiian Electric's compensation policies and practices are designed to encourage executives to build value for all stakeholders, including shareholders, customers and employees, and to discourage decisions that introduce inappropriate risks.

275.    The HEI Board has assigned to the Audit & Risk Committee the responsibility of assisting in the oversight of the overall risk management strategy of the Company. In providing such assistance, the Audit & Risk Committee is specifically required to discuss policies with respect to risk assessment and risk management, including the guidelines and policies governing the process by which risk assessment and risk management are undertaken at the Company, and to report to the Board the committee's discussion and findings so that the entire Board can consider changes (if any) in the Company's risk profile. This review of policies certainly would have included review of the Company's policies with respect to wildfire mitigation, as outlined in the Company's Wildfire Mitigation Plan.

276.    Indeed, HECO's CFO Tayne S.Y. Sekimura also served as HECO's Chief Risk Officer. In that role, she was responsible for identifying, assessing, managing, monitoring and reporting risks at the Utility, which included wildfire risks. Sekimura was responsible for providing *regular reports* to the HEI Board and Audit & Risk Committee on the status of those risks, any changes to the risk catalog or management's assessment of those risks, and any other risk management matters that the Board may request from time to time. The Board and Audit &

Risk Committee are also supposed to receive reports from HEI's internal auditor evaluating the effectiveness of management's implementation of the approved ERM system.

277.    In fact, as a matter of policy, all of HEI's directors were apprised of risks that might materially affect the Company, as stated in the Company's Annual Reports:

> Hawaiian Electric's Enterprise Risk Management (ERM) function is principally responsible for identifying and monitoring risk at Hawaiian Electric and its subsidiaries, and for reporting on high risk areas to the Hawaiian Electric Board and Hawaiian Electric Audit & Risk Committee. Hawaiian Electric's ERM function is part of HEI's overall ERM function, which is responsible for identifying and monitoring risk throughout the HEI companies and for reporting on areas of significant risk to the HEI Board and designated board committees. As a result, **all Hawaiian Electric and HEI directors, including those who serve on or are representatives to the HEI Compensation & Human Capital Management Committee, are apprised of risks that could have a material adverse effect on Hawaiian Electric**.

278.    HEI also made clear in its Annual Reports that among the risks it believes could have a material adverse effect on its business include wildfires, specifically: "weather, natural disasters . . . and wildfires, including their impact on the resilience and reliability and cost of the Company's and Utilities' operations."

279.    Indeed, as stated in the Company's 2020 ESG Report:

> The Board provides oversight of climate-related and other risks through comprehensive and integrated ERM processes and regular reporting on the material risks that can potentially impact our operations, strategies and long-term financial performance. The Board also reviews and provides feedback on the company's ERM processes for identifying, monitoring, managing and mitigating risks to ensure these processes are effective. **Topics discussed at the board level include utility reliability and resilience,** technology innovation and integration, **increased frequency of natural disasters and extreme weather events and their potential impacts for our companies**, sea-level rise and its potential implications for physical assets and financial assets such as the bank's loan portfolio, and land use and community sentiment in the context of accelerated renewable energy development.

> Each Board committee has responsibilities with respect to oversight of climate-related risks and opportunities, and reports on its activities and recommendations through our regular and, as necessary, special Board and/or committee meetings.

280.    Accordingly, because wildfire risk management was a key concern, particularly given the high risk of wildfires in Maui, Defendants were aware or recklessly disregarded that HEI and its policies failed to mitigate wildfire risk.

## X.    CLASS ACTION ALLEGATIONS

281.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired HEI securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

282.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, HEI securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by HEI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

283.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

284.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

285.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and prospects of HEI;

- whether the Individual Defendants caused HEI to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of HEI securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages, and, if so, what is the proper measure of damages.

286.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

287.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- HEI securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold HEI securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

288.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

289.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XI.    COUNT ONE

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

290.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

291.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

292.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of HEI securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire HEI securities and

options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

293.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for HEI securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about HEI's finances and business prospects.

294.    By virtue of their positions at HEI, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

295.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of HEI, the Individual Defendants had knowledge of the details of HEI's internal affairs.

296.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of HEI.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to HEI's businesses,

operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of HEI securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning HEI's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired HEI securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

297.    During the Class Period, HEI securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of HEI securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of HEI securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of HEI securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

298.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

299.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**XII.    COUNT TWO**

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

300.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

301.    During the Class Period, the Individual Defendants participated in the operation and management of HEI, and conducted and participated, directly and indirectly, in the conduct of HEI's business affairs.  Because of their senior positions, they knew the adverse non-public information about HEI's misstatement of income and expenses and false financial statements.

302.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to HEI's financial condition and results of operations, and to correct promptly any public statements issued by HEI which had become materially false or misleading.

303.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which HEI disseminated in the marketplace during the Class Period concerning HEI's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause HEI to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of HEI within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of HEI securities.

304.    Each of the Individual Defendants, therefore, acted as a controlling person of HEI. By reason of their senior management positions and/or being directors of HEI, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, HEI to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of HEI and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

305.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by HEI.

## XIII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## XIV.   DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  November 12, 2024                    Respectfully submitted,

                                             POMERANTZ LLP

                                             */s/ Austin P. Van*

                                             POMERANTZ LLP
                                             Jeremy A. Lieberman
                                             (*pro hac vice*)
                                             Austin P. Van
                                             (*pro hac vice*)
                                             600 Third Avenue, 20th Floor
                                             New York, New York 10016
                                             Telephone: (212) 661-1100
                                             Facsimile: (917) 463-1044
                                             jalieberman@pomlaw.com
                                             avan@pomlaw.com

                                             Jennifer Pafiti (SBN 282790)
                                             1100 Glendon Avenue, 15th Floor
                                             Los Angeles, California 90024
                                             Telephone: (310) 405-7190
                                             jpafiti@pomlaw.com

                                             *Lead Counsel for Lead Plaintiff Daniel
                                             Warren*

                                             PORTNOY LAW FIRM
                                             Lesley F. Portnoy, Esq.
                                             1800 Century Park East, Suite 600
                                             Los Angeles, California 90067
                                             Telephone: (310) 692-8883
                                             lesley@portnoylaw.com

                                             *Attorneys for Additional Plaintiff
                                             Bhapinderpal S. Bhangal*

                                             LEVI & KORSINSKY LLP
                                             Shannon L. Hopkins
                                             Gregory M. Potrepka
                                             1111 Summer Street, Suite 403
                                             Stamford, CT 06905
                                             Telephone: 203/992-5423
                                             212/363-7171 (fax)
                                             shopkins@zlk.com
                                             gpotrepka@zlk.com

                                             *Attorneys for Additional Plaintiff Emaad
                                             Kuhdear*

**CERTIFICATE OF SERVICE**

I, Austin P. Van, hereby certify that a true and correct duplicate copy of the foregoing Second Amended Class Action Complaint for Violations of the Federal Securities Laws was filed electronically on November 12, 2024. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Austin P. Van*
Austin P. Van

SECOND AMENDED COMPLAINT