**POMERANTZ LLP**
Jeremy A. Lieberman
Austin P. Van
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
jalieberman@pomlaw.com
avan@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Lead Counsel for Lead Plaintiffs*

*Additional Counsel on Signature Page*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| BHAPINDERPAL S. BHANGAL, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> HAWAIIAN ELECTRIC INDUSTRIES, INC., HAWAIIAN ELECTRIC COMPANY, INC., CONSTANCE H. LAU, SCOTT W. H. SEU, GREGORY C. HAZELTON, PAUL K. ITO, and SHELEE KIMURA, <br><br> Defendants. | CASE NO.  3:23-cv-04332-JSC <br><br> **OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** <br><br> **CLASS ACTION** <br><br> Hearing Date:  June 26, 2025 <br> Time:  10:00AM <br> Judge:  Hon. Jacqueline Scott Corley <br> Courtroom:  8—19th Floor |

**TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................................... 1

II.     FACTUAL BACKGROUND ............................................................................................. 3

        A.      New Allegations Show HEI Was Failing To Take Steps To Mitigate Wildfire
                Risk ...................................................................................................................... 3

                1.      HEI Was Failing To Regularly Trim Risky Vegetation Around Its Power
                        Lines........................................................................................................... 3

                2.      HEI Failed To Continually Maintain Its Poles ......................................... 4

                3.      HEI Failed to Replace Exposed Power Lines with Insulated Conductor
                        Wires ......................................................................................................... 5

        B.      These New Allegations Resolve the Court's Concerns in Its Opinion ................. 5

III.    LEGAL STANDARDS ..................................................................................................... 5

IV.     HEI REPEATEDLY MISLED INVESTORS TO BELIEVE IT WAS TAKING
        APPROPRIATE ACTION TO MITIGATE WILDFIRE RISK, WHEN IT KNEW IT
        WAS FAILING TO DO SO .............................................................................................. 6

        A.      HEI Misled Investors To Believe It Was Regularly Trimming Vegetation Around
                Power Lines .......................................................................................................... 6

        B.      HEI Misled Investors To Believe That Its Poles Were Regularly Maintained.... 10

        C.      HEI Misled Investors To Believe It Had Replaced Exposed Power Lines with
                Insulated Conductor Wires ................................................................................. 13

        D.      Defendants Misled Investors To Believe That They Had Investigated
                Subsidiaries' Responses to Environmental Conditions Requiring Action and
                Determined that They Had Taken Appropriate Actions, When They Had Not
                Taken the Actions HEI Claimed They Had Taken .............................................. 17

V.      THE SAC ADEQUATELY PLEADS SCIENTER ......................................................... 19

        A.      Defendants Created or Reviewed Documents Contradicting Their Statements .. 19

                1.      May 2020 Audit Report ........................................................................... 20

                2.      Wildfire Mitigation Plan ......................................................................... 22

        B.      Defendants' Own Statements Support Scienter .................................................. 23

        C.      A Holistic Review Supports Scienter ................................................................. 25

VI.     CONCLUSION ............................................................................................................... 25

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| **10-K** | Annual Report on SEC Form 10-K |
| **10-Q** | Quarterly Report on SEC Form 10-Q |
| **AC** | Amended Complaint (ECF No. 70) |
| **After-Action Report** | County of Maui's Department of Fire and Public Safety's After-Action Report |
| **ATF** | U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, National Response Team |
| **ATF Report** | U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, National Response Team's September 19, 2024 Report |
| **Audit Report** | May 2020 Hawaiian Public Utilities Commission Audit Report (ECF No. 107-30) |
| **Company** | Hawaiian Electric Industries, Inc. |
| **Defs.' Mem.** | Defendants' Notice of Motion and Motion to Dismiss the Second Amended Complaint; Memorandum of Points and Authorities in Support (March 18, 2025) (ECF No. 106) |
| **Def. Ex.** | Exhibit to Declaration of Raza Rasheed in Support of Defendants' Motion to Dismiss the Second Amended Class Action Complaint (March 18, 2025) (ECF No. 107) |
| **Defendants** | Hawaiian Electric Industries Inc., Hawaiian Electric Company, Inc., Constance H. Lau, Scott W. H. Seu, Gregory C. Hazelton, Paul K. Ito and Shelee Kimura |
| **ESG Report** | Environmental, Social, and Governance Report |
| **FE** | former employee |
| **FSRI** | Fire Safety Research Institute |
| **FSRI Report** | Fire Safety Research Institute's Lahaina Fire Incident Analysis Report |
| **HECO** | Hawaiian Electric Company, Inc. |
| **HEI** | Hawaiian Electric Industries Inc. |
| **HWMO** | Hawaii Wildfire Management Organization |
| **Individual Defendants** | Constance H. Lau, Scott W. H. Seu, Gregory C. Hazelton Paul K. Ito, and Shelee Kimura |
| **Lead Plaintiff** | Daniel Warren |
| **MFD** | County of Maui Department of Fire and Public Safety |
| **MFD Report** | County of Maui Department of Fire and Public Safety's October 1, 2024 Origin and Cause Report |
| **Motion or Mot.** | Defendants' Notice of Motion and Motion to Dismiss the Second Amended Complaint; Memorandum of Points and Authorities in Support (March 18, 2025) (ECF No. 106) |
| **Opinion or Order or Op.** | October 15, 2024 Order Re: Motion to Dismiss (ECF No. 92) |

| | |
|---|---|
| **Plaintiffs** | Daniel Warren, Bhapinderpal S. Bhangal and Emaad Kuhdear |
| **PSLRA** | Private Securities Litigation Reform Act of 1995 (15 U.S.C. § 78u–4) |
| **PUC** | Hawaii's Public Utilities Commission |
| **RWG** | Resiliency Working Group |
| **SAC or Complaint** | Second Amended Complaint (ECF No. 93) |
| **SEC** | United States Securities and Exchange Commission |
| **Van Decl.** | Declaration of Austin P. Van in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss the Second Amended Complaint (May 2, 2025) |
| **WMP** | HEI's Wildfire Mitigation Plan (ECF No. 107-1) |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arpin v. Santa Clara Valley Transp. Agency*,
261 F.3d 912 (9th Cir. 2001) ..........................................................................................8

*Hatamian v. Advanced Micro Devices, Inc.*,
87 F. Supp. 3d 1149 (N.D. Cal. 2015) ............................................................................9

*Howard v. Everex Sys.*,
228 F.3d 1057 (9th Cir. 2000) .......................................................................................24

*In re Acadia Pharm. Inc. Sec. Litig.*,
2020 WL 2838686 (S.D. Cal. June 1, 2020)...................................................................19

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ............................................................................................19

*In re Amgen Inc. Sec. Litig.*,
No. CV 07–2536 PSG, 2014 WL 12585809 (C.D. Cal. Aug. 4, 2014)...........................19, 25

*In re Apple Computer Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989) .......................................................................................21

*In re Atossa Genetics Inc. Sec. Litig.*,
868 F.3d 784 (9th Cir. 2017) ..........................................................................5, 15, 23

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) .........................................................................................6

*In re MannKind Sec. Actions*,
835 F. Supp. 2d 797 (C.D. Cal. 2011) ...........................................................................20

*In re Syntex Corp. Sec. Litig.*,
95 F.3d 922 (9th Cir. 1996) .............................................................................................6

*In re VeriFone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012) .........................................................................................19

*In re Zillow Grp., Inc. Sec. Litig.*,
No. C17-1387-JCC, 2019 WL 1755293 (W.D. Wash. Apr. 19, 2019)................................24

*Jackson Cty. Emples. Ret. Sys. v. Ghosn*,
510 F. Supp. 3d 583 (M.D. Tenn. 2020)..........................................................................23

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
601 U.S. 257 (2024)................................................................................9, 16, 20

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004) ...............................................................................................19

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)...............................................................................................................18

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014) ...........................................................................................19, 24

*Roberti v. OSI Sys., Inc.*,
   No. CV 13–9174–MWF, 2015 WL 1985562 (C.D. Cal. Feb. 27, 2015)................................25

*Roberts v. Zuora, Inc.*,
   2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) ......................................................................19

*S. Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ................................................................................................19

*S. Ferry LP #2 v. Killinger*,
   687 F. Supp. 2d 1248 (W.D. Wash. 2009)............................................................................24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)..............................................................................................................19

*United States v. Laurienti*,
   611 F.3d 530 (9th Cir. 2010) ..................................................................................... *passim*

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009), *as amended* (Feb. 10, 2009)....................................................10

**Statutes**

17 C.F.R. § 240.10b-5.............................................................................................................19

Private Securities Litigation Reform Act of 1995 .........................................................................3

## I.   INTRODUCTION

The SAC contains compelling new allegations, from official investigations of the Lahaina fire and other sources, that concretely address the Court's prior concerns and show that Defendants knowingly misled investors with four categories of misrepresentations.[1]

*First*, the Company repeatedly assured investors that it was regularly trimming the vegetation around its poles, which included tall grasses and shrubs, by flatly stating in its ESG reports that "[w]e regularly trim the vegetation around our equipment." New allegations show that the Company itself has expressly admitted that it "generally does not clear any vegetation that does not encroach upon the overhead conductors, such as shrubs and grasses." New allegations from former employees confirm that they and their colleagues were instructed by supervisors not to trim grasses or even trees throughout the Class Period.

*Second*, HEI repeatedly assured investors in its ESG Reports that it was "continually maintain[ing]" its poles and that HEI "regularly inspect[ed its] poles." In fact, new allegations from former employees confirm that the majority of HEI's poles in Lahaina were *actively in need of replacement*, with many rotting from termite damage and excessively aged. Multiple former employees newly confirm that poles were actually failing. New allegations likewise show that HEI did not regularly inspect its poles, and that the poles in Lahaina had not been inspected for nearly a decade prior to the Lahaina fires.

*Third*, HEI informed investors that it had successfully replaced traditional power lines with insulated wires, when it had not. In HEI's ESG Reports for 2021 and 2022, Defendants stated:

> We have . . . replaced traditional power lines with insulated conductor systems to improve . . . resilience in targeted areas prone to vegetation-related outages.

In fact, as confirmed by multiple sources, Hawaiian Electric had not replaced uninsulated power lines with insulated lines even in targeted areas, including Lahaina. The SAC newly alleges that HECO announced in a press release in 2019 that it was targeting Lahaina, and in particular Lahainaluna Road (where the Lahaina fire started), for installation of insulated wires specifically

---

[1] Plaintiffs respect the Court's October 15, 2024 Order (ECF No. 92) and limit the claims defended in this opposition to those that are now adequately pleaded in accordance with that Order. However, Plaintiffs respectfully continue to assert that all claims contained in the SAC are actionable and reserve the right to pursue all such claims in the event of an appeal.

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (CASE NO. 3:23-cv-04332-JSC)

to address "falling branches from large trees along Lahainaluna Road." Yet even though Lahainaluna Road was a "targeted area[] prone to vegetation-related outages," multiple sources confirm that the power lines on that very road were not insulated at the time of the Lahaina fire.

*Fourth*, Defendants repeatedly implied to investors that they had looked into what their subsidiaries were doing to address environmental conditions requiring action, and had found that the subsidiaries had taken appropriate actions to address those environmental conditions. In HEI's annual reports on Form 10-K for 2018-2023, Defendants stated that they "believe[d] that each subsidiary ha[d] appropriately responded to environmental conditions requiring action." These statements were misleading because, as the new allegations referenced above make clear, HEI's subsidiaries were not taking the very actions *HEI itself* had stated in its ESG reports were required to address environmental conditions, such as trimming vegetation around poles, continually maintaining poles and insulating wires in targeted areas. As Defendants directly implied in these statements that they had looked into what their subsidiaries were doing to address these conditions, Defendants knew that these conditions had not been addressed.

New allegations in the SAC now make clear that Defendants knew or were severely reckless in not knowing that the above statements were misleading. Defendants had *documents* showing their statements were misleading. The SAC newly alleges that the PUC commissioned an audit report *for Defendants* that notified them that the Company was not regularly trimming vegetation or adequately addressing its pole infrastructure. Likewise, the SAC alleges that the Wildfire Mitigation Plan was drafted in part by newly named Defendant Kimura and, even setting its language aside, it contains *photos* showing that the Company was failing to trim the vegetation around its poles. Moreover, in their statements above assuring investors that the subsidiaries had appropriately responded to environmental conditions, *Defendants themselves* directly implied that they had knowledge of the steps the subsidiaries had taken to respond to environmental conditions, including the conditions Defendants themselves had noted required action in their ESG reports.

Defendants' motion makes significant mistakes about both facts and law. Defendants' motion largely ignores the key new allegations summarized above. These allegations cannot be ignored—they are dispositive. Defendants' motion likewise repeatedly asserts that if their

statements were partly true, they are not actionable.  Yet established law holds that statements that are only partly true are actionably misleading for the purposes of Section 10(b).  And Defendants repeatedly suggest that the Court view the allegations in a light that is favorable to Defendants rather than Plaintiffs.  But the law requires this Court to do the opposite.

Defendants are liable not because the Lahaina fire was a tragedy, but because they blatantly misrepresented to investors that they were taking specific actions when in fact they were not.  Defendants made statements that have been *proven false* by government investigations and the Company's own admissions.  Defendants read documents prepared for them that showed these statements were false, and they directly implied to investors that they had undertaken investigations that would have shown that these statements were false.  While caselaw makes clear that the PSLRA imposes a heightened pleading bar, caselaw makes equally clear that cases like this one clear that bar.

## II.    FACTUAL BACKGROUND

### A.    New Allegations Show HEI Was Failing To Take Steps To Mitigate Wildfire Risk

#### 1.    HEI Was Failing To Regularly Trim Risky Vegetation Around Its Power Lines

The SAC newly alleges that HEI admitted that the Company generally does not clear low-lying vegetation.  SAC ¶ 127.  The May 2020 PUC audit ("Audit Report") confirmed that the Company was delinquent in vegetation management work for years.  SAC ¶ 128.  Aerial drone-captured images in 2019 and 2020 confirm that the Company was not trimming low-lying vegetation surrounding its power lines at all.  SAC ¶¶ 128, 140.

Hawaiian Electric's failure to trim vegetation around poles led to the Lahaina fire.  SAC ¶¶ 129-33.  The newly alleged MFD Report found that "the origin of the fire was the *overgrown vegetation* at and surrounding utility pole 25 off of Lahainaluna Road" and that the fire was caused by the ignition of the "*unmaintained vegetation* below" the wires.  SAC ¶ 129.  The MFD Report agreed with investigators from the ATF that:

> the area of origin for the Lahaina Wildfire was *overgrown vegetation at or surrounding utility pole 25 on Lahainaluna Road* . . . .  [T]he fire . . . resulted from sparking utility equipment following re-energization at utility pole 25 on Lahainaluna Road [] which *ignited overgrown brush at the base of pole 25* and

moved into an unmaintained firebreak.

*Id.* The FSRI Report found, with respect to vegetation management at the time of the fire and in the targeted areas specifically:

> *Vegetation played a crucial role in the Lahaina PM fire.* [. . .] *The vegetation management, or lack thereof, leading up to August 8, 2023, left lands at high risk of ignition and rapid spread . . . .*
>
> *Highly ignitable vegetative fuels are also present under and around utility lines and substations across West Maui . . . . The wildfire risk posed by downed lines onto unmanaged vegetative fuels, a plan for fuels management under lines, and the opportunities for powerline vegetation management to serve as additional emergency access or fuel breaks, do not appear to be effectively addressed in Hawaiian Electric's previous or current wildfire safety plans.*

SAC ¶ 134; *id.* ¶ 130 (ATF Report noting "thick and unkempt" grasses in area of fire).

### 2. HEI Failed To Continually Maintain Its Poles

The SAC contains new allegations from former employees confirming that the majority of HEI's poles on Maui actively needed to be replaced. FE4 stated that the *majority* of poles around Lahaina actively needed to be replaced. SAC ¶¶ 101-02. FE4 noted that poles frequently failed due to rotting during the Class Period. *Id.* FE1 likewise newly confirmed that not only were the majority of the Company's poles leaning and approaching the end of their lifespan, poles had reached the end of their lifespan and needed to be replaced, and some poles fell over during the Class Period due to lack of maintenance. SAC ¶ 100. Termites were a huge problem on the island and a lot of poles—including older, rotted poles—never received termite guard. SAC ¶ 102. Though an inspection "a few years prior" to 2017 recorded and tagged rotting poles that needed replacement in Lahaina, they were never replaced. SAC ¶¶ 100, 102. FE5 confirmed that *at least ten percent* of HEI's poles were past their lifespan during the Class Period, that Lahaina's poles in particular were in horrible shape, and that poles that needed replacement were never replaced. SAC ¶ 104. During the Class Period, HEI spent millions of dollars less on upgrades than it had planned in the years leading up to the Lahaina Fire. SAC ¶¶ 98-99, 105-06. FE4 newly confirmed that the Company was not spending money on pole maintenance and replacement due to "pressure" from Maui Electric CEO Suzuki to be "very frugal." SAC ¶ 103. The Audit Report's likewise found that costs were prioritized over pole and vegetation maintenance Company-wide. SAC ¶¶ 61-66, 128, 151, 255, 257-58.

Failed poles were a cause of the Lahaina fire.  SAC ¶¶ 112-15.  The SAC newly alleges that Utility Pole 7A, a 43-year-old pole riddled with termite damage, snapped in the night wind, and "literally broke right at the termite damage," which resulted in the fires by Utility Poles 24 and 25 on Lahainaluna Road.  SAC ¶¶ 114-15.

### 3. HEI Failed to Replace Exposed Power Lines with Insulated Conductor Wires

HEI failed to replace uninsulated power lines with insulated lines even in areas that the Company targeted prone to vegetation related outages, including West Maui, and specifically Lahainaluna Road.  In 2019 press releases, Hawaiian Electric stated that it was targeting West Maui, and specifically Lahainaluna Road, for replacement of traditional power lines with insulated conductors specifically to address "falling branches from large trees along Lahainaluna Road." SAC ¶¶ 82-83.  New allegations from investigations, former employees and other sources confirm that the poles on Lahainaluna Road found to be the origin of the Maui fires were not insulated. SAC ¶¶ 85-88.  FE2, FE4 and FE5 confirmed that almost all power lines in Lahaina and on Maui were not insulated, and FE4 stated that the wires that failed and caused the Lahaina fire were very old *uninsulated* copper wire.  SAC ¶¶ 87-88.

### B. These New Allegations Resolve the Court's Concerns in Its Opinion

In October 2024, the Court issued a detailed opinion granting Defendants' motion to dismiss the AC with leave to amend, providing Plaintiffs a roadmap of specific ways in which Plaintiffs could adequately allege their case in an amended complaint.  As explained below, the SAC addresses all of these areas with new allegations from recent investigatory reports, former employees, and other sources.

## III. LEGAL STANDARDS

On a 12(b)(6) motion, the court "accept[s] the Plaintiffs' allegations as true and construe[s] them in the light most favorable to Plaintiffs." *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 793 (9th Cir. 2017).  When ruling on a motion to dismiss a securities case, any "skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

**IV.    HEI REPEATEDLY MISLED INVESTORS TO BELIEVE IT WAS TAKING APPROPRIATE ACTION TO MITIGATE WILDFIRE RISK, WHEN IT KNEW IT WAS FAILING TO DO SO**

In securities litigation, unless "the adequacy of the disclosure . . . is so obvious that reasonable minds could not differ," the question of "[w]hether a statement is misleading and whether adverse facts were adequately disclosed . . . should be left to the trier of fact." *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 926 (9th Cir. 1996).

**A.    HEI Misled Investors To Believe It Was Regularly Trimming Vegetation Around Power Lines**

During the Class Period, the Company repeatedly misled investors to believe that it was regularly trimming dry grasses and brush around its poles, when in fact, it did not engage in any regular trimming of grasses and brushes, and failed even to trim tree branches in some areas. In the 2020 and 2021 ESG Reports, Defendants stated straightforwardly: "We regularly trim the vegetation around our equipment . . . ." SAC ¶¶ 222, 232 ("Vegetation Trimming Misstatements"). These statements misled investors to believe that Hawaiian Electric "regularly trim[med] the vegetation around [its] equipment," including the grasses and shrubs in the immediate vicinity of its poles.

Multiple sources, including the Company itself, make clear that the Vegetation Trimming Misstatements were patently misleading. The SAC newly alleges that HEI expressly admitted in response to information requests from the PUC that the Company "generally does not clear any vegetation that does not encroach upon the overhead conductors, such as shrubs and grasses." SAC ¶ 127. This fact alone dispositively shows that HEI's statements that it "regularly trims vegetation" around its poles were at best misleading half-truths.

Additional new sources confirm that HEI was failing to trim the vegetation around its poles, and even show that this failure directly contributed to the Lahaina fire. The October 1, 2024 MFD Report on the cause of the Lahaina fire states that "[t]he origin of the fire was the *overgrown vegetation* at and surrounding utility pole 25 off of Lahainaluna Road," which "was conclusively established through multiple witness statements, photographic and videographic evidence, as well as scene examination." SAC ¶ 129. The Report stated that the fire "resulted from sparking utility

equipment" "which ignited *overgrown brush* at the base of pole 25." *Id*. The ATF also noted a firebreak near pole 25 was "covered with dense and dry grasses (fuel load) that were not maintained." SAC ¶ 132.

The May 12, 2020 PUC Audit Report shows that HEI's failure to maintain the vegetation around its poles was a chronic problem that extended back at least half a decade. The Audit Report confirmed that the Company had "*not been able to complete*" planned vegetation work for years, meaning that it had failed regularly to trim vegetation for years. SAC ¶ 128.

New allegations from former employees likewise make clear that HEI's failure to maintain vegetation around its poles was an ongoing problem throughout the Class Period. A former employee ("FE2") confirmed that utility poles, including those near Lahaina, were "consumed by brush," yet that FE2 was repeatedly instructed by superiors not to trim back trees or vegetation at the bottom of poles. SAC ¶¶ 135-36. FE2 was a Troubleman for Hawaiian Electric in the Lahaina area from 2014 to 2021. SAC ¶ 87. FE2 newly confirmed that *throughout the entire time FE2 worked at Hawaiian Electric*, FE2's supervisor, Rod Morton, was "constantly telling [FE2] and [FE2's colleague, FE4] not to trim back trees on the lines." SAC ¶ 135. FE2 stated, "I have pictures of me driving through grass that's so high . . . it grows six, seven feet tall." *Id*.

A second former employee, FE4, confirmed that FE4 and FE2 were repeatedly told by their supervisor, Rod Morton, not to trim back trees and vegetation at the bottom of poles during the entire time FE4 was a Troubleman at Hawaiian Electric. FE4 was a Troubleman for Hawaiian Electric from August 2017 to August 2021 and a Trouble Dispatcher from August 2021 to May 2022. SAC ¶ 101. FE4 further noted that the troublemen who came after FE4 once FE4 became a dispatcher in August 2021 were also told not to do so. SAC ¶ 136. As a result of this, FE4 stated that Hawaiian Electric was failing at regular vegetation management. *Id*. FE2 also noted that Hawaiian Electric was "constantly behind schedule" on vegetation management the entire time FE2 worked for them. *Id*. A third former employee ("FE3") likewise confirmed that HECO "neglected" keeping invasive grasses "under control" due to cost. SAC ¶ 137. FE3 was the Senior Environmental Specialist for Hawaiian Electric from May 2004 to January 2023. *Id*. FE3

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (CASE NO. 3:23-cv-04332-JSC)

explained that "[i]t is costly to maintain that land, keep that vegetation down low," and as a result, Hawaiian Electric neglected maintaining the grasses down low. *Id*.

Finally, *plain photographic evidence*—images taken by Hawaiian Electric itself in 2019 and 2020 of its own power lines and included in its Wildfire Mitigation Plan ("WMP")—confirms that the Company was not trimming low-lying vegetation surrounding its power lines at all. SAC ¶ 140. The pictures on pages 20-26 of the WMP show tall grasses and shrubs below and around the power lines growing unabated in equal size to the surrounding vegetation. *Id*. These photos are direct evidence that HEI was not unqualifiedly "regularly trim[ming] the vegetation around [its] equipment . . . ," as Defendants told investors.

In its Opinion, the Court had no occasion to consider the dispositive new allegations above, including the admission by the Company that it "generally does not clear . . . vegetation . . . such as shrubs and grasses," SAC ¶ 127, which eliminates any doubt that Defendants' unqualified statements that they were regularly trimming the vegetation around their poles were misleading. Moreover, new allegations from the SAC resolve specific deficiencies the Court found in the allegations in the AC. The Court found that the AC alleged only that FE2 was ordered to stop clearing vegetation from poles "in 2016 or 2017," prior to the Class Period, Op. at 17, but the SAC now makes abundantly clear that FE2 was told by supervisors not to trim back trees or vegetation at the bottom of poles *throughout FE2's time at HEI*, 2014 *through 2021*, SAC ¶¶ 135-36. Moreover, new allegations confirm that FE4 was also told by supervisors not to trim back trees or vegetation at the bottom of poles, and that the troublemen who were employed after FE4 began work as a Trouble Dispatcher from August 2021 to May 2022 were told the same.

In their Motion, Defendants fail to cite, quote or even to reference the Vegetation Trimming Misstatements of SAC paragraphs 222 and 232. Accordingly, Defendants have conceded that the falsity of these statement has been adequately pleaded. *See, e.g.*, *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001) ("[I]ssues which are not specifically and distinctly argued and raised in a party's opening brief are waived.").

In any event, the arguments Defendants make in Part III.B.3 of their brief would fail even had they been raised against the Vegetation Trimming Misstatements. Defendants argue that the

8

Company's admission that it "generally does not clear any vegetation that does not encroach upon the overhead conductors, such as shrubs and grasses," SAC ¶ 127, "does not suggest that the Wildfire Mitigation Plan established a policy against trimming." Defs.' Mem. at 16. As an initial matter, Defendants are attacking a straw man—Plaintiffs need not show that Defendants had any policy against trimming (in the WMP or elsewhere) in order to prove the falsity of the Vegetation Trimming Misstatements. Those misstatements were misleading if during the Class Period the Company failed to "regularly trim" any material part of "the vegetation around [its] equipment," as then these unqualified statements would be, at best, half-truths. *See, e.g.*, *United States v. Laurienti*, 611 F.3d 530, 539 (9th Cir. 2010) (Section 10(b) "prohibits the telling of material half-truths"); *Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1158–59 (N.D. Cal. 2015) (statements made "notably without qualification" were actionable). Multiple sources establish this failure was widespread in Lahaina and Maui throughout the Class Period. *See* SAC ¶¶ 128-29, 134-40. Yet in any event, the SAC *does* clear Defendants' artificial hurdle—the Company' admission that it "generally does not clear any vegetation that does not encroach upon the overhead conductors, such as shrubs and grasses" *does* establish that the Company had a policy against trimming shrubs and grasses, which are part of the "vegetation around [its] equipment."

Defendants also argue that the Vegetation Trimming Misstatements were not misleading if they were half true. Defs.' Mem. at 16. Defendants argue that if HEI engaged in regular trimming of some vegetation around its poles (e.g., tree branches), but did not regularly trim other vegetation around its poles (like tall grasses), its statement that it "regularly trim[s] the vegetation around [its] equipment . . ." was nevertheless partly true and therefore not misleading. Again, Defendants have the law reversed. *See Laurienti*, 611 F.3d at 539 (Section 10(b) "prohibits the telling of material half-truths"); *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 262 (2024) ("[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth.").

Defendants also argue that statements by FE2 and FE4 that they were instructed not to trim trees or vegetation around poles throughout their time as Troublemen are "consistent with the Wildfire Mitigation Plan" and do not show that HEI "had a general policy against trimming vegetation." Defs.' Mem. at 16. Defendants similarly argue that allegations that two Troublemen

were instructed by their superiors not to trim vegetation around poles does not show that HEI had a companywide policy against trimming. Again, Defendants are attacking a straw man. The relevant question is whether the statements by FE2 and FE4 show that the Vegetation Trimming Misstatements were misleading, and (in conjunction with the Company's admissions to the PUC) they do—they show that Defendants' unqualified statements that HEI "regularly trim[s] the vegetation around [its] equipment" were, at best, half-truths. And while, as explained above, Plaintiffs need not show that HEI had a companywide policy against trimming some vegetation near poles to show that the Vegetation Trimming Misstatements were misleading, the SAC alleges exactly that through allegations including HEI's admission to the PUC, and FE2 and FE4 provide direct evidence that that policy was being implemented.

Defendants argue that FE4's allegations that FE4's successors were instructed not to trim vegetation is unreliable hearsay. Defs.' Mem. at 17. But FE4 learned this information directly in FE4's role as a Trouble Dispatcher, so FE4 was in a position to know these facts. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009) (confidential witness statements may be relied upon where the witnesses are described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.").

### B. HEI Misled Investors To Believe That Its Poles Were Regularly Maintained

During the Class Period, HEI repeatedly assured investors that it was regularly maintaining its poles, when in fact, HEI's pole maintenance was severely deficient. In HEI's 2020 and 2021 ESG Reports, Defendants stated:

> We continually maintain and upgrade our transmission and distribution system to ensure seamless delivery of power to our customers. Day-to-day maintenance is a key part of keeping the grid resilient. We regularly inspect our poles, lines, and other equipment, and work to replace and upgrade aging and faulty equipment before failures happen.

SAC ¶¶ 97, 232.

In fact, far from "continually maintain[ing]" its poles with "day-to-day maintenance," the *majority* of the poles on Maui were *rotten* prior to the Lahaina fire and *actively needed to be replaced*, and they would *frequently fail* when there was wind, as confirmed by multiple new

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (CASE NO. 3:23-cv-04332-JSC)

sources. FE4 worked at Hawaiian Electric first as a Troubleman, then Trouble Dispatcher, and then System Operator Supervisor between August 2017 and March 2023. According to FE4, "the "majority of the poles were rotten prior to the [Lahaina] fire." SAC ¶ 102. FE4 knew this because Osmose, a utilities services company, had inspected the poles "a few years prior" to 2017 and had recorded that the majority of the poles were rotten. *Id*. Although "Osmose left tags on poles that were rotted and needed to be replaced in Lahaina," they were never replaced. *Id*. According to FE4's own observations, a "significant amount of poles . . . needed to be replaced . . . percentage wise" on the west side" of Maui. *Id*. FE4 personally documented "probably more than" 100 poles that needed replacement and that by the time of the August 2023 fire, none of these poles had been replaced. SAC ¶ 101.

Another former employee ("FE5") also confirmed that Hawaiian Electric was failing to "continually maintain" its poles because many poles needed replacement that were never replaced. SAC ¶ 104. FE5 was a Troubleman for Hawaiian Electric in the Lahaina area from 2009 to 2019. *Id*. According to FE5, there were poles that needed replacement when FE5 first began working at Hawaiian Electric that never were replaced in the ten years FE5 worked there. *Id*. FE5 estimated that "*at least ten percent*" of poles were "past their lifespan." *Id*. FE5 also stated that poles in Lahaina specifically were in "horrible, horrible" shape. *Id*.

Additionally, one former employee of Hawaiian Electric ("FE1") newly confirmed in the SAC that some of HEI's poles had already passed the end of their lifespan and actively needed to be replaced. SAC ¶ 100. FE1 was the Director of Regional Transmission and Distribution Operations for Hawaiian Electric from October 2018 to July 2020. *Id*. FE1's role was to serve as a managing director over the electric grid on all five islands. *Id*. According to FE1, Hawaiian Electric uses "large wooden poles that are largely uninsulated" and "leaning." *Id*. During the Class Period, thousands of Hawaiian Electric's poles were more than 40 years old, and so were at high risk of breaking down. SAC ¶ 106. Utility poles on the islands have an average service life of 40 to 45 years or less before they need replacing. SAC ¶ 105. Indeed, in 2016, a consultant wrote that of some 24,000 HEI poles on Maui, the consultant determined at least 7,700, almost one-third, were 40 years old or more. SAC ¶ 106. The SAC newly alleges that according to FE1,

some poles during the Class Period were not merely nearing the end of their lifespan, but had already reached it and needed to be replaced. FE1 likewise newly admitted that some poles during the Class Period fell over "due to lack of maintenance." SAC ¶ 100. Notably, the SAC newly alleges that, based on their personal knowledge of the state of HEI's poles, both FE4 and FE1 agreed that HEI's statement that it was "continually maintain[ing]" its poles was "misleading" and "not true." SAC ¶¶ 100, 102.

Relatedly, the SAC newly alleges that HEI did not "regularly inspect [its] poles." SAC ¶ 102. FE4 stated that poles in Lahaina were not regularly inspected at any point while FE4 worked as a Troubleman between August 2017 and August 2021. *Id*. In his role as a Troubleman, FE4 was perfectly positioned to know about pole inspections on Maui. Indeed, FE4 knew that the last pole inspection had occurred *years* prior to FE4's starting work in 2017, and knew that even poles identified as needing replacement in that inspection had not been replaced. *Id*. Accordingly, HEI's statements that it "regularly inspect [its] poles" were blatantly false.

In its Opinion, the Court found that Plaintiffs had failed to plead that HEI was failing to "continually maintain" its poles because, while the AC alleged that "many of the poles were nearing the end of their lifespan, Plaintiffs do not allege any poles failed." Op. at 16. In this way, the Court found that there was no benchmark or standard to judge whether poles that were aging but not yet failing were being "continually maintain[ed]," as aging poles are not (for that reason alone) in a state of disrepair or lacking maintenance. *Id*. The new allegations of the SAC thoroughly resolve this concern. The absolute minimum imaginable standard or "benchmark" for poles to be "maintained," is for those poles *not to actively be in need of replacement*—not to have exceeded their lifespan or to be in such a state of disrepair from age and termite damage that they fail and fall over "any time [there is] any kind of wind." SAC ¶ 102. By definition, poles that actively need to be replaced are not "maintain[ed]." Yet FEs stated that a majority of poles in areas including Lahaina failed even to meet this absolute minimum standard and actively needed to be replaced. SAC ¶¶ 100-04.

The Court also held that Plaintiffs had failed to allege that Defendants' statement that HEI "regularly inspect[s its] poles" was false because "Plaintiffs do not allege Defendants did not

regularly inspect their poles." Op. at 16. As noted above, the SAC now unmistakably pleads, based on FE4's personal knowledge, that poles in Lahaina were not regularly inspected at any point between August 2017 and August 2021. SAC ¶ 102.

In their Motion, Defendants largely ignore the key new allegations of the SAC described above that eliminate any doubt that HEI was not "continually maintain[ing]" or "regularly inspect[ing]" its poles. Defs.' Mem. at 12-13. Defendants' claim that "HEI never implied HECO completed its maintenance efforts" is of no relevance—in stating that HEI "continually maintain[s]" its poles, HEI was not making a representation about some discrete maintenance project to be completed at some point, but rather was representing that, on an *ongoing basis*, it would "without interruption" "keep [its poles] in good condition," according to standard dictionary definitions.[2] That statement was at best a half-truth if for any material period of time HEI's poles were not "maintain[ed]," as the majority on Lahaina were not throughout the Class Period. *See Laurienti*, 611 F.3d at 539 (Section 10(b) "prohibits the telling of material half-truths").

### C.   HEI Misled Investors To Believe It Had Replaced Exposed Power Lines with Insulated Conductor Wires

During the Class Period, HEI repeatedly misled investors to believe that it had replaced uninsulated power lines with insulated wires to prevent wildfires from starting when poles fall and exposed wires contact dry vegetation. SAC ¶¶ 81-96. In the 2020 and 2021 ESG Reports, Defendants stated:

> We have also replaced traditional power lines with insulated conductor systems to improve reliability and resilience in targeted areas prone to vegetation-related outages.

SAC ¶ 84 (the "Insulated Wires Misstatements").

In fact, HEI had not replaced uninsulated power lines with insulated conductors, even in "targeted areas," including Maui in general and Lahainaluna Road in particular. The Company itself identified Maui and Lahaina as targeted areas for the installation of insulated conductors. As early as November 2019, HEI's utilities stated in a press release that Maui was an "identif[ied]"

---

[2] *See Continually*, Merriam-Webster, https://www.merriam-webster.com/dictionary/continually (last visited May 1, 2025) ("without stopping or interruption"); *Maintain*, Cambridge English Dictionary, https://dictionary.cambridge.org/us/dictionary/english/maintain (last visited May 1, 2025) ("to keep a road, machine, building, etc. in good condition").

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (CASE NO. 3:23-cv-04332-JSC)

"area" where the utilities planned to install "insulated conductors" as part of their "resilience initiatives . . . to prevent wildfires." SAC ¶ 82. Then in December 2019, Maui Electric issued a press release titled "Maui Electric upgrading poles, insulated power lines along Lahainaluna Road." Defs.' Ex. 18. This press release stated that the Company had targeted Lahainaluna Road itself for the installation of insulated power lines "to withstand high winds or the force of falling branches from large trees along Lahainaluna Road." SAC ¶ 83. In this way, the Company made pellucid that Lahainaluna Road was a "targeted area[] prone to vegetation-related outages" where insulated power lines were to be installed. SAC ¶ 84.

Numerous sources confirm that the power lines in Maui in general, and Lahainaluna Road in particular, were not insulated at the time of the 2023 Maui fires. A former Troubleman at the Company ("FE2") has confirmed that most of the power lines in Maui were not insulated when FE2 left the company in May 2021, and that poles 24 and 25 on Lahainaluna Road (two poles involved in the source of the Lahaina fire) were not insulated. SAC ¶¶ 87, 129-30. A second former Troubleman at the Company ("FE4") stated that the wires on Lahainaluna Road that failed were "very old" *uninsulated* copper wire, and stated with personal knowledge, "[t]hat particular wire had been down on the ground several times over the course of five years that I know of. They never changed it all out." SAC ¶¶ 101, 119.

The Associated Press analyzed videos and images of West Maui power lines and found that Hawaiian Electric had left miles of electrical line "naked to the weather and often-thick foliage." SAC ¶ 85. According to the Associated Press, those videos and images show that in the first moments of the Maui fires, when high winds brought down power poles, which slapped electrified wires to the dry grass below, the flames erupted all at once in long, neat rows because those wires were bare, uninsulated metal that could spark on contact. *Id*. An expert in electrical systems, Michael Ahern, who served as a director of power systems at Worcester Polytechnic Institute in Massachusetts, stated that it is "very unlikely" a fully-insulated cable would have sparked and caused a fire in dry vegetation. SAC ¶ 86. Other experts who watched videos showing downed power lines agreed that insulated wire would not have arced and sparked, igniting a line of flame. *Id*.

In its Opinion, the Court found that "[t]o allege falsity" of Insulated Wires Misstatements, "Plaintiffs must identify the 'targeted areas prone to vegetation-related outages' and plausibly allege HEI did not install insulated conductors there." Op. at 15. As explained above, the SAC does exactly that. *See supra* Part IV(B).

In their Motion, Defendants argue that Plaintiffs have failed to allege that Lahaina was a targeted area prone to vegetation-related outages. Defs.' Mot. at 10. Defendants simply ignore the central allegations that make clear that Lahaina was a targeted area, namely, allegations that HEI's subsidiaries expressly told investors in press releases that they were targeting Maui and Lahaina for installations of insulated wire "to withstand . . . falling branches from large trees along Lahainaluna Road." SAC ¶ 83. In a separate section of their brief, Defs.' Mem. 10-11, Defendants argue that the December 19, 2019 press release stated that Maui Electric would replace power lines only "between Mill Street and Kalena Street" and not along the stretch where they claim the Lahaina wildfire began. That argument blatantly misrepresents the press release, which merely states that "for safety reasons due to the work involved and the width of the road, parts of the uphill (mauka) lane of Lahainaluna Road, between Mill Street and Kalena Street, will be closed to traffic," not that only those sections would have lines replaced. Defs.' Ex. 18. Indeed, Lahainaluna Road is particularly narrow between those two streets because that is the only major section of Lahainaluna Road with houses on both sides, *see* Ex. 1 to Van Decl., and presumably for that reason, Maui Electric planned partly to close only that section of the road during construction. The press release did not state that the installation of insulated lines would occur only on that narrow section of Lahainaluna Road. Defs.' Ex. 18. Indeed, the Company twice made clear that it was conducting this work all "along Lahainaluna Road" when it stated that "[i]t's also advised that motorists avoid parking their vehicles along Lahainaluna Road during this time," without limiting that advice only to particular sections of Lahainaluna Road, and when it opened the press release by stating that "Maui Electric Company will be . . . installing insulated power lines along Lahainaluna Road in West Maui," without qualification. *Id*. The press release cannot be read in the light most favorable to Defendants rather than Plaintiffs on a motion to dismiss. *See In re Atossa*, 868 F.3d at 793.

Defendants next argue that the MFD Report "contradict[s] Plaintiffs' claim that all of the power lines along Lahainaluna Road were uninsulated." Defs.' Mem. at 10. The MFD Report shows that investigators found evidence that only *two poles* (the two cited by Defendants) had insulated wires near them. Defs.' Ex. 31 at 44-49. The remaining poles along Lahainaluna Road appear *not* to have been uninsulated. *Id.* Accordingly, the MFD Report is excellent evidence that the vast majority of the poles in the fire area along Lahainaluna Road were not insulated. And if Defendants insulated some power lines, but failed to insulate the majority of the power lines along Lahainaluna Road, a targeted area, then Defendants were telling at best a half-truth when they stated that they had "replaced traditional power lines" "in targeted areas prone to vegetation-related outages." Again, it is well established that Defendants cannot speak in half-truths. *See Laurienti*, 611 F.3d at 539 (Section 10(b) "prohibits the telling of material half-truths"); *Macquarie*, 601 U.S. at 263-64 (half-truths are "representations that state the truth only so far as it goes, while omitting critical qualifying information" and are actionable under Section 10(b)).

Defendants argue that statements by FE2 and FE4 do not support a showing that the Company had failed to insulate the lines along Lahainaluna Road. Defendants are mistaken. Defendants argue that FE2's statement that Poles 24 and 25 along Lahainaluna Road were uninsulated "does not contradict Maui Electric's [December 19, 2019] press release." Defs.' Mem. at 11. It does—the press release stated that the Company was insulating the power lines along Lahainaluna Road, Defs.' Ex. 18, but according to FE2, the Company failed to insulate at the majority of those lines, including the power lines connected to Poles 24 and 25 along Lahainaluna Road, SAC ¶ 87. FE2 was in an ideal position to know these facts because FE2 was a Troubleman for Hawaiian Electric in the Lahaina area from 2014 to 2021. SAC ¶¶ 87, 135-36.

Defendants argue that FE4's statements that the power lines that failed in the Lahaina fire were uninsulated copper wire are unreliable because, according to them, FE4 "never claims to have had personal knowledge about these specific power lines in Lahaina." Defs.' Mem. at 11. But FE4 claims exactly that in the SAC: with respect to "the wire that went down between the poles in Lahaina which caused the August 2023 fire," FE4 stated, "[t]hat particular wire had been

down on the ground several times over the course of five years that I know of. They never changed it all out." SAC ¶ 119.

Defendants argue that allegations that Lahaina was an area targeted for wildfire prevention do not show that Lahaina was an area targeted for installation of insulated conductor wires. But the other allegations described above, including admissions by Defendants that Maui Electric was installing insulated wires "to withstand . . . falling branches from large trees along Lahainaluna Road," SAC ¶ 83, dispositively establish as much. Allegations that Lahaina was an area targeted for wildfire prevention simply make that admission all the more plausible.

> **D.     Defendants Misled Investors To Believe That They Had Investigated Subsidiaries' Responses to Environmental Conditions Requiring Action and Determined that They Had Taken Appropriate Actions, When They Had Not Taken the Actions HEI Claimed They Had Taken**

During the Class Period, Defendants repeatedly implied to investors that they had looked into what their subsidiaries were doing to address environmental conditions requiring action, and had found that the subsidiaries had taken appropriate actions to address those environmental conditions. HEI's annual reports on Form 10-K for 2018-2023, signed variously by Defendants Lau, Seu, Kimura, Hazelton and Ito, stated:

> [T]he Company believes that each subsidiary has appropriately responded to environmental conditions requiring action and that, as a result of such actions, such environmental conditions will not have a material adverse effect on [HEI].

SAC ¶¶ 202, 210, 218, 228, 260 ("Subsidiary Actions Misstatements"). These statements were misleading because Defendants knew that HEI's subsidiaries were not taking the very actions *HEI itself* had stated in its ESG report were appropriate actions to address environmental conditions such as unmaintained vegetation, uninsulated wires and failing poles. If, as they implied in these statements, Defendants looked into whether HEI's subsidiaries were actually taking the actions HEI claimed they were taking to address urgent environmental conditions—including clearing all vegetation around its equipment, installing insulated conductor wire and replacing aging poles— then Defendants knew the truth that HEI's subsidiaries were failing to take these actions and did not believe what they said they did. *See supra* Parts IV(A)-(C).

The Subsidiary Actions Misstatements are opinion statements that are actionable both as misrepresentations and omissions. *First*, Defendants' statements were affirmative misrepresentations because Defendants did not in fact believe that the subsidiaries were taking appropriate actions to address environmental conditions requiring action—Defendants knew that the subsidiaries were not taking the actions Defendants themselves had deemed appropriate to take in their ESG Reports. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184–85 (2015). Moreover, as an objective matter, Defendants were not taking those actions, as explained above. *See supra* Parts IV(A)-(C). *Second*, Defendants' statements contain actionable omissions under *Omnicare* because they "omit[] material facts about the issuer's . . . knowledge," and "those facts conflict with what a reasonable investor would take from the statement itself." *Omnicare*, 575 U.S. at 189. Reasonable investors would take from these statements that HEI's subsidiaries had taken the actions to address environmental conditions that HEI contemporaneously claimed they had taken, including installing insulated conductor wire, replacing aging poles, and clearing fire-prone grasses, yet Defendants omitted from these statements that they knew that the subsidiaries in fact had not taken such actions. *See infra* Part V.

In its Opinion dismissing this claim with leave to replead, Op. at 21-23, the Court did not have occasion to consider the new allegations above showing the objective falsity of these statements—allegations showing that HEI's subsidiaries were indeed failing to take the actions Defendants had stated they were taking in the ESG report, including clearing all vegetation around equipment, installing insulated conductor wire and replacing aging poles. The SAC also now pleads subjective falsity by pointing to Defendants' own implicit admission in the Subsidiary Actions Misstatements that Defendants had looked into what actions the subsidiaries were taking to address the environmental conditions requiring action HEI had identified, and so could not have believed that they were taking those actions. For the same reasons, the SAC now pleads that Defendants "knew undisclosed information that seriously undermined the basis for its opinion." Op. at 14.

In their Motion, Defendants argue that Plaintiffs have failed to plead that the Subsidiary Actions Misstatements were objectively or subjectively false, or that Defendants omitted facts

18

from these Misstatements that seriously undermined the basis of their opinion. Defs.' Mem. at 19-20. Defendants ignore the new bases for falsity explained above.

## V.    THE SAC ADEQUATELY PLEADS SCIENTER

The relevant inquiry in considering scienter is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323 (2007). The inference "need not be irrefutable . . . or even the most plausible," and no "smoking-gun" is required. *Id.* at 324. An inference of scienter is "strong," and a motion to dismiss must be denied, where "a reasonable person would deem [it] cogent and *at least as compelling* as any opposing inference." *Id.* (emphasis added). As a matter of logic, that means "a tie goes to the Plaintiff." *In re Amgen Inc. Sec. Litig.*, No. CV 07–2536, 2014 WL 12585809, at *8 (C.D. Cal. Aug. 4, 2014). Scienter may be pled by alleging facts suggesting defendants had "actual access to the disputed information," or were in a position to know facts about operational issues affecting a significant portion of the company's revenue. *Reese v. Malone*, 747 F.3d 557, 575 (9th Cir. 2014); *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 706 (9th Cir. 2021). Moreover, "[r]ecklessly turning a 'blind eye' to impropriety is equally culpable conduct under Rule 10b-5." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012).

### A.    Defendants Created or Reviewed Documents Contradicting Their Statements

Defendants participated in the creation of, or reviewed, both the May 2020 Audit Report and the Wildfire Mitigation Plan. SAC ¶¶ 67, 75, 253-69. These documents contained information that specifically contradicted Defendants' public statements. *See Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004) ("The most direct way to show . . . that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement."); *In re Acadia Pharms. Inc. Sec. Litig.*, No. 18-CV-01647, 2020 WL 2838686, at *7 (S.D. Cal. June 1, 2020) (access to contrary data indicative of scienter); *Roberts v. Zuora, Inc.*, No. 19-cv-03422, 2020 WL 2042244, at *11 (N.D. Cal. Apr. 28, 2020) (scienter adequately alleged where defendants are in possession of contradictory

information); *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 815 (C.D. Cal. 2011) (finding scienter "based on . . . defendants' access to information contradicting [their] statements").

### 1.   May 2020 Audit Report

The May 2020 Audit Report made clear that HECO was not "regularly trim[ming] the vegetation around [its] equipment" and was not "continually maintain[ing]" or "regularly inspect[ing]" its poles.  SAC ¶¶ 61-66; 255-58.  The Audit Report flatly informed Defendants that HECO's "not completing vegetation management work" was resulting in "vegetation interference with overhead lines."  SAC ¶ 255.  Indeed, the Report found that failure to complete vegetation management was chronic:  "Vegetation Management has not been able to complete its planned mitigation programs over the last few years."  *Id*.  The Report even found that HECO had no "strategy to complete the annual work program" or "catch up on the overdue work," and that without such a strategy, "these results will continue."  *Id*.  The Report likewise found that there was "no evidence of any . . . tracking" by HEI or HECO of "programs—for example pole replacement" in order "to confirm that predicted volumes of work and business outcomes were actually being achieved."  SAC ¶¶ 63, 257.  The Report made clear that pole replacement was an "issue" that was not "properly prioritized" for HECO.  SAC ¶ 258.  Accordingly, the Audit Report highlighted for Defendants that they were not telling "the whole truth," *Macquarie*, 601 U.S. at 262, when they stated that HEI was "regularly trimming vegetation" because in fact HECO was "not completing vegetation management work."  SAC ¶ 255.  Likewise, the Report highlighted that Defendants lacked any basis to claim that HECO was "continually maintain[ing]" its poles when did not even track its pole maintenance.  SAC ¶ 257.

Defendants read the May 2020 Audit Report because it was prepared for them with their assistance and discussed with them.  SAC ¶¶ 67, 253.  At the time, Seu was CEO of HECO, Kimura was its Senior Vice President of Strategic Planning, Lau was CEO of HEI, Hazelton was CFO and Ito Treasurer of HEI. SAC ¶¶ 31-35.  Indeed, both Seu and the "CEO and Chairman of HEI"—at the time Lau—*were interviewed for it*.  SAC ¶ 253.

From the May 2020 Audit Report and other sources, Defendants knew in May 2020 that the Company was not "regularly trimming vegetation," and knew at that time that the Company

20

had no basis to state whether the Company was "continually maintain[ing]" its poles. Accordingly, after May 2020 and throughout the Class Period, Defendants were, at a minimum, under an obligation to investigate whether these statements had *newly become* supportable before issuing them repeatedly to the public during the Class Period. As the problems identified in the May 2020 Audit Report persisted *throughout the Class Period* (as detailed above, *see supra*, Parts IV(A)-(C)), if Defendants did investigate, then they learned that the statements were not supportable, and if they did not investigate, then they were severely reckless in issuing these statements.

Defendants' arguments that the Audit Report does not support scienter are meritless. Defs.' Mem. at 22-23. Defendants contend that the Report focuses on "infrastructure vulnerabilities" rather than "wildfires" and conclude that the Report therefore cannot support scienter. Defs.' Mem. at 22. Yet Plaintiffs challenge statements regarding HEI's *failure to maintain its infrastructure*. *See, e.g.*, SAC ¶¶ 204, 206, 226, 230, 246, 250. The Report shows that Defendants knew that their statements about maintaining infrastructure were misleading, and that knowledge suffices to support a strong inference of scienter for the challenged statements regardless of whether Defendants knew anything about wildfires (even though they certainly did).

Defendants also argue that the Audit Report "actually praised HECO's commitment to infrastructure maintenance." Defs.' Mem. at 22. While Plaintiffs disagree that other parts of the Report generally praised HECO, there can be no dispute that the relevant passages of the Report on which Plaintiffs rely criticized HECO for "not completing vegetation management work" and showing "no evidence of any . . . tracking" of "pole replacement." SAC ¶¶ 61, 63, 128, 255, 257. These passages demonstrate scienter regardless of the Reports' notes on other matters.

Defendants conflate falsity and scienter in arguing that the Audit Report is a "public record," and that its contents therefore could not have contained a truth hidden from investors. Defs.' Mem. at 23. Regarding falsity, this highly disfavored "truth-on-the-market"-style argument fails because the Report was not disseminated to investors or reported on by stock analysts, and was buried deep in the Hawaii PUC website. *See In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989) (information "in a few poorly-circulated or lightly regarded publications" did not neutralize misleading statements). Indeed, the Court has already rejected arguments that PUC

records "neutralize" misleading statements. *See* Op. at 14. Regarding scienter, to the extent that the Report was public, its public availability shows that *all Defendants had access* to it. Defendants also make a falsity argument in arguing that the Report does not show that Defendants had "a policy against vegetation trimming or replacing outdated utility poles." Defs.' Mem. at 23. Yet as explained often above, *supra*, Parts IV(A)-(C), the falsity of Defendants' statements does not turn on whether Defendants had any such policies (even though they did)—Defendants statements were false if *to any material extent* the Company was failing to "regularly trim" its vegetation or "continually maintain" its poles. *See Laurienti*, 611 F.3d at 539 (Section 10(b) "prohibits the telling of material half-truths").

### 2.      Wildfire Mitigation Plan

Defendants also knew that their statements that they were "regularly trimming vegetation" and that they "ha[d] replaced traditional power lines with insulated conductor[s]" were misleading because the WMP unmistakably indicated as much in ways the Court did not reach in its Opinion and in ways that are now clear in light of new allegations in the SAC.

*First*, regardless of any interpretation of particular language in the WMP, the WMP contains *photographic evidence*, taken by HEI in 2019 and 2020, that undeniably shows that HEI was failing to trim the vegetation around its poles, including around poles on Maui. SAC ¶ 140, Figure 8. These images show overgrown, mature bushes and grasses across Maui, Oahu and Hawaii Island that obviously had not been trimmed regularly, if ever. These images gave Defendants reason to know that their statements that HEI was "regularly trim[ming] the vegetation around its equipment" were not wholly true.

*Second*, the SAC newly pleads Defendants' admission that, as a matter of policy, HEI "generally does not clear . . . vegetation . . . such as shrubs and grasses." SAC ¶ 127. This admission of HEI's policy removes any doubts about the meaning of HEI's statement in the WMP recommending against "[f]urther trimming of the already low-lying vegetation." SAC ¶ 126. This statement in the WMP was a statement of HEI's now admitted policy that HEI generally does not trim low-lying vegetation *at all*, not a statement that HEI bizarrely does *some* initial trimming of low-lying vegetation, but not additional or "further" trimming of that vegetation. To interpret this

statement in the WMP as a *misstatement* of HEI's actual policy, as Defendants request, rather than as a correct statement of their policy, would be to read this statement in the light most favorable to *Defendants*, not Plaintiffs, contrary to established precedent.  *See In re Atossa*, 868 F.3d at 793. Accordingly, the WMP is properly read as informing Defendants that HEI generally does not clear low-lying vegetation, so the WMP provided an additional reason for Defendants to know that their Vegetation Trimming Misstatements were misleading.

*Third*, the WMP states that "if there are wildfire areas with tall trees adjacent to the line rights-of-way" insulated conductors merely "should be considered."  This statement confirms that HEI had not already "replaced traditional power lines with insulated conductor systems" even "in targeted areas prone to vegetation-related outages"—if traditional lines already had been replaced with insulated lines in "areas prone to vegetation-related outages," there would be no need to "consider" whether to install insulated lines in "areas with tall trees adjacent to" the lines.  SAC ¶ 89.  Accordingly, the WMP also provided Defendants with clear evidence that insulated conductor systems had not in fact been fully installed even in areas prone to vegetation-related outages.

Defendants were aware of the WMP.  In Congressional testimony, Kimura acknowledged participation in the development of the WMP (using first person plural pronouns ("we" and "our") in speaking of her work on the WMP).  SAC ¶¶ 75, 263-64.  Kimura testified that the WMP was followed from 2019 as an "internal working document" throughout HECO (and up to 2023).  SAC ¶¶ 75, 264.  As Kimura has admitted to being familiar with the WMP through her role as CEO of HECO, there is a strong inference that Seu likewise was familiar with the WMP through holding that office.  Moreover, Seu expressly invoked the WMP in the 2021 ESG Report he signed.  *See e.g.*, SAC ¶¶ 234, 269; *Jackson Cnty. Emps.' Ret. Sys. v. Ghosn*, 510 F. Supp. 3d 583, 614-15 (M.D. Tenn. 2020) (CEO charged with knowledge of sustainability report for which he wrote foreword).  Accordingly, there is a strong inference Kimura and Seu at a minimum read and were familiar with its contents.

**B.    Defendants' Own Statements Support Scienter**

Every Defendant signed at least one of HEI's annual reports on Form 10-K in which they

stated that they believed "each subsidiary ha[d] appropriately responded to environmental conditions requiring action and that, as a result of such actions, such environmental conditions w[ould] not have a material adverse effect" on HEI.  SAC ¶¶ 202, 210, 218, 228.  In these statements, Defendants directly implied that they had looked into what "each subsidiary" was doing to respond to "environmental conditions requiring action."  Such environmental conditions certainly included the vegetation management and pole replacement problems that the PUC Audit Report had determined (and informed Defendants) required action to address.  SAC ¶¶ 61, 64, 255-58.  These conditions also surely included the conditions HEI itself had stated in its ESG reports required addressing through action, including by trimming overgrown vegetation, maintaining poles, and insulating conductor wires.  *See* SAC ¶¶ 97, 124, 222, 230, 232, 246. Accordingly, Defendants themselves effectively admitted in these statements that they had investigated and knew what actions the subsidiaries were taking (and not taking) to address these matters, and so admitted that they had a basis to know that their statements about these matters were misleading.  Alternatively, if Defendants did not know what actions the subsidiaries had taken to address these environmental conditions, then Defendants were severely reckless for implying that they did know. *See S. Ferry LP No. 2 v. Killinger*, 687 F. Supp. 2d 1248, 1258 (W.D. Wash. 2009) (court can infer at least deliberate recklessness where the statements themselves suggest actual knowledge); *Reese*, 747 F.3d at 572, 581 (scienter alleged where defendants referenced the relevant issue indicating their awareness of it); *Roberti v. OSI Sys., Inc.*, No. CV 13–9174, 2015 WL 1985562, at *12 (C.D. Cal. Feb. 27, 2015) (scienter established where public statements suggest actual knowledge); *In re Zillow Grp., Inc. Sec. Litig.*, No. C17-1387, 2019 WL 1755293, at *20 (W.D. Wash. Apr. 19, 2019) (defendants were "at least deliberately reckless in continuing to make statements that the co-marketing program was legally compliant" given their statements evincing familiarity with the program); *Howard v. Everex Sys. Inc.*, 228 F.3d 1057, 1062, 1064 (9th Cir. 2000) (officers signing SEC filings cannot claim ignorance where they "failed to obtain and disclose [contrary] facts although [they] could have done so without extraordinary effort.").

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (CASE NO. 3:23-cv-04332-JSC)

### C.    A Holistic Review Supports Scienter

While documents showing that Defendants knew their statements were misleading and Defendants' own representations that they looked into subsidiaries actions independently give rise to a strong inference of scienter, numerous additional considerations support the Court's holistic finding of scienter.  Defendants repeatedly emphasized that they were highly focused on wildfire risk mitigation. *See, e.g.*, SAC ¶¶ 272-74.  HEI specifically required regular reports on the material risks affecting HECO, including wildfire risks, through, *inter alia*, HEI's Audit & Risk Committee, HECO's CFO/Chief Risk Officer, and HECO's "Enterprise Risk Management" function, which is responsible "for reporting on areas of significant risk to the HEI Board." SAC ¶¶ 273-77.  Likewise, the Company assured investors that compensation of its executives was designed to encourage them to minimize risk. SAC ¶ 274 ("Hawaiian Electric's compensation policies . . . are designed . . . to discourage decisions that introduce inappropriate risks").  The potential catastrophic impact of wildfires on HEI's core operations also supports scienter—91% of HEI's revenues came from HECO's operations in the power industry, a heavily regulated industry requiring close attention, particularly on matters of wildfire mitigation.  *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988-89 (9th Cir. 2008) (scienter is more easily shown when subject affects core operations); *Longo v. OSI Sys., Inc.*, No. CV 17-8841, 2021 WL 1232678, at *9 (C.D. Cal. Mar. 31, 2021) (same, even where allegations implicated only one business division accounting for 49-58% of company revenues).  Risk and hazard information fall "squarely within" upper management's "bailiwick." *Amgen*, 2014 WL 12585809, at *12 (finding "compelling" that VP of Clinical Development would be aware of reports regarding potential hazards of drug); *S. Ferry LP No. 2*, 687 F. Supp. 2d at 1258 ("repeatedly assur[ing] the public that [the company] was adequately managing its risk" supports scienter).  *Finally*, Defendants had a motive to hide their cutting corners on wildfire mitigation in order to reduce costs without backlash.  SAC ¶¶ 61-66, 103.  Numerous allegations show that Defendants repeatedly failed to spend even the amounts they had allocated for wildfire prevention.  *See, e.g.*, SAC ¶¶ 61-66, 99, 128, 150, 255.

### VI.    CONCLUSION

Defendants' Motion should be denied.

25

Dated:  May 2, 2025

Respectfully submitted,

**POMERANTZ LLP**

/s/ Austin P. Van
Jeremy A. Lieberman (admitted *pro hac vice*)
Austin P. Van (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (917) 463-1044
E-mail:  jalieberman@pomlaw.com
avan@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California  90024
Telephone:  (310) 405 7190
Facsimile:  (917) 463 1044
jpafiti@pomlaw.com

*Attorneys for Lead Plaintiffs*

LEVI & KORSINSKY LLP
Shannon L. Hopkins
Gregory M. Potrepka
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: 203/992-5423
212/363-7171 (fax)
shopkins@zlk.com
gpotrepka@zlk.com

*Attorneys for Additional Plaintiff Emaad
Kuhdear*

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (CASE NO. 3:23-cv-04332-JSC)

**CERTIFICATE OF SERVICE**

I, Austin P. Van, hereby certify that a true and correct duplicate copy of the foregoing Second Amended Class Action Complaint for Violations of the Federal Securities Laws was filed electronically on May 2, 2025.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/ Austin P. Van
Austin P. Van

27

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (CASE NO. 3:23-cv-04332-JSC)