United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BHAPINDERPAL S. BHANGAL, Plaintiff, v. HAWAIIAN ELECTRIC INDUSTRIES, INC., et al., Defendants. | Case No. 3:23-cv-04332-JSC<br>**ORDER RE: MOTIONS FOR FINAL APPROVAL AND FOR AWARD OF ATTORNEYS' FEES, COSTS, AND COMPENSATORY AWARD**<br>Re: Dkt. Nos. 129, 137 |

Plaintiff in this federal securities class action alleges Hawaiian Electric Industries, Inc. ("HEI") and its top officials misled investors the utility was taking appropriate action to mitigate wildfire risk. The Court previously dismissed the action with leave to amend. (Dkt. No. 92.[1]) Following amendment, Defendants again moved to dismiss, and the parties reached a class action settlement while that motion was pending. (Dkt. Nos. 93, 106, 116.) The Court previously granted preliminary approval of the parties' class action settlement. (Dkt. No. 124.) Plaintiff's motion for final approval and motion for attorneys' fees, costs, and a compensatory award for the class representative are now pending before the Court. (Dkt. Nos. 129, 137.) Having reviewed the briefing, including the supplemental briefing, and having had the benefit of oral argument on October 15, 2026, the Court GRANTS final approval of the settlement, and GRANTS IN PART and DENIES IN PART the motion for attorneys' fees, costs, and a compensatory award.

//

//

[1] Record Citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the document.

United States District Court
Northern District of California

## THE SETTLEMENT AGREEMENT

### A. The Settlement Class

The Agreement defines the Settlement Class as "all persons and entities other than defendants who purchased or otherwise acquired HEI securities between February 28, 2019 and September 4, 2023, both dates inclusive, and were damaged thereby." (Dkt. No. 119-1, Settlement Agreement at ¶ 1(ww).) The Settlement Class excludes (1) Defendants; (2) current and former HEI officers and directors; (3) Individual Defendants' immediate family; (4) all subsidiaries and affiliates of the Company and the subsidiary directors and officers; (5) any persons, firms, trusts, corporations, officers, directors, and entity in which any defendant has a controlling interest; (6) the legal representative of any excluded party; and (7) anyone who properly excludes themselves by filing a valid and timely request for exclusion. (*Id.*)

### B. Payment Terms

Under the Settlement Agreement, Defendants will pay $47,750,000 ("Settlement Fund"). (Dkt. No. 119-1, Settlement Agreement at ¶ 1(vv).) After deducting any taxes, notice and administration costs, and attorneys' fees and costs, the remaining funds will be distributed to the Settlement Class Members in pro rata shares pursuant to a specified Plan of Allocation. (*Id.* at ¶¶ 1(bb). 19.)

### C. Scope of Release

Any Settlement Class Member who does not submit a timely request for exclusion releases:

> all claims, actions, causes of action, demands, losses, rights, duties, obligations, debts, sums of money, suits, contracts, agreements, judgments, matters, issues, promises, damages and liabilities of every nature and description, whether known or unknown, known claims or Unknown Claims, whether arising under federal, state, common or foreign law, that Plaintiffs, any other member of the Settlement Class, or any other of Releasing Plaintiffs' Parties: (i) asserted in any complaint in this Action or (ii) could have asserted in any forum that arise out of, are based on, or relate in any way to, directly or indirectly, any of the allegations, acts, transactions, facts, events, matters, occurrences, representations or omissions involved, set forth, alleged or referred to, in the Action, or which could have been alleged in the Action, or which arise out of, are based upon, or relate in any way, directly or indirectly, to the purchase, acquisition, transfer, holding, ownership, disposition or sale of HEI securities by any members of

> the Settlement Class, and/or any disclosures, public filings, registration statements, or other statements by any Defendant during the Class Period, whether arising under federal, state, common or foreign law.

(*Id*. at ¶ 1(pp).)

**D. Notice**

Plaintiff selected Verita as the Settlement Claims Administrator following a competitive bidding process. (Dkt. No. 118 at 30.) Following preliminary approval, Verita disseminated 160,167 notice packets to potential Settlement Class Members. (Dkt. No. 138-1, Supp. Cavallo Decl. at ¶ 2.) Verita also created and maintains the settlement website: www.HawaiianElectricSecuritiesSettlement.com and toll-free number. (*Id*. at ¶ 4.) Verita received 67,472 claims, 24,306 of which it deemed valid. (Dkt. No. 141.)

**E. Opt-Outs and Objections**

The deadline to object or opt-out of the settlement was June 25, 2026. Verita received 20 requests for exclusion and one objection. (Dkt. No. 138-1 at ¶ 7.)

**DISCUSSION**

The approval of a settlement is a multi-step process. At the preliminary approval stage, the court should grant such approval only if it is justified by the parties' showing that the court will likely be able to (1) "certify the class for purposes of judgment on the proposal" and (2) "approve the proposal under Rule 23(e)(2)." Fed. R. Civ P. 23(e)(B). If the court preliminarily certifies the class and finds the settlement appropriate after "a preliminary fairness evaluation," then the class will be notified, and a final fairness hearing scheduled to determine if the settlement is fair, adequate, and reasonable pursuant to Rule 23. *Villegas v. J.P. Morgan Chase & Co.*, No. CV 09-00261 SBA (EMC), 2012 WL 5878390, at *5 (N.D. Cal. Nov. 21, 2012).

At the second stage, "after notice is given to putative class members, the Court entertains any of their objections to (1) the treatment of the litigation as a class action and/or (2) the terms of the settlement." *Ontiveros v. Zamora*, 303 F.R.D. 356, 363 (E.D. Cal. Oct. 8, 2014) (citing *Diaz v. Tr. Territory of Pac. Islands*, 876 F.2d 1401, 1408 (9th Cir. 1989)). Following the final fairness hearing, the Court must finally determine whether the parties should be allowed to settle the class

United States District Court
Northern District of California

action pursuant to their agreed upon terms. *See Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004).

**I. CLASS CERTIFICATION**

Final approval of a class action settlement requires, as a threshold matter, an assessment of whether the class satisfies the requirements of Federal Rule of Civil Procedure 23(a) and (b). *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019–1022 (9th Cir. 1998). Because no facts that would affect these requirements have changed since the Court preliminarily approved the class on March 3, 2026, this Order incorporates by reference the Court's prior analysis under Rules 23(a) and (b) as set forth in the Order granting preliminary approval. (Dkt. No. 124 at 4-6.)

**II. ADEQUACY OF NOTICE**

Under Federal Rule of Civil Procedure 23(e), the Court "must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). Notice includes "[n]otice of the motion [for attorneys' fees which] must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner." Fed. R. Civ. P. 23(h)(1).

Rule 23(c)(2)(B) requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." The notice must "clearly and concisely state in plain, easily understood language" the nature of the action, the class definition, and the class members' right to exclude themselves from the class. Fed. R. Civ. P. 23(c)(2)(B); *see also Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 575 (9th Cir. 2004) ("Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.") (cleaned up). Although Rule 23 requires reasonable efforts be made to reach all class members, it does not require that each class member actually receive notice. *See Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994) (noting the standard for class notice is "best practicable" notice, not "actually received" notice).

The Court finds the notice plan previously approved by the Court, as implemented by the Claims Administrator Verita, complied with Rule 23(c)(2)(B). The Claims Administrator

provided two types of notice: email notice and mail notice. (Dkt. No. 123-4; Dkt. No. 123-6.) On March 23, 2026, Verita mailed the Notice Packet by first-class mail, postage prepaid, to the 21,457 shareholders of record and provided notice packets to the 255 nominees in Verita's nominee database. (Dkt. No. 130-6 at ¶¶ 3-4.) Verita also provided a copy of the notice to "the Depository Trust Company ("DTC") for posting on its Legal Notice System ("LENS"). The LENS may be accessed by any broker or other nominee that participates in DTC's security settlement system." (*Id*. at ¶ 6.) On May 19, 2026, Vertia mailed notice to a second set of 12,187 individuals. (*Id*. at ¶ 7.) In total, Verita disseminated notice to 160,167 potential Settlement Class Members. (*Id*. at ¶ 8.)

In accordance with Rule 23(e)(1)(A), the notice clearly and concisely provided an overview of the lawsuit, Class Members options under the settlement including the Plan of Allocation, the process for requesting exclusion or objecting to all or part of the settlement including the request for attorneys fees and costs, provided contact information for Class Counsel and the Claims Administrator, and directed Class Members to the website, email, and toll-free number for additional information. (Dkt. No. 123-4; Dkt. No. 130-6 at ¶¶ 10-11.)

The Claims Administrator received 67,472 claims, 24,306 of which were deemed valid. (Dkt. No. 141.) According to Verita's fourth supplemental declaration, for the 43,166 denied claims, Verita provided written notice of the basis for the denial and the time for claimants to appeal the denial has run. (Dkt. No. 149-1 at ¶¶ 4-5.) One objection and 20 requests for exclusion have been received. (Dkt. No. 138-1 at ¶ 7.)

Given the above, the Court concludes the parties have sufficiently provided the best practicable notice to Class Members.

## III. FINAL APPROVAL

To grant final approval, the Court must find the terms of the parties' settlement are fair, adequate, and reasonable under Rule 23(e). *In re California Pizza Kitchen Data Breach Litig*., 129 F.4th 667, 674 (9th Cir. 2025). In making this determination, courts generally must consider the following factors:

> (1) the strength of the plaintiff's case; (2) the risk, expense,

United States District Court
Northern District of California

> complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*Churchill*, 361 F.3d at 575. "This list is not exclusive and different factors may predominate in different factual contexts." *Torrisi v. Tucson Elec. Power Co*., 8 F.3d 1370, 1376 (9th Cir. 1993).

Under the revised Rule 23(e), the Court must also consider whether the settlement resulted from collusion among the parties. *See Briseno v. Henderson*, 998 F.3d 1014, 1023 (9th Cir. 2021) (holding that courts must apply the collusion factors set forth in *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935, 941 (9th Cir. 2011), to post-class action settlements as well as those settled before certification).

### A. The Fairness Factors

#### 1. The Strength of Plaintiff's Case and Risk, Expense, Complexity, and Likely Duration of Further Litigation

The Court first considers "the strength of [Plaintiff's] case on the merits balanced against the amount offered in the settlement." *See Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc*., 221 F.R.D. 523, 526 (C.D. Cal. 2004) (internal quotation marks and citation omitted). The Court need not reach an ultimate conclusion about the merits of the dispute to resolve this factor "for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). To that end, there is no "particular formula by which th[e] outcome must be tested." *Rodriguez v. W. Publ'g Corp*., 563 F.3d 948, 965 (9th Cir. 2009). Rather, the Court's assessment of the likelihood of success is "nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Id*. (internal quotation marks and citation omitted). "In reality, parties, counsel, mediators, and district judges naturally arrive at a reasonable range for settlement by considering the likelihood of a plaintiffs' or defense verdict, the potential recovery, and the chances of obtaining it, discounted to a present value." *Id.*

Here, although Plaintiff believes he has a strong case, he recognizes the expense, risk, and length of continued proceedings necessary to prosecute the action through trial and potential

appeal. *See Hefler v. Wells Fargo & Co*., 2018 WL 6619983, at *13 (N.D. Cal. Dec. 18, 2018) (recognizing securities class actions "are highly complex and [litigating] securities class litigation is notably difficult and notoriously uncertain"), aff'd sub nom. *Hefler v. Pekoc*, 802 F. App'x 285 (9th Cir. 2020). At the time the parties settled the action, Defendants' second motion to dismiss was pending. While Plaintiff believed he would prevail on the motion, he still faced "substantial costs associated with conducting full fact and expert discovery, and, thereafter, class certification, summary judgment, motions to exclude experts, and motions in limine before trying the case to a jury," and then trial and possible appeal. (Dkt. No. 137 at 20 (citing *Destefano v. Zynga, Inc.*, 2016 WL 537946, at *10 (N.D. Cal. Feb. 11, 2016) (observing "continuing litigation would not only be costly–representing expenses that would take away from any ultimate classwide recovery–but would also delay resolution and recovery for Settlement Class Members")).)

Given the risks posed by continuing to litigate Plaintiff's claims, the certainty of class member recovery under the settlement weighs in favor of granting final approval.

**2. Settlement Amount**

When considering the fairness and adequacy of the amount offered in settlement, "it is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *DIRECTV, Inc*., 221 F.R.D. at 527. "[I]t is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *Id*. (collecting cases).

The Court previously concluded the amount of the settlement, $47.7 million was within the range of possible approval. (Dkt. No. 124 at 9.) Plaintiff's expert Zachary Nye estimates total possible damages of $1.716 billion based on 83.2 million shares having been affected by Defendants' conduct. (Dkt. No. 121-1, Nye Decl. at ¶ 12.) The Settlement Agreement thus provides a recovery of approximately 2.8 percent of estimated damages. (Dkt. No. 121-2, Van Decl. at ¶ 18.) Plaintiff's counsel attests this amount is "well within the range of reasonableness, and substantially exceeds the median settlement amount in securities class actions settling in 2024." (*Id*. at ¶ 18 (citing Dkt. No. 121-2 at, Ex. A (Edward Flores and Svetlana Starykh, Recent Trends in Securities Class Action Litigation: 2024 Full-Year Review, at 27 (Fig. 24) (NERA Jan.

22, 2025) ("NERA Report") (indicating (median recovery in securities class actions in 2024 was approximately 1.2 percent of estimated damages)).) Plaintiff's counsel also attests this result is "more than double the 1.3% median settlement value for settlements where losses were in comparable damage estimate category ($1 billion-$4.999 billion)." (Dkt. No. 121-2, Van Decl. at ¶ 18 (citing Ex. A at 26 (Fig. 23)).)

This factor thus likewise weighs in favor of final approval.

**3. Extent of Discovery Completed and Stage of Proceedings**

In the context of class action settlements, as long as the parties have sufficient information to make an informed decision about settlement, "formal discovery is not a necessary ticket to the bargaining table." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998). Rather, a court's focus is on whether "the parties carefully investigated the claims before reaching a resolution." *Ontiveros v. Zamora*, 303 F.R.D. 356, 371 (E.D. Cal. 2014). According to Plaintiff's counsel:

> Prior to Settlement, Plaintiffs and their counsel vigorously prosecuted this Action for more than two years by conducting an extensive investigation of the underlying claims; filing two detailed amended complaints; briefing two motions to dismiss; reviewing and analyzing public utility and task force reports about HEI, HECO and the 2023 Lahaina Wildfire; conducting informal discovery into the issues in the case; extensively consulting with experts to evaluate potential damages and causation, preparing and exchanging formal mediation statements and exhibits; [] and participated in three mediation sessions.

(Dkt. No. 138 at ¶ 4.)

Given the above, the Court concludes the extent of the investigation and the stage of the proceedings supports approval of the settlement.

**4. Experience and Views of Counsel**

The experience and views of counsel also weigh in favor of approving the settlement. Class Counsel has extensive experience in the securities litigation field and strongly supports approval of the settlement given the risks and challenges involved. (Dkt. No. 138 at ¶ 8.)

**5. Presence of a Government Participant**

No government entity is a party to this action.

United States District Court
Northern District of California

**6. Reaction of Class Members**

As previously discussed, the Claims Administrator attests they received 67,472 claims and rejected 43,166 of these claims. (Dkt. No. 141.) While the Court initially had concerns about this high rejection rate (Dkt. No. 144), Verita's third supplemental declaration explained the majority of claims were rejected because

> (1) no loss under the Plan of Allocation (which is sometimes impacted by the required look back period); (2) the inclusion of ineligible security types and/or dates outside the Class Period in a claims submission; and/or (3) failure to provide documentation sufficient to verify a claim.

(Dkt. No. 145-1 at ¶ 3.) Verita further explained many "lay claimants" submitted claims "even though they fail to satisfy one or more basic requirements for eligibility, such as not purchasing or acquiring any shares covered by the settlement" potentially because of the "highly publicized nature of the events underlying this litigation." (*Id*. at ¶ 5.) The majority—94 percent—of claims were submitted by third-party filers (custodians, brokerages, law firms, contingency filers and other service providers) and these filers "generally file claims for all accounts that could conceivably participate in a recovery, and therefore include any possible trading activity or position that may relate in any way to the securities at issue in such settlements." (*Id*. at ¶¶ 6-7.) These explanations adequately address the Court's concerns regarding the high rejection rate especially given the representation that none of the 43,166 rejected claimants challenged the denial of their claim. (Dkt. No. 149-1 at ¶¶ 4-5.)

Notably, the 24,306 approved claims represent 60 million shares which is 75 percent of the estimated damaged shares identified by the damage expert. (Dkt. No. 145-1 at ¶ 8.) Additionally, only 20 requests for exclusion were received.

Given the above, the reaction of the class weighs in favor of final approval of the settlement.

**7. Objections**

Only one objection was received. It was from a class member who inherited HEI shares in 2022. (Dkt. No. 131.) The class member submitted a claim and objects to application of Paragraph 54 of the Plan of Allocation. (*Id*. at 2.) This paragraph provides:

> 54. Acquisition by Gift, Inheritance, or Operation of Law: If a Settlement Class Member acquired HEI common stock during the Class Period by way of gift, inheritance, or operation of law, such a claim will be computed by using the date and price of the original purchase and not the date and price of transfer. To the extent that HEI shares were originally purchased prior to the commencement of the Class Period, the Recognized Loss for that acquisition shall be deemed to be zero ($0.00).

According to Plaintiff's counsel:

> Upon review of this objection, the Settlement Administrator determined that paragraph 54 prevents [the class] member from obtaining any recovery because paragraph 54 states that a claim for shares acquired through inheritance "will be computed by using the date and price of the original purchase and not the date and price of transfer." As [the class member] only provided documentation of the transfer of shares to her, and no documentation of their original acquisition, her claim can be fairly rejected as she has no proof of an eligible acquisition under paragraph 54.

(Dkt. No. 138 at 9.)

At the final approval hearing, Plaintiff represented the class member was provided written notice of the basis for the denial of her claim and she did not submit anything further; that is, she did not submit the necessary documentation indicating the shares were purchased during the class period. (Dkt. No. 148 at 6-7.) Given this representation, the Court denies the class member's objection—she was given the opportunity to address the basis for the claim denial and provide proof the shares were purchased during the class period such that she could be an eligible claimant, but she did not do so.

***

In sum, the fairness factors weigh in favor of granting Plaintiff's motion for final approval of the class action settlement.

**B. The *Bluetooth* Factors**

Finally, the Court must determine whether the settlement was the result of good faith, arms-length negotiations or fraud and collusion. *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011). In determining whether the settlement is the result of collusion, courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interest and that of certain class members to infect the negotiations." *Id*. The Ninth Circuit has identified three such signs:

> (1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded;
>
> (2) when the parties negotiate a 'clear sailing' arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class; and
>
> (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.

*Id.* at 947 (internal quotation marks and citations omitted).

For the first *Bluetooth* factor, the Court compares the class payout to class counsel's fees claim. *See In re California Pizza Kitchen Data Breach Litig*., 129 F.4th 667, 675 (9th Cir. 2025) ("class counsel receiving a disproportionately large fee award compared to what the class members received signals potential collusion."). The gross settlement amount is $47,750,000 and Class Counsel seeks $14,325,000 in attorney's fees—30 percent of the settlement amount. This ratio taken alone may be a sign of collusion. *See Bluetooth*, 654 F.3d at 947. However, as discussed below, the Court finds this amount both excessive and unsupported. Thus, while the high percentage is a red flag, the Court has addressed the issue through reduction of the fees.

The second warning sign—a "clear sailing" provision—is not present here. *See Bluetooth*, 654 F.3d at 940, n.6 ("a 'clear sailing agreement,' wherein the defendant agrees not to oppose a petition for a fee award up to a specified maximum value."). Defendants did not agree they would not oppose the fees request, although they have not done so. (Dkt. No. 119-1 at ¶ 14 (stating "Plaintiffs' Counsel will apply to the Court for a collective award of attorneys' fees to Plaintiffs' Counsel to be paid from the Settlement Fund").)

The third warning sign—whether the parties have arranged for fees not awarded to the class to revert to the defendant rather than be added to the settlement fund, *see Bluetooth*, 654 F.3d at 948—is also not present here. The Settlement Agreement is non-reversionary—all of the remaining funds will be distributed to the Class Members. (Dkt. No. 119-1 at ¶ 12.)

The Court thus concludes the Settlement Agreement did not result from, nor was it influenced by, collusion. Instead, the Settlement Agreement adequately satisfies the Settlement

United States District Court
Northern District of California

Class Members' claims.

* * *

In sum, the *Churchill* fairness factors support approval, and the *Bluetooth* factors do not indicate collusion. The Court is therefore satisfied the Settlement Agreement was not the result of collusion between the parties and instead is the product of arms-length negotiations between experienced and professional counsel. For each of these reasons, the Settlement Agreement passes muster under Rule 23(e) and final approval is appropriate.

## IV. FINAL APPROVAL OF PLAN OF ALLOCATION

"Approval of a plan of allocation of settlement proceeds in a class action ... is governed by the same standards of review applicable to approval of the settlement as a whole: the plan must be fair, reasonable and adequate." *In re Oracle Sec. Litig*., No. C–90–0931–VRW, 1994 WL 502054, at *1-2 (N.D. Cal. June 18, 1994) (citing *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1284-85 (9th Cir. 1992)). "A settlement in a securities class action case can be reasonable if it fairly treats class members by awarding a pro rata share to every Authorized Claimant, but also sensibly makes interclass distinctions based upon, inter alia, the relative strengths and weaknesses of class members' individual claims and the timing of purchases of the securities at issue." *Hampton v. Aqua Metals, Inc*., No. 17-CV-07142-HSG, 2021 WL 4553578, at *10 (N.D. Cal. Oct. 5, 2021) (internal quotation omitted). "[C]ourts recognize that an allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent counsel." *Id*

The Plan of Allocation here uses a "recognized loss" value that tailors the recovery of each Class Member to the purchase and sale of HEI common stock during the class period, as well as the number of shares at issue in each Class Member's claim. (Dkt. No. 123-4 at ¶ 45.) The Net Settlement Fund will be distributed on a pro rata basis according to each Settlement Class Member's recognized loss. (*Id.* at ¶ 46.) To the extent funds remain after the initial distribution to Settlement Class Members, the Claims Administrator will attempt a second distribution. (Dkt. No. 123-4 at ¶ 63.) According to Plaintiff's representations at oral argument, the Claims Administrator will continue to make distributions until it is "no longer economically feasible to do so" (Dkt. No. 148 at 7.) Given the above, the Court finds no reason to reconsider its prior

approval of the Plan of Allocation. (Dkt. No. 124 at 10.)

At the final approval hearing, Plaintiff's counsel represented they would address the question of what happens with any remaining funds once it is no longer economically feasible to make a further distribution once the Claims Administrator makes that determination, but counsel indicated "often it just goes to the claims administrator if there's no cy pres." (Dkt. No. 148 at 8.) If, after two attempts at distribution, there are funds remaining, Plaintiff must file a status update with the Court indicating how much remains and Plaintiff's proposal for distribution of the funds. **These funds may not be distributed to the Claims Administrator without an order from the Court.**

## V. MOTION FOR ATTORNEYS' FEES, COSTS, AND CLASS REPRESENTATIVE AWARD

### A. Attorneys' Fees

Rule 23 permits a court to award "reasonable attorneys' fees ... that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). "Attorneys' fees provisions included in proposed class action settlement agreements are, like every other aspect of such agreements, subject to the determination of whether the settlement is 'fundamentally fair, adequate, and reasonable.'" *Staton v. Boeing Co*., 327 F.3d 938, 963 (9th Cir. 2003) (quoting Fed. R. Civ. P. 23(e)).

The Ninth Circuit has approved two methods of determining attorneys' fees in cases where the amount of the attorneys' fee award is taken from the common fund set aside for the entire settlement: the "percentage of the fund" method and the "lodestar" method. *Vizcaino v. Microsoft Corp*., 290 F.3d 1043, 1047 (9th Cir. 2002) (citation omitted). The district court retains discretion in common fund cases to choose either method. *Id*. Under either approach, "[r]easonableness is the goal, and mechanical or formulaic application of either method, where it yields an unreasonable result, can be an abuse of discretion." *Fischel v. Equitable Life Assurance Soc'y of the U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002).

Here, Plaintiff seeks 30 percent of the fund—$14,325,000—in attorneys' fees.

United States District Court
Northern District of California

**1. Percentage-of-Recovery Method**

"Under the percentage-of-recovery method, the attorney's fees equal some percentage of the common settlement fund." *In re Online DVD-Rental Antitrust Litig*., 779 F.3d 934, 949 (9th Cir. 2015). In the Ninth Circuit, "courts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award, providing adequate explanation in the record of any 'special circumstances' justifying a departure." *In re Bluetooth*, 654 F.3d at 942. "The benchmark percentage should be adjusted, or replaced by a lodestar calculation, when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors." *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990). Courts consider

> several factors [ ] when assessing requests for attorneys' fees calculated pursuant to the percentage-of-recovery method: (1) the extent to which class counsel achieved exceptional results for the class; (2) whether the case was risky for class counsel; (3) whether counsel's performance generated benefits beyond the cash settlement fund; (4) the market rate for the particular field of law; (5) the burdens class counsel experienced while litigating the case; (6) and whether the case was handled on a contingency basis.

*In re Optical Disk Drive Prod. Antitrust Litig*., 959 F.3d 922, 930 (9th Cir. 2020) (citation omitted).

Plaintiff's request for 30 percent of the Settlement Fund is higher than the Ninth Circuit's 25 percent benchmark. While recognizing this amount is higher than the benchmark, Plaintiff urges this amount "is appropriate given Ninth Circuit precedent" (Dkt. No. 129 at 12), and have submitted a chart identifying cases purportedly awarding 33 percent or more of the common fund. (Dkt. No. 130-4.) Counsel maintain a similar result is warranted here because the result obtained, the contingent fee risk, the number of hours counsel dedicated to this action, counsel's "financial commitment," and the important public policy advanced by securities litigation, all weigh in favor of a 30 percent award. (Dkt. No. 129 at 14-15.) Although the Court agrees the overall result and benefit to the class is notable given the hurdles Plaintiff faced just to survive the pleading stage, Plaintiff has not shown that result warrants an upward departure from the 25 percent benchmark. The recovery here represents less than three percent of the estimated damages. Additionally, the case settled very early, which the Court must take into account when considering both the level of

United States District Court
Northern District of California

risk and the burdens on Class Counsel. Under these circumstances, counsel has not demonstrated the presence of unusual circumstances that would justify a departure from the Ninth Circuit's 25 percent benchmark. *See In re Google Inc. St. View Elec. Commc'ns Litig*., 21 F.4th 1102, 1122 (9th Cir. 2021) ("the district court properly considered all relevant circumstances, including the value to the class members, and concluded that a 25% benchmark was appropriate"). This is especially true when, as here, issues with the lodestar cross-check warrant a fee award below the 25 percent benchmark.

**B. Lodestar Method**

The lodestar method "requires multiplying a reasonable hourly rate by the number of hours reasonably expended on the case." *Shirrod v. Dir., Office of Workers' Comp. Programs*, 809 F.3d 1082, 1086 (9th Cir. 2015). "In determining reasonable hours, counsel bears the burden of submitting detailed time records justifying the hours claimed to have been expended." *Chalmers City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986), amended on denial of reh'g, 808 F.2d 1373 (9th Cir. 1987).

Counsel attests the total lodestar is $4,632,430.00 for 5,779.15 hours of work. There are many serious issues with the lodestar. (Dkt. No. 130 at ¶ 17.)

***First***, the lodestar purportedly represents 3,730.8 hours work ($3,200,645) performed by appointed Class Counsel Pomerantz LLP as well as 2,048.35 hours of work ($1,431,785) performed by Levi & Korsinsky. Early in the case, Lead Plaintiff Warren and competing lead plaintiffs, the City of Pontiac Reestablished General Employees' Retirement System and Phu Tran, submitted a stipulation to be appointed joint lead plaintiff and to have each of their respective counsel, Pomerantz LLP,Levi & Korsinsky, and Robbins Geller Rudman & Dowd LLP, serve jointly as co-lead counsel. (Dkt. No. 44.) The Court denied the stipulation in a written order. (Dkt. No. 48.) The Court subsequently appointed Warren lead plaintiff, and his selected counsel, Pomerantz LLP, as lead counsel over objections the above stipulation demonstrated Warren was an inadequate representative and the case was instead lawyer driven. (Dkt. No. 58 at 7.)

Notwithstanding the Court's explicit rejection of the proposal to have Pomerantz LLP and

Levi & Korsinsky serve as co-lead counsel, Plaintiff subsequently prosecuted the action as if they were co-lead counsel, in contravention of the Court's written order denying their stipulation. Levi & Korsinsky performed 35 percent of the billed work in this action, submitted pleadings identifying themselves as "additional Plaintiff's Counsel" (Dkt. No. 130-2 at ¶ 1), and even appeared at the final approval hearing introducing themselves as class counsel.[2] (Dkt. No. 148 at 3.) Moreover, this is not the first time Pomerantz LLP has violated a court order rejecting a co-lead plaintiff proposal in an PSLRA action. *See In re Allergan PLC Sec. Litig.,* No. 18-CIV-12089 (CM)(GWG), 2020 WL 5796763, at *6-8 (S.D.N.Y. Sept. 29, 2020); *Id*. at *8 ("Full transparency required advising the Court that, despite its ruling, two law firms intended to continue working on this matter" and "[i]t required advising the court that lawyers from both firms were attending conferences and reviewing pleadings (matters about which I could not possibly know anything) – even though I specifically said there could not be co-lead counsel and explained that duplication of effort was the reason why.").

***Second***, Counsel has not provided adequate justification for the hourly rates sought here. "In determining a reasonable hourly rate, the district court should be guided by the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *Chalmers*, 796 F.2d at 1210-11 (citation omitted). The relevant community for the purposes of determining the prevailing market rate is generally the "forum in which the district court sits." *Camacho v. Bridgeport Fin., Inc*., 523 F.3d 973, 979 (9th Cir. 2008) (citation omitted). In addition to affidavits from the fee applicant, other evidence of prevailing market rates may include affidavits from other area attorneys or examples of rates awarded to counsel in previous cases. *See Cotton v. City of Eureka*, 889 F. Supp. 2d 1154, 1167 (N.D. Cal. 2012) (citation omitted). Civil Local Rule 54-5(b)(3) requires the party seeking fees to submit "[a] brief description of relevant qualifications and experience and a statement of the customary hourly charges of each such person or of comparable prevailing hourly rates or other indication of value

---

[2] At the final approval hearing, Shannon Hopkins and Andrew Lencyk of Levi & Korsinsky attempted to appear on behalf of the class. (Dkt. No. 148 at 3.) While Ms. Hopkins was admitted pro hac vice in this action (Dkt. No. 78), Mr. Lencyk was not and the District's records do not indicate he is admitted to practice in this District.

United States District Court
Northern District of California

of the services." In support of their hourly rates of $500-$575 per hour for associates, $850-$925 per hour for counsel, and $1,050-$1500 per hour for partners, Counsel submitted their "law firm resume," and a chart offering "a breakdown of reasonably comparable rates, by Firm." (Dkt. No. 130 at ¶ 19; Dkt. No. 130-1 at 35; Dkt. No. 130-5.) Counsel did not identify any examples of cases in which they had been awarded these rates or include any discussion of why any particular attorney's hourly billing rate was reasonable. Plaintiff's counsel has not met their burden of providing adequate justification for the requested hourly rates.

***Third***, the billing records themselves are replete with examples of Counsels' overreach. As an initial matter, **over 50 percent of the billing entries, and over $2.5 million of the claimed fees, were billed in blocks of 8 or more hours**. For example, between March 14, 2025 and May 2, 2025, partner Austin Van billed 8.5 to 9 hours nearly every day "Draft[ing] opposition to Motion to Dismiss Second Amended Complaint." (Dkt. No. 130-1 at 9-10.) Mr. Van then billed an entire week of 9-hour days "prepar[ing] for motion to dismiss hearing," and a few weeks later, an entire week of exactly 9-hour days "draft[ing] mediation brief." (Dkt. No. 130-1 at 9.) These are not isolated entries—nearly all the entries are day-after-day of the same activity billed in over 8-hour increments. The following are side-by-side screenshots of Mr. Van's work opposing the two motions to dismiss:

| | | | | | | |
|---|---|---|---|---|---|---|
| 09/12/2024 | 3AV | MTD | Prepare for oral argument on motion to dismiss. | $1,175.00 | 9.00 | 10,575.00 |
| 07/08/2024 | 3AV | MTD | Finalize and file opposition to motion to dismiss. | $1,175.00 | 3.00 | 3,525.00 |
| 07/01/2024 | 3AV | MTD | Research and draft opposition to motion to dismiss. | $1,175.00 | 9.00 | 10,575.00 |
| 06/28/2024 | 3AV | MTD | Research and draft opposition to motion to dismiss. | $1,175.00 | 8.50 | 9,987.50 |
| 06/27/2024 | 3AV | MTD | Research and draft opposition to motion to dismiss. | $1,175.00 | 5.00 | 5,875.00 |
| 06/26/2024 | 3AV | MTD | Research and draft opposition to motion to dismiss. | $1,175.00 | 6.00 | 7,050.00 |
| 06/25/2024 | 3AV | MTD | Research and draft opposition to motion to dismiss. | $1,175.00 | 6.00 | 7,050.00 |
| 06/24/2024 | 3AV | MTD | Research and draft opposition to motion to dismiss. | $1,175.00 | 9.00 | 10,575.00 |
| 06/21/2024 | 3AV | MTD | Research and draft opposition to motion to dismiss. | $1,175.00 | 9.00 | 10,575.00 |
| 06/20/2024 | 3AV | MTD | Research and draft opposition to motion to dismiss. | $1,175.00 | 6.00 | 7,050.00 |
| 06/18/2024 | 3AV | MTD | Research and draft opposition to motion to dismiss. | $1,175.00 | 5.00 | 5,875.00 |
| 06/17/2024 | 3AV | MTD | Research and draft opposition to motion to dismiss. | $1,175.00 | 5.00 | 5,875.00 |
| 06/13/2024 | 3AV | MTD | Research and draft opposition to motion to dismiss. | $1,175.00 | 8.00 | 9,400.00 |
| 06/11/2024 | 3AV | MTD | Research and draft opposition to motion to dismiss. | $1,175.00 | 8.50 | 9,987.50 |
| 06/10/2024 | 3AV | MTD | Research and draft opposition to motion to dismiss. | $1,175.00 | 9.00 | 10,575.00 |
| 06/03/2024 | 3AV | MTD | Research and draft opposition to motion to dismiss. | $1,175.00 | 8.00 | 9,400.00 |
| 05/31/2024 | 3AV | MTD | Research and draft opposition to motion to dismiss. | $1,175.00 | 8.50 | 9,987.50 |
| 05/30/2024 | 3AV | MTD | Research and draft opposition to motion to dismiss. | $1,175.00 | 9.00 | 10,575.00 |
| 05/29/2024 | 3AV | MTD | Research and draft opposition to motion to dismiss. | $1,175.00 | 8.00 | 9,400.00 |
| 05/28/2024 | 3AV | MTD | Research and draft opposition to motion to dismiss. | $1,175.00 | 8.00 | 9,400.00 |
| 05/17/2024 | 3AV | MTD | Research and draft opposition to motion to dismiss. | $1,175.00 | 8.00 | 9,400.00 |
| 05/15/2024 | 3AV | MTD | Research and draft opposition to motion to dismiss. | $1,175.00 | 9.00 | 10,575.00 |
| 05/14/2024 | 3AV | MTD | Research and draft opposition to motion to dismiss. | $1,175.00 | 9.00 | 10,575.00 |
| 05/13/2024 | 3AV | MTD | Research and draft opposition to motion to dismiss. | $1,175.00 | 9.00 | 10,575.00 |
| 05/10/2024 | 3AV | MTD | Research and draft opposition to motion to dismiss. | $1,175.00 | 8.50 | 9,987.50 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 04/28/2025 | 3AV | MTD | Draft opposition to Motion to Dismiss Second Amended Complaint. | $1,175.00 | 9.00 | 10,575.00 |
| 04/25/2025 | 3AV | MTD | Draft opposition to Motion to Dismiss Second Amended Complaint. | $1,175.00 | 8.20 | 9,635.00 |
| 04/15/2025 | 3AV | MTD | Draft opposition to Motion to Dismiss Second Amended Complaint. | $1,175.00 | 5.00 | 5,875.00 |
| 04/14/2025 | 3AV | MTD | Draft opposition to Motion to Dismiss Second Amended Complaint. | $1,175.00 | 8.00 | 9,400.00 |
| 04/11/2025 | 3AV | MTD | Draft opposition to Motion to Dismiss Second Amended Complaint. | $1,175.00 | 8.50 | 9,987.50 |
| 04/10/2025 | 3AV | MTD | Draft opposition to Motion to Dismiss Second Amended Complaint. | $1,175.00 | 9.00 | 10,575.00 |
| 04/09/2025 | 3AV | MTD | Draft opposition to Motion to Dismiss Second Amended Complaint. | $1,175.00 | 9.00 | 10,575.00 |
| 04/08/2025 | 3AV | MTD | Draft opposition to Motion to Dismiss Second Amended Complaint. | $1,175.00 | 9.00 | 10,575.00 |
| 04/07/2025 | 3AV | MTD | Draft opposition to Motion to Dismiss Second Amended Complaint. | $1,175.00 | 9.00 | 10,575.00 |
| 04/04/2025 | 3AV | MTD | Draft opposition to Motion to Dismiss Second Amended Complaint. | $1,175.00 | 8.50 | 9,987.50 |
| 04/02/2025 | 3AV | MTD | Draft opposition to Motion to Dismiss Second Amended Complaint. | $1,175.00 | 9.00 | 10,575.00 |
| 04/01/2025 | 3AV | MTD | Draft opposition to Motion to Dismiss Second Amended Complaint. | $1,175.00 | 9.00 | 10,575.00 |
| 03/31/2025 | 3AV | MTD | Draft opposition to Motion to Dismiss Second Amended Complaint. | $1,175.00 | 9.00 | 10,575.00 |
| 03/28/2025 | 3AV | MTD | Draft opposition to Motion to Dismiss Second Amended Complaint. | $1,175.00 | 8.50 | 9,987.50 |
| 03/27/2025 | 3AV | MTD | Draft opposition to Motion to Dismiss Second Amended Complaint. | $1,175.00 | 9.00 | 10,575.00 |
| 03/26/2025 | 3AV | MTD | Draft opposition to Motion to Dismiss Second Amended Complaint. | $1,175.00 | 9.00 | 10,575.00 |
| 03/25/2025 | 3AV | MTD | Draft opposition to Motion to Dismiss Second Amended Complaint. | $1,175.00 | 9.00 | 10,575.00 |
| 03/24/2025 | 3AV | MTD | Draft opposition to Motion to Dismiss Second Amended Complaint. | $1,175.00 | 9.00 | 10,575.00 |
| 03/21/2025 | 3AV | MTD | Draft opposition to Motion to Dismiss Second Amended Complaint. | $1,175.00 | 8.50 | 9,987.50 |
| 03/20/2025 | 3AV | MTD | Draft opposition to Motion to Dismiss Second Amended Complaint. | $1,175.00 | 9.00 | 10,575.00 |
| 03/19/2025 | 3AV | MTD | Draft opposition to Motion to Dismiss Second Amended Complaint. | $1,175.00 | 9.00 | 10,575.00 |
| 03/18/2025 | 3AV | MTD | Draft opposition to Motion to Dismiss Second Amended Complaint. | $1,175.00 | 9.00 | 10,575.00 |
| 03/17/2025 | 3AV | MTD | Draft opposition to Motion to Dismiss Second Amended Complaint. | $1,175.00 | 9.00 | 10,575.00 |
| 03/14/2025 | 3AV | MTD | Draft opposition to Motion to Dismiss Second Amended Complaint. | $1,175.00 | 8.50 | 9,987.50 |
| 01/22/2025 | 3AV | OM | Mediation with David Murphy. | $1,175.00 | 9.00 | 10,575.00 |

United States District Court
Northern District of California

(Dkt. No. 130-1 at 10, 12.) This type of generic block billing is not limited to Mr. Van and instead, appears throughout the Pomerantz billing records. (*Id*. at 8-31.)

Further, although the parties notified the Court this matter had settled on November 5, 2025 (Dkt. No. 116), **over one-third of the time billed—1,946 hours for a total of nearly $1.3 million—post-dates the settlement.** For example, in November and December 2025—*after* the parties signed the settlement agreement—Mr. Van billed 62 hours for 12 discovery-related tasks. (Dkt. No. 130-1 at 8-9.) Mr. Van also inexplicably billed 6 hours on October 29, 2025 to travel to a hearing the Court has no record of. (*Id*. at 9.) So, it appears these entries are false.

The vast majority of billing entries (225 of the 358 entries) present both these issues—block billing of more than 6 hours at time on consecutive days after the settlement was signed. For example, between October 1, 2025 and December 24, 2025, attorney Laura Perrone billed 396.10 hours over 56 entries for "[f]urther research for timeline, reports and articles from Wikipedia sources." (Dkt. No. 130-1 at 16-18.) Ms. Perrone performed this task for 6 to 8 hours a day every single week between October 1 and up through and including Christmas eve—with the exception of three days during Thanksgiving week. Between January 5, 2026 and March 11, 2026 she also billed over 295 hours over 40 days for "Work on spreadsheet of additional articles. Rereviewed SAC." (*Id.* at 15-16.) Again, the majority of this work was performed **after the settlement was signed on November 5, 2025**. Below is an example screenshot of Mr. Perrone's billing records:

| | | | | | | |
|---|---|---|---|---|---|---|
| 02/12/2026 | 3LMP | DIS | Work on spreadsheet of additional articles. | $725.00 | 7.50 | 5,437.50 |
| 02/11/2026 | 3LMP | DIS | Work on spreadsheet of additional articles. | $725.00 | 7.40 | 5,365.00 |
| 02/10/2026 | 3LMP | DIS | Work on spreadsheet of additional articles. | $725.00 | 7.20 | 5,220.00 |
| 02/09/2026 | 3LMP | DIS | Work on spreadsheet of additional articles. | $725.00 | 7.80 | 5,655.00 |
| 02/06/2026 | 3LMP | DIS | Work on spreadsheet of additional articles. | $725.00 | 6.90 | 5,002.50 |
| 02/05/2026 | 3LMP | DIS | Work on spreadsheet of additional articles. | $725.00 | 6.30 | 4,567.50 |
| 02/04/2026 | 3LMP | DIS | Work on spreadsheet of additional articles. | $725.00 | 7.00 | 5,075.00 |
| 02/03/2026 | 3LMP | DIS | Work on spreadsheet of additional articles. | $725.00 | 7.10 | 5,147.50 |
| 02/02/2026 | 3LMP | DIS | Work on spreadsheet of additional articles. | $725.00 | 7.00 | 5,075.00 |
| 01/30/2026 | 3LMP | DIS | Work on spreadsheet of additional articles. | $725.00 | 6.30 | 4,567.50 |
| 01/29/2026 | 3LMP | DIS | Contacted Megan Scott re case. Worked on spreadsheet of additional articles. | $725.00 | 7.70 | 5,582.50 |
| 01/26/2026 | 3LMP | DIS | Work on spreadsheet of additional articles. | $725.00 | 7.00 | 5,075.00 |
| 01/23/2026 | 3LMP | DIS | Work on spreadsheet of additional articles. | $725.00 | 7.00 | 5,075.00 |
| 01/22/2026 | 3LMP | DIS | Work on spreadsheet of additional articles. | $725.00 | 6.20 | 4,495.00 |
| 01/20/2026 | 3LMP | DIS | Work on spreadsheet of additional articles. | $725.00 | 8.30 | 6,017.50 |
| 01/16/2026 | 3LMP | DIS | Work on spreadsheet of additional articles. | $725.00 | 7.00 | 5,075.00 |
| 01/15/2026 | 3LMP | DIS | Work on spreadsheet of additional articles. | $725.00 | 7.30 | 5,292.50 |
| 01/14/2026 | 3LMP | DIS | Work on spreadsheet of additional articles. | $725.00 | 7.50 | 5,437.50 |
| 01/13/2026 | 3LMP | DIS | Work on spreadsheet of additional articles. | $725.00 | 2.70 | 1,957.50 |
| 01/12/2026 | 3LMP | DIS | Work on spreadsheet of additional articles. | $725.00 | 7.30 | 5,292.50 |
| 01/09/2026 | 3LMP | DIS | Work on spreeadsheet of additional aricles. | $725.00 | 6.20 | 4,495.00 |
| 01/08/2026 | 3LMP | DIS | Work on spreeadsheet of additional aricles. | $725.00 | 5.30 | 3,842.50 |
| 01/07/2026 | 3LMP | DIS | Work on spreeadsheet of additional aricles. | $725.00 | 7.70 | 5,582.50 |
| 01/06/2026 | 3LMP | DIS | Work on spreeadsheet of additional aricles. | $725.00 | 7.30 | 5,292.50 |
| 01/05/2026 | 3LMP | DIS | Work on spreeadsheet of additional aricles. | $725.00 | 7.40 | 5,365.00 |
| 12/24/2025 | 3LMP | DIS | Further research for timeline, reports and articles from Wikipedia and other sources. | $725.00 | 5.30 | 3,842.50 |
| 12/23/2025 | 3LMP | DIS | Further research for timeline, reports and articles from Wikipedia and other sources. | $725.00 | 7.30 | 5,292.50 |
| 12/22/2025 | 3LMP | DIS | Further research for timeline, reports and articles from Wikipedia and other sources. | $725.00 | 7.30 | 5,292.50 |
| 12/18/2025 | 3LMP | DIS | Further research for timeline, reports and articles from Wikipedia and other sources. | $725.00 | 7.30 | 5,292.50 |
| 12/17/2025 | 3LMP | DIS | Further research for timeline, reports and articles from Wikipedia and other sources. | $725.00 | 7.30 | 5,292.50 |
| 12/16/2025 | 3LMP | DIS | Further research for timeline, reports and articles from Wikipedia and other sources. | $725.00 | 7.30 | 5,292.50 |
| 12/15/2025 | 3LMP | DIS | Further research for timeline, reports and articles from Wikipedia and other sources. | $725.00 | 7.70 | 5,582.50 |
| 12/12/2025 | 3LMP | DIS | Further research for timeline, reports and articles from Wikipedia and other sources. | $725.00 | 6.50 | 4,712.50 |
| 12/11/2025 | 3LMP | DIS | Further research for timeline, reports and articles from Wikipedia and other sources. | $725.00 | 6.20 | 4,495.00 |
| 12/10/2025 | 3LMP | DIS | Further research for timeline, reports and articles from Wikipedia and other sources. | $725.00 | 7.70 | 5,582.50 |
| 12/09/2025 | 3LMP | DIS | Further research for timeline, reports and articles from Wikipedia and other sources. | $725.00 | 7.30 | 5,292.50 |

(Dkt. No. 130-1 at 16.)

Similarly, between September 4, 2025 and January 19, 2026, Ben Schlager billed 484 hours for a total of over $250,000 reviewing assorted documents including "periodicals and news," the conclusions of the Maui Fire Department, the "Attorney General Reports," pleadings, "photographic and print coverage," "government findings," and an "Emory University law school article." (Dkt. No. 130-1 at 23-28.) Much of this time post-dates the settlement, is in large blocks of time, and performed day-after-day:



United States District Court
Northern District of California

| | | | | | | |
|---|---|---|---|---|---|---|
| **Schlager, Ben** | | | **Document Reviewer** | **$540.00** | **484.00** | **261,360.00** |
| 01/19/2026 | 7BS | DIS | Review of December 2025 periodicals and news, coverage of legislative and expert findings. | $540.00 | 3.10 | 1,674.00 |
| 01/16/2026 | 7BS | DIS | Review of December 2025 periodicals and news, coverage of legislative and expert findings. | $540.00 | 7.60 | 4,104.00 |
| 01/15/2026 | 7BS | DIS | Findings of HECO - Dember 2024 and Analyst coverage. | $540.00 | 6.80 | 3,672.00 |
| 01/14/2026 | 7BS | DIS | Findings of HECO - Dember 2024 and Analyst coverage. | $540.00 | 6.10 | 3,294.00 |
| 01/13/2026 | 7BS | DIS | Review of COMMITTEE ON OVERSIGHT AND ACCOUNTABILITY of September 4, 2024. | $540.00 | 6.80 | 3,672.00 |
| 01/12/2026 | 7BS | DIS | Review of COMMITTEE ON OVERSIGHT AND ACCOUNTABILITY of September 4, 2024. | $540.00 | 7.30 | 3,942.00 |
| 01/08/2026 | 7BS | DIS | Organization of information and comparison with AG reported. | $540.00 | 7.70 | 4,158.00 |
| 01/07/2026 | 7BS | DIS | Organization of information and comparison with AG reported. | $540.00 | 6.50 | 3,510.00 |
| 01/06/2026 | 7BS | DIS | Review of December 2025 periodicals and news, coverage of legislative and expert findings. | $540.00 | 6.90 | 3,726.00 |
| 01/05/2026 | 7BS | DIS | Review of December 2025 periodicals and news, coverage of legislative and expert findings. | $540.00 | 6.60 | 3,564.00 |
| 12/31/2025 | 7BS | DIS | Organization and timelining . Review of Attorney General Reports and search for related coverage. | $540.00 | 7.30 | 3,942.00 |
| 12/30/2025 | 7BS | DIS | Study of conclusion of Maui Fire Department + ATF Joint Report, review of vegetation schematic and FEMA and ATF statements. | $540.00 | 6.80 | 3,672.00 |
| 12/29/2025 | 7BS | DIS | Study of conclusion of Maui Fire Department + ATF Joint Report, review of vegetation schematic and FEMA and ATF statements. | $540.00 | 7.00 | 3,780.00 |
| 12/26/2025 | 7BS | DIS | Review of Maui Recovers recommendations and public statements. | $540.00 | 5.70 | 3,078.00 |
| 12/24/2025 | 7BS | DIS | Research of UL Research Institute's January 2025 Forward Looking Report Priorities and Recommendations. | $540.00 | 5.00 | 2,700.00 |
| 12/23/2025 | 7BS | DIS | Research of UL Research Institute's January 2025 Forward Looking Report Priorities and Recommendations. | $540.00 | 6.10 | 3,294.00 |
| 12/22/2025 | 7BS | DIS | Research of UL Research Institute's January 2025 Forward Looking Report. | $540.00 | 7.20 | 3,888.00 |
| 12/19/2025 | 7BS | DIS | Organization and timelining . Review of Attorney General Reports and search for related coverage. | $540.00 | 6.30 | 3,402.00 |
| 12/18/2025 | 7BS | DIS | Review of Phase I and Phase 2 timelines. | $540.00 | 7.10 | 3,834.00 |

(Dkt. No. 130-1 at 23.) Likewise, between January to March 2026 (again, post-settlement), Megan Scott billed multiple consecutive 8-hour days for tasks that included "daily media check" and updating spreadsheet. (*Id*. at 28-29.)

The Levi & Korsinsky billing records follow suit. Between September 8, 2025 and December 12, 2025, Ruben Marquez billed 488 hours in nearly universal 8-hour blocks "reviewing background materials" and preparing "memorandums" on individual Defendants Constance Lau, Scott Seu, Paul Ito, Gregory Hazelton, and Shelee Kimura. (Dkt. No. 130-2 at 20-21.) In early 2026—during the same time Megan Scott was billing 8-hour days for her daily "media checks" and spreadsheet preparation—Mr. Marquez billed another 351 hours in either 7 or 8 hour blocks performing three tasks: (1) "Review of ATF Report and Maui Fire Department (MFD) Report and investigatory files of the Hawaii Public Utilities Commission background materials"; (2) "Draft Memorandum from following sources: Review of ATF Report and Maui Fire Department (MFD) Report, investigatory files of the Hawaii Public Utilities Commission, and



United States District Court
Northern District of California

Management Audit Report background materials"; (3) "Draft third memo regarding parent liability for comments by a subsidiary." (*Id*. at 21-24.) Here is a three-week sample of Mr. Marquez's time billing records with the identical 8-hour activity billed day-after-day:

| | | | | | |
|---|---|---|---|---|---|
| Ruben Marquez | 2/10/2026 | 8.00 | $ 500.00 | $ 4,000.00 | Draft Memorandum from following sources: Review of ATF Report and Maui Fire Department (MFD) Report, investigatory files of the Hawaii Public Utilities Commission, and Management Audit Report background materials. |
| Ruben Marquez | 2/11/2026 | 8.00 | $ 500.00 | $ 4,000.00 | Draft Memorandum from following sources: Review of ATF Report and Maui Fire Department (MFD) Report, investigatory files of the Hawaii Public Utilities Commission, and Management Audit Report background materials. |
| Ruben Marquez | 2/12/2026 | 8.00 | $ 500.00 | $ 4,000.00 | Draft Memorandum from following sources: Review of ATF Report and Maui Fire Department (MFD) Report, investigatory files of the Hawaii Public Utilities Commission, and Management Audit Report background materials. |
| Ruben Marquez | 2/13/2026 | 8.00 | $ 500.00 | $ 4,000.00 | Draft Memorandum from following sources: Review of ATF Report and Maui Fire Department (MFD) Report, investigatory files of the Hawaii Public Utilities Commission, and Management Audit Report background materials. |
| Ruben Marquez | 2/17/2026 | 8.00 | $ 500.00 | $ 4,000.00 | Draft Memorandum from following sources: Review of ATF Report and Maui Fire Department (MFD) Report, investigatory files of the Hawaii Public Utilities Commission, and Management Audit Report background materials. |
| Ruben Marquez | 2/18/2026 | 8.00 | $ 500.00 | $ 4,000.00 | Draft Memorandum from following sources: Review of ATF Report and Maui Fire Department (MFD) Report, investigatory files of the Hawaii Public Utilities Commission, and Management Audit Report background materials. |
| Ruben Marquez | 2/19/2026 | 8.00 | $ 500.00 | $ 4,000.00 | Draft Memorandum from following sources: Review of ATF Report and Maui Fire Department (MFD) Report, investigatory files of the Hawaii Public Utilities Commission, and Management Audit Report background materials. |
| Ruben Marquez | 2/20/2026 | 8.00 | $ 500.00 | $ 4,000.00 | Draft Memorandum from following sources: Review of ATF Report and Maui Fire Department (MFD) Report, investigatory files of the Hawaii Public Utilities Commission, and Management Audit Report background materials. |
| Ruben Marquez | 2/23/2026 | 8.00 | $ 500.00 | $ 4,000.00 | Draft Memorandum from following sources: Review of ATF Report and Maui Fire Department (MFD) Report, investigatory files of the Hawaii Public Utilities Commission, and Management Audit Report background materials. |
| Ruben Marquez | 2/24/2026 | 8.00 | $ 500.00 | $ 4,000.00 | Draft Memorandum from following sources: Review of ATF Report and Maui Fire Department (MFD) Report, investigatory files of the Hawaii Public Utilities Commission, and Management Audit Report background materials. |
| Ruben Marquez | 2/25/2026 | 8.00 | $ 500.00 | $ 4,000.00 | Draft Memorandum from following sources: Review of ATF Report and Maui Fire Department (MFD) Report, investigatory files of the Hawaii Public Utilities Commission, and Management Audit Report background materials. |
| Ruben Marquez | 2/26/2026 | 8.00 | $ 500.00 | $ 4,000.00 | Draft Memorandum from following sources: Review of ATF Report and Maui Fire Department (MFD) Report, investigatory files of the Hawaii Public Utilities Commission, and Management Audit Report background materials. |
| Ruben Marquez | 2/27/2026 | 8.00 | $ 500.00 | $ 4,000.00 | Draft Memorandum from following sources: Review of ATF Report and Maui Fire Department (MFD) Report, investigatory files of the Hawaii Public Utilities Commission, and Management Audit Report background materials. |
| Ruben Marquez | 3/2/2026 | 8.00 | $ 500.00 | $ 4,000.00 | Draft Memorandum from following sources: Review of ATF Report and Maui Fire Department (MFD) Report, investigatory files of the Hawaii Public Utilities Commission, and Management Audit Report background materials. Draft third memo regarding parent liability for comments by a subsidiary. |
| Ruben Marquez | 3/3/2026 | 8.00 | $ 500.00 | $ 4,000.00 | Draft Memorandum from following sources: Review of ATF Report and Maui Fire Department (MFD) Report, investigatory files of the Hawaii Public Utilities Commission, and Management Audit Report background materials. Draft third memo regarding parent liability for comments by a subsidiary. |

(Dkt. No. 130-2 at 23.) **In total, Mr. Marquez billed the equivalent of over 20 40-hour weeks for a total of over $400,000.**

Finally, there are numerous instances of multiple counsel billing large swaths of time for the same tasks. For example, between May 8, 2024—when Defendants first motion to dismiss was filed—and July 8, 2025—when Plaintiff filed his opposition—Counsel billed 489.30 hours over 92 separate entries by counsel at Pomerantz and Levi. (*Compare* Dkt. No. 130-1 (Pomerantz Time Records) *with* Dkt. No. 130-2 (Levi Time Records).) Many of these entries reflect multiple individuals across the two firms billing for preparing the opposition brief on the same day, and over 10 entries where Mr. Van and Mr. Lencyk both billed more than 8 hour-days performing the same task. **Effectively, across both firms, the hours billed on the opposition to the first**

**motion to dismiss equals 12 40-hour work weeks.**

While a lodestar figure is generally "presumptively reasonable," it is based on "the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation)." *In re Bluetooth*, 654 F.3d at 941 (emphasis added). The party seeking fees "bear[s] the burden of showing the time spent and that it was reasonably necessary to the successful prosecution of [the] claims." *Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.*, 886 F.2d 1545, 1557 (9th Cir. 1989) ("hours should be credited only if reasonable under the circumstances and supported by other evidence such as testimony or secondary documentation."). Counsel has wholly failed to meet their burden of providing adequate support for the hours requested and the Court finds them excessive and, indeed, in many cases the entries appear made up, likely long after the fact. It is apparent the $4.6 million lodestar figure is wildly overinflated, and is most likely closer to $2.5 million for reasonable, non-duplicative hours.

Given Counsel's conduct—ignoring the Court's order denying co-lead counsel and providing billing records that are questionable at best and fraudulent at worst—a benchmark fee award of 25 percent is not appropriate. Instead, the Court will award 20 percent of the common fund ($9,550,000). Given the likely true lodestar, the multiplier reflected by this amount is still at the high end for a common fund case. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 n.6 (9th Cir. 2002) (noting the range of multipliers applied in most common fund cases is 1.0 to 4.0). If Counsel had not achieved such a substantial recovery for the class despite the risks of non-recovery, the Court would further reduce the fee award.

### C. Litigation Expenses

"There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation expenses from that fund." *Ontiveros v. Zamora*, 303 F.R.D. 356, 375 (E.D. Cal. 2014) (internal quotation marks and citation omitted). Generally, reimbursement of taxable costs is governed by 28 U.S.C. § 1920 and Federal Rule of Civil Procedure 54. Attorneys may recover reasonable expenses that would typically be billed to paying clients in non-contingency matters. *See Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994).

Plaintiff seeks $177,225.67 in litigation costs: $133,938.30 for Pomerantz and $43,297.37 for Levi & Korsinsky. (Dkt. No. 130 at ¶ 20; Dkt. No. 130-2 at ¶ 10.) These litigation costs are set forth in Exhibit B to Mr. Van's declaration. (Dkt. No. 130-1 at 33) and Ex. B to Ms. Hopkins' Declaration (Dkt. No. 130-2 at 27.) The bulk of the expenses relate to retention of the experts, research, and investigation costs. As the parties violated the Court's Order by continuing to have Levi & Korsinsky perform work on this action as if they were co-lead counsel, the Court declines to award Levi's separately accrued costs. The Court concludes Pomerantz's expenses are reasonable and grants their request for $133,938.30 in litigation costs.

**D. Settlement Administration Costs**

The preliminary approval order approved settlement administration costs of up to $500,000, as Plaintiff requested. (Dkt. No.124 at 14.) Because Plaintiff's motion for final settlement approval did not include any statement of settlement administration costs to date, the Court asked Plaintiff at the final approval hearing about the amount of the settlement administration costs. Plaintiff's counsel then represented:

> I think that they were well below what we put in the notice. I'm not sure I have that figure, but I do know that they came in well below what we notified all potential claimants the – the settlement costs would be – the administration costs.

(Dkt. No. 148 at 8.) The Court then requested Plaintiff to update the record with settlement administration costs to date. Shortly thereafter, Plaintiff filed a fourth supplemental declaration from Mr. Cavallo of Verita. Mr. Cavallo attests the costs are in fact well beyond what the Court approved:

> Through September 30, 2026, Verita's total administrative fees and expenses are $681,026.85, of which, $246,731.10 is for third-party expenses (i.e., print, postage, broker reimbursement, and taxes incurred by the settlement fund).

(Dkt. No. 149-1 at ¶ 3.) And Mr. Cavallo estimates an additional $68,947.17 in settlement administration costs. (*Id.*)

The Court awards $500,000 in settlement administration costs. This is the maximum amount allowed on the current record. (Dkt. No. 119-1 at 18.)

**E. Award to Plaintiff Warren Under 15 U.S.C. § 78U-4(A)(4)**

Under the PSLRA, the representative parties may not recover more than other members of the class except the representatives may recover "reasonable costs and expenses (including lost wages) directly relating to the representation of the class." *See* 15 U.S.C. § 78u-4(a)(4). Plaintiff Daniel Warren seeks $10,000 for his representation of the class. To support his request he submitted a declaration attesting he spent "a total of at least 40 hours carrying out the above-referenced activities and overseeing the prosecution of this Action in my capacity as Lead Plaintiff in this Action, which was time that I would otherwise have spent on other activities, and thus, represented a cost to me." (Dkt. No. 130-3 at ¶ 8.). The above-referenced activities include communicating with Plaintiff's counsel, compiling trading data and completing certifications, consulting with counsel about settlement, and evaluating and approving the settlement. (*Id*. at ¶ 3.) He does not attest he incurred any out-of-pocket costs or lost wages as a result of his participation this action, but he attests "I value my time at approximately $75-$250 an hour" and thus seeks $10,000 (40 hours at $250/hour). (*Id*. at ¶ 8.)

Plaintiff essentially seeks the type of incentive payment typically awarded in common fund cases; but, under the PSLRA, named plaintiffs are not allowed to recover the types of incentive/service awards awarded in other cases. *See* 15 U.S.C. § 78u-4(a)(4); *see also In re Lyft Inc. Sec. Litig*., No. 19-CV-02690-HSG, 2023 WL 5068504, at *13 (N.D. Cal. Aug. 7, 2023) ("Plaintiff is essentially requesting to be paid for his time and effort at an unsubstantiated hourly rate, not seeking recovery of costs, expenses, or lost wages that would be permissible under the PSLRA" and collecting cases denying incentive awards under the PSLRA).

The Court thus denies Plaintiff Warren's request for a service award.

**CONCLUSION**

For the reasons stated above, the Court GRANTS Plaintiff's motion for final approval of the parties' class action settlement. In addition, the Court GRANTS IN PART AND DENIES IN PART Plaintiff's motion for attorney's fees and costs, and a compensatory award for the class representative; specifically, the Court awards $9,550,000 in attorneys' fees, $133,938.30 in litigation costs, and $500,000 in settlement administration costs.

In accordance with the Northern District's Procedural Guidance for Class Action Settlements, "[w]ithin 21 days after the distribution of the settlement funds and payment of attorneys' fees," Class Counsel shall file "a Post-Distribution Accounting" that provides the following, to the extent applicable:

> The total settlement fund, the total number of class members, the total number of class members to whom notice was sent and not returned as undeliverable, the number and percentage of claim forms submitted, the number and percentage of opt-outs, the number and percentage of objections, the average and median recovery per claimant, the largest and smallest amounts paid to class members, the method(s) of notice and the method(s) of payment to class members, the number and value of checks not cashed, the amounts distributed to each cy pres recipient, the administrative costs, the attorneys' fees and costs, the attorneys' fees in terms of percentage of the settlement fund, and the multiplier, if any.

https://www.cand.uscourts.gov/forms/procedural-guidance-for-class-action-settlements/. Class Counsel shall "summarize this information in an easy-to-read chart that allows for quick comparisons with other cases," and "post the Post-Distribution Accounting, including the easy-to-read chart, on the settlement website." *See id*. **Following the second distribution, Class Counsel shall file another post-distribution accounting addressing their proposal for what to do with any funds remaining after the second distribution.**

The parties shall file a proposed judgment on or before November 6, 2026. As examples, the Court directs the parties' attention to *Broadmoor Lumber & Plywood Co. et al v. Toyota Industries Corporation et al.,* Case No. 24-6640, Dkt. Nos. 109, 110; *In re California Gasoline Spot Market Antitrust Litigation,* Case No. 20-3131, Dkt. Nos. 632, 633.

This Order disposes of Docket Nos. 129, 137.

**IT IS SO ORDERED.**

Dated: October 23, 2026

JACQUELINE SCOTT CORLEY
United States District Judge

United States District Court
Northern District of California